UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
                          :

UNITED STATES OF AMERICA,            :

                          :

          - v. -              :  S2 15 Cr. 765 (PAC)

                          :

EFRAIN ANTONIO CAMPO FLORES and  :
FRANQUI FRANCISCO FLORES DE FREITAS,  :

                          :

          Defendants.       :

                          :

--------------------------------------------------------------X

 

**DEFENDANTS' JOINT MOTION TO SUPPRESS
<u>EVIDENCE ON THE BASIS OF SPOLIATION</u>**

# TABLE OF CONTENTS

Page

**PRELIMINARY STATEMENT** ...................................................................................1

**BACKGROUND** .........................................................................................................2

**DISCUSSION** ............................................................................................................5

    **I.**..........**The Court Should Suppress All References to the October 4, 2015 Meeting and All Video Recordings of All Other Meetings Between the Defendants and the DEA's Informants**.........................................................................................7

    **II.**........**The Court Should Suppress Images of the Supposed Brick of "Cocaine" and Any Reference to the Brick** ............................................................................12

**CONCLUSION** ........................................................................................................17

## PRELIMINARY STATEMENT

It is axiomatic that the due process rights of defendants are violated when individuals working on behalf of the Government willfully destroy important evidence.  Here, just such a destruction of evidence was committed by paid Government informants, operating outside of the country and outside of any limitations imposed by the training, ethics, or accountability of actual Drug Enforcement Administration ("DEA") agents.  Specifically, the discovery record indicates that the informants either destroyed audio and video recordings of crucial meetings with the Defendants or strategically deactivated their recording devices at critical times in order to eliminate records of conversations that did not fit the narrative that the informants wanted to craft.  Both of these improper actions had the same result—exculpatory conversations with the Defendants were eliminated from the record.

In this case, the impact of this willful spoliation is enormous, because virtually the entire case against the Defendants rests on the body of recordings that were made by the informants.  In this case, there were no seizures of cocaine, no searches of locations where narcotics were stored or delivered, no searches or seizures of ships or other vehicles used for the exportation of narcotics, and no acts of violence.  At bottom, there are the recordings made by the confidential informants, and those recordings are irreparably tainted by the informants' improper conduct.

Perhaps even more problematically, during a meeting with the Defendants, the confidential informants obtained a quantity of an unknown substance—which the Government now claims to have been cocaine—but destroyed or otherwise spoliated the obtained sample before any known testing could be completed.  The spoliated, alleged "cocaine" sample is the only purported controlled substance that was ever even viewed during the course of the instant investigation.

On the basis of these acts of spoliation by the Government's confidential informants, Defendants Efrain Antonio Campo Flores and Franqui Francisco Flores de Freitas (collectively, "Defendants") seek suppression of several pieces of evidence, namely: (1) testimony regarding the first meeting between the Defendants and the confidential informants, on or about October 4, 2015; (2) audio and video recordings of the Defendants' subsequent meetings with the informants; and (3) all testimony regarding, and images of, the display of a purported brick of cocaine during a meeting between the Defendants and the informants on October 25, 2015. The Defendants respectfully request suppression of these three categories of evidence, or, in the alternative, an evidentiary hearing at which the informants' bad faith can be tested.

## BACKGROUND

In or about October of 2015, a group of individuals—all granted status as "confidential informants" or "confidential sources" by the DEA—began to contact the Defendants to solicit them to participate in what the informants promised was an extraordinarily lucrative business opportunity involving narcotics.[1] (Decl. of Efrain Antonio Campo Flores in Supp. of Defs. Joint Mot. to Suppress Evid. on the Basis of Spoliation ("Campo Flores Decl.") ¶ 1, annexed to Decl. of Randall W. Jackson in Supp. of Defs. Joint Mot. to Suppress Evid. on the Basis of Spoliation ("Jackson Decl.") as Ex. A). At the time of these initial conversations, neither of the Defendants was engaged in the business of drug trafficking, but rather were living modestly in Venezuela. (Campo Flores Decl. ¶ 1). Neither of the Defendants had any business connections to the United States. (*Id.*).

