UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10-12-16
```

-----------------------------------------------------------X
                                     :

UNITED STATES OF AMERICA,
                                       :

    *-against-*                       :

                                       :

EFRAIN ANTONIO CAMPO FLORES, and
FRANQUI FRANCISCO FLORES DE
FREITAS,
                                     :

                *Defendants.*        :
-----------------------------------------------------------X

    S5 15 Cr. 765 (PAC)

    **OPINION & ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

    Defendants Efrain Antonio Campo Flores ("Campo Flores") and Franqui Francisco

Flores de Freitas ("Flores de Freitas") (together, "Defendants") are charged in a one-count

indictment with conspiring (i) to import five or more kilograms of cocaine into the United States

from a foreign country, in violation of 21 U.S.C. §§ 952(a) and 960(a)(1); and (ii) to manufacture

or distribute five or more kilograms of cocaine, knowing and intending that it would be imported

into the United States, in violation of 21 U.S.C. §§ 959(a) and 960(a)(3).

    On July 1, 2016, Defendants filed five joint motions for a Bill of Particulars; the early

production of translated materials; prompt production of *Brady* and *Giglio* material, and the

identities of confidential informants; suppression of evidence based on spoliation; and

suppression of Defendants' post-arrest statements on November 10, 2015. Dkt. 44, 45, 47, 48,

49. The Government responded on July 22, 2016; and Defendants jointly replied on August 5,

2016. Dkt. 53, 58.

    The Court conducted a two-day hearing on September 8 and 9, 2016 on the two

suppression motions. Post-hearing submissions were made on September 26, 2016. Dkt. 65, 66.

The Court now: (i) DENIES Defendants' motion to suppress on the basis of spoliation; (ii) DENIES Defendants' motion to suppress Defendants' post-arrest statements; (iii) DENIES Defendants' motion for a Bill of Particulars; (iv) DENIES Defendants' motion to compel prompt production of *Brady* and *Giglio* material, and the identities of the confidential informants; and (v) DENIES Defendants' motion to compel the early production of translated materials.

## ANALYSIS

### I.    Motion to Suppress Based on Spoliation

Defendants seek suppression of three categories of evidence due to spoliation. First, Defendants seek to block any testimony relating to a meeting with Defendants in Honduras on or about October 4, 2015. Dkt. 48 at 2. Second, audio and video recordings of a number of meetings are claimed to be incomplete, and further that the missing components contained exculpatory materials. *Id.* In other words, the confidential sources who were taping the meetings taped only incriminating materials, and deliberately excluded exculpatory materials, and on that basis, the recordings should be suppressed. Finally, Defendants seek suppression of any reference to a purported brick of cocaine that Defendants brought to a meeting in Caracas, Venezuela. *Id.*

### A.    The Meetings and Recordings

#### a.    Testimony and Evidence

##### i.    October Meeting in Honduras

Drug Enforcement Administration ("DEA") Special Agent Sandalio Gonzalez ("S.A. Gonzalez") testified at the hearing regarding the October 4, 2015 meeting in Honduras. On or about October 3, 2015, a cooperating witness, CW-1[1] informed S.A. Gonzalez that a Venezuelan

---

[1] CW-1 was not available to testify; he was murdered in December 2015. Dkt. 55 ¶ 8.

official would be sending his nephew to Honduras to meet with CW-1 within the next 24 hours to discuss bringing planes with drugs into Honduras. Suppression Hr'g Tr. ("Tr.") 30:14–31:2, 83:19–23. The meeting was to take place south of San Pedro Sula, and the DEA's main Honduras office is located in Tegucigalpa. Tr. 31:5–11. Given the distance between San Pedro Sula and Tegucigalpa, S.A. Gonzalez did not think DEA agents would be able to surveil the meeting, though he did notify a DEA agent in Honduras that the meeting would occur. Tr. 35:14–20, 154:23–155:19.

S.A. Gonzalez asked CW-1 to locate another DEA cooperator to see if that individual could attend the meeting, but CW-1 was unable to do so. Tr. 32:18–24. S.A. Gonzalez also instructed CW-1 to record the meeting. Tr. 31:21–25. CW-1 indicated that he would do so on his telephone, but he later told S.A. Gonzalez that he was unable to record the meeting. Tr. 32:8–13, 33:3–7. CW-1, however, told S.A. Gonzalez that a female friend had taken photographs of the meeting, and he later provided S.A. Gonzalez with one photograph. Tr. 33:6–14, 96:25–97:2. The photograph shows CW-1 meeting with Defendants and others. GX 4; Tr. 33:15–18.

### ii. October Meetings in Venezuela

S.A. Gonzalez testified that after the October 4, 2015 meeting, CW-1 reported that Defendants had requested CW-1 send a representative to Venezuela to meet with them. Tr. 35:6–12. S.A. Gonzalez then contacted two confidential sources ("CS"), CS-1 and CS-2, to see if they could travel to Venezuela. Tr. 35:13–23. The CSes were instructed "to record all conversations, negotiations, and discussions of drug trafficking or money laundering" and were

3

provided with two recording devices. Tr. 36:9–37:3. One device had audio and video recording capabilities ("Device-1"), and the other had audio only recording capabilities ("Device-2").[2] *Id.*

Defendants met with the CSes on four occasions in Caracas, Venezuela in October 2015. Tr. 40:19–23. The CSes testified that they recorded three of those four meetings. 360:16–362:18, 405:22–406:2. CS-1, using Device-2, started the recordings at the beginning of the three meetings when he went to the bathroom and stopped them at the end of the meetings when he again went to the bathroom. Tr. 406:23–408:7; *see also* Tr. 361:10–17. CS-2, using Device-1, started and stopped the recordings at various points during the three meetings in order to verify that the device was working and to save storage space for later meetings. Tr. 360:16–361:6. The first three meetings took place in an office building; the fourth meeting took place in a night club. Tr. 359:24–360:4, 361:18–22, 405:22–406:22. The CSes did not record it because they were told they would not discuss business and also because the club would be loud. Tr. 362:15–24, 406:3–15. S.A. Gonzalez testified that the CSes turned over the recording devices to the DEA on November 1 or 2. Tr. 41:8–12.