From the start of the investigation, the informants were equipped with sensitive audio and video recording devices, to be activated during any pertinent conversation with either of the

---

[1] For the purposes of this motion, the confidential informants are identified as "CS-1, CS-2, CS-3, and CS-4." The actual identities of these individuals have not been disclosed to the Defendants.

Defendants.  (Jackson Decl. ¶ 3).  Over the course of several discussions, the informants

promised the Defendants that they would be awarded with millions of dollars of profit for

relatively minimal participation in the proposed transaction.  (Campo Flores Decl. ¶ 1).  The

informants proposed to the Defendants that:  (1) the informants would supply the planes to

transport several hundred kilograms of cocaine; (2) the informants would supply a contact who

would provide the cocaine; and (3) the informants would then supply a purchaser for the cocaine

themselves. (*Id.* ¶ 3).  The initial conversations between the informants and the Defendants left

largely unclear, however, what the Defendants were intended to contribute to this informant-

crafted "conspiracy."  Moreover, at no point during the meetings did the informants—or anyone

else—discuss a plan for delivering drugs into the United States.  (*Id.* ¶ 2).

     Based on a review of the discovery produced, the confidential informants purposely

deactivated their recording devices so as not to record, or destroyed the recordings of, a number

of key moments during their initial conversations with the Defendants. (*Id.* ¶¶ 4–5).  During

these key moments, the Defendants expressed, among other things, concerns about their lack of

knowledge with regard to how to execute the plans of the confidential informants and their lack

of capacity to procure and deliver narcotics.  (*Id.* ¶ 2).  Moreover, during a number of meetings

with the Defendants, the confidential informants openly used cocaine and discussed their

personal use of cocaine. (*Id.* ¶ 7).  The recordings of these moments of narcotics use and

discussions of narcotics use by the informants were all destroyed or otherwise spoliated by the

informants.  (*Id.* ¶¶ 4–5).

     On or about October 4, 2015, the most critical of these early meetings occurred.  On that

date, the Defendants met in Honduras with another of the confidential informants ("CS-4") who

posed as a major trafficker with the Sinaloa cartel.  (*Id.*; Jackson Decl. ¶ 4).  At this meeting,

which occurred in an open-air area, several confidential informants were present. (Campo Flores Decl. ¶¶ 3–5). In addition, someone working at the direction of the DEA took surveillance photographs that captured the Defendants in conversation with multiple informants. (*Id.* ¶ 5). The informants were equipped with (among other unknown recording devices) personal communication devices, including smart phones capable of recording the meeting. (*Id.*). During this critical meeting, the informants set in motion the complex series of events that would ultimately lead to the Defendants' arrests. (*Id.* ¶¶ 3–5). Specifically, in addition to the types of logistical instructions described above, the informants also instructed the Defendants about various lies, including lies about their experience and capabilities within the narcotics world, that the Defendants should repeat in subsequent meetings in order to bolster the false image that they were actually drug traffickers capable of facilitating an 800-kilogram cocaine transaction. (*Id.* ¶ 4). The confidential informants either purposely refused to record this meeting or destroyed or otherwise spoliated the recordings that were made of this meeting. (*Id.* ¶¶ 4–5; Jackson Decl. ¶ 4).

During several subsequent meetings between the Defendants and various informants, the informants regularly used recording devices to capture what was said during those meetings. Yet those recordings are riddled with gaps and other inconsistencies. First, the recordings are oddly segmented—no single recording captures an entire meeting. For example, the Defendants' hour-long meeting on November 6, 2015 spans no fewer than *seven* different recordings. In total, there are 25 recordings for just over 6 hours of recorded conversations, and the recordings range in length from a few seconds to nearly 20 minutes. Moreover, on at least some occasions there are substantial gaps between where one recording ends and the next begins; indeed, the gaps are so significant that sometimes it appears that the topic of conversation has shifted between video

4

segments.  The discovery contains no explanation for these gaps, which in at least some

instances have overlapped with portions of the conversation in which one or both of the

Defendants expressed reservations about the informants' plans.  (Campo Flores Decl. ¶ 4)[2]