### iii.   November Meetings in Honduras

According to S.A. Gonzalez, after the four October meetings in Venezuela, a third confidential source, CS-3, went to Honduras in early November to discuss flight logistics. Tr.

---

[2] DEA Special Agent Leith Habayeb ("S.A. Habayeb") testified as to Device-1 and Device 2. Because Device-1's audio and video recordings "use[] up a lot of memory," recordings are segmented into smaller files. Tr. 218:6–9. There are a number of steps to access the files, which are encrypted, and CSes are not trained on how to retrieve the files from Device-1. Tr. 218:17–219:5. Recordings on Device-2 can only be accessed by using proprietary hardware and software. Tr. 219:6–24. CS-1 and CS-2 testified that they did not have access to that equipment. Tr. 359:5–9, 415:5–7.

44:18–45:13.  CS-3 took Device-2 (audio only) and a third device, Device-3 (audio and video).[3]
Tr. 45:14–46:7.

CS-3 testified that he used both Device-2 and Device-3 to record two meetings in
Honduras.  Tr. 470:17–473:5.  He started recording with Device-2 at the beginning of the
meetings, and with Device-3 during the meeting.  *Id.*  He turned both devices off when he felt the
meetings had ended.  *Id.*  When he departed Honduras, CS-3 said he accidentally left Device-3 in
his hotel room, but CW-1 helped recover and provide the device to the DEA.  Tr. 473:6–475:1.
CS-3 returned Device-2 to the DEA when he returned from his trip.  Tr. 475:2–5.

###### b.    Mr. Campo Flores's Declaration in Support of the Spoliation Motion

Mr. Campo Flores asserts that he has reviewed the audio and video recordings of the
relevant meetings and that "numerous conversations that [his] cousin and [he] had with the
informants are missing from the recordings."  Dkt. 51-1 ("Campo Flores Spoliation Decl.") at
¶ 4.  What is missing, according to Mr. Campo Flores, are his and Mr. Flores de Freitas'
explanations that they "had no capacity or ability to execute the plans that were proposed by the
informants" and instances where "the informants provided [him] with instructions that explain
various false statements [he] made during the course of the meetings."  *Id.*

###### c.    Discussion

Defendants' argument is that anything exculpatory in their meetings with CW-1 and the
CSes was willfully destroyed by CW-1, the CSes, or the Government.  In particular, Defendants
claim that portions of various meetings are missing wherein they "divulg[ed] their total lack of
familiarity with the drug trade and lack of capacity to engage in a drug transaction."  Dkt. 48 at

---

[3] DEA Special Agent Kevin Corcoran ("S.A. Corcoran") testified that files saved on Device-3 can only be
downloaded, modified, and deleted using a password and that CS-3 was not provided with that password.  Tr.
294:14–295:3.

8. They point to the fact that any recording of the October 4, 2015 meeting is missing, and that CW-1 did not provide all photographs of the meeting. Further, the recordings produced by the Government are said to be incomplete, made up of clips of inconsistent length, and inconsistently named. On that basis, Defendants claim the recordings were spoliated. *See id.* at 7–11.

There is no dispute that the deliberate destruction of exculpatory evidence may give rise to sanctions, such as suppression of the remaining recordings or related testimony. *See United States v. Hunley*, 476 F. App'x 897, 898–99 (2d Cir. 2012); *United States v. Steele*, 390 F. App'x 6, 9 (2d Cir. 2010). But that is not what happened here. Recordings are not "missing" because the confidential sources or anyone else destroyed them, but rather because they were never made.[4] Dkt. 53 at 38–40. The Government is not obligated to record every interaction between a confidential source and a suspect. *See United States v. Chaudhry*, 850 F.2d 851, 857 (1st Cir. 1988) ("We see no basis for the imposition, by judicial fiat as it were, of an 'all-or-nothing' rule, requiring officers to record *all* conversations (heedless of risk, opportunity, or likely fruitlessness) or none, with no middle ground."); *United States v. Feekes*, 879 F.2d 1562, 1564 (7th Cir. 1989).

Moreover, there was no evidence at the hearing showing that there were deliberate attempts to selectively record portions of meetings. Defendants take particular issue with the recordings made in Venezuela in October by CS-1 and CS-2. *See* Dkt. 66 at 18–20, 23–25; Dkt. 48 at 9–11. S.A. Gonzalez testified credibly that the CSes were instructed "to record all conversations, negotiations, and discussions of drug trafficking or money laundering." Tr. 36:9–37:3. Also, the length of the recordings indicate that the recordings were not selectively made.

---

[4] The Court credits the testimony of S.A. Habayeb and S.A. Corcoran about the operational difficulties in accessing or altering recordings saved to Device-1, -2, and -3. And there is no reason to believe that CS-1, -2, or -3 modified or deleted any recordings.

Although the video recordings made by CS-2 are segmented, the audio recordings made by CS-1 are not, and the total duration of the audio recordings exceeds the total duration of the video recordings made on the same days. *See* GX 5. This indicates that there are audio recordings capturing portions of meetings omitted from the video recordings, undercutting any suggestion of selective recording.