On or about October 25, 2015, certain of the confidential informants met again with the

Defendants.  During this meeting, at the direction of the informants, the Defendants brought a

brick of a white powdery substance, supposedly cocaine, for sampling.  (*Id.* ¶ 6).  During this

meeting, the informants positioned their cameras in a manner that prevented the recording

devices from capturing any of the important actions of the informants.  (Jackson Decl. ¶ 5).  The

informants also took a sample of the white powdery substance.  (Campo Flores Decl. ¶ 6;

Jackson Decl. ¶ 5(a)).  The informants handled the substance with latex gloves.  (Campo Flores

Decl. ¶ 6).  Both the sample and the white latex gloves covered with residue of the substance

were destroyed or otherwise spoliated by the informants before they could be submitted for

testing by any laboratory.  (Campo Flores Decl. ¶ 6; Jackson Decl. ¶ 6).

## DISCUSSION

Due process requires disclosure of any evidence that provides grounds for the defense to

attack the reliability, thoroughness, and good faith of the investigation, to impeach the credibility

of the Government's witnesses, or to bolster the defense case against prosecutorial attacks.  *See*

*Kyles* v. *Whitley*, 514 U.S. 419, 442 n.13, 445–51 (1995); *Brady* v. *Maryland*, 373 U.S. 83, 87

(1963).  Because one of the potential defenses that the Defendants may raise at trial is

entrapment, the scope of *Brady* material disclosed in this case includes any information in the

possession of the Government that tends to show either Government inducement or a lack of

---

[2] Moreover, on November 10, 2015, after being lured to Haiti by the informants, both Defendants were arrested in Haiti at the direction of the DEA and expelled to the United States.  During the expulsion flight to the United States, in spite of DEA and U.S. Department of Justice policy requiring that any such interviews be videotaped, the interviews of the Defendants were not recorded.  *See* https://www.justice.gov/opa/pr/attorney-general-holder-announces-significant-policy-shift-concerning-electronic-recording.

predisposition by the defendant to commit the charged offense.  *See United States* v. *Cromitie*, No. 09 Cr. 558 (CM) (S.D.N.Y. May 18, 2010); (*see also* Defs. Joint Mot. to Compel Production of *Brady* and *Giglio* Material and the Identities of Confidential Informants).

The willful destruction of exculpatory evidence by government actors violates the due process rights of a defendant.  *See* U.S. Const. amend V.  Where confidential informants have made recordings of a defendant and destroyed such recordings deliberately, "sanctions will normally follow, irrespective of the perpetrator's motivation, unless the Government can bear the heavy burden of demonstrating that no prejudice resulted to the defendant."  *United States* v. *Bufalino*, 576 F.2d 446, 450 (2d Cir. 1976).  "The Supreme Court has distinguished between evidence that was apparently exculpatory before the evidence was destroyed, for which the failure to preserve is a due process violation even without bad faith, and evidence that was only 'potentially useful' for the defense, for which the defendant must establish the government's bad faith to show a violation."  *See United States* v. *Laurent*, 607 F.3d 895, 899 (1st Cir. 2010).  As the Second Circuit has made clear, "[a] criminal defendant is entitled to relief based on the government's pre-trial destruction of (or failure to preserve) *potentially exculpatory evidence* where: '(1) the government . . . acted in bad faith in destroying the evidence; (2) the evidence . . . possess[ed] an exculpatory value that was apparent before it was destroyed; and (3) the defendant [was] unable to obtain comparable evidence by other reasonably available means."  *United States* v. *Hunley*, 476 F. App'x 897, 898–99 (2d Cir. 2012) (alterations in original) (emphasis added) (quoting *United States* v. *Tyree*, 279 F. App'x 31, 33 (2d Cir. 2008)); *see also United States* v. *Prado*, 143 F. Supp. 3d 94, 101–02 (S.D.N.Y. 2015).[3]

---

[3] Where, as here, the conduct in question was performed by actors other than law enforcement or the prosecution, the defendant also must show that the loss of evidence is "chargeable to the State."  *United States* v. *Rahman*, 189 F.3d 88, 139 (2d Cir. 1999).  That standard is satisfied here because the informants' actions in recording the