Nor is there any evidence of bad faith on the part of the Government. *Cf. In re Terrorist Bombing of the U.S. Embassies in East Africa*, 552 F.3d 93, 148 (2d Cir. 2008) ("Even if the government had been under an obligation to preserve the tapes, [defendant] has pointed to no evidence that the tapes were intentionally destroyed, and therefore the destruction of the tapes could not have amounted to spoliation."). And with respect to the October 4, 2015 meeting, S.A. Gonzalez testified credibly that he tried to have CW-1 meet with another cooperating witness before the meeting, and also directed CW-1 to record the meeting. CW-1's failure to do either is not "chargeable to the Government." *See United States v. Rahman*, 189 F.3d 88, 139–40 (2d Cir. 1999).

Finally, with respect to any additional photographs from the October 4, 2015 meeting, the Government's failure to collect them did not violate Defendants' due process rights because they did not "possess an exculpatory value that was apparent before [they] were destroyed." *California v. Trombetta*, 467 U.S. 479, 489 (1984).

### B. The White Powdery Substance (a/k/a Cocaine)

At the third meeting with CS-1 and CS-2 in Caracas, Venezuela, Mr. Campo Flores states that he "brought a block of a white powdery substance." Campo Flores Spoliation Decl. ¶ 6. Mr. Campo Flores also states that the CSes handled the substance, claiming it "had the qualities of high purity cocaine," and said that "they intended to test it." *Id.* But no field or chemical tests

7

were ever done, nor did the CSes keep any samples or turn over any portion of the substance to the DEA.

The CSes testified that they believed the substance to be cocaine. Tr. 363:7–23, 410:9–23. The CSes further testified that CS-1 placed latex gloves on his hands and touched the substance; but CS-1 did not take a sample or the latex gloves with him after the end of the meeting. Tr. 363:24–364:13, 410:17–411:11. No sample was collected because of the CSes' concerns about what might happen, if they were arrested or stopped in Venezuela or at the border with cocaine. Tr. 364:17–365:6, 411:12–17. Indeed, S.A. Gonzalez testified that he had not instructed the CSes to collect narcotics evidence because of concerns of what might happen if the CSes were stopped by police. Tr. 37:4–38:22. The CSes had no access to U.S. law enforcement in Venezuela, and could not say they were working for law enforcement or the DEA, if they were arrested as it may have put them in greater danger. *Id.*

Defendants argue that the confidential informants' failure to preserve that evidence "warrant[s] suppression of any images of the substance, any portions of the recordings referencing the substance, and any testimony regarding it." Dkt. 48 at 12. That argument must be rejected. The evidence must be exculpatory at the time of its destruction; and if the evidence is only merely potentially useful, the destruction must be in bad faith. *Illinois v. Fisher*, 540 U.S. 544, 547–48 (2004).

Here, the brick of powdery substance, said to have been cocaine, cannot be exculpatory; indeed it was highly inculpatory. Both CSes thought the substance was cocaine, and said so at the time. Tr. 363:7–23, 410:9–23; Campo Flores Spoliation Decl. ¶ 6. There is no indication that Defendants thought otherwise at the time they brought the substance to the meeting. *Cf. United States v. Welch*, Nos. 12 Cr. 4402, 12 Cr. 5004, 2016 WL 536656, at *2 (2d Cir. Feb. 11,

2016) ("Defendants also allege a *Brady* violation, in that they argue that the government failed to preserve the marijuana plants, thereby depriving the defendants of the right to inspect the plants. The argument fails, as nothing about the marijuana evidence is exculpatory."). Moreover, the Government argues that there is no evidence of bad faith as a result of the CSes not bringing any portion of the evidence back to the DEA agents. Dkt. 53 at 44. S.A. Gonzalez recognized the real danger for the CSes to be in possession of cocaine while in Venezuela, and so did the CSes. That makes sense. The Court concludes that the failure to obtain and retain a sample of the purported cocaine was not in bad faith.[5]

## II.   Motion to Suppress Post-Arrest Statements

### A.   Defendants' Assertions in Support of the Motion to Suppress

Mr. Campo Flores is 29 years old, and Mr. Flores de Freitas is 30 years old. Dkt. 45 at 3. Defendants are Venezuelan citizens and are not fluent in English. *Id.* at 3–4. They are cousins; and they are both the nephews of the First Lady of Venezuela, Cilia Flores. *Id.* at 4. Mr. Campo Flores is an attorney, and Mr. Flores de Freitas attended high school up to the fourth year. Dkt. 53 at 24. Defendants have no physical or mental health issues. *Id.* at 24. Neither Defendant has been previously arrested, incarcerated, or charged with any crime, and neither is familiar with the United States justice system. Dkt. 45 at 3.

Defendants each submitted declarations in support of their motion to suppress their post-arrest statements. Dkt. 46-1 ("Flores de Freitas Decl."); Dkt. 52-1 ("Campo Flores Post-Arrest Decl."). They assert that they were terrified at the time of their arrest, fearful that they were

---

[5] Defendants also argue that the Court should preclude "video and any reference to" the brick pursuant to Federal Rules of Evidence 403 and 802. Dkt. 48 at 13. There is no legal support for the argument that evidence relating to the brick could "lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). And Defendants wholly fail to explain why recordings relating to the brick should be excluded as hearsay.

9

being kidnapped and might be killed. Flores de Freitas Decl. ¶¶ 8, 10; Campo Flores Post-Arrest Decl. ¶¶ 2–5. Defendants were arrested by heavily armed, masked men who did not wear anything with visible identification. Flores de Freitas Decl. ¶ 6; Campo Flores Post-Arrest Decl. ¶ 2. The arresting officers did not tell Defendants what was happening, answer any questions, or allow Defendants to call Venezuela during the hours that they were held. Flores de Freitas Decl. ¶¶ 7, 10; Campo Flores Post-Arrest Decl. ¶¶ 2–4.