Indeed, courts have found suppression appropriate even where the Government's destruction or spoliation of potentially exculpatory evidence was merely negligent.  *See United States* v. *Fishel*, 324 F. Supp. 429, 432 (S.D.N.Y. 1971) ("The Government can hardly complain about the suppression of the one tape now in its possession, since while it had possession of all of the tapes, it had a duty to keep them in such a manner that they would be available for use upon trial by all parties"); *see also* 6 LaFave et al., *Crim. Proc.* § 24.3(e) (4th ed.) ("Even if a court finds no due process violation, it might nevertheless decide the defendant is entitled to a remedial jury instruction or other sanction based on the destruction of evidence.").

Finally, "because the issue of sanctions depends on a case-by-case examination of the facts surrounding the destruction of the [evidence], including the Government's culpability for the loss of the evidence," courts regularly hold evidentiary hearings to appropriately ascertain and weigh the relevant facts.  *See United States* v. *Dalisay*, No. 03 Cr. 1305 (JGK), 2005 WL 1176115, at *1 (S.D.N.Y. May 17, 2005) (citing *United States* v. *Grammatikos*, 633 F.2d 1013, 1019–20 (2d Cir. 1980)); *see also United States* v. *Eldridge*, No. 09 Cr. 29-A, 2014 WL 4829146, at *1–2 (W.D.N.Y. Sept. 29, 2014); *United States* v. *Kendrick*, No. 10 Cr. 6096, 2015 WL 627886, at *10 (W.D.N.Y. Feb. 10, 2015), *report and recommendation adopted*, No. 10 Cr. 6096 (FPG), 2015 WL 2129573 (W.D.N.Y. Apr. 29, 2015).

I.    **The Court Should Suppress All References to the October 4, 2015 Meeting and All Video Recordings of All Other Meetings Between the Defendants and the DEA's Informants**

In this case, the record indicates that the Government's confidential informants participated in the willful destruction or spoliation of evidence that had obvious exculpatory value.  First and foremost, the confidential informants either purposely refused to record, or

---

Defendants were at the behest of, and directed by, the DEA.  *Compare id.* at 140 (recordings not made at Government's request).

subsequently destroyed the recording of, the Defendants' October 4, 2015 meeting in Honduras with CS-4 and other informants.  This satisfies the applicable standard for spoliation.  Even assuming the absence of any intent to entrap the Defendants on the part of the informants, the potentially exculpatory character of that initial meeting was obvious before it began.  *See Hunley*, 476 F. App'x at 898–99.  In such a scenario, the informants knew that they were proposing a drug-smuggling venture to the Defendants, and that the Defendants' reaction to that proposal would be critical evidence for the case:  the Defendants might embrace the informants' plan, or might refuse to agree to one or more critical element of the plan (*e.g.*, the goal of importing cocaine *into the United States*).  Thus, the purposeful failure to record that meeting, or the destruction of any recording that was made, violated due process.

Based on the discovery, however, the Defendants may potentially argue at trial that the alleged conspiracy was entirely manufactured by the confidential informants and that they did intentionally entrap the Defendants.  In these circumstances, the recordings—the only record of what was actually said by both the informants and the Defendants at the handful of meetings— are critical, irreplaceable evidence.  Particularly problematic is the absence of recordings from the October 4, 2015 meeting.  As described above, the conversation that unfolded during this meeting is the key that unlocks the meaning of all of the subsequent interactions between the informants and the Defendants.  For example, during that meeting the Defendants made various exculpatory statements, including divulging their total lack of familiarity with the drug trade and lack of capacity to engage in a drug transaction.  (Campo Flores Decl. ¶¶ 1–2).  Also during that meeting, the informants instructed the Defendants about various lies they should repeat in subsequent meetings in order to bolster the false image that they were actually major drug traffickers.  (*Id.* ¶ 3).