Defendants were taken to an airport and transferred to six men who wore nothing with visible identification. Flores de Freitas Decl. ¶ 12; Campo Flores Post-Arrest Decl. ¶¶ 5, 6. On the airplane, the six men identified themselves as DEA agents. Flores de Freitas Decl. ¶ 14; Campo Flores Post-Arrest Decl. ¶ 7. The DEA agents told Defendants they were being charged with conspiring against the United States, Campo Flores Post-Arrest Decl. ¶ 7, and showed Defendants a warrant for their arrest, Flores de Freitas Decl. ¶ 14. They also told Defendants that they would likely never see their families again, and die in a United States prison, if they did not cooperate with the agents. *Id.* ¶ 14; Campo Flores Post-Arrest Decl. ¶¶ 7–10. Defendants remained in a state of fear. Flores de Freitas Decl. ¶ 14; Campo Flores Post-Arrest Decl. ¶ 8. They answered questions from the DEA agents, and were subsequently made to sign *Miranda* waivers before answering further questions. Flores de Freitas Decl. ¶¶ 16, 18, 20–21; Campo Flores Post-Arrest Decl. ¶¶ 9, 11.

Mr. Flores de Freitas states that the Haitian police did not give him food and water. Flores de Freitas Decl. ¶ 9. On the airplane, he was given water after he asked, and he was only offered a potato chip, which he declined. Flores de Freitas Decl. ¶¶ 13, 18. He was allowed to use the bathroom once. *Id.* ¶ 13.

**B.     Testimony and Evidence Regarding Arrest and Transportation to the United States**

Around 11:16 a.m. on November 10, 2015, the Haitian *Bureau de Lutte Contre le Trafic de Stupéfiants* ("BLTS") arrested Defendants at a restaurant in the Servotel in Port-au-Prince, Haiti. GX 18 at 1; *see also* Tr. 209:11–24. DEA Special Agent Robert Zachariasiewicz ("S.A. Zachariasiewicz") testified that after the arrest, the DEA agents sought and obtained approval from the Haitian Ministry of Justice for Defendants to be transferred to the United States. Tr. 310:13–311:20. Defendants were taken to the Port-au-Prince airport and transferred into the custody of the DEA at approximately 4:00 p.m. GX 18 at 5; *see also* Tr. 214:11–19. Defendants and the DEA agents departed Haiti in a DEA Learjet at approximately 4:30 p.m. Tr. 215:17–18; GX 18 at 5; GX 7. Onboard the plane, the DEA agents provided Defendants with water at 4:31 p.m., and with candy at 4:50 p.m. Tr. 215:19–23; GX 18 at 5.

S.A. Gonzalez testified that after leveling off, and following a request from Mr. Campo Flores to talk, S.A. Gonzalez moved with Mr. Campo Flores to the front of the plane with S.A. Zachariasiewicz. Tr. 64:5–65:21; *see also* Tr. 314:2–5. S.A. Gonzalez provided Mr. Campo Flores with a *Miranda* waiver form in Spanish, and Mr. Campo Flores read it, said he understood it, commented that he was an attorney, and signed it as of 5:15 p.m. Tr. 65:5–18; *see also* GX 10-A; GX 10-B. Prior to signing the form, Mr. Campo Flores was not asked any questions about drug trafficking or about the evidence in the case. Tr. 67:10–15; *see also* Tr. 315:15–21. According to S.A. Zachariasiewicz, during the interrogation, Mr. Campo Flores "cried on several occasions, at which point [S.A.] Gonzalez would take a little time and . . . appeared to try to be somewhat comforting to him." Tr. 316:4–10. At one point when Mr. Campo Flores was crying, Mr. Campo Flores asked S.A. Gonzalez what the potential penalties could be, and S.A. Gonzalez told him the range of penalties. Tr. 347:1–12.

11

S.A. Brooks testified that he asked Mr. Flores de Freitas pedigree questions while Mr. Campo Flores was talking with S.A. Gonzalez and S.A. Zachariasiewicz. Tr. 243:5–246:21. S.A. Brooks did so because the pedigree information is needed upon landing for processing. Tr. 243:17–244:8. According to S.A. Gonzalez, after speaking with Mr. Campo Flores for some time, Mr. Flores de Freitas was moved to the front of the plane to talk with S.A. Gonzalez. Tr. 69:10–15. S.A. Gonzalez provided Mr. Flores de Freitas with a *Miranda* form in Spanish, which Mr. Flores de Freitas read, indicated he understood, and signed as of 7:37 p.m. Tr. 69:14–25; *see also* GX 11-A; GX 11-B. Before Mr. Flores de Freitas signed the form, he was not asked any questions about drug trafficking or about the evidence in the case. Tr. 71:11–16; *see also* Tr. 317:25–318:2.

The plane landed at Westchester County International Airport at approximately 8:10 p.m. *See* GX 18 at 5; Dkt. 53 at 11. The next day, November 11, 2015, was Veteran's Day, and the court was closed. Defendants were taken to court on November 12, 2015. Tr. 252:9–12.

### C.   Discussion

Defendants argue that their post-arrest statements must be suppressed because (i) they were made as part of a deliberate two-step interrogation; (ii) they were not knowing and voluntary; and (iii) they were not made within six hours of Defendants' arrest, and the Government unreasonably delayed presentment of Defendants. Dkt. 45 at 1–2.