Such manipulation of the record by Government actors offends due process and compels suppression of the ill-gotten evidence—here, both any testimony or other evidence regarding the October 4, 2015 meeting, as well as the Defendants' subsequent recorded statements, all of which are colored by the missing recordings from the October 4 meeting. *See Laurent*, 607 F.3d at 899; *Prado*, 2015 WL 6526834, at *5; *Fishel*, 324 F. Supp. at 432 (suppressing recordings where certain recordings made by a government operative were preserved and others were destroyed); *cf. United States* v. *Feeks*, 879 F.2d 1562, 1564 n.2 (7th Cir. 1989) ("Our sympathies may well be aroused, and the analysis different, by an allegation that the government introduced selective conversations from a catalogue of conversations, or deliberately destroyed certain tapes or selectively taped or edited taped conversations, all of which might run afoul of the constitutional guarantee of due process . . . .").

The recordings of Defendants' other meetings must be suppressed for the further reason that those recordings, too, have apparently been spoliated by the informants' misconduct. As even a cursory review of the Rule 16 discovery reveals, the informants' 25 videos are incomplete in numerous respects. The 25 videos purportedly depict six meetings that occurred between the Defendants and confidential informants. The Government provided multiple videos for each meeting, and each of those videos varies greatly in length and range from one second to 19 minutes and fifty eight seconds.[4] There are several notable examples of these issues:

---

[4] For ease of reference, a table presenting the lengths of the various recording segments is set forth below:

| File Name | Date of Meeting | Length (mm:ss.) |
|---|---|---|
| video_20151023_205231.avi | 10/23/2015 | 19:50 |
| video_20151023_211223.avi | 10/23/2015 | 19:58 |
| video_20151023_213223.avi | 10/23/2015 | 12:33 |
| video_20151026_185407.avi | 10/26/2015 | 19:06 |
| video_20151026_191316.avi | 10/26/2015 | 19:58 |
| video_20151026_193315.avi | 10/26/2015 | 19:58 |
| video_20151026_195316.avi | 10/26/2015 | 19:58 |

- First, for the meetings on October 23, 26, and 27, the first video in the set covering those meetings begin after the participants have already begun talking, and consequently, the beginning of those meetings are not captured on video—there is no way of knowing how great a portion of the meetings those videos omit.

- Second, in three videos (each of which is from a different meeting and is nearly 20 minutes long), the audio lasts less than one minute at the beginning of the video; for the remainder of those videos, there is no sound and it is impossible to know what the participants are discussing.

- Third, there are numerous videos for each meeting, making it difficult to determine whether any audio may be missing. For the meetings on October 27, November 5, and November 6, many of the videos are very short. For the November 6 meeting, for instance, there are seven videos for that meeting, ranging in length from four seconds to fifteen minutes; moreover, three of the videos primarily consist of a loud buzzing noise, making it impossible to hear any conversation that may have been occurring.

In short, whether the result of deliberate manipulation, *Hunley*, 476 F. App'x at 898–99, or negligent misfeasance, *Fishel*, 324 F. Supp. at 432; 6 LaFave et al., *Crim. Proc.* § 24.3(e) ("Even if a court finds no due process violation, it might nevertheless decide the defendant is entitled to a remedial jury instruction or other sanction based on the destruction of evidence."),

| | | |
|---|---|---|
| video_20151026_201315.avi | 10/26/2015 | 18:49 |
| video_20151027_233148.avi | 10/27/2015 | 18:27 |
| video_20151027_235017.avi | 10/27/2015 | 0:38 |
| video_20151027_235101.avi | 10/27/2015 | 1:34 |
| video_20151027_235302.avi | 10/27/2015 | 9:50 |
| 11052026_0015.MOV | 11/5/2015 | 15:00 |
| 11052041_0016.MOV | 11/5/2015 | 8:55 |
| 11052050_0017.MOV | 11/5/2015 | 0:01 |
| 11052050_0018.MOV | 11/5/2015 | 0:02 |
| 11062156_0019.MOV | 11/6/2015 | 0:46 |
| 11062157_0020.MOV | 11/6/2015 | 8:11 |
| 11062208_0021.MOV | 11/6/2015 | 15:00 |
| 11062223_0022.MOV | 11/6/2015 | 15:00 |
| 11062238_0023.MOV | 11/6/2015 | 15:00 |
| 11062253_0024.MOV | 11/6/2015 | 2:48 |
| 11062300_0025.MOV | 11/6/2015 | 0:04 |
| video_20151110_102935.avi | 11/10/2015 | 19:53 |
| video_20151110_104930.avi | 11/10/2015 | 8:58 |