#### a.   Deliberate Two-Step Interrogation

Defendants argue that their post-arrest statements should be suppressed because the statements are a product of an impermissible two-step interrogation. *See United States v. Capers*, 627 F.3d 470, 476 (2d Cir. 2010). Defendants assert that on the flight to New York, the DEA agents deliberately interrogated them prior to advising them of their *Miranda* rights, and

then persuaded them to repeat their earlier, unwarned statements after they had waived their rights. Dkt. 45 at 11.

The Court adopts the timeline established by the credible testimony of the DEA agents and the evidence presented at the hearing. Defendants were arrested by the Haitian authorities at 11:16 a.m. They were held by the Haitians for less than five hours before they were expelled from Haiti, and transferred to the DEA at approximately 4:00 p.m. They were put on board a DEA Learjet, which left Haiti for New York at 4:30 p.m. Mr. Campo Flores signed a *Miranda* form at 5:15 p.m., 45 minutes after takeoff, and Mr. Flores de Freitas signed a *Miranda* form at 7:37 p.m. The plane landed at 8:10 p.m. There is no evidence that the DEA or anyone else questioned Defendants prior to 4:00 p.m., and Defendants do not contend otherwise.

In light of the timeline and the DEA agents' testimony, the Court finds there was no custodial interrogation of Mr. Campo Flores prior to him signing the *Miranda* waiver form. Mr. Campo Flores' declaration explains that only after they "were in the air for what seemed to be a significant period of time" did S.A. Gonzalez begin to talk to Defendants to explain the charge against them and to discuss consequences. Campo Flores Post-Arrest Decl. ¶ 7. He further states that he was then questioned by S.A. Gonzalez for "what seemed to [him] to be a substantial period of time" before being provided with a *Miranda* form. *Id.* ¶ 9. It is uncontroverted that there was absolutely no interrogation by the DEA agents while Defendants were in Haitian custody. Custody was turned over at 4:00 p.m., and only 45 minutes elapsed between the plane's takeoff at 4:30 p.m. and the time Mr. Campo Flores signed his *Miranda* form. The Court does not find Mr. Campo Flores's declaration credible with respect to any pre-warning questioning. Instead, the Court adopts the DEA agents' testimony and finds that there was no pre-*Miranda* interrogation of Mr. Campo Flores.

13

Mr. Flores de Freitas states in his declaration that, prior to signing a *Miranda* form, S.A. Brooks questioned him regarding his familial and business relations with Cilia Flores and several cousins; and regarding his son. Flores de Freitas Decl. ¶ 18. S.A. Brooks testified credibly that he asked Mr. Flores de Freitas pedigree questions only; and S.A. Brooks further testified that he did not ask Mr. Flores de Freitas about business deals with his family. Tr. 243:13–18, 258:16–18. "[T]he solicitation of information concerning a person's identity and background does not amount to custodial interrogation prohibited by *Miranda* . . . ." *United States v. Adegbite*, 846 F.2d 834, 838 (2d Cir. 1988). The Court therefore finds that there was no two-step interrogation of Mr. Flores de Freitas.

### b.    Waiver of *Miranda* Rights and Voluntariness of Statements

"A statement made by the accused during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived [*Miranda*] rights when making the statement." *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014). A waiver is knowing if it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011). Statements are "not voluntary when obtained under circumstances that overbear the defendant's will at the time [they are] given." *Taylor*, 745 F.3d at 23. Rather, statements are voluntary if they are "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Plugh*, 648 F.3d at 127. "The voluntariness inquiry should examine the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement." *Taylor*, 745 F.3d at 23–24 (internal quotation marks omitted).

14

As discussed above, Defendants signed *Miranda* forms prior to making the statements at issue here. There is no indication that Defendants, despite not having prior experience with the United States legal system, did not waive their *Miranda* rights knowingly. S.A. Gonzalez testified credibly that each defendant read the Spanish-language *Miranda* forms, each indicated he understood, and then signed. Mr. Campo Flores even commented when asked if he understood the form that he was an attorney.[6] Also, the *Miranda* forms show check marks next to each statement, indicating that Defendants reviewed the forms line by line. GX 10-A, 10-B, 11-A, 11-B. Further, the DEA agents testified credibly that Defendants wanted to talk and did not appear to be in any kind of distress. *See, e.g.*, Tr. 65:1–5, 68:25–69:3, 71:8–10, 222:12–14, 222:3–7, 263:10–20. The Court therefore finds Defendants knowingly waived their *Miranda* rights. *See Taylor*, 745 F.3d at 23.

Defendants also contend that their waiver and statements to the DEA were not voluntary. Defendants focus on (i) the actions of the Haitian police during Defendants' arrest and custody; (ii) the conditions of their interrogation by the DEA agents; (iii) the length of their restraint and their lack of food; and (iv) the fact that the DEA agents did not notify Defendants of their consular rights under Article 36 of the Vienna Convention on Consular Relations ("Vienna Convention"), Apr. 24, 1963, [1970] 21 U.S.T. 77. *See* Dkt. 66 at 1–13.

Defendants are educated adults in good physical and mental health. Defendants stress their mental state to show that their statements were involuntary. They claim that as a result of the actions of the Haitian authorities during their arrest and during their custody in Haiti, they were terrorized, fearful that they were being kidnapped and might be killed. The actions of

---

[6] We also note that the Venezuelan criminal justice system appears to afford defendants the right to counsel and the right not to testify or confess guilt. *See* United States Department of State, Venezuela 2015 Human Rights Report 11, 13 (2015). It seems unlikely that Defendants, and especially Mr. Campo Flores, who is an attorney, did not understand the similar rights accorded by United States law. Nor do Defendants so contend.