there are significant, irremediable gaps in the critical memorialization of the Defendants' conduct—gaps that in at least some instances result in exculpatory information being excluded from the record before the Court.  (Campo Flores Decl. ¶ 4).  Accordingly, suppression of all of the informants' recordings of the Defendants is warranted here.

At a minimum, the Court should order a hearing and require the testimony of the confidential informants.  *See Bufalino*, 576 F.2d at 448 (indicating that the district court appropriately held a hearing and took testimony on the nature and extent of the destruction of evidence); *United States* v. *Dalisay*, No. 03 Cr. 1305 (JGK), 2005 WL 1176115, at *1 (S.D.N.Y. May 17, 2005) (citing *Grammatikos*, 633 F.2d at 1019–20) *United States* v. *Andreas*, No. 96 Cr. 762, 1998 WL 214666, at *1, 3, 5–7 (N.D. Ill. Apr. 22, 1998), *aff'd*, 216 F.3d 645 (7th Cir. 2000) (noting that the court granted defendant's "motion for an evidentiary hearing on whether the government selectively taped and destroyed exculpatory evidence contained on" audiotapes that a whistleblower surreptitiously recorded); *see also United States* v. *Pena*, 961 F.2d 333, 339 (2d Cir. 1992) ("[A]n evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the [alleged constitutional violation] are in question." (citations and internal quotation marks omitted)).  Here the Defendants have set out a specific and detailed explanation of their bases for concluding that the confidential informants willfully failed to preserve (or willfully destroyed) exculpatory evidence. The Defendants are entitled to a hearing with regard to the destruction of this evidence, and the confidential informants are the critical witnesses with regard to this information.

## II.     The Court Should Suppress Images of the Supposed Brick of "Cocaine" and Any Reference to the Brick

Similarly, the destruction of a sample taken of the brick of supposed "cocaine" that was discussed at the late October meeting warrants suppression of any images of the brick and any testimony referencing it.  *See Laurent*, 607 F.3d at 899; *Prado*, 2015 WL 6526834, at *5; *cf.United States* v. *Dodd*, 347 F. Supp. 2d 664, 674–76 (S.D. Iowa 2004) (reversing narcotics conspiracy conviction, finding evidence insufficient, where, among other deficiencies, "[t]he bag of cocaine found by [the] [o]fficers . . . was destroyed prior to trial and was never tested for crack cocaine").  As the recordings produced in discovery make clear, the informants handled the substance contained in the brick with latex gloves and took a sample of the substance.  (*See* Campo Flores Decl. ¶ 6; Jackson Decl. ¶ 5(a) (describing statement of informant that "from that shine and *that test that I am going to do*, I'm going to know what the cut is" (emphasis added))).  But without explanation, the confidential informants destroyed or otherwise spoliated the residue-containing gloves and the sample taken by the informants.  (*See* Jackson Decl ¶ 6).

In any sting operation, one of the inevitable key questions is whether the government can meet its high burden of demonstrating that the Defendants had the intent and capacity to engage in the criminal activity that is the target of the sting.  Here, the only substantive evidence of these components of the Government's burden is the brief image of an unidentified block of white powder displayed during one of the video recordings taken by the informants.  (*See id.*).  That the informants handled the substance with latex gloves and took a sample of the substance, but failed to preserve any portion of that substance for testing, is an unacceptable spoliation of evidence warranting suppression of any images of the substance, any portions of the recordings referencing the substance, and any testimony regarding it.  At a minimum, the Court should hold a hearing to determine the circumstances under which the samples were destroyed—and should

require the confidential informants who handled the powdery substance to testify at the hearing. *See United States* v. *Aviles*, 315 F.2d 186, 191–92 (2d Cir. 1963) (describing appropriate hearing conducted by district court to assess circumstances surrounding the spoliation of evidence by government agents).