foreign officials are not attributable to the United States, unless the foreign officials were acting

as agents of the United States. *See United States v. Yousef*, 925 F. Supp. 1063, 1076–77

(S.D.N.Y. 1996). The evidence does not support the contention, and Defendants do not argue,

that the Haitian authorities were acting as agents for the United States.[7] Thus, the Haitian

authorities' conduct is only relevant if Defendants' mental state made "mental or physical

coercion by the [United States] police more effective." *United States v. Salameh*, 152 F.3d 88,

117 (2d Cir. 1998) (citation omitted).[8] But there is no credible evidence that the DEA agents

used mental or physical coercion in eliciting Defendants' waiver or statements. The proper place

for the beginning of the analysis is not the arrest at 11:16 a.m., but rather when the Haitian

authorities transferred custody of Defendants to the DEA agents at 4:00 p.m.

The evidence does not show that the DEA agents physically threatened Defendants or

that Defendants were physically mistreated at any point. Defendants were transferred into the

DEA's custody at 4:00 p.m., and they arrived in New York approximately 4 hours later, at 8:10

p.m. The Learjet had large leather seats. The DEA agents provided Defendants with water and

---

[7] Defendants make passing references to the Haitian authorities acting as "proxies" "on behalf of" the DEA. *See, e.g.*, Dkt. 45 at 19. The record reflects that the Haitian authorities acted in accordance with their own procedures, even if they were conducting an arrest at the request of the United States. *See United States v. Lira*, 515 F.2d 68, 71 (2d Cir. 1975). For example, S.A. Gonzalez testified that the Haitian authorities did not ask the DEA what to do when Defendants requested to make a phone call while in Haitian custody. Tr. 55:20–56:12, 196:5–17.

[8] Even if the Court were to consider the conduct of the Haitian police, the evidence and testimony do not support Defendants' declarations. Defendants did not testify at the hearing; they were not subject to cross examination and the Court was unable to assess their demeanor. *See United States v. Thompson*, No. 10 Cr. 94 (JSR), 2010 WL 3069668, at *5 (S.D.N.Y. July 29, 2010). In a number of particulars, the evidence at the hearing contradicts Defendants' declarations. For instance, photographs taken the day of the arrest show that the Haitian police's uniforms had patches stating, in large letters, POLICE. GX 6, GX 19; *see also* Tr. 60:5–14, 211:11–23. Further, credible testimony from a BLTS officer establishes that Defendants were informed in Spanish that they were being arrested by police at the time of their arrest. Tr. 10:20–11:3, 17:9–18:2. And a photograph taken at the time Defendants were transferred into the DEA's custody shows a DEA agent wearing a jacket clearly identifying him as DEA. GX 6; *see also* Tr. 60:5–14. Moreover, the photograph does not show Defendants to be in obvious distress. *Id.* Defendants' claims that they feared being kidnapped and possibly murdered seem exaggerated.

16

candy within 20 minutes of taking off from Haiti.[9]  And Mr. Flores de Freitas states that he was allowed to go to the bathroom.  That Defendants remained in restraints on an airplane where ensuring security would be a priority, does not suggest, in light of all other circumstances, physical coercion.

The record also does not support a conclusion that Defendants were mentally intimidated, coerced, or deceived.  Even if Defendants feared being kidnapped or possibly murdered immediately after the arrest by the Haitian authorities, the same cannot be said about the time after Defendants were transferred to the DEA's custody.  At least one DEA agent was wearing a jacket with a badge and DEA written in large letters on the front during the transfer of custody. GX 6; *see also* Tr. 60:5–14.  And Defendants do not assert that, at the time they waived their *Miranda* rights and made their statements, they were unaware of who the agents were or why they were in custody; to the contrary, they state that the DEA agents identified themselves as DEA agents, showed them a warrant for their arrest in the United States, and informed them that they had been charged with the crime of conspiring against the United States.

With respect to the interrogations, S.A. Gonzalez testified credibly that Mr. Campo Flores asked for the opportunity to talk with S.A. Gonzalez.  Tr. 64:5–65:4.  After talking with S.A. Gonzalez for quite some time, Mr. Campo Flores indicated that he wanted to give Mr. Flores de Freitas the opportunity to speak with S.A. Gonzalez.  Tr. 69:7–13.  According to Mr. Flores de Freitas, Mr. Campo Flores told Mr. Flores de Freitas to talk to the agents, and with Mr. Campo Flores's encouragement, Mr. Flores de Freitas did so.  Flores de Freitas Decl. ¶¶ 19, 20. Neither Defendant alleges that they asked the DEA agents for the opportunity to call anyone.

---

[9] Mr. Campo Flores does not state in his declaration that he was without food or water while in Haitian or DEA custody on November 10, 2015.

17

Mr. Campo Flores was interrogated for not more than 2.5 hours, and Mr. Flores de Freitas was interrogated for less than one hour. There is no evidence that the DEA agents sought to take advantage of any upset of Defendants. For example, when Mr. Campo Flores appeared to cry, S.A. Gonzalez tried to comfort him.

Defendants contend that S.A. Gonzalez and S.A. Brooks told them that if they did not cooperate, they would likely die in a United States prison and never see their families again. S.A. Gonzalez testified, however, that he did not tell Mr. Flores de Freitas that signing the *Miranda* form would be "for his own good," Tr. 71:17–19, or tell Mr. Campo Flores that there was a potential for him not to see his children, Tr. 138:15–17. S.A. Brooks testified that he did not tell Mr. Flores de Freitas that he thought "his crime was very serious," Tr. 246:22–24, that "he could go to jail for life," Tr. 246:25–247:2, or that "he was in big trouble," Tr. 259:4–6, and he did not tell Defendants that they faced penalties of "ten to life," Tr. 259:7–11. According to S.A. Zachariasiewicz, S.A. Gonzalez did explain the potential sentences Defendants were facing, but S.A. Gonzalez only discussed this in response to a question Mr. Campo Flores posed during the interrogation (and after Mr. Campo Flores signed his *Miranda* waiver).[10] Tr. 347:1–9. It seems perfectly rational that Defendants would ask questions as they claimed that they asked the Haitian authorities questions, which the Haitian authorities did not answer. It therefore makes sense that Mr. Campo Flores would ask S.A. Gonzalez questions. The Court credits the DEA agents' testimony.