Moreover, even if the Court found that there was no spoliation implicating due process or otherwise requiring suppression, the Court should nevertheless preclude the introduction of the video and any reference to the powdery substance pursuant to Federal Rules of Evidence 403 and 802. Here, the Government will argue at trial that the substance in question was, in fact, cocaine. But without the introduction of even simple field test results—much less laboratory testing of the substance—the Government cannot meet its burden of demonstrating that the substance in question was cocaine. If the main purpose of the video is to show that the Defendants were capable of producing cocaine, it would be misleading to the jury and improper to allow the video's introduction where there is absolutely no evidence that this is cocaine and not some other substance. *See* Fed. R. Evid. 403.

Indeed the only evidence supporting the notion that the substance in the video is, in fact, cocaine, is the body of hearsay statements made by the confidential informants who handle the cocaine in the video. In the recording, the confidential informants can be heard explaining to the Defendants (who, as novices, know nothing about the identification of cocaine) what aspects of the substances indicate that it is supposedly "high-purity" cocaine. (*See, e.g.*, Campo Flores Decl. ¶¶ 2, 6; Jackson Decl. ¶ 5(a) (describing informant's explanations to novice Defendants that "it has a lot of that shine, like a seashell, mother of pearl shine, from that shine and that test that I am going to do, I'm going to know what the cut is")). These statements are hearsay as they are offered for their truth and were made by confidential informants, not any members of the

13

alleged conspiracy. *See* Fed. R. Evid. 801, 803; *United States* v. *Dominguez*, 992 F.2d 678, 681

(7th Cir. 1993). In *Dominguez*, which, as here, involved a sting operation on an alleged cocaine

conspiracy, the district court admitted a law enforcement witness's testimony that she learned

that a foreign police force tested a one kilogram "sample" from a particular package and

determined it to be cocaine. *Id.* at 680. On appeal, the Seventh Circuit found the admission of

that testimony to constitute an abuse of discretion, as it was "clearly hearsay," being "a

statement, other than one made by the declarant while testifying at trial, offered to prove that the

substance received was in fact cocaine." *Id.* at 681.

　　Here, of course, the hearsay testimony is even more problematic than in *Dominguez*

because it refers not to unconfirmed laboratory testing, but instead to the dubious quasi-expert

analysis of a confidential informant based on the "feel" of the white substance. (*See* Jackson

Decl. ¶ 5(c) ("[J]ust with the moisture I feel, which is just the oil and the moisture, the smell and

all of that, this has between 95% to 97% purity.")); *United States* v. *Kaplan*, 490 F.3d 110, 119–

20 (2d Cir. 2007) (reversing conviction where district court improperly admitted lay opinion

testimony of cooperating witness that was not "rationally based on his own perception"

(emphasis omitted)). Moreover, the informants' statements identifying the substance in question

as cocaine do not put the Defendants' statements in context—the Defendants merely

acknowledge that these explanations are being given by the informants (who purport to be

experts in cocaine who are educating the Defendants). All of this goes to the heart of the central

concerns of Rule 403: in the absence of any testing results, the images and discussion of the

alleged cocaine has extraordinarily low probative value that is greatly outweighed by the

potential for unfair prejudice and misleading the jury. *Cf. Dominguez*, 992 F.2d at 681–82 ("The

other circumstantial evidence relied on by the government (an agreed upon price of $12,000,

consistent with the price for one kilogram of cocaine in Guatemala and the covert manner in which the transaction was conducted, with delivery in Guatemala and payment in Milwaukee) could as easily support the existence of a sham drug sale as an authentic drug sale. More importantly, those arrangements were made by the undercover agent, and thus are not necessarily indicative of the conspirators' intent.").

Indeed, although the court in *Dominguez* ultimately affirmed for reasons inapplicable here, the Court underscored that the failure of the government to appropriately identify the substance in question, in a conspiracy case where only a "sample" was ever received, was a matter of grave concern. *See id.* at 682 ("The government's failure to prove the identity of the substance underlying a drug conviction, particularly involving an undercover 'controlled buy,' creates a significant problem. It casts doubt on an essential element of the crime, the defendant's intent to sell narcotics"). With regard to this problematic aspect of the case, the situation in *Dominguez* is identical to the instant case.