Defendants also argue that the DEA agents failed to advise them of their consular rights under the Vienna Convention. This alone does not require suppression. *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 350 (2006). Instead, the failure to advise defendants of their consular

---

[10] S.A. Gonzalez does not recall this conversation. Tr. 136:19–24.

18

rights may be considered in a "broader challenge to the voluntariness of [a defendant's]

statements to police." *Id.* Viewed in the context of the totality of all surrounding circumstances,

however, the Court finds that Defendants' waiver and post-arrest statements were voluntary.

### c. Timing of Statements and Presentment

Fed. R. Crim. P. 5(a)(1)(B) requires that "[a] person making an arrest outside the United

States must take the defendant without unnecessary delay before a magistrate judge . . . ."

Where this rule is not complied with, pre-presentment statements are "generally . . .

inadmissible." *Corley v. United States*, 556 U.S. 303, 309 (2009). 18 U.S.C. § 3501(c),

however, provides a safe harbor for voluntary statements made within six hours of a defendant's

arrest, or if made beyond six hours, within a time period that is "reasonable considering the

means of transportation and the distance to be traveled to the nearest available . . . magistrate

judge."

While Defendants claim their statements were made after the safe harbor period, in fact,

the § 3501(c) clock did not commence until 4:00 p.m. when the Haitian authorities transferred

custody of Defendants to the DEA. *See United States v. Abu Ghayth*, 945 F. Supp. 2d 511, 519

(S.D.N.Y. 2013) (no violation of Fed. R. Civ. P. 5(a) as a result of Turkish detention where there

was no evidence that "the United States colluded with Turkey or was otherwise involved in his

arrest or interrogation in that country in order to delay presentment"). Section 3501(c) is a

revision of the *McNabb-Mallory* rule. *See Corley*, 556 U.S. at 316–18. Prompt presentment is

the rule, but here, Defendants were in Haitian custody. The federal rules do not command that a

foreign government must process arrests in its territory within United States temporal limitations.

The time in Haitian custody cannot be logically charged to the DEA. This is especially so here

as the DEA did not conduct any questioning of Defendants while they were in Haitian custody;

19

and Defendants made no statements to the Haitian authorities. The DEA also did not cause any delay in the transfer of custody.

But even if the clock started at 11:16 a.m., the Court finds that Defendants were presented to a magistrate judge within a reasonable period of time. There is no indication that the Government delayed the process or took advantage of any delay. The DEA and Defendants departed Haiti for New York as soon as custody was transferred. They arrived on November 10 after the court closed for the day, and the Court was closed on November 11, 2015 for Veteran's Day. *See* DX 3510-05. Defendants were taken to court on November 12, 2015.[11]

Defendants argue that they were not taken to the nearest available magistrate judge (in Puerto Rico), and so presentment was unreasonably delayed. Dkt. 45 at 25–26. This argument is unavailing. The proximity of the nearest available magistrate judge is only a factor for the Court to consider in determining reasonableness; it does not require a finding of unreasonableness.[12] It is highly doubtful that Defendants could have been taken to a magistrate judge in Puerto Rico before the courts closed, given that the plane took off from Haiti at 4:30 p.m. and upon arrival in Puerto Rico, there would be additional delays for customs, processing, and transportation to the courthouse. Further, the operative indictment required that the point of entry for at least one of the Defendants be the Southern District of New York. Dkt. 5 ¶ 1. As a result, it was reasonable to fly to Westchester County, and there was no unreasonable delay.

---

[11] Defendants contend that presentment was unreasonably delayed on November 12 because it did not occur until 6:30 p.m. Dkt. 45 at 26. S.A. Brooks testified that on November 12, DEA agents went to MCC in the morning to pick Defendants up and took them to the courthouse. Tr. 252:9–17. Defendants waited approximately six hours at the courthouse before being presented "as a result of the need for processing by Pretrial Services, issues arising from the defendants' initial desire to be represented by the same law firm, and congestion on the Magistrate Court's docket." Dkt. 53 at 31. These delays are not unreasonable.

[12] In determining whether a delay is reasonable, courts in the Second Circuit have considered factors other than the two set forth in 18 U.S.C. § 3501(c), *i.e.*, the means of transportation and the proximity of the nearest available magistrate judge. *See, e.g.*, *United States v. Pena Ontiveros*, 547 F. Supp. 2d 323, 339 (S.D.N.Y. 2008) (collecting cases where delays were reasonable considering, among other things, routine processing).

20

### III.    Bill of Particulars

"The function of a bill of particulars is to provide defendant with information about the

details of the charge against him if this is necessary to the preparation of his defense, and to

avoid prejudicial surprise at the trial." *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990).

Granting or denying a bill of particulars "rests within the sound discretion of the district court."

*Id.*

Defendants seek further information pursuant to Fed. R. Crim. P. 7 in three so-called

"critical" areas:

> (1)  the identities of known, but uncharged co-conspirators;
>
> (2)  the specifics of when, where, and with whom Defendants'
> alleged agreement to import cocaine into the United States was
> formed; and
>
> (3)  an explanation of why Defendants are not safety-valve eligible
> and why in this case they do not qualify for the Department of
> Justice's policy of not always seeking the mandatory minimum for
> drug cases.