In a notable dissent, one of the circuit judges on the *Dominguez* panel found that she would have reversed the defendant's conviction based on the district court's abuse of its discretion in "admit[ing] hearsay evidence identifying the 'one kilogram sample' as cocaine." *See id.* at 686 (Rovner, J., dissenting). Judge Rovner observed that "[t]he evidence definitively shows that Dominguez was engaged in a scheme to distribute a powdery substance to the government agents. However, it does not unequivocally establish defendant's intent to distribute a controlled substance. The only direct evidence of defendant's criminal intent in this respect was the improper hearsay." *Id.* Again, the analysis of Judge Rovner in *Dominguez* applies with even greater force in this case. The question of substantive evidence of intent is no small matter. The confidential informants convinced the Defendants to attend multiple meetings in different

15

countries, including Haiti, where the Defendants were arrested.  There was no shortage of opportunities for the informants to demand that the Defendants produce some testable portion of the 800 kilograms of cocaine that the Government alleges the Defendants were prepared to deliver.[5]  And yet, the investigation was completed without the seizure of even a single gram of any matter confirmed to be a controlled substance.  That a sample was held by the confidential informants and spoliated, coupled with the fact that no further samples were ever obtained, is a powerful indication of bad faith.[6]  The Court should suppress this evidence, or at a minimum require a prompt hearing to address the spoliation at issue.

---

[5] Indeed, to put the purported 800 kilogram conspiracy into perspective, the ability to facilitate such a transaction would mean that the Defendants, both relatively young men with no criminal records, were among the most powerful drug traffickers in the world—this quantity of high-purity cocaine would have a wholesale value of over $30,000,000, and a street value that was tens of millions of dollars higher.  *See, e.g.*, *United States* v. *Jesus Guadalupe Ramos-Rodriguez*, 809 F.3d 817, 824 (5th Cir. 2016) (describing expert testimony of DEA agent that cocaine had U.S. street value of approximately $80,000 per kilogram).  But even in the later meetings with the confidential informants, it is apparent that it is the informants, not the Defendants, who are the experts—in the meeting where the supposed "brick" of cocaine is discussed, the informants spend substantial time during the meeting educating the Defendants on how the quality of the "cocaine" can be determined through the "feel" of the substance.  *See* Jackson Decl. ¶ 5(b) ("Since you don't know a lot about that and your lack of experience, the best thing to do and the safest, try to focus on the levels. I don't need to do that, because of my experience, I don't need to do that. Just from smelling it, from looking at the color and the shine . . . . I'll know if it's good").

[6] The bad faith of the informants is underscored by their apparent failure to appropriately discharge their responsibilities without abusing controlled substances or to disclose such use to their handlers.  As described above, at various points during the course of the investigation, the confidential informants were observed using cocaine, and yet no disclosure of this activity appears in any of the discovery disclosed to date.  *See* Campo Flores Decl. ¶ 7.  The use of controlled substances by the informants, particularly where it was not disclosed to their DEA handlers, calls into question whether their perception and recollection of key events during the investigation can be credited.

## CONCLUSION

For all of the reasons described above, the Court should: (1) suppress the recordings made by the confidential informants, or in the alternative, order a hearing on this issue; (2) suppress images of the supposed brick of "cocaine" and any reference to it, or in the alternative, order a hearing on this issue; (3) require the Government to produce the confidential informants as witnesses for any necessary hearing.

Dated: July 1, 2016
New York, New York

Respectfully Submitted,

/s/ Randall W. Jackson
_____
Randall W. Jackson
John T. Zach
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446–2300
Facsimile:    (212) 446–2350

*Attorneys for Defendant Efrain Antonio Campo Flores*

/s/ David M. Rody
_____
David M. Rody
Michael D. Mann
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Telephone:    (212) 839–5300
Facsimile:    (212) 839–5599

*Attorneys for Defendant Franqui Francisco Flores de Freitas*