As a preliminary matter, the Court notes that the Government has produced documents,

including all recordings; draft and revised draft translations; and search warrant materials. Dkt.

53 at 49.  In addition, the Government produced two thick volumes of 3500 materials for the

eleven potential witnesses for the hearing held on September 8 and 9, 2016.  The produced

materials and the allegations in the indictment are more than sufficient for Defendants to prepare

for trial.  No bill of particulars is required.

With respect to Critical Area 1, the Government does not have to provide information on

the identities of the individuals whom the Government at present regards as uncharged co-

conspirators. *See Torres*, 901 F.2d at 233–34 (affirming denial of motion for bill of particulars

seeking, *inter alia*, the identity of "other persons 'known and unknown' as alleged in . . . the

indictment"). Based on the discovery produced to date, Defendants are well prepared to conduct their factual investigation in anticipation of trial.

With respect to Critical Area 2, the Government has no obligation to provide the "when," "where," and "with whom," Defendants conspired to import cocaine into the United States. The Government has explained its theory as follows:

> [A]t or before the October 4, 2015 meeting with CW-1 in Honduras—one of the principal transshipment points in the world for U.S.-bound cocaine produced in Columbia and dispatched from Venezuela—the defendants agreed with each other, among others, to participate in a cocaine transaction that would involve the importation of more than five kilograms into the United States. The defendants manifested their agreement through, among other things, electronic communications that have been produced during discovery and three sets of subsequent meetings with CS-1, CS-2, and/or CS-3.

Dkt. 53 at 54–55.

The Government's statement provides more than sufficient information, and it need not provide more detail. *See United States v. Santiago*, 174 F. Supp. 2d 16, 35 (S.D.N.Y. 2001).

With respect to Critical Area 3, the Government does not have to provide information as to the applicability of safety-valve relief or the *Holder* memorandum. Safety-valve applicability is determined by the Court, 18 U.S.C. § 3553(f), and Defendants bear the burden to establish applicability, *United States v. Tang*, 214 F.3d 365, 370–71 (2d Cir. 2000). As to the *Holder* memorandum, it was "not intended to create or confer any rights, privileges, or benefits in any matter, case, or proceeding." Dkt. 54-14 at 2 n.2. The Government is under no obligation to provide Defendants information about its decision relating to the applicability of the *Holder* memorandum. *United States v. Jackson*, No. 13 Cr. 142, 2013 WL 4744828 (S.D.N.Y. Sept. 4, 2013) does not support Defendants' position. *Jackson* dealt with the purely legal question of

22

whether changes to the Rockefeller Drug Laws could be applied retroactively and so impact the defendant's status as a career criminal.

## IV.   Prompt Production of *Brady* and *Giglio* Material, and the Identities of Confidential Informants

Defendants seek immediate production of *Brady* material. The Government represents that it is aware of its obligation under *Brady*; that it has complied; and will continue to comply. Dkt. 53 at 58–59. That is sufficient to deny Defendants' motion for *Brady* relief. *See United States v. Trippe*, 171 F. Supp. 2d 230, 237 (S.D.N.Y. 2001).

Defendants also seek production of *Giglio* material ninety days in advance of trial. The Government has represented that it will make impeachment material relating to its anticipated trial witnesses available by October 28, 2016, ten days before trial. Dkt. 53 at 64. There is no need to depart from the customary rule in this district of disclosure shortly before trial. *See id.* at 237–38. The Court also denies Defendants' request for an order directing the Government to preserve evidence not in the DEA's possession regarding any narcotics use by the CSes, and requiring the CSes to submit to hair testing. *See* Dkt. 49 at 9–10; *United States v. Tomasetta*, No. 10 Cr. 1205, 2012 WL 896152, at *4–5 (S.D.N.Y. Mar. 16, 2012).

As to confidential informants, the Government has already disclosed three confidential sources who testified at the hearing held on September 8 and 9, 2016. The Government has undertaken to make confidential sources available to defense counsel by October 28, 2016, ten days before the trial, if there are such others that are not expected to testify at trial. Dkt. 53 at 61. Coupled with the production of impeachment materials ten days before trial, this is sufficient for defense counsel to prepare. *See DiBlasio v. Keane*, 932 F.2d 1038, 1043 (2d Cir. 1991).

## V.      Early Production of Translated Materials

Defendants seek production at least 90 days before trial of all English-translated materials that the Government intends to use at trial. As of July 22, 2016, the Government had provided "draft translations and transcriptions of 22 of the approximately 32 recordings obtained by CS-1, CS-2, and CS-3, as well as hundreds of pages of draft translations of additional electronic communications involving one or both of the defendants." Dkt. 53 at 66–67. The Government also represented it would provide Defendants with "draft translations that it considers potentially relevant as they are completed." *Id.* at 67.

There is no reason to require more here, and Defendants cite no case holding otherwise. Defendants do not suggest that they have not been in possession of any relevant Spanish-language material for too little time or that they have been unable to adequately review the material; there is no reason to conclude that Defendants have not been able to prepare to meet any translations put forward by the Government.[13]

## CONCLUSION

Defendants' motions are denied in all respects. The case will proceed to trial on November 7, 2016, as scheduled. An arraignment on the superseding indictment will go forward on October 13, 2016 at 4:00 p.m. The Clerk is directed to close the motions at Docket 44, 45, 47, 48, and 49.

Dated: New York, New York
       October 12, 2016

                                        SO ORDERED

                                        _____
                                        PAUL A. CROTTY
                                        United States District Judge

---

[13] As discussed above, the Government has represented that it is aware of and will comply with its *Brady* obligations.

24