GB85flo1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
                v.                          15 Cr. 765 (PAC)
 4
     EFRAIN ANTONIO CAMPO FLORES and
 5   FRANQUI FRANCISCO FLORES DE FREITAS,

 6                Defendants.
     ------------------------------x
 7
                                        New York, N.Y.
 8                                      November 8, 2016
                                        10:30 a.m.
 9   Before:

10                   HON. PAUL A. CROTTY,

11                                         District Judge

12                         APPEARANCES

13   PREET BHARARA
          United States Attorney for the
14        Southern District of New York
     EMIL J. BOVE III
15   BRENDAN F. QUIGLEY
          Assistant United States Attorneys
16
     BOIES, SCHILLER & FLEXNER LLP
17        Attorneys for Defendant Campo Flores
     RANDALL W. JACKSON
18   JOHN T. ZACH
     JOANNA CHRISTINE WRIGHT
19
     SIDLEY AUSTIN LLP
20        Attorneys for Defendant Flores de Freitas
     DAVID M. RODY
21   ELIZABETH A. ESPINOSA
     MICHAEL D. MANN
22
     ALSO PRESENT:
23
     MERCEDES AVALOS
24   NANCY I. ADLER
     Spanish Interpreters
25
```

GB85flo1

1          (Case called)

2          THE COURT:  While we are waiting for the jury to

3     arrive I have got numerous letters.  I thought I would review

4     the letters with you and give you my rulings on them.

5          First of all, with regard to the Sidley Austin letter

6     of November 7, dealing with manufactured jurisdiction, I guess

7     I would like to get the -- I don't have to rule on this right

8     now because this deals with the appropriate charge to the jury.

9     I would like to get the government's response before I decide

10    this issue.

11         With respect to the government's letter of November 7,

12    regarding whether defense counsel opened the door to limited

13    testimony regarding the death of El Sentado, I'm going to

14    adhere to the ruling yesterday.  I do this on the

15    representation by the defendant that the references in the

16    opening statement are to the investigative failures by the

17    government in failing to properly debrief El Sentado which took

18    place in October -- the debriefing should have taken place in

19    October and November.  If there is any more references to this

20    I will reconsider my ruling, but right now I am adhering to my

21    ruling of yesterday.

22         With regard to the Boies Schiller motion to strike the

23    testimony of Special Agent Sandalio Gonzalez with regard to his

24    interpretation of one of the defendant's alleged post-arrest

25    statements, the post-arrest statement that "you know what that

GB85flo1

1    is," I am going to deny the motion to strike.

2            And, Boies Schiller asks the Court to reconsider its

3    ruling that the defendant opened the door to the admissibility

4    of Agent Gonzalez' reports and I am going to deny

5    reconsideration and adhere to the ruling of yesterday.

6            I think that takes care of the four matters that I

7    received correspondence on from the adjournment of yesterday's

8    trial to this morning at 10:30.

9            Did I miss anything?

10           MR. BOVE:  No, your Honor.  There are two additional

11   issues I would like to raise at the the appropriate time.

12           THE COURT:  Okay.

13           MR. JACKSON:  I would just say, your Honor, that we

14   think that you covered everything.  Thank you.

15           THE COURT:  Do you want to raise them now?

16           MR. BOVE:  Yes, please, your Honor.

17           The first relates to our letter of last night and, in

18   particular, whether the defense has opened the door to the

19   death of El Sentado.  We do think there is additional basis for

20   offering that evidence about his death.  And I apologize for

21   doing this in a piecemeal fashion and not bringing it to the

22   Court's attention last night, but at page 64 of the transcript

23   during Mr. Zach's opening he argued that the DEA gave him,

24   referring to El Sentado, a tremendous deal, the DEA and the

25   prosecutors got on a plane in New York and they flew to him in

GB85flo1

Honduras and when they got there the DEA said to him if you can

go out and help us get some other people, we won't arrest you.

If we ever do arrest you, we will give you a good deal at

sentencing.

Based on that argument, your Honor, the jury is now

left with the misimpression that El Sentado in fact received

such a deal when that is not the case.  The reason that the

charge already in evidence has not been resolved and disposed

of is because the man is dead.  He got one of the worst deals

of any witness in a case, by far.

We think this argument is an alternative basis to

permit the government to offer this evidence and to make clear

to the jury that there was no deal here whatsoever and the

reason that he is not before the jury to explain what happened

on October 3rd is that he is no longer living.

THE COURT:  Anything else, Mr. Bove?

MR. BOVE:  The second issue, your Honor, is just a

record-keeping matter.

We understand that Ms. Nadler, one of the court

interpreters today, has also provided services to the defendant

during the course of the case.  We don't have any objection to

her assisting the Court today and we just wanted that to be

clear for the record.

THE COURT:  Do you want her sworn or any inquiry made?

MR. BOVE:  I think as long as the defendants register

GB85flo1

1    their lack of objection that would be fine.

2            MR. ZACH:  We have no objection.  We are happy to have

3    her.

4            THE COURT:  We are happy to have the interpreters.  We

5    need the interpreters.  I gather the official interpreters took

6    the day off.

7            Is that the reason we have substitute interpreters?

8            INTERPRETER:  Yes, your Honor.

9            THE COURT:  It is.  Thank you.  I am going to adhere

10   to my ruling.

11           Marlon, is the jury here?

12           THE DEPUTY CLERK:  Not yet.

13           THE COURT:  Who is missing.

14           THE DEPUTY CLERK:  I'll check.

15           THE MARSHAL:  One missing.

16           THE COURT:  One is missing.  Thank you

17           MR. RODY:  Your Honor, is the Court planning to go

18   straight through lunch or what are you thinking?

19           THE COURT:  Thank you, Mr. Rody.

20           The plan today is to go from the jury's arrival until

21   12:30.  We will break at 12:30, resume at 1:15.  We are serving

22   lunch in the jury room.  We will try to keep the jurors in the

23   building and the lunch hour to 45 minutes.  We will resume at

24   1:15 and go to 3:30.

25           MR. RODY:  Thanks, Judge.

GB85flo1

1              Will there be an afternoon break?

2              THE COURT:  There will not -- is there going to be?

3              THE DEPUTY CLERK:  10 minutes.

4              THE COURT:  One 10-minute break in the afternoon.

5              MR. RODY:  Thank you.

6              THE COURT:  We will go this morning from whenever they

7    arrive until 12:30.  No break this morning.

8              MR. RODY:  Understood.  Thank you.

9              (Pause)

10             THE COURT:  The jury has arrived now.  Is Agent

11   Gonzalez available?

12             MR. QUIGLEY:  He is in the witness room, your Honor.

13             THE COURT:  Call him up.

14             (Witness resumes stand)

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

GB85flo1                        Gonzalez - cross

1                (Jury present)

2                THE COURT:  Good morning.

3                THE JURY:  Good morning.

4                THE COURT:  Please, be seated.

5                Before Mr. Jackson resumes, Agent, I want to remind

6       you, you are still under oath.

7                THE WITNESS:  Yes, your Honor.

8        SANDALIO GONZALEZ, (Cont'd)

9                THE COURT:  All right, Mr. Jackson.

10               MR. JACKSON:  Thank you, your Honor.

11               THE COURT:  You are welcome.

12      CROSS EXAMINATION

13      BY MR. JACKSON:

14      Q.  Good morning, Special Agent Gonzalez.

15      A.  Good morning, sir.

16      Q.  Thank you.

17               Now, Special Agent Gonzalez, yesterday you remember

18      that there was -- I want to finish talking about some of the

19      alleged statements that you described but before I do that I

20      just want to address, real quickly, we looked at a number of

21      pictures of planes yesterday, right?

22      A.  Yes, sir.

23      Q.  And the planes that we looked at, I think your testimony is

24      that you are familiar with planes used in drug trafficking?

25      A.  I believe that was the testimony.

GB85flo1                         Gonzalez - cross

1    Q.  That was your testimony before we looked at those pictures

2    of the planes, right?

3    A.  I believe so.

4    Q.  Okay.

5          Can we call up any of the pictures of the planes,

6    please?  How about the GV picture?

7          Was I to understand that the import of that testimony

8    is you were saying that these are all planes used in drug

9    trafficking?

10   A.  I don't recall exactly what was said.

11   Q.  Is that your understanding?

12   A.  Yes, they have been used for drug trafficking.

13   Q.  Okay.

14         These are also all planes that are not used in drug

15   trafficking, right?

16   A.  Yes, sir.

17   Q.  There is nothing special about a Gulfstream V that relates

18   to drug trafficking, right?

19   A.  Other than its autonomy.

20   Q.  Autonomy?

21   A.  How far it can go on a full tank of gas.

22   Q.  Right.  It is a plane that can go pretty far, right?

23   A.  Yes, sir.

24   Q.  And so, this is a plane that is used by many different

25   types of professionals, right?

GB85flo1                    Gonzalez - cross

1   A.  Yes, sir.

2   Q.  It is used in a lot of contexts outside of drug

3   trafficking?

4   A.  Yes, sir.

5   Q.  And that's true of all of the planes you showed us pictures

6   of?

7   A.  Yes.

8   Q.  Also, Agent Gonzalez, correct me if I am wrong, but these

9   are just photos that you pulled off of the Internet, right?

10  A.  I did not.

11  Q.  Okay, but none of these are photos of -- this is not a

12  photo of a plane from this investigation, right?

13  A.  Correct.

14  Q.  This is just a stock, generic photo of a Gulfstream V?

15  A.  I believe so.

16  Q.  And that is true of other of the planes that you pulled up

17  yesterday, right?

18  A.  With the exception of the defendant's plane.

19  Q.  Okay.

20          With the exception of the one plane we looked at, all

21  of these are just stock, generic photos?

22  A.  I believe so.

23  Q.  Okay. thank you very much, sir.  If you can take that down?

24          One of the things that you said yesterday is that when

25  you started questioning Mr. Campo Flores he stated to you,

GB85flo1                        Gonzalez - cross

1    unequivocally, initially, that he did not know that the drugs
2    were going to the United States, right?
3    A.    That wasn't the first thing he said.
4    Q.    Right, but I'm saying during the course of the initial part
5    of your debriefing with him, that was what he said to you,
6    right?
7    A.    Yes.
8    Q.    And then, after that, you began pressing on him with pieces
9    of evidence that you believe implicated him, right?
10    A.    I didn't press him.  I just reminded him that there were
11    videos.
12    Q.    And let me ask you, Agent Gonzalez, during your
13    interrogations you are not always using just a calm voice,
14    right?
15    A.    Yes, I am.
16    Q.    At all times you used a calm voice?
17    A.    Yes, sir.
18    Q.    You never raise your voice with any of the suspects that
19    you are interviewing?
20    A.    No, sir.  I don't feel yelling makes any difference.
21    Q.    Right.
22            Certainly you are aware that some agents that you work
23    with do amplify their volume in communications with suspects,
24    right?
25    A.    It's possible.

GB85flo1                        Gonzalez – cross

1  Q.  You have seen that before?

2  A.  At times, yes.

3  Q.  Right.

4          There are different techniques that are utilized in

5  order to try to coax information out of a potential suspect,

6  right?

7  A.  I wouldn't call them techniques, I would just call them

8  people's demeanor.

9  Q.  Well, you train on the techniques that are used for

10  interrogation at Quantico, don't you?

11  A.  I wouldn't say we train on techniques.  We are just taught

12  to interview people.

13  Q.  Wait a minute.  You have been trained on how to interview

14  people, right?

15  A.  I have been trained on reading them the Miranda warnings

16  and then asking them questions.

17  Q.  And so you are saying at no point have you received

18  training that relates to attempting to get people to give you

19  answers to questions that you want answers to, in

20  investigations?

21  A.  I don't recall so, no.

22  Q.  Okay.

23          Now, one of the other things that you said

24  Mr. Campo Flores said is that after you reminded him that there

25  were recordings, he said that he did not emphasize that, right?

GB85flo1                          Gonzalez – cross

1  A.  Yes.

2  Q.  Okay.

3      And the way that you recorded this was you have him

4  saying I did not emphasize that, right?

5  A.  Yes.

6  Q.  But you are not a hundred percent sure, as you sit here

7  today, whether it was I did not emphasize that or he did not

8  emphasize that, right?

9  A.  No, I'm sure he said that.

10 Q.  Well, let's go back to how your notes were created because

11 you had the pen in your hand, right?

12 A.  Yes.

13 Q.  And you are writing stuff out as he is speaking to you --

14 A.  Yes.

15 Q.  -- right?

16     And you have the phone in your hand at one point,

17 right?

18 A.  Briefly, yes.

19 Q.  So you are listening to this conversation and you are

20 taking notes but not taking notes of everything, right?

21 A.  No.

22 Q.  There is quite a bit that you don't write down?

23 A.  I wouldn't say that.

24 Q.  Okay.

25     You wouldn't be able to say, though, that you wrote

GB85flo1                      Gonzalez – cross

1    the majority of things that were said down, would you?

2    A.  I wrote with the majority of the pertinent facts, yes.

3    Q.  The majority of the facts that you found pertinent, right?

4    A.  Yes.

5    Q.  You can't say that you wrote down the majority of

6    everything that was said, right?

7    A.  Correct.

8    Q.  Now, at what point in the conversation, precisely, was it

9    when you brought up the fact that he could be potentially

10   facing life in prison?

11   A.  I never said he was going to face life in prison.

12   Q.  Okay.

13          At what point in the conversation was it that you

14   brought up the penalty that he was going to be facing?

15   A.  When he asked me.

16   Q.  When in the conversation was that?

17   A.  I believe that was towards the middle or end of the

18   conversation.

19   Q.  How far into the conversation, timewise, was that?

20   A.  I don't know, sir.

21   Q.  You have no idea?

22   A.  No, sir.

23   Q.  Okay.

24          Now, one of the other things that you talked about

25   yesterday is the fact that Mr. Campo Flores said he didn't even

GB85flo1                         Gonzalez - cross

1    know Gocho's ream name, right?

2    A.   Yes.

3    Q.   He told you that he barely knew this individual, right?

4    A.   He said he met him five times, I believe.

5    Q.   Right; he said he had met him only a short time ago, right?

6    A.   Yes.

7    Q.   And you also -- he told you that he did not have the drugs,

8    right?

9    A.   At the time, that's what he said.

10   Q.   Well, he told you that he did not have the drugs, right, at

11   any time.

12   A.   He said he did not have the 800 kilos, yes.

13   Q.   Right; and that he never possessed the 800 kilos, right?

14   A.   Correct.

15   Q.   There is also a point where you asked about the fact -- you

16   record the statement where he said to you, allegedly, you know,

17   what if someone went down a path to commit a crime but repented

18   before committing the crime, right?  Do you remember that part

19   of the question?

20   A.   Yes, sir.

21   Q.   And you offered your interpretation that you understood

22   this to be referring to the cocaine transaction, right?

23   A.   Yes, sir.

24   Q.   And the fact of the matter is this was not just an isolated

25   question out of nowhere, right?

GB85flo1                          Gonzalez – cross

1   A.  Yes, it was.

2   Q.  Well, this was part of a long conversation that you were

3   having, right?

4   A.  That was actually one of the first things he said.

5   Q.  Okay.  And you didn't write down all of the conversation

6   that related to that specific statement for us to analyze now,

7   right?

8   A.  That was pretty short and straightforward.  He was trying

9   to ascertain if we actually had evidence before talking.

10  Q.  Sir, that's your opinion of what he was doing, right?

11  A.  Yes.

12  Q.  Now, as he was talking about this you had a whole

13  conversation with him related to this that you did not write

14  down, correct?

15  A.  Related to what, sir?

16  Q.  Related to the idea of going down the path and not

17  committing the crime, right?

18  A.  No.  Like I said, that was just one question that he asked

19  me.

20  Q.  Sir, it is a fact, isn't it, that Mr. Campo Flores told you

21  that they intended to keep the money and not deliver the drugs,

22  correct?

23  A.  No, sir.

24  Q.  You told him in response that you were not -- that there

25  would be -- that that was not believable by you, right?

GB85flo1                        Gonzalez - cross

1           MR. BOVE:  I object, Judge.

2           THE COURT:  Overruled.

3   A.  Can you please repeat your question?

4   Q.  When he said that, you told him in response that you didn't

5   believe that, right?

6   A.  No, sir, he did not say that and I did not respond to that.

7   Q.  There is no way for us to be able to verify for sure

8   because you chose not to record it, right?

9   A.  He did not say that.

10  Q.  Right, but we don't have any actual record of what the

11  nature of that conversation was, right?

12  A.  Other than my notes.

13  Q.  Right, just your notes.

14  A.  Yes, sir; and the report I wrote afterwards.

15  Q.  Right.  The report that you wrote a week later?

16  A.  I don't remember exactly how many days.

17  Q.  There are things, sir, that you even consider important

18  that you didn't actually put in your notes, right?

19  A.  I'm not sure what you mean, sir.

20          MR. JACKSON:  Well, may I have one moment, your Honor?

21          THE COURT:  Yes, you may.

22          (Counsel conferring)

23  Q.  One of the things that you talked about on direct

24  examination is this idea that Mr. Campo Flores said to you that

25  he was interested in cooperating and had information about

GB85flo1                        Gonzalez - cross

1    money laundering?

2    A.  Yes, sir.

3    Q.  And you thought that was an important fact, right?

4    A.  It was incomplete.

5    Q.  It was important enough for you to want to talk about on

6    the stand, right?

7    A.  Yes.

8    Q.  That doesn't appear anywhere in your contemporaneous notes,

9    does it?

10   A.  No, it does not.

11   Q.  So you are telling me that one of the main goals of this

12   flight was to try to get cooperation and when he actually

13   mentioned cooperation and money laundering, you didn't write it

14   down?

15   A.  He didn't provide any specific details for --

16   Q.  Right, that's not my question.

17          You didn't write it down, right?

18   A.  I don't recall if it is in my notes or not.

19   Q.  You don't recall?

20   A.  No, sir.

21   Q.  Let me show you something that's been marked --

22          Your Honor, may I approach?

23          THE COURT:  Yes.

24   Q.  I am giving you a document which has been admitted in

25   evidence as Government Exhibit 2000.  Do you recognize that

GB85flo1                        Gonzalez - cross

1    document, sir?

2    A.   Yes, I do.

3    Q.   What is that document?

4    A.   Those are my notes.

5    Q.   I would like to ask you to take a look through that and

6    tell me if it refreshes your recollection as to whether you

7    wrote down the conversation that you allege happened about the

8    offer to cooperate, about money laundering, and winking and

9    smiling at you.

10   A.   Yes, it does, sir.

11   Q.   Where is it?

12   A.   It is not here.

13   Q.   It refreshes your recollection?

14        I'm sorry.  When you said, yes, it does, you meant it

15   refreshes your recollection?

16   A.   Yes.  That was your first question.

17   Q.   Okay.  Thank you very much, Special Agent.

18        And now that your recollection is refreshed, nowhere

19   in your notes do you make any reference to that, do you?

20   A.   No, sir.

21   Q.   It is also not in your DEA-6 report that he you wrote a

22   week later, is it?

23   A.   I don't believe so.

24   Q.   So, even a week after the offer of cooperation you still

25   hadn't put it anywhere to be placed into your DEA-6 report,

GB85flo1                        Gonzalez – cross

```
 1  right?
 2  A.  No, sir.
 3  Q.  You know how to write down a wink, right?
 4  A.  Yes, sir.
 5  Q.  I mean, we saw the winky face that you put into the
 6  conversation about the -- with CS-1 about the expenses, winky
 7  face; right?
 8  A.  Yes, sir.
 9  Q.  So this would have been something that would have been easy
10  for you to record, correct?
11  A.  Yes.
12  Q.  And you didn't record it anywhere?
13  A.  No, I did not.
14  Q.  So, even information that you consider important somehow
15  didn't make it into the notes of the conversation that you
16  allegedly had with Mr. Campo Flores?
17  A.  No, sir.
18  Q.  And let me ask you, how long after was it that my client
19  was crying on the plane that he ended up winking and smiling at
20  you?  How long in minutes?
21  A.  I don't remember when he was crying but the winking and the
22  nodding was towards the end.
23  Q.  Okay.  You agreed though, yesterday, there was a point at
24  which he was crying, right?
25  A.  Yes.
```

GB85flo1                         Gonzalez - cross

1    Q.  And so you just don't know at this point how long it went

2    from when the point that he was in tears on the plane to the

3    point that he was winking and smiling at you and offering

4    cooperation?

5    A.  I believe yesterday I said he was crying after we arrived

6    in New York and he was making the phone call.

7    Q.  Oh, so it was during the exact same time period that he was

8    making -- that he was crying, during that same time period is

9    when he was winking at you and smiling?

10   A.  No, sir.

11   Q.  Okay.

12          So, sir, it is a fact, isn't it, that he was also

13   crying on the airplane, right?

14   A.  I don't remember that, sir.

15   Q.  And other agents have informed you of that though, right?

16   A.  No, sir, they have not.

17   Q.  Now, there was a photo that you showed us that we looked

18   at, Government Exhibit 60, right, and this is your favorite

19   photo, the photo where he is holding the brick of the

20   unidentified substance?

21   A.  I don't recall the exact exhibit number.

22   Q.  Okay.

23          Now, you do remember the photo though, right?

24   A.  Yes, sir.

25   Q.  And it is a photo that you said you called up on your phone

1    before you asked him a question about it, right?

2    A.  Yes, sir.

3    Q.  And after you called it up you asked him, according to you,

4    what he was holding in the picture, right?

5    A.  Yes, I did.

6    Q.  He did not say that that was cocaine, did he?

7    A.  No, he did not.

8    Q.  He said, *you know what that is*, according to you, right?

9    A.  Yes, sir.

10   Q.  Which, at that point, Agent Gonzalez, he had just learned

11   that you had orchestrated an entire sting investigation, right?

12   A.  I don't think so.

13   Q.  Well, you hadn't revealed the fact that he had been

14   involved in a sting investigation at that point?

15   A.  I didn't say he was involved in a sting operation, no.

16   Q.  Okay.

17          You told him that there were undercover recordings,

18   right?

19   A.  He asked me if we had recordings and I showed him that.

20   Q.  So, you essentially revealed the nature of the

21   investigation though, right?

22   A.  I just showed him a picture.

23   Q.  Before that you had revealed the essential nature of the

24   investigation, right?

25   A.  I told him that he had attended meetings and that we knew

GB85flo1                        Gonzalez - cross

1    about that, yes.

2    Q.  And so, your interpretation of what that statement meant is

3    not what was actually said, right?

4    A.  Correct.

5    Q.  By the way, you didn't record the actual words that he

6    said, right?

7    A.  No, sir.

8    Q.  I think --

9    A.  I wrote them down.

10   Q.  You wrote down the actual words that he said?

11   A.  Yes, sir.

12   Q.  Where did you write down the actual words that he said?

13   A.  Right here on the second page.

14   Q.  Okay.  Can we call up that exhibit?  What exhibit are you

15   holding?

16   A.  It is the one you just gave me.

17           MR. QUIGLEY:  2000.

18           THE COURT:  2000.

19   Q.  2000.  Thank you, your Honor.

20           Can you call up Government Exhibit 2000, please?

21   Thank you, Mr. Calabrese.

22           Let's go to, you said page 3?

23   A.  No, I think it was the second page.

24   Q.  Let's go to page 2 and let's zoom in on page 2.

25           Why don't you point us to where you wrote down the

GB85flo1                        Gonzalez - cross

1  words that he actually said.

2  A.  I believe it is the second to last paragraph.  It says:

3  Showed him pic with kilo.  It is me, period.

4  Q.  Uh-huh.

5          And then what else?

6  A.  What is it you are holding?  You know what it is.

7  Q.  Okay.

8          Sir, my client doesn't speak English, does he?

9  A.  Not fluently.

10  Q.  Does he speak -- was he speaking English to you on the

11  flight?

12  A.  No, he was not.

13  Q.  So you did not write down the actual words that he said,

14  did you?

15  A.  In Spanish?

16  Q.  The actual words that he said, sir.

17  A.  No, I did not write the Spanish words.

18  Q.  Okay.  Can we go to the next page of this?

19          There is something here before *I didn't emphasize it*

20  that you wrote that you scratched out.  Do you see that?

21  A.  Yes.

22  Q.  What did you scratch out?

23  A.  I don't remember.

24  Q.  You have no recollection at this point of what it was you

25  scratched out right before *I didn't emphasize it*?

GB85flo1                         Gonzalez – cross

1    A.  No, sir.

2    Q.  Sir, you have gone back and looked at your notes, haven't

3    you, in preparation for your testimony?

4    A.  Yes, sir.

5    Q.  And the prosecutors in the 25 hours of preparation that you

6    have done for this have gone over certain aspects of your notes

7    with you, right?

8    A.  Yes, sir.

9    Q.  And this is the only record that you created of the

10   supposed conversation that you had with Mr. Campo Flores,

11   right?

12   A.  No.  I wrote a report also.

13   Q.  Right; you wrote the report based on this a week later,

14   right?

15   A.  Yes.

16   Q.  So this is the only thing that you can even point to which

17   is a halfway contemporaneous record, right?

18   A.  Yes, sir.

19   Q.  And you didn't endeavor to try to figure out what I

20   scratched out here, the words you scratched out before he

21   supposedly said *I didn't emphasize it*?

22   A.  No, sir.

23   Q.  Okay.

24           Do you have a guess as to what you wrote?

25   A.  No, sir.

GB85flo1                         Gonzalez - cross

1              MR. BOVE:  Objection.

2              THE COURT:  Sustained.  Strike the answer.

3    BY MR. JACKSON:

4    Q.  Can we take that down Mr. Calabrese?

5              Thank you, your Honor.

6              Now, I want to ask you about a different subject.  It

7    is a fact, Agent Gonzalez, that during the course of your

8    working this investigation you lost control of the informants,

9    right?

10   A.  No, sir.

11   Q.  It is a fact that in terms of DEA best practices with

12   regard to informants, you did not follow them, correct?

13   A.  Not necessarily.

14   Q.  What do you mean not necessarily?

15   A.  What do you mean by best practices?

16   Q.  Well, it is a simple yes or no question.  In your view did

17   you follow DEA best practices when it came to your management

18   of the informants?

19   A.  Yes; to the best of my abilities I did.

20   Q.  You believe that you filed DEA best practices?

21   A.  Yes, sir.

22   Q.  Okay.

23             Now, you are aware, are you not, that the Office of

24   the Inspector General of the Department of Justice has

25   addressed --

GB85flo1                        Gonzalez – cross

1              MR. BOVE:  Objection.

2              MR. JACKSON:  Let me finish my question –– has

3     addressed problems with the confidential source program at the

4     DEA, right?

5              MR. BOVE:  Objection.

6              THE COURT:  Sustained.

7     BY MR. JACKSON:

8     Q.  Let's talk about something different.  It is a fact, isn't

9     it, sir, that one of the things ––

10             Just one moment, Judge?  (pause)

11             One of the things that is required of you by the DEA

12    manual is that all significant contacts with the informant and

13    all information obtained by these contacts will be documented

14    in writing, correct?

15    A.  Yes.

16    Q.  That's not something that you did consistently throughout

17    this investigation, is it?

18    A.  Actually, I believe when they're providing ––

19    Q.  Sir, it is a yes or no question.

20    A.  Can you repeat your question?

21    Q.  The DEA manual, you admitted, requires you to have all

22    significant contacts with an informant and all information

23    obtained at these contacts documented in writing, right?

24    A.  Yes.

25    Q.  That is not something that you did consistently throughout

GB85flo1                         Gonzalez - cross

1  this investigation?  Yes or no.

2  A.  I believe I did.

3  Q.  You did.

4  A.  I believe so.

5  Q.  Now, there is also a requirement in the DEA manual that

6  agent and informant contacts will be of a strictly professional

7  nature, correct?

8  A.  No, sir.

9  Q.  That's not anywhere in the DEA manual?

10  A.  No, sir.

11  Q.  You don't believe it exists anywhere in the DEA manual?

12  A.  No, sir.

13  Q.  There is a requirement in the DEA manual -- we will come

14  back to that.

15         There is a requirement in the DEA manual, isn't it,

16  that informants are supposed to be explicitly debriefed by two

17  agents, right?

18  A.  Unless there is an exceptional circumstance in which case

19  the telephonic interview is approved.

20  Q.  Right; in the normal course you are supposed to debrief an

21  agent and create a formal report of two agents, right?

22  A.  Yes.

23  Q.  And that's not something that you ever did in this

24  investigation with regard to any of the informants you used,

25  right?

GB85flo1                              Gonzalez - cross

1    A.   I believe a report was generated after the November 1st or

2    November 2nd interview.

3    Q.   You never debriefed any of these informants with two agents

4    or created a formal report on that basis, right?

5    A.   CS-1 and CS-2 were debriefed by two agents.

6    Q.   After the conclusion -- after the arrest of the defendant,

7    right?

8    A.   No, sir.  I believe it was after the first trip to Caracas.

9    Q.   Okay.  When was that?

10   A.   I believe it was November 1st or November 2nd.

11   Q.   Okay.

12          So, just going back to the requirement to maintain

13   professional contacts with the informants, I mean one of the

14   things that you talked about during your -- you say that you

15   don't understand that to be part of the DEA manual, right?

16   A.   Correct.  The manual talks about romantic relationships,

17   business relationships.  Things of that nature.

18   Q.   Okay.

19          Regardless -- we will come back to the manual in a

20   moment -- regardless of that, it is your understanding that you

21   are supposed to maintain professional contact with DEA sources,

22   right?

23   A.   Sure.

24   Q.   And that's not something that you did at all times during

25   the course of this investigation, is it?

GB85flo1                    Gonzalez - cross

1    A.  I think so.

2    Q.  Well, there is a conversation that you had with Jose, Sr.

3    on October 22nd of last year where Jose, Sr., the informant,

4    long term informant that you had been using, says to you that

5    he is gay, that El Sentado can suck his dick, right?

6              MR. BOVE:  Judge, this is not in evidence.  This is

7    not a document in evidence.

8              THE COURT:  Do you have an objection?

9              MR. BOVE:  Yes.

10             THE COURT:  Overruled.

11             THE WITNESS:  I don't recall who he was talking about.

12   Yes, he was vulgar and he did speak like that very often.

13   BY MR. JACKSON:

14   Q.  You remember that specific conversation, right?

15   A.  I don't remember that specific one but I know he did say

16   those things, yes.

17   Q.  Well, I'm going to show you a document that is marked as

18   D 1009 and I just want to ask you if it refreshes your

19   recollection.

20             THE COURT:  What is this supposed to refresh his

21   recollection on, Mr. Jackson?

22             MR. JACKSON:  As to whether that specific conversation

23   was held on October 21st of last year.

24   Q.  Does that refresh your recollection, Agent?

25   A.  This is just an excerpt taken.  I'm not sure where it came

GB85flo1                    Gonzalez - cross

1    from.

2    Q.  So it does not refresh your recollection?

3    A.  That's how he spoke.  I am not going to deny he was vulgar

4    but I'm not sure where you got that small excerpt from.

5    Q.  It is a simple -- that's a no, it does not refresh your

6    recollection about that?

7    A.  No, it does not.

8    Q.  Okay.

9            There is another conversation in June where you said

10   to -- you said to Jose, Sr., ha ha, listen, don't become a

11   faggot.

12           Do you remember saying that?

13   A.  No, I do not.

14   Q.  I want to show you another document and ask you if it

15   refreshes your recollection.  And this is D 1000-10.

16   A.  Yes.

17   Q.  That does refresh your recollection?

18   A.  Yes.

19   Q.  That's what you said to him in a private chat that you were

20   having with him, right?

21   A.  Yes.  He had sent me a emoticon --

22   Q.  Sir, that's sufficient.

23   A.  Okay.

24   Q.  Now, there is also a conversation that you had during this

25   investigation while the informant was in Haiti where you

GB85flo1                         Gonzalez - cross

1   laughed after he said to you that he needed to shower because

2   he smelled like a Haitian.

3           Do you remember that?

4   A.  No, I don't.

5   Q.  Let me show you another document marked as D 1000-11 and I

6   am going to ask you if that refreshes your recollection.  Does

7   that refresh your recollection, Special Agent?

8   A.  Yes, it does.

9   Q.  That's what happened, right?

10  A.  Yes, he did say that.

11  Q.  And you laughed after that, right?

12  A.  Yes.

13  Q.  Now, there is another conversation during the investigation

14  where the informant said that he wanted to sexually assault the

15  mother of one of the defendants and made a derogatory reference

16  to her vagina; and you responded:  Yes.

17          Do you remember that?

18  A.  No, I do not.

19  Q.  I want to show you another document which is marked as

20  D 1000-12 and I am going to ask you if that refreshes your

21  recollection.

22  A.  Yes.

23  Q.  That's what the conversation was, right?

24  A.  It was not about -- I was not saying yes to that.

25  Q.  You are saying, yes, it refreshes your recollection about

GB85flo1                          Gonzalez – cross

1    the conversation?

2    A.   Yes.

3    Q.   And what he said there, he made a reference to sexual

4    assault, right?

5    A.   I don't know about assault.

6    Q.   Okay.

7              MR. BOVE:  Objection, Judge.

8              THE COURT:  Sustained.

9              I think you better move on to another topic,

10   Mr. Jackson.

11             MR. JACKSON:  Absolutely, your Honor.

12   BY MR. JACKSON:

13   Q.   Let me just ask you, and this is related but it is

14   different; there was a point in this investigation where there

15   was a supposed test flight that was going to occur.

16             Do you remember that?

17   A.   Yes, sir.

18   Q.   And the test flight, which had no cocaine in it at all,

19   right?

20   A.   I don't believe so.

21   Q.   There was no cocaine involved in the test flight, right?

22   A.   Correct.

23   Q.   And the pilots that were secured for this supposed test

24   flight were such great narco pilots that they were afraid to

25   get off of the plane, right?

GB85flo1                        Gonzalez - cross

1   A.   You are talking about two different things, sir.

2   Q.   Okay.

3           Well, there was a situation, right, where the pilots,

4   in November, November 5th, were afraid to get off of the plane,

5   right?

6   A.   No.  They were afraid to leave the airport for a meeting.

7   Q.   I see.  They were afraid to leave the airport, right?

8   A.   Yes.

9   Q.   Again, there was no cocaine, right?

10  A.   Nope.

11  Q.   But they were just afraid to leave the airport, period?

12  A.   I believe so.

13  Q.   And this is one of the incidents where you came to the

14  understanding that the defendants clearly did not have any sort

15  of sophisticated narco operation, right?

16  A.   No.

17  Q.   You came to the understanding that they couldn't even get

18  pilots who were able to -- who were not afraid to walk through

19  the airport with no drugs, right?

20  A.   Can you repeat your question, please?

21  Q.   Sure.

22          This is one of the points where you came to the

23  realization the defendants couldn't even secure pilots who

24  weren't afraid to walk through the airport with no drugs?

25          MR. BOVE:  Objection.  Relevance.

GB85flo1                        Gonzalez - cross

1          THE COURT:  Sustained.  Yes, sustained.

2   Q.  Now --

3          THE COURT:  Sustained.

4          MR. JACKSON:  Absolutely, your Honor.  Moving on.

5   Q.  You had a conversation about these pilots with CS-1, right?

6   A.  I believe so.

7   Q.  And the comment that you made to him was that those drivers

8   are faggots, what did they think they were going there for.

9   Right?

10         THE COURT:  Sustained.

11  Q.  Sir, it was your testimony on direct that all of this

12  language was just your attempt to get into the head of CS-1,

13  right?

14  A.  No, not to get in his head.  I just spoke his language.

15  Q.  You were just speaking his language?

16  A.  Yes, sir.

17  Q.  But that's not your language is your testimony, right?

18  A.  No, sir.

19  Q.  Is there any communication anywhere where you said to

20  another agent, I'm really bothered by the nature of the way

21  CS-1 communicates but I'm forced to communicate with him in

22  this way?

23         MR. BOVE:  Objection.

24         THE COURT:  Sustained.

25  Q.  Now, one of the other things that you said on direct

GB85flo1                          Gonzalez - cross

1    examination was the prosecutor asked you why did you end the

2    investigation when you did, right?

3    A.  What do you mean by end the investigation?

4    Q.  Well, the specific question that was put to you was why did

5    you plan an arrest at that point in the investigation.

6           That's the question you recall, right?

7    A.  Okay.

8    Q.  And you explained to him that all investigations have a

9    natural end state, right?

10   A.  Yes, sir.

11   Q.  In fact, there was nothing natural about the end of this

12   investigation, right?

13   A.  Yes, there was.

14   Q.  Well, you were the one that orchestrated the meet in Haiti,

15   right?

16   A.  I was one of the individuals, yes.

17   Q.  Right; that was your plan, correct?

18   A.  It was a joint plan.

19   Q.  A joint plan with other DEA agents and the confidential

20   sources you were working with, right?

21   A.  They had no choice on Haiti.

22   Q.  Well, the defendants didn't come up with Haiti, right?

23   A.  No.  Neither did the CS.

24   Q.  Okay.  So DEA came up with Haiti?

25   A.  Yes, sir.

GB85flo1                        Gonzalez - cross

1    Q.  Right.

2               And you chose, at that point, to tell the defendants

3    that they could collect tens of millions of dollars in cash if

4    they came to Haiti, right?

5    A.  I did not, no.

6    Q.  Well, that was the manual, right?

7    A.  Yes.

8    Q.  Now, it's a fact, isn't it, that at the beginning of the

9    investigation there was a completely different plan, right?

10              MR. BOVE:  Objection.

11              THE COURT:  Sustained.

12   Q.  At the beginning of your dealings with CS-1, the

13   communications that you had, what you instructed him to attempt

14   to set up was something very different from what ended up,

15   right?

16              MR. BOVE:  Objection.

17              THE COURT:  Sustained.

18   Q.  You also said in your direct testimony, and I am quoting:

19   If the operation had gone a different way and there had been a

20   seizure, then the defendants at that point, like in most

21   investigations, would have started suspecting their partners.

22              Right?

23   A.  Yes, I said that.

24   Q.  And that's because in most investigations there is a

25   seizure, right?

GB85flo1                      Gonzalez - cross

1    A.  There are all kinds of investigations.  Some are with

2    seizure, some do not have seizures.

3    Q.  Right.

4          And there are -- when you said, like most

5    investigations, right, you are referring to most

6    investigations?

7          MR. BOVE:  Objection.

8          THE COURT:  Overruled.

9    A.  Yes.

10   Q.  Okay.

11         Now, I want to ask you about on October 16th, in the

12   middle of the investigation, you had a conversation with CS-1

13   about the specific nature of what was going to be orchestrated

14   in the sting, right?

15   A.  I'm not sure.

16   Q.  Okay.  What you said to him at that point was:  Let's see

17   what they propose because if they send the merchandise without

18   us putting up the money, they're screwed.

19         Right?

20         MR. BOVE:  Objection.

21         THE COURT:  Overruled.

22   A.  I believe I said that.

23   Q.  Right.

24         And what you meant by that was that if they were

25   willing to send you drugs without them actually giving money

GB85flo1                         Gonzalez – cross

1    for it, that would be airtight proof in the investigation,

2    right?

3    A.  Not necessarily airtight proof but a good event, yes.

4    Q.  Right.

5          That's what you meant when you said they're screwed,

6    right?

7    A.  Meant what?

8    Q.  That it would be very important, very good evidence, right?

9    A.  Yes, sir.

10   Q.  And that was your hope at that point, that you could have

11   them send merchandise without putting up the money, right?

12   A.  Yes.

13   Q.  And there was a number of discussions that you had with

14   CW 1 and CS-1 about setting it up so the defendants would send

15   merchandise with the promise that they would get payment for it

16   several days later, right?

17   A.  I don't remember having multiple discussions about that

18   with both of them.

19   Q.  You remember having at least one discussion like that,

20   right?

21   A.  With CS-1, yes.

22   Q.  Right.

23          And that never came into fruition, right?

24   A.  No, it did not.

25   Q.  What ended up happening was that you discovered that there

GB85flo1                         Gonzalez – cross

1    was absolutely no way that they were going to be able to

2    procure any drugs, right?

3    A.  No, sir.

4    Q.  You discovered that they certainly weren't going to be able

5    to procure drugs without you putting up any money, right?

6    A.  They were requesting payment in advance, yes.

7    Q.  Sir, in your career, investigating real drug deals, you

8    have never heard of a real drug deal where someone put up $20

9    million in cash in advance, have you?

10   A.  $20 million?  I don't recall.  No.

11                 (Continued on next page)

GB89GLO2                    Gonzalez – cross

1    Q.  Right.  You've never heard of a real drug deal where

2    somebody put up a million dollars cash in advance, have you?

3    A.  Yes, I have.

4    Q.  You've investigated that kind of drug deal?

5    A.  You asked me if I heard of them, and I have heard of them.

6    Q.  Here's my question:  Have you actually seen evidence of any

7    drug deal of that type?

8    A.  I have not conducted those investigations but I've read

9    reports where that has happened, yes.

10   Q.  Let me know the name of one case where you're aware of

11   where that happened.

12           THE COURT:  Sustained.  It's not a memory test.

13           MR. JACKSON:  It's not a memory test, your Honor.

14           THE COURT:  What's the next question.

15   Q.  The next question is:  You have not worked on any

16   investigations where that happened, with real drug traffickers?

17           MR. BOVE:  Objection.

18           THE COURT:  Sustained.

19   Q.  Now, one of the other things that happened in this

20   investigation that has never happened in any other

21   investigation that you've worked on, correct, is that the

22   defendant, Mr. Campo Flores, in the middle of his negotiations

23   with CS-1 about this supposedly sensitive drug deal asked CS-1

24   if CS-1 could get ahold of some baby tigers or baby lions,

25   right?

GB89GLO2                          Gonzalez - cross

1    A.  Have I ever heard of that?

2    Q.  That's something that occurred in this investigation,

3    right?

4                MR. BOVE:  Objection.  Hearsay.

5                THE COURT:  Overruled.

6                THE WITNESS:  I don't understand your question.  It

7    was kind of long.

8    Q.  My question is -- I will try to shorten it for you.

9                My question is you recall that in the communications

10   in this investigation Mr. Campo Flores communicated to CS-1:

11   Can you get a hold of some tiger or lion cubs for me, right?

12   A.  Yes.

13   Q.  And he actually asked CS-1:  I'd really love to get a

14   leopard's cub; it would be nice; I might be giving you a call

15   sometime to see if you can get one for me?

16               MR. BOVE:  Objection.  Relevance.

17               THE COURT:  Sustained.

18   Q.  Well, you remember the conversations about asking for the

19   baby cats, right?

20               MR. BOVE:  Objection.

21               THE COURT:  Sustained.

22               MR. JACKSON:  Your Honor, can I have just a bit of

23   leeway for two questions.

24               THE COURT:  No.  Go on to something else.  We're not

25   talking about lions and tigers here.

1              MR. JACKSON:  All right.  I have one more question,

2      your Honor, I'll pose it.  If they want to object, your Honor

3      can rule.

4              THE COURT:  Okay.

5      Q.  My question is:  In any real investigation of drug

6      trafficking have you ever heard of a person asking another

7      target if they could secure baby lion and tiger cubs for them?

8              THE COURT:  Sustained.

9      Q.  Now, the conversations that we talked about earlier that

10     you testified that you didn't recall are part of a long chat

11     that you produced, right, of your communications, your written

12     communications with CS-1, right?

13     A.  I know I produced a long chat of CS-1, yes.

14     Q.  Right.  And you didn't just produce it, right?  You

15     actually went through it and took notes in it on; what was

16     accurate and what was not accurate, right?

17     A.  About accuracy, no.  I remember jotting some notes down but

18     not about accuracy, I don't believe.

19     Q.  And there is one point in this conversation in the middle

20     of this investigation where you specifically directed CS-1 to,

21     quote, confuse them, referring to the defendants, right?

22     A.  No.  I don't remember that part.

23     Q.  You don't remember saying "confuse them"?

24     A.  No, sir.

25     Q.  Do you remember scratching "confuse them" out when you went

GB89GLO2                        Gonzalez - cross

1   and reviewed the notes?

2   A.   No, sir.

3   Q.   I want to show you something which has been marked as

4   3508-45.

5           This is 3508-43 at page 23.  I want to direct your

6   attention to it and ask you if it refreshes your recollection.

7   A.   Yes, sir.

8   Q.   So that is something that you wrote down, right?  That's

9   something that you directed CS-1, you wrote, "confuse them,"

10  right?

11  A.   No.  I wrote the word in Spanish.  That's not how I would

12  have translated it.

13  Q.   The word you wrote was enredados, right?

14  A.   Close, yeah.

15  Q.   And the translation that the government translator had of

16  that was confuse them, right?

17  A.   That's how they translated it, yes.

18  Q.   And you scratched that out?

19  A.   Yes.

20  Q.   Because you don't believe that that's the correct

21  translation of that?

22  A.   That's because that's not what I meant.

23  Q.   But that is an accurate translation of that phrase, right?

24  A.   That is one of the translations, yes.

25  Q.   And so it's your testimony that you were not directing the

GB89GLO2                        Gonzalez - cross

1   informants to try to confuse Mr. Campo Flores and

2   Mr. Flores de Freitas, right?

3   A.  No, I was not.

4           MR. JACKSON:  Your Honor, may I retrieve that book?

5           THE COURT:  Yes, you may.

6   Q.  Now, sir, this whole -- beyond putting aside the confused

7   discussion, there are other points in the investigation where

8   you refer to your intent to knowledge-up certain people, right?

9   A.  Yes.

10  Q.  And in one communication with your partners at the DEA when

11  you were talking about the people who were going to be flying

12  in, you said to them if two additional guys participate in the

13  meeting then he will knowledge them up and see where they fit

14  in the whole thing so we can all decide if they warrant

15  charges, right?

16  A.  Yes, sir.

17  Q.  And by "knowledge them up," what you meant was say specific

18  things that would trigger them being liable in the United

19  States for drug trafficking, right?

20  A.  No.

21  Q.  Okay.  You also directed CS-1 and CS-2 to knowledge up the

22  defendants at various points, right?

23  A.  I don't know if I used that term.

24  Q.  You're not sure?

25  A.  No.

GB89GLO2                         Gonzalez – cross

1    Q.  It's possible you did?

2    A.  It's possible.  Is it written down somewhere?

3    Q.  That's fine.

4            Now, just going back to all of the -- just focusing on

5    the decision to end the investigation when you decided to end

6    it, okay.  You had received actually in evidence no cocaine at

7    that point, right?

8    A.  Correct.

9    Q.  Now, there were various investigative options available to

10   you that would have potentially allowed you to actually receive

11   cocaine, right?

12   A.  Not at that time there did not seem to be any.

13   Q.  Well, it was your belief at the time that the defendants

14   actually had access to the 800 kilos of cocaine, right?

15   A.  Yes.

16   Q.  And, in fact, they didn't have the 800 kilos of cocaine,

17   right?

18   A.  I don't know that.

19   Q.  You have no evidence that they actually possessed the

20   800 kilos of cocaine at any point, right?

21   A.  Other than their statements.

22   Q.  Well their statement is that they didn't possess it, right?

23   A.  Actually there is evidence where they said they do possess

24   it.

25   Q.  Right.  And in the postarrest statement that you had they

1  said that they did not possess the cocaine, right?

2  A.  Yes.

3  Q.  And you never wired up CS-1 or CS-2 to go to the location

4  and actually see the cocaine, did you?

5  A.  Where?

6  Q.  Wherever the imaginary cocaine might be.

7  A.  They actually were wired up and they actually did see

8  cocaine.

9  Q.  Okay.  Let's -- I want to definitely talk about the brick

10 of powder but let's set that aside for a moment and talk about

11 the 800-kilo grams of cocaine that is the focus of this

12 investigation.

13         None of your CSs actually ever laid eyes on that,

14 right?

15 A.  Correct.

16 Q.  And putting a camera on someone, that's something that is

17 done in your investigations, right?

18 A.  Camera or recording device?  Is that what you're referring

19 to?

20 Q.  Sure.

21 A.  Yes.

22 Q.  That was done in this investigation, right?

23 A.  Yes.

24 Q.  There was nothing that would have prevented you from having

25 CS-1 and CS-2 actually go to the location where the cocaine was

1   supposedly housed, right?

2   A.  That wasn't offered.

3   Q.  There is nothing that would have prevented you from doing

4   that, right?

5   A.  That was not offered for them to go and do, sir.

6   Q.  There is no rule that would have prevented you from having

7   them go to actually see the supposed 800 kilos of cocaine,

8   right?

9   A.  What do you mean by rule?  I don't understand.

10  Q.  Well you made reference a number of times in your direct

11  examination to certain rules that exist, supposedly in

12  Venezuela.  There is no rule with regard to the way that you

13  handle sources that would have prevented you from actually

14  having someone go and put their eyes on the 800 kilos of

15  supposed cocaine, right?

16  A.  I don't believe so.

17  Q.  And, in fact, you could have actually asked the defendants

18  to bring a sample of that cocaine 30, 40 kilograms to Haiti

19  when they flew there for the supposed money pickup, right?

20  A.  No.

21  Q.  There is no way that you could have requested that?

22  A.  That wasn't part of the negotiations.

23  Q.  Right.  That's not my question.  My question is:  Could you

24  have requested that?

25  A.  It wouldn't have made sense.

GB89GLO2                        Gonzalez – cross

1    Q.  My question again:  Could you have requested that, sir?

2    A.  Okay.  I guess we could have requested that.

3    Q.  Right.  You chose not to do that, right?

4    A.  No.  We didn't think to do it because it wasn't an option.

5    Q.  Your counterparts in Haiti would have assisted you if a

6    flight had flown in that actually had cocaine on it, right?

7    A.  Yes.

8    Q.  And in some other investigations DEA SOD actually has

9    obtained a smaller sample like that, right?

10             MR. BOVE:  Objection.

11             THE COURT:  Sustained.

12   Q.  Now, one of the things in terms of -- one of the things

13   that happened relatively in the middle of this investigation is

14   that you had a number of communications from the CSs that

15   indicated the lack of experience and capability of the

16   defendants, right?

17   A.  No.  There were not a number of communications.

18   Q.  Well, there was a communication on October 23, wasn't

19   there, where you said to Jose Senior, a/k/a CS-1, he told

20   Sentado they don't have airplanes, right?

21   A.  On which day are you referring to?

22   Q.  October 23.

23   A.  I believe on October 23 that was the case.

24   Q.  Right.  You said that.  He told Sentado they don't have

25   airplanes, right?

1    A.  Yes.

2    Q.  And CS-1's response was ha, ha, ha, ha, ha, right?

3    A.  I don't remember his response.

4    Q.  Let me show you a document which is marked as D-1000-14 and

5    I want to ask you if that refreshes your recollection.

6    A.  Yes, it does.

7    Q.  And that was the conversation, right?

8    A.  I don't believe his laughing was in reference to the

9    comment about the planes.

10   Q.  I see.  His immediate response after you said that was ha,

11   ha, ha, right?

12   A.  Yes.

13   Q.  Okay.  Now, there was also a point a couple days after that

14   where you asked CS-1:  Do you think this is his first job or

15   does he already do this, in reference to the defendants, right?

16           MR. BOVE:  Objection, relevance.

17           THE COURT:  Sustained.

18   Q.  Well, there was a point in that communication where CS-1

19   communicated to you they're new, right?

20           MR. BOVE:  Same objection.

21           THE COURT:  Sustained.

22           MR. JACKSON:  Your Honor, may I be heard?

23           THE COURT:  No.  Ask the next question.

24   Q.  One of the things that you also said on direct examination,

25   Special Agent Gonzalez, is that it would have been infeasible

1    for the informants to actually obtain a sample of the cocaine

2    in this case, right?

3    A.  Yes.

4    Q.  Now, in other investigations that you've had, informants

5    have obtained samples, right?

6              MR. BOVE:  Objection.

7              THE COURT:  Sustained.

8    Q.  You're aware of the fact that there is no DEA rule that

9    prevents its informants from obtaining a sample?

10             MR. BOVE:  Objection.

11             THE COURT:  Overruled.

12             THE WITNESS:  Can you please repeat the question, sir.

13   Q.  You're aware of the fact that there is no DEA rule which

14   prohibits an informant from obtaining a sample?

15   A.  No.  I'm not aware of any rule.

16   Q.  Right.  And your testimony is that it would have been

17   essentially impossible for them to get a sample in Venezuela,

18   right?

19   A.  I believe so.  That's what I said.

20   Q.  And one of the things that you said is that they could not

21   have coordinated with your Venezuelan counterparts in the DEA,

22   right?

23   A.  With who?

24   Q.  The DEA Venezuela office personnel, right?

25   A.  Correct.

GB89GLO2                         Gonzalez - cross

1    Q.  There are DEA agents in Venezuela, right?

2    A.  Yes.

3    Q.  And they're working on the investigation of drug

4    trafficking crimes, right?

5    A.  They have more of a liaison role over there.

6    Q.  Right.  But they're working on the investigation of drug

7    trafficking crimes?

8    A.  Like I said, they're in a liaison role over there.  They're

9    not conducting investigation, no.

10   Q.  Simple yes-or-no question.  If the answer is no, that's

11   fine.  They work on the investigation of drug trafficking

12   crimes?

13   A.  Not in Venezuela.

14   Q.  Okay.  So it is the case, isn't it, that in Venezuela you

15   have -- that there are several agents who are working there,

16   right?

17            MR. BOVE:  Objection.

18            THE COURT:  Overruled.  He's already testified there's

19   several agents who work there.

20            MR. JACKSON:  That's correct, your Honor.

21            THE COURT:  So.

22            MR. JACKSON:  Just orienting the witness, your Honor.

23            THE WITNESS:  Yes.  There's DEA personnel in Caracas.

24   Q.  Correct me if I'm wrong but by having confidential sources

25   with recording devises operating in Venezuela, you are already

GB89GLO2                         Gonzalez – cross

1    operating outside of what is authorized in Venezuela, right?

2    A.  No, sir.

3    Q.  You're claiming that you had authorization to run an op

4    involving confidential sources in Venezuela from the Venezuelan

5    government?

6    A.  I obtained the necessary approval from the United States

7    government.

8    Q.  Right.  But my question to you is:  Did you obtain any

9    approval from the Venezuelan government?

10             MR. BOVE:  Objection.

11             THE COURT:  Overruled.

12             THE WITNESS:  No.

13   Q.  So, while you said on direct testimony that it would have

14   been –– it would have not –– it would have been authorized for

15   your personnel in Caracas to take possession of illegal

16   narcotics, your CSs were operating outside of authorization

17   from the Venezuelan government anyway, right?

18   A.  I'm not aware that we have to obtain authorization from the

19   Venezuelan government.

20   Q.  Right.  Sir, you are aware that as a general matter, as a

21   general matter law enforcement when it runs operations in

22   foreign countries seeks approval from the foreign countries,

23   right?

24   A.  No, sir.  Not necessarily.

25   Q.  Isn't that part of what you testified about on direct in

1    terms of didn't you say that the DEA doesn't have ability to

2    arrest people all over the world?

3    A.  Yes, sir.

4    Q.  And when you went to Haiti you got specific approval from

5    the Haitian government to conduct the arrest operation that you

6    were doing, right?

7    A.  No, we did not seek approval for us to conduct the arrest

8    operation.

9    Q.  You didn't get authorization from the Haitian government in

10   that operation that you set up with BLTS?

11   A.  No.  They did that operation.

12   Q.  I see.  But you coordinated with them so that they would

13   actually do the operation because you couldn't do it?

14   A.  Correct.

15   Q.  And the reason that you couldn't do it is because law

16   enforcement as a general matter is operating outside of the

17   authorization in a specific country whenever they are running

18   an operation without the authorization of that country, right?

19   A.  Can you repeat your question, please.

20   Q.  The reason that you did that is because law enforcement,

21   when it's operating in a foreign country, without authorization

22   from that country, is always operating outside of that

23   country's law?

24            MR. BOVE:  Objection.

25            THE COURT:  Overruled.

GB89GLO2                        Gonzalez - cross

1          THE WITNESS:  The reason we did that is because we had

2     to ask them if they would conduct the arrest operation.

3          MR. JACKSON:  I see.

4     BY MR. JACKSON:

5     Q.  Now, one of the things that you didn't know about CS-1 when

6     he went to go pick up -- when he went to go see the supposed

7     kilo of cocaine is that CS-1 was a serious, serious cocaine

8     addict, right?

9     A.  Correct.  I did not know he was a cocaine addict.

10    Q.  He had been a cocaine addict for years, right?

11    A.  I believe so.

12    Q.  For decades?

13    A.  I don't know if it was decades.

14    Q.  You are aware of the fact that he admitted after he was

15    busted that he sometimes used cocaine every single day for

16    periods, right?

17    A.  I believe so.

18    Q.  And this is something that in your dealings with him you

19    never noticed, right?

20    A.  No, sir.

21    Q.  It's a fact that that particular informant has something of

22    a tic where he laughs uncontrollably at different times?

23    A.  I don't know if he has a tic.

24    Q.  Well, it's one of his -- it's one of his habits that he

25    bursts into explosive fits of laughter repeatedly, right?

1          MR. BOVE:  Objection.  Relevance.

2          THE COURT:  Overruled.  Did you notice that?

3          THE WITNESS:  He laughs, yeah.  I don't know what an

4    explosive fit of laughter is.

5    Q.  He has big bursts of laughter constantly in the middle of

6    normal conversations, right?

7          THE COURT:  Sustained.

8    Q.  So, were there any points in your interaction with CS-1

9    where you suspected that he might be using controlled

10   substances?

11   A.  No, sir.

12   Q.  That never occurred to you?

13   A.  No, sir.

14   Q.  If it had occurred to you, you would not have sent him down

15   there on that operation, would you?

16   A.  Probably not.

17   Q.  It's not probably.  It's a no, right?

18   A.  Probably not.  I would not have.

19   Q.  Well you don't ever send someone who is a cocaine addict to

20   go handle potential cocaine evidence, right?

21   A.  I don't believe so, no.

22   Q.  That's not something that the DEA does, right?

23   A.  I don't think so.

24   Q.  And that's not a decision that you would have personally

25   made, right?

1  A.  Which decision, sir?

2  Q.  To send Jose Senior down to Venezuela to handle the

3  supposed drug evidence if you had known he was a cocaine

4  addict?

5  A.  Would I have made the decision?

6  Q.  You would not have done that if you had known that he was a

7  cocaine addict, right?

8  A.  No.

9  Q.  The reason that you would not have done that is because it

10  inherently compromises an investigation in terms of the

11  handling of drugs when a drug addict is the primary handler of

12  the alleged substances, right?

13  A.  I don't know if that's the reason.

14  Q.  You're not sure if it would compromise the integrity of the

15  evidence when a drug addict is handling the evidence?

16  A.  No.  I'm not sure.

17  Q.  What is the reason that you believe that you would not have

18  sent a drug addict to go handle the supposed drug evidence?

19  A.  I just don't think it's a good practice.

20  Q.  Why?

21  A.  When you work for the DEA.  I don't think it's a good

22  practice.

23  Q.  You don't have any belief that the use of a drug addict

24  could compromise an investigation?

25  A.  If the drug addict was not equipped with a concealed

GB89GLO2                    Gonzalez – cross

1    recording device, then probably there is the possibility.

2    Q.  So, where the drug addict is equipped with a controlled --

3    with a recording device, you believe that there is no

4    possibility that it will compromise the investigation?

5    A.  There's always a possibility.

6    Q.  Right.

7    A.  There would be a possibility.

8    Q.  So you would have done it, again, with the controlled --

9    with the recording device you would have, if you could do this

10   over again, you still would have sent the informant down

11   knowing that he was a serious drug addict?

12          MR. BOVE:  Objection.

13          THE COURT:  Sustained.

14   Q.  Now, it is a fact, Agent Gonzalez, that it is impossible to

15   determine what a substance is just by looking at it on a video,

16   right?

17   A.  Looking at it on a video?

18   Q.  Yeah.

19   A.  Technically.

20   Q.  Right?  It's impossible, right?

21   A.  Yes.

22   Q.  And the only substantive evidence of any supposed cocaine

23   that was ever developed in this investigation is the testimony

24   of the drug addict that we were just talking about, right?

25   A.  You're referring to Mr. Santos Peña?

1    Q.  Yes.

2    A.  Yes.

3    Q.  So in terms of the question of whether or not there was

4    ever any actual cocaine that was ever viewed in the course of

5    this investigation, you are entirely depending on the truth

6    telling of the drug addict that we are talking about?

7                MR. BOVE:  Objection, relevance.

8                THE COURT:  Overruled.

9                THE WITNESS:  Yes.

10   Q.  This individual you know has been required, as a result of

11   his fraud of the DEA, to plead guilty to a crime of lying to

12   federal officers that stretches over a four-year period, right?

13   A.  I believe so.

14   Q.  And that four-year period encompasses the month-and-a-half

15   of this investigation, right?

16   A.  I don't know the exact timeframe, but I believe so.

17   Q.  You're certain during that four-year period, the

18   investigation falls within that, aren't you?

19   A.  I'm not sure what the timeframe was listed on the charge.

20   Q.  Sir, have you looked at the charging documents that relate

21   to Mr. Santos Peña?

22               MR. BOVE:  Objection.

23               THE COURT:  Sustained.

24   Q.  Now, by the way, the communications that we went through

25   between you and the informant, when was the last time before

GB89GLO2                         Gonzalez – cross

1   your testimony that you looked at those?

2   A.  All of them?

3   Q.  Any of them.  That you looked at that document.  That set

4   of documents.

5   A.  The big folder that you brought over here, you mean?

6   Q.  Yes.

7   A.  A week, two weeks ago.

8   Q.  So you went through that a week or two ago?

9   A.  I believe so.

10  Q.  And you have no recollection of the stuff that you claim

11  you have no recollection of?

12  A.  Yes, sir.

13  Q.  That stuff just didn't jump off the page?

14          MR. BOVE:  Objection.

15          THE COURT:  Sustained.

16  Q.  Now, one of the other things that you testified on direct

17  examination, you stated that we fully expected the defendants,

18  being who they were, were going to have a security contingent,

19  right?

20  A.  Yes.

21  Q.  And that was based on your understanding that all members

22  of the extended family of the President of Venezuela will have

23  a security contingent, right?

24  A.  I believe so.

25  Q.  Right.  You worked in Venezuela for a while, right?

1    A.  Yes.

2    Q.  That's a fact that you're familiar with?

3    A.  Yes.

4    Q.  And that's what you were referring to, right?

5    A.  I believe so.

6    Q.  And those are government-supplied security, right?

7    A.  I believe so.

8    Q.  Now, you also said that during your time in Venezuela there

9    were many times that you were surveilled by Venezuelan

10   officials?

11   A.  Yes.

12   Q.  Did the Venezuelan officials do surveillance on you like in

13   a marked official car?

14   A.  No.

15   Q.  Did they ever announce to you that they were doing

16   surveillance of you?

17            MR. BOVE:  Objection.

18            THE COURT:  Sustained.

19   Q.  What is your basis for knowing that they did, Venezuelan

20   officials did surveillance of you?

21            MR. BOVE:  Objection.

22            THE COURT:  Sustained.

23   Q.  Now, there were also some questions that were put to you

24   about the devices that were sent to the confidential sources.

25   Do you remember that?

GB89GLO2                      Gonzalez - cross

1    A.  Yes.

2    Q.  And one of the things that you discussed with the

3    prosecutors is the fact that there were limited recording times

4    for some of these devices, right?

5    A.  Yes.

6    Q.  What is the approximate recording time of the devices that

7    would have utilized by CS-1 and CS-2 in this investigation?

8    A.  I'm not sure of the exact amount.

9    Q.  Do you have a rough understanding?

10   A.  No, sir.

11   Q.  Isn't that information that would be important in terms of

12   setting up an operation?

13   A.  It depends on the charge.

14   Q.  You have no idea how long these can record for?

15   A.  It's over an hour, over two hours.  I'm not sure exactly

16   how much.

17   Q.  It's much more than an hour, right?

18          MR. BOVE:  Objection.

19          THE COURT:  Overruled.

20          THE WITNESS:  I believe it's over an hour, yes, sir.

21   Q.  Certain of these devices can record for several hours,

22   right?

23   A.  I believe so.

24   Q.  And I don't want you to get into any technical

25   specifications, but certain of these devices are very small,

1    right?

2    A.  I wouldn't say they are very small, no.

3    Q.  Well they are certainly small enough that you could fit,

4    say, ten of them in a briefcase, right?

5    A.  It's possible.

6    Q.  It's true, right?

7    A.  It's possible, yes.

8    Q.  Well, I mean is it true or is it not true that you could

9    fit ten of certain of these devices in briefcases?

10            THE COURT:  Also depends on the size of the briefcase.

11    So it's possible.

12    Q.  What about a briefcase that's about this big, that's about

13    12 by -- let's call it 14-by-14?

14    A.  It would be highly suspicious for ten of these devices to

15    be in a briefcase, sir.

16    Q.  I'm only trying to get at the size of the devices without

17    asking you the specific details about the devices.

18    A.  It's possible they could fit in a briefcase.

19    Q.  They could fit, right?

20    A.  Yes.

21    Q.  And so there is no reason why you could only send the

22    limited set of devices that you sent, right?

23    A.  No.  There is a reason.

24    Q.  Well DEA doesn't have any budgetary constraints with regard

25    to devices, right, recording devices?

GB89GLO2                    Gonzalez – cross

1   A.  We certainly don't have an unlimited supply of them.

2   Q.  Well what is the budget of the DEA again?

3           MR. BOVE:  Objection.

4           THE COURT:  Sustained.

5   Q.  There are numerous devices that DEA has on hand, correct?

6   A.  Yes.

7   Q.  And if you needed to get your hands on a dozen devices for

8   an important investigation you certainly could do that,

9   couldn't you?

10  A.  It's possible.

11  Q.  So, you could have sent more devices to the informants if

12  you wanted to, right?

13  A.  No.

14  Q.  Now, one of the specific instructions that you gave to

15  Sentado at the time that the investigation was beginning was to

16  record the meeting, correct?

17  A.  Yes.

18  Q.  And he acknowledged to you that he was going to record the

19  meeting, right?

20  A.  Yes.

21  Q.  Then he sent you -- then after the meeting he told you

22  about the meeting, right?

23  A.  Yes, sir.

24  Q.  And you asked him in that conversation:  Did you record the

25  meeting?  Correct?

GB89GLO2                        Gonzalez – cross

1   A.  Yes, sir.

2   Q.  That was one of the first questions that you posed to him,

3   right?

4   A.  I believe so.

5   Q.  And what he said to you was that it was impossible to do

6   because he was in a restaurant, right?

7   A.  I don't know if he said because, but I remember him saying

8   it was impossible to do.

9   Q.  You remember him saying it was impossible to do in that

10  restaurant, right?

11  A.  I'm not sure if he said in that restaurant.  I remember him

12  saying it was impossible to do.

13  Q.  I want to show you a document which is marked –– I want to

14  show you a document which is marked as D-1000-24.

15          Let me withdraw that.  Let me show you D-1000-39.  I

16  want to just ask you if it refreshes your recollection.

17          MR. BOVE:  Judge, I object to this line on hearsay

18  grounds.

19          THE COURT:  Can I see the document.

20          MR. JACKSON:  Your Honor, I think it will be easier

21  for the Court if I call up 3508-3B.

22          THE COURT:  3508?

23          MR. JACKSON:  Yes, your Honor.

24          MR. BOVE:  I don't think there's an admissible purpose

25  at this point to be speaking about this document.

1          THE COURT:  Could I see 3508, please.

2          MR. JACKSON:  Your Honor, just to clarify.  I'm not

3    seeking the admission of the document.  I'm refreshing the

4    witness's recollection about a conversation that he had.

5          MR. BOVE:  About statements of that declarant.

6          THE COURT:  About statements?

7          MR. BOVE:  The declarant in that document.

8          MR. JACKSON:  Which are clearly not offered for the

9    truth because they're false.

10          THE COURT:  Ask the question again, will you please.

11          MR. JACKSON:  Thank you, your Honor.

12   Q.  My question to you, Special Agent Gonzalez, is he told you

13   that it was impossible for him to record the meeting in that

14   restaurant?

15          MR. BOVE:  Objection.

16          THE COURT:  Overruled.

17          THE WITNESS:  Again, I remember him saying it was

18   impossible.  I don't remember him saying the part about a

19   restaurant.

20   Q.  I want to show you something.  I want to ask you if it

21   refreshes your recollection.  This is an excerpt from 3508-3B

22   marked D-1000-39.

23          THE COURT:  The question is does that refresh his

24   recollection.

25          MR. JACKSON:  Yes, your Honor.  Thank you.

GB89GLO2                        Gonzalez - cross

1   Q.  Does that refresh your recollection, sir?

2   A.  Yes, sir.

3   Q.  And that's what he said, right?

4           MR. BOVE:  Objection as to what he said.  If it's not

5   being offered for the truth it's not relevant.

6           THE COURT:  Sustained.

7           MR. JACKSON:  Your Honor, I would like to ask to be

8   heard.

9           THE COURT:  Go on, please.

10          MR. JACKSON:  Your Honor, I'd like to ask to be heard.

11          THE COURT:  I'm not going to hear you now.  I'll hear

12  you later.

13          MR. JACKSON:  Thank you, your Honor.

14          So, I would like -- I would like to complete my

15  question.  He said it refreshes his recollection.  The question

16  is what --

17          THE COURT:  There was an objection made.  It was

18  sustained.  I'll hear you later.  So go on to something else.

19          MR. JACKSON:  Absolutely.

20  BY MR. JACKSON:

21  Q.  In fact, the actual photo that he sent you later was not in

22  a restaurant, right?

23  A.  The photo was outdoors.

24  Q.  It was not in a restaurant, right?

25  A.  There is a building in the back.  It could have been the

GB89GLO2                          Gonzalez - cross

1    restaurant.  I assume he was outside, but he was not inside the

2    restaurant.

3           MR. JACKSON:  Mr. Calabrese, can you call up the

4    photo.

5    Q.  This is Government Exhibit 110.

6           MR. JACKSON:  Mr. Calabrese, could you zoom in --

7    nevermind.  Leave it as is, please.  Thank you.

8    Q.  So this is clearly, Special Agent Gonzalez, not inside of a

9    restaurant, right?

10   A.  No, sir.

11   Q.  When you saw this you realized that Sentado had lied to

12   you, right?

13   A.  No, sir.

14   Q.  It was inconsistent with what he had told you about his

15   reasons for not recording it, right?

16   A.  No, sir.

17   Q.  Well, there is nothing in this photograph that you could

18   see that would make it impossible to record, right?

19   A.  There were a lot of people there with him.  Like I said, I

20   don't know if he would have been able to record it or not.

21   Q.  As a matter of fact, you are aware that Sentado used his

22   phone to record in other situations, correct?

23   A.  Yes.

24   Q.  And in this situation he supposedly could not use his phone

25   to record, right?

1    A.  Correct.

2    Q.  That's what he told you?

3    A.  Yes, sir.

4    Q.  And in spite of that he had someone working this situation

5    with him that you hadn't authorized, right?

6    A.  Correct.

7    Q.  He had a woman either photographing or videotaping this

8    meeting, right?

9    A.  Correct.

10   Q.  And you have not been able -- you haven't spoken with that

11   woman, right?

12   A.  No, sir.

13   Q.  And you haven't obtained the original of that, right?

14   A.  No, sir.

15   Q.  He also told you that there were multiple photographs

16   taken, right?

17   A.  I believe it says pictures here, yes.

18   Q.  And this is the only one that he sent you, right?

19   A.  Yes, sir.

20   Q.  You asked him several times to send you the other ones,

21   right?

22   A.  Yes, sir.

23   Q.  And he still only sent you this one?

24   A.  Yes, sir.

25   Q.  Now, Agent Gonzalez, this is even --

1              MR. JACKSON:  Please take that down, Mr. Calabrese --

2      by the way.  Actually, I'm sorry.  Let's call it back up.

3      Q.  This whole scene, which looks like some kind of finca, this

4      is actually in like a nice family resort, right?

5      A.  I don't know if it is.

6      Q.  Well you know from your communications with Sentado that

7      this was at the Las Glorias resort?

8      A.  I don't know if it was a resort.  Las Glorias.

9      Q.  Right?

10     A.  Yes.

11     Q.  You've looked at the website of Las Glorias?

12     A.  No, sir.

13     Q.  You have some general familiarity with it?

14     A.  No, sir.

15     Q.  You have no familiarity with that location?

16     A.  No, sir.

17     Q.  You have no awareness if it's a family resort with ponies

18     and little children?

19             MR. BOVE:  Objection.

20             THE COURT:  Sustained.

21     Q.  Now the fact of the matter is this was not a location that

22     was controlled by Sentado, right?

23     A.  What do you mean by controlled?

24     Q.  Well it's your understanding that this was a public

25     location, right?

1    A.  Yes, sir.

2    Q.  And one of the things that you talked about in terms of an

3    impediment to your ability to be able to meet with Sentado

4    during that time period was the fact that he was surrounded by

5    bodyguards, right?

6    A.  That was one of the concerns.

7    Q.  But those were his bodyguards, right?

8    A.  Correct.

9    Q.  And so it's your testimony that there was -- it would have

10   been difficult for him to meet with you because of his own

11   bodyguards or meet with any agent?

12   A.  No.  That wasn't my testimony.

13   Q.  Because that's not the case, right?

14   A.  I don't think so.

15   Q.  Now, DEA operates all throughout this country, right?

16   A.  Throughout which country, sir?

17   Q.  The United States.

18   A.  Yes, sir.

19   Q.  There are DEA offices literally in every state?

20   A.  Not quite.

21   Q.  Close to it, right?

22   A.  Possibly, yes.

23   Q.  Some of the places out west there's like a regional office

24   that may cover a couple of states?

25   A.  Yes, sir.

GB89GLO2                          Gonzalez - cross

1   Q.  And during the course of this investigation you have never

2   come across any evidence of any actual cocaine load that was

3   sent by the defendants in this case to a location in the United

4   States?

5   A.  Directly?

6   Q.  Yes.

7   A.  No.

8   Q.  Now one of the things that was a discussion between you and

9   the informant Jose Senior were the political implications of

10  your investigation, right?

11  A.  I'm not sure if I discussed that with Mr. Santos Peña.

12  Q.  Well it's a fact, isn't it, that in certain of your

13  communications with him you discussed the fact that this case

14  was going to be a blow to Cilia Flores, right?

15          MR. BOVE:  Objection.  Relevance.

16          THE COURT:  Overruled.

17          THE WITNESS:  I don't remember if I said that.

18  Q.  Do you remember him saying to you that it will be a blow to

19  her mouth?

20  A.  No.  I don't remember him saying that.

21          MR. JACKSON:  Just one moment.

22  BY MR. JACKSON:

23  Q.  I want to -- could we have -- I want to show you a document

24  which has been marked as DX633.

25          Does that refresh your recollection, Agent Gonzalez?

1    A.  Yes, it does.

2    Q.  And, in fact, there was a discussion between you and Jose

3    Senior where you sent him communications telling him to search

4    on Twitter, right?

5    A.  Yes.

6    Q.  After the defendants had been arrested?

7    A.  Yes.

8    Q.  And you asked him to put in the hashtag Cilia Flores?

9    A.  Yes.

10   Q.  And he said to you that it would be a fucking blow for her,

11   the opposition is happy, blow to the mouth.  Right?

12   A.  I see that there but I didn't respond to that so I'm not

13   sure.

14   Q.  My question is he said to you it will be a fucking blow to

15   her?

16             THE COURT:  You're repeating yourself.

17             MR. JACKSON:  But he didn't answer the question.

18             THE COURT:  He did.

19             MR. JACKSON:  He said he sees that.  It's a yes-or-no

20   question.

21             THE COURT:  Objection sustained.

22   Q.  Now, Agent Gonzalez, it is not supposed to be an operative

23   of a DEA operation to disrupt the political affairs of another

24   country, right?

25             MR. BOVE:  Objection.

GB89GLO2                          Gonzalez - cross

1          THE COURT:  Sustained.

2    Q.  And that wasn't one of your objectives, right?

3          MR. BOVE:  Objection.

4          THE COURT:  Sustained.

5    Q.  Just going back, it is a fact that you lost control of the

6    appropriate communications that you were supposed to have with

7    the informants, right?

8    A.  What do you mean?

9    Q.  Well, looking back at the nature of your communications

10   with them, you'd agree that you lost control?

11         MR. BOVE:  Objection, Judge.  We've covered this.

12         THE COURT:  Overruled.

13         THE WITNESS:  No.  I do not believe so.

14   Q.  There are long periods of time, right, during the course of

15   the investigation where you -- there -- I'm sorry.  Withdrawn.

16         There were points in the investigation where you asked

17   one of the informants to send you communications that he had

18   with the defendants and he told you that he had accidentally

19   deleted them, right?

20   A.  Who are you referring to, sir?

21   Q.  Let's go with Jose Senior.

22   A.  I don't recall him accidentally deleting something.

23   Q.  You have no recollection of him accidentally deleting

24   certain communications?

25   A.  No, I don't, sir.

1    Q.   Do you have any recollection of any of them, any of the

2    informants informing you that he had accidentally deleted any

3    of the communications?

4    A.   No, I don't.

5              MR. JACKSON:   Just one moment, please.

6              (Pause)

7              MR. JACKSON:   Just one moment, your Honor.   I

8    appreciate the indulgence of the Court.

9              (Pause).

10   Q.   Let me ask you about CW-1, Sentado.   Were there

11   communications where he told you that he had deleted

12   communications with the defendants?

13   A.   I don't believe so.

14   Q.   I want to show you what's been marked as 3508-3B at page

15   17.

16             My only question, yes or no, does that refresh your

17   recollection?

18   A.   Yes, it does.

19   Q.   There was a discussion about deleting, right?

20             MR. BOVE:   Objection.   Hearsay.

21             THE COURT:   Sustained.

22   Q.   Well he told you that he deleted?

23             MR. BOVE:   Objection.

24             THE COURT:   Sustained.

25   Q.   Now, one of the other communications that you had with the

GB89GLO2                    Gonzalez - cross

1    informant known as CS-1, Jose Senior, in one of the

2    communications that he had with you he allegedly deleted a

3    communication on November 7, saying:  Sorry.  I erased the last

4    one thinking it was yours.  And your response was fuck.

5         Do you remember that?

6    A.  No, I don't.

7    Q.  I want to show you what's been marked as DX630-001 and ask

8    you if it refreshes your recollection.

9    A.  Yes, it does.

10   Q.  And that was the conversation between you, right?

11   A.  Yes.

12   Q.  Now, this is a situation where you've realized in the

13   middle of an investigation that important evidence is being

14   destroyed, right?

15   A.  No.

16   Q.  Well, you certainly considered all communications between

17   the informants and the defendants to be important evidence,

18   right?

19   A.  Most of them, yes.

20   Q.  I mean the reason that you said fuck is because that's

21   important information that you thought should have been sent to

22   you, right?

23   A.  It was information that should have been sent to me, yes.

24   Q.  It was important information, right?

25   A.  Reading this.  It was a very short communication that he

GB89GLO2                          Gonzalez – cross

1    had.

2    Q.  It's a yes-or-no question, sir.

3    A.  What was the question?

4    Q.  It's important information?

5    A.  This information, no, it was not.

6    Q.  You have no idea what was in it because it was deleted,

7    right?

8    A.  I know what he told me was in it.

9    Q.  And when you say "he," you're referring to the informant

10   who has pled guilty to four years of lying to the DEA?

11   A.  Yes, sir.

12   Q.  Okay.  And at this point you have confidence in the

13   communications that he gave to you about what happened during

14   the time period are reliable?

15   A.  Yes, sir.

16            MR. JACKSON:  Your Honor, I only have a couple of more

17   areas but it might make sense to break if the Court is

18   inclined.

19            THE COURT:  Well it's almost 12:30.  So you're out of

20   the gas?

21            MR. JACKSON:  I just have a couple of short areas.

22            THE COURT:  We'll take our luncheon recess now.  We'll

23   resume at 1:15.

24            (Luncheon recess.)

25            (Continued on next page)

1              (Jury not present)

2              THE COURT:  How much more do you have, Mr. Jackson?

3              MR. JACKSON:  I think I can be done in less than 30

4    minutes but I do have to register, your Honor, with, you know,

5    an understanding that the Court is managing a complex case.  We

6    have a significant --

7              MR. RODY:  Your Honor, before we have this discussion

8    I just note the witness is still on the stand.

9              THE COURT:  Excuse me.  You may step outside.

10             Thank you, Mr. Rody.

11             MR. RODY:  Before we continue.  Thank you.

12             (Witness excused)

13             THE COURT:  Okay.

14             MR. JACKSON:  Thank you, your Honor.  There were

15   certain objections this morning the Court sustained, your

16   Honor, that we believe we just don't -- we don't believe -- we

17   believe that they were appropriate areas of inquiry.

18             One of them is the questions that we were attempting

19   to pose about the informants communicating to Agent Gonzalez

20   their beliefs that this was -- that these people were new and

21   that this was their first time.  Those go directly to the

22   intent and potentially to the previous position questions that

23   we have been discussing.  And it's not clear to us why that is

24   objectionable.

25             The original plan for the investigation, your Honor,

1    we believe also goes directly to the intent because what

2    happened in this case is that the DEA orchestrated a sting

3    operation and then completely reversed the nature of the sting

4    operation in the middle of the sting operation.  And so we

5    believe it's appropriate for us to probe with the witness who

6    was the primary person responsible for orchestrating that and

7    making that change, why they would make that change.  It goes

8    to the defendants' actual capability to execute on the type of

9    conspiracy that the government has charged they were capable of

10   executing on.

11         With regard to the OIG report that we sought to

12   reference, we were potentially going to enter that audit of the

13   Drug Enforcement Administration's management oversight of its

14   confidential source program in evidence.  We didn't even get

15   there because there was an objection to just the questions

16   about it.  But we think that that is clearly admissible under

17   803(8)(A)(ii) which authorizes us to put in, in a case against

18   the government, the results of an investigation that was

19   authorized by a government agency.  And that's set out

20   explicitly in the federal rules.

21         Also in terms of the pilot's inexperience, again, your

22   Honor, this goes directly to intent and to previous position.

23   And frankly, the questions that we were posing about the lion

24   cubs conversation, that is -- it may seem tangential, your

25   Honor, but it --

1              THE COURT:  That's putting it mildly.

2              MR. JACKSON:  What's that?  I hear you, your Honor.

3     And actually with that one, your Honor, I completely understand

4     at first blush why the Court might feel that this is moving far

5     afield but there are numerous components of the communications

6     between our clients and the drug traffickers which just are not

7     the types of conversations that people actually have in real

8     drug trafficking, people who have any real experience.  And

9     the -- that conversation goes to the intent question.  It goes

10    to the previous position question.

11             And then the last thing, your Honor, is in terms of

12    the questions that we were posing about the, I think, frankly

13    degrading, I guess, indications that the informants were making

14    to the case agent, the controlling case agent, about Cilia

15    Flores in the investigation, that is core bias and motive --

16             (Continued on next page)

GB85flo3                        Gonzalez – cross

1           THE COURT:  You asked those questions, didn't you?

2           MR. JACKSON:  I was prevented, your Honor, from

3    asking.

4           THE COURT:  I think the jury has the point.  Just

5    because you want to ask a lot of questions doesn't mean you get

6    to ask a lot of questions.

7           MR. JACKSON:  I agree with you, your Honor.

8           THE COURT:  You asked a number of pertinent questions.

9    The jury has the point.  You go on.

10          MR. JACKSON:  I agree with that, your Honor.  I only

11   had two additional questions on that.

12          THE COURT:  You had four or five before that.  That's

13   plenty.

14          MR. JACKSON:  Fair enough, Judge.

15          But, those are our objections and I would like to

16   briefly touch on certain of those areas.  I don't think that

17   the government has a valid objection and frankly, in terms of

18   some of the stuff that they have claimed as hearsay in these

19   conversations, it is not offered for the truth.  There is no

20   communication between the CSs and Agent Gonzalez that is being

21   offered for the truth.  So, it is not clear to us how they can

22   claim that it is hearsay.

23          THE COURT:  Mr. Bove?

24          MR. BOVE:  Judge, I think there were four categories

25   that were just raised, first related to communications between

1    the confidential sources and Special Agent Gonzalez.  I believe

2    the assertion was that they are relevant to the entrapment

3    defense being presented by the defendants.  The questions, to

4    the extent that issue goes to the jury, the questions are going

5    to be inducement and predisposition.  I don't understand how

6    statements by the confidential sources who were not privy to

7    all aspects of the investigation at the time, much less what

8    the government will establish was the full state of the

9    evidence during the actual investigation, I don't understand

10   how those sources' communications are relevant to the

11   defendants' state of mind on the entrapment question.  And I

12   think -- I'm not sure what, other than the offering of those

13   statements for the truth, I'm not sure how they're relevant.

14          With respect to the OIG report, I think my initial

15   reaction is that it does invite a mini trial about the

16   circumstances of that report, what it pertained to, and why or

17   why not it is relevant here.  I would be open, of course, to

18   conferring with defense counsel because this is the first time

19   I have heard of the report itself being attempted to being

20   offered.

21          THE COURT:  The point is not about the OIG report, the

22   point is whether or not it is good practice and I thought

23   Mr. Jackson did a pretty good job of examining Agent Gonzalez

24   about whether it was a good practice.  And the jury will come

25   to its own conclusion on whether they were following good

1    practices or not good practices.

2            With regard to the OIG report, it is pretty much like

3    the policy about recording statements -- it leads to a mini

4    trial about what is and what is not a good practice.  Agent

5    Gonzalez made a number of concessions in response to

6    Mr. Jackson's questions about departures from good practice.

7            So, what's next?  What is the third one?

8            MR. BOVE:  The third one I believe that was referenced

9    by Mr. Jackson was the supposed inexperience of the pilots, and

10   here I think in context what he is speaking about are pilots

11   that we understand traveled to Honduras about November 4th of

12   2015 just prior to the meetings that Defendant Flores

13   participated in with El Sentado and the confidential source

14   Juan Gomez.  I just don't understand how, first of all, how

15   there is admissible evidence relating to their experience or

16   lack thereof that's being offered through Special Agent

17   Gonzalez and, even if there was, how that is relevant to what

18   the defendants' mental state was.

19           THE COURT:  I agree.  I agree.  The pilots making day

20   trips often times stay in the airport.  That's what these

21   pilots did.  According to Agent Gonzalez, they got out of the

22   airplane and walked around the airport.  I don't know what

23   level experience that indicates but maybe they didn't want to

24   go through customs and stay in the airport.

25           What else?

1           MR. BOVE:  There is one category that I would like to

2     raise, your Honor, which I thought was the reason that we had

3     an objection that was going to be discussed here at the lunch

4     break which relates to the continued efforts to elicit

5     statements from Special Agent Gonzalez about his interactions

6     with El Sentado including statements about deleting evidence,

7     and Special Agent Gonzalez' inability or failure to collect

8     evidence that we continue to feel create a misimpression with

9     this jury about the status of this investigation, the way it

10    was --

11          THE COURT:  I think it is fair game for inquiry about

12    El Sentado from the period of October through his demise and

13    what should have been done, what shouldn't have been done, what

14    he did do, what he didn't do, are fair games for inquiry.

15          MR. BOVE:  I agree with that, your Honor.  My only

16    point is that the jury is left with the misimpression that

17    there were steps that could have been taken but were not after

18    December 2015 because they don't know that we were unable to

19    access him.  And I think it is important here to keep in mind

20    that his death occurred less than 30 days after the defendants

21    were arrested.  It is not like this was a six-month process

22    where the DEA --

23          THE COURT:  The problem is you don't document an

24    investigation three months after it has been conducted.  You

25    document it when it is an ongoing phenomenon and that seems to

GB85flo3                    Gonzalez - cross

1    be what is missing, and they keep bringing that out and I think

2    that is fair game.

3           MR. BOVE:  And I agree with respect to your point

4    about three months but we are talking about less than 30 days,

5    30 days that were spent securing the pretrial detention of

6    these defendants, preparing discovery, collecting discovery in

7    this matter.  30 days, I submit to you, I don't think is not an

8    unreasonable delay to organize a trip to a foreign country to

9    collect evidence relating to this defendant.  And that's the

10   misimpression that this jury is left with right now.

11          THE COURT:  Mr. Rody, do you have anything to say?

12          MR. RODY:  Just on Mr. Jackson's point about -- I

13   don't think it is just the entrapment defense, it is also our

14   intent defense which their inexperience goes to that defense.

15   To say that someone is an amateur and doesn't know what they're

16   doing goes to their capacity and their ability to commit the

17   crime.  That is one of our --

18          THE COURT:  Amateurs get a first free attempt, is that

19   what you are suggesting?

20          MR. RODY:  No, Judge.  It goes to the actual ability

21   to do it.  I think one of our claims to the jury at the end of

22   the day was these guys never had the intent or ability to

23   actually commit this crime and some of these questions are

24   probative of that.  I don't intend to point to a single one of

25   the references that Mr. Jackson already pointed to but some of

GB85flo3                        Gonzalez - cross

1    the same themes may come up through other references.

2            THE COURT:  How long is your examination going to be?

3            MR. RODY:  I do not know, Judge.  Possibly not as long

4    as Mr. Jackson's but it depends how much resistance I get from

5    the witness.  I think it will be at least --

6            THE COURT:  You are aware of Rule 611, aren't you?

7            MR. RODY:  I am, Judge, but I haven't had a chance to

8    ask a single question of this witness and I have wholly

9    separate areas that I want to go into.  I do not intend to ask

10   the same questions he asked.

11           THE COURT:  Well, cross-examination can't be endless

12   and the rules call for me to give -- the judge, the presiding

13   judge -- the ability to set limits.  The only limit I can set

14   is one of time and Mr. Jackson has been examining now for two

15   and a quarter hours including the time that he spent yesterday,

16   the half hour, and an hour and three quarters this morning so

17   it is two and a half hours, which is the approximate time that

18   the government took in its examination.

19           MR. RODY:  Judge, there are really three main

20   witnesses in this case, maybe four.

21           THE COURT:  Yes.

22           MR. RODY:  He is one of them.

23           There is a lot of witnesses here that we may not

24   cross-examine on, I don't know if either side is going to

25   cross-examine on, but there are some witnesses that Mr. Jackson

GB85flo3                         Gonzalez – cross

```
 1    will cross-examine on and we won't.  There are other witnesses
 2    that relate to the Honduras situation that Mr. Campo Flores'
 3    lawyers may not cross examine on.  But, for Gonzalez and CS-1
 4    and CS-2, this is --
 5            THE COURT:  I'm not surprised.  We have been through
 6    this once before at the suppression hearing.
 7            MR. RODY:  And for some of these other agents who are
 8    coming on there will be minimal cross in some cases, maybe
 9    none, but I haven't had a chance to ask this man a single
10    question.
11            THE COURT:  I am not limiting you but if it goes too
12    far, too long, I am going to exercise my prerogative.
13            MR. RODY:  Understood, Judge.
14            THE COURT:  Hopefully we can finish with Agent
15    Gonzalez today.
16            Mr. Jackson, I request that you spend your next -- we
17    will be resuming at quarter after 1:00, thereabouts.  I would
18    suggest that you trim your inquiry so that we can get on to
19    Mr. Rody's examination as quickly as possible.
20            MR. JACKSON:  Understood, your Honor.
21            THE COURT:  Thank you very much.  Enjoy your lunch.
22            (Luncheon recess)
23            (Continued next page)
24
25
```

GB85flo3                          Gonzalez - cross

1                    A F T E R N O O N   S E S S I O N

2                                  1:20 p.m.

3               THE COURT:  For planning purposes, we are going to sit

4    until 2:20 and take a 10-minute break, then go from 2:30 to

5    3:30.

6               MR. JACKSON:  Thank you, your Honor.

7               THE COURT:  Please, be seated.

8               (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GB85flo3                          Gonzalez – cross

1           (Jury present)

2           THE COURT:  Good afternoon.

3           THE JURY:  Good afternoon.

4           THE COURT:  Did everybody have a good lunch?

5           THE JURY:  Yes.  Thank you.

6           THE COURT:  Please, be seated.

7           Mr. Jackson.

8           MR. JACKSON:  Thank you very much, your Honor.

9           THE COURT:  You're welcome.

10  BY MR. JACKSON:

11  Q.  Agent Gonzalez, there were a number of communications that

12  you had with the informants in this case about the potential

13  reward that they could get, right?

14  A.  I believe so.

15  Q.  And one of the things that you were telling the informants

16  throughout the case is that they could get an extremely

17  substantial reward if they were to help you bring in this case,

18  right?

19  A.  I don't recall having said that.

20  Q.  Well, in sum and substance, that was a discussion that you

21  were having with Jose, Jr. and Jose, Sr. throughout the

22  investigation, right?

23  A.  I'm not sure.  They only get paid after doing work.

24  Q.  But there were also a number of points where they were

25  specifically asking you about the reward that they were going

GB85flo3                    Gonzalez – cross

1   to get at the end of the case, right?

2   A.  I believe so.

3   Q.  And Jose, Sr. told you that he hoped to buy a house with

4   his reward, right?

5   A.  I believe so.

6   Q.  He also told you -- he asked you on a few different

7   occasions, immediately after the investigation was over, when

8   the reward would be coming in, right?

9   A.  I believe so.

10  Q.  And you told him that you were working on it, processing it

11  with your boss?

12  A.  I don't know if it was the reward that I was working on,

13  possibly a payment, but I don't know about the reward itself.

14  Q.  You did tell him at some point, though, that you did plan

15  to seek a reward for him, right?

16  A.  Yes, sir.

17  Q.  And what was the reward that you suggested that you would

18  get?

19  A.  I did not suggest an amount.

20  Q.  At any point did he ask you how much money he could expect

21  to get from this?

22  A.  I don't recall if he did or not.

23  Q.  It is a fact, though, that he was a long-term DEA

24  confidential source, right?

25  A.  What do you mean by long-term?

GB85flo3                        Gonzalez – cross

1   Q.  Well, he had been working as a confidential source for a

2   number of years for the DEA, correct?

3   A.  Yes.

4   Q.  And he had interacted with a number of other confidential

5   sources for the DEA and other agencies, right?

6   A.  I don't know about other agencies, but he did deal with

7   other confidential sources in DEA.

8   Q.  And you are aware that the DEA has, on some occasions, paid

9   millions of dollars to informants for their work on a single

10  case?

11          MR. BOVE:  Objection.

12          THE COURT:  Sustained.

13  Q.  What was the maximum award that the informants could have

14  gotten for participating in this?

15  A.  I believe the maximum award that DEA provides per

16  investigation is $250,000.

17  Q.  On no occasion have you heard of an informant getting more

18  than $250,000 as a reward?

19          MR. BOVE:  Objection.

20          THE COURT:  Overruled.

21  A.  Not a DEA reward.

22  Q.  Let me just repeat my question, though.  On any occasion

23  have you heard of a DEA informant getting a reward exceeding

24  $250,000 as a result of their work on a DEA investigation?

25  A.  Yes.

GB85flo3                          Gonzalez – cross

1   Q.  And those rewards have sometimes been substantially greater

2   than $250,000, right?

3             MR. BOVE:  Objection.

4             THE COURT:  Sustained.

5   Q.  Now, we spoke a little bit earlier about the fact --

6             I'm sorry, just one last question on that, on the

7   subject of the reward.  On November 6, did you communicate to

8   the informant who was known as CS-1, Jose, Sr., did you

9   communicate to him:  *After we bust those assholes I will*

10  *deposit some more for you and I will submit the paperwork for*

11  *the reward*?

12  A.  It's possible.

13  Q.  You don't remember?

14  A.  It's possible.

15  Q.  I'm going to show you something and ask you if it refreshes

16  your recollection.

17  A.  Yes, it does.

18  Q.  And that's what you said to Jose, Sr., correct?

19  A.  Yes.

20  Q.  And what you were referring to is after the investigation

21  you were going to send -- after the arrest you were going to

22  send some additional money and submit the paperwork immediately

23  for the reward, right?

24  A.  Not immediately, but I was going to, yes.

25  Q.  Now, there are a number of points in your communications

GB85flo3                          Gonzalez - cross

1    with the informants in this case where, based on the subject

2    matter that you arrived at in the sort of chat communication

3    you were having with him, there was a discussion about -- there

4    was a point where you advised them that they should call you,

5    right?

6    A.   I'm not sure what you are referring to, sir.

7    Q.   Well, do you remember that there were certain occasions

8    where in the middle of a chat you would -- the question would

9    be -- there would be a discussion and then you would advise

10   them to call you?

11   A.   To who?

12   Q.   To different informants.  Let's go with Jose, Sr.

13   A.   I don't recall telling him to call me.

14   Q.   You do recall, on certain occasions, in the middle of

15   conversations that you had phone calls with him, right?

16   A.   I spoke very rarely over the phone with Mr.Santos Peña.

17   Q.   But you did speak on the phone with him on certain

18   occasions during the course of the investigation, right?

19   A.   I believe so.  I don't remember specifically if I did or

20   not.

21   Q.   Did you take notes of any of those conversations?

22   A.   I don't know.

23   Q.   It is DEA best practice, when you have a conversation with

24   an informant in an active investigation, to actually take notes

25   of a phone call that you are having with them where they're

GB85flo3                        Gonzalez - cross

1  giving you information, right?

2  A.  No.  Actually you are supposed to write a report when you

3  receive significant information.

4  Q.  And for the phone calls that you had with the informants in

5  this case, you don't have notes of specific phone calls, right?

6  A.  Actually, I believe I do have some notes from a phone call

7  with CW 1.

8  Q.  You have notes from one phone call, right?

9  A.  I don't know if it was one or two.

10  Q.  But there were a number of phone calls that you have no

11  notes from?

12  A.  I don't think I had a number of phone calls, no.

13  Q.  Okay.

14        MR. JACKSON:  Just one moment?  (pause)

15  Q.  Do you remember a conservation on November 1st when you had

16  the following exchange with Jose, Sr.?

17        MR. BOVE:  Objection to recapping this exchange.

18        THE COURT:  Have you done this before, Mr. Jackson?

19  This conversation?

20        MR. JACKSON:  No, your Honor.  It is a very brief

21  exchange.

22        MR. BOVE:  It's from a document that's not in

23  evidence.

24        THE COURT:  If you are reading from a document not in

25  evidence the objection is sustained.

1           MR. JACKSON:  Okay.

2    BY MR. JACKSON:

3    Q.  Let me ask you the question:  On November 1st did you state

4    to -- in response to --

5           MR. BOVE:  I object to this line.

6           THE COURT:  Let him finish the question.

7    Q.  -- in response to the informant saying to you that there

8    were problems with El Sentado and that he needed to put on the

9    team jersey more, did you respond to him:  *Call me*.  And give

10   the phone number?

11          THE COURT:  Sustained.

12   Q.  Do you remember telling him to call you on November 1st?

13   A.  No, do I not.

14   Q.  I'm going to show you a document which is marked as

15   DX- 620.  I just want to ask you to look at it and tell me if

16   it refreshes your recollection.

17          Does that refresh your recollection?

18   A.  Yes.

19   Q.  And you were having a chat conversation with him on that

20   day, right?

21   A.  Yes.

22   Q.  And in the middle of that you told him *call me*?

23          MR. BOVE:  Judge, I object.  The chat conversation is

24   still inadmissible.

25          MR. JACKSON:  I haven't quoted the chat conversation.

 1          THE COURT:  Your objection is overruled.

 2          THE WITNESS:  What was your question, sir?

 3   BY MR. JACKSON:

 4   Q.  In the middle of you having a chat conversation with him

 5   you told him to *call me*?

 6   A.  Yes.

 7   Q.  And then you had a phone call with him, right?

 8   A.  I'm not sure if he did call me.

 9   Q.  Did you take notes of that phone call?

10   A.  Again, I'm not sure if he called me.

11   Q.  You have no idea as you sit here today whether or not you

12   had that phone call?

13   A.  No.

14   Q.  Now, one of the things that we also talked about a little

15   bit, you have, in other investigations, domestically dealt with

16   situations where you have sent confidential sources in to

17   handle drugs, right?

18          MR. BOVE:  Objection.

19          THE COURT:  Sustained.

20   Q.  It's DEA best practice to search the informant before they

21   handle drugs, right?

22   A.  During buys informants are searched, prior and post buys.

23   Q.  Right.

24          The reason for that is because the search helps to

25   assure that the integrity of the evidence is maintained, right?

1   A.   The search is to verify the amount of drugs that were

2   supposedly paid for or what was recovered.

3   Q.   Right; and that all comes down to the integrity of the

4   evidence, right?

5   A.   I suppose.

6   Q.   And in this case, when the informants known as Jose, Jr.

7   and Sr. returned from Venezuela, did you or any other agents

8   conduct any searches of them?

9   A.   They weren't purchasing drugs, sir.

10  Q.   My only question is did you conduct any searches of them?

11  A.   No.

12  Q.   Did you conduct any searches of them at any point in the

13  investigation?

14  A.   No.

15          MR. JACKSON:   Just one moment, your Honor?

16          (counsel conferring)

17  Q.   I just have a couple more questions for you.   One of them

18  is there were periods of time, during the course of the

19  investigation, when you were trying to get in touch with

20  El Sentado and he wouldn't respond to your calls for days at a

21  time?

22  A.   Yes, sir.

23  Q.   And that was a source of frustration for you and the

24  investigation, right?

25  A.   A little bit.

GB85flo3                    Gonzalez – cross

1   Q.  By the way, El Sentado disclosed to the government that he

2   had been involved in millions of dollars of money laundering,

3   right?

4   A.  Not that I recall.

5   Q.  You are aware of significant money laundering involving

6   financial institutions that he admitted to being involved in?

7   A.  No, I have not.

8   Q.  You have no knowledge of his money laundering activities?

9   A.  No, sir.

10  Q.  Final question:  Knowing now the massive amount of drug

11  trafficking that Jose, Sr. and Jose, Jr. were hiding from the

12  DEA would you, knowing what you know now, have still sent them

13  on the operation that you sent them on?

14  A.  Knowing what I know now they would not have been

15  confidential sources, so no.

16          MR. JACKSON:  Thank you.

17          I have no further questions, your Honor.

18          THE COURT:  Thank you, Mr. Jackson.

19          MR. JACKSON:  Thank you.

20          MR. RODY:  May I inquire, Judge?

21          THE COURT:  Yes, Mr. Rody.

22          MR. RODY:  Thank you, your Honor.

23  CROSS EXAMINATION

24  BY MR. RODY:

25  Q.  Agent Gonzalez, when is the first time you began working

GB85flo3                          Gonzalez – cross

1   with the informant we have referred to as Jose, Sr. or CS-1?

2   A.  I don't know the exact date.

3   Q.  Is it 2015 or earlier?

4   A.  I'm not sure.

5   Q.  You have no idea?

6   A.  No, sir.

7   Q.  You were one of his handlers, correct?

8   A.  Yes.

9   Q.  And you have no idea when you started working with him?

10  A.  No, sir.

11  Q.  Was it in the decade of the 2000s?

12  A.  You mean before 2010?

13  Q.  Yes.

14  A.  No, sir.

15  Q.  Was it after 2010?

16  A.  Sometime after 2010.

17  Q.  And other than that, after 2010, you can't provide any more

18  specificity about when you began working with Jose, Sr.?

19  A.  I do not recall the year, sir; no.

20  Q.  And you are his DEA handler?

21  A.  I am one of them.

22  Q.  How many are there?

23  A.  I don't know.

24  Q.  How do you not know that?

25  A.  Because sometimes informants are activated and deactivated.

GB85flo3                          Gonzalez - cross

1    Q.  You are one of his handlers, that meaning you are

2    responsible for performing quarterly debriefings of him?

3    A.  No.  Quarterly debriefings have to be done.  I don't

4    necessarily have to be the one to do them.

5    Q.  Have you every done a quarterly debriefing of CS-1?

6    A.  I may have participated in them.  I'm not sure.

7    Q.  Why are you not sure?  You don't remember?

8    A.  I don't remember if I participated in this specific

9    quarterly debriefing.

10   Q.  You debriefed him on November 2nd down at SOD headquarters

11   in Virginia, correct?

12   A.  Yes, sir.

13   Q.  Other than that, have you ever debriefed him at any other

14   time, in person?

15   A.  Yes, sir.

16   Q.  How many times?

17   A.  I don't know.

18   Q.  Do you have any records of that anywhere?

19   A.  I am sure there are reports.

20   Q.  Do you have them?

21   A.  On my person?  No.

22   Q.  Have you provided them to the government?  To the

23   prosecutors?

24   A.  The government reviewed Mr. Santos Peña's CS file.

25   Q.  And the CS file is maintained centrally at DEA somewhere?

GB85flo3                         Gonzalez – cross

1    A.  Yes, sir.

2    Q.  Would that be in New York?  Would it be in Washington?

3    Where?

4    A.  He has a file in every office where he is active.

5    Q.  And so are you telling me there is no one person at DEA who

6    is responsible for him?

7    A.  No, sir.

8    Q.  That turned out not to be a very good practice with him,

9    right?

10   A.  Seemingly, no.

11   Q.  Because he fooled the DEA for years and years, right?

12   A.  Yes, sir.

13   Q.  You didn't figure it out, right?

14   A.  No, sir.

15   Q.  None of your other fellow officers figured it out, right?

16   A.  No, sir.

17   Q.  Now, how about CS-2, Jose, Jr., his son; when is the first

18   time you worked with him?

19   A.  I assume the same time when I worked with CS-1.

20   Q.  Have you ever worked with CS-1 when you did not also work

21   with CS-2 at the same time?

22   A.  I believe the trip to Haiti CS-2 was not there.

23   Q.  Understood, but I mean on a case.  Have you ever worked on

24   a case with CS-1, Jose, Sr., when Jr. was not also involved?

25   A.  I'm not sure.  I don't think so.

GB85flo3                     Gonzalez - cross

1   Q.  Meaning that typically they're a team, they're a father/son

2   team, right?

3   A.  Yes, sir.

4   Q.  How about Juan Gomez who goes to Haiti, CS-3; how long were

5   you working with him?

6   A.  Juan Gomez did not go to Haiti.

7   Q.  I'm sorry.  I didn't mean Haiti.  Honduras.  Forgive me.

8   A.  I did not work with him, he is not one of my sources.

9   Q.  That's another agent worked with him?

10  A.  Yes, sir.

11  Q.  And who is that?

12  A.  Kevin Corcoran.

13  Q.  Now, in this operation, after you received some

14  communication from El Sentado, you reached out to CS-1 in order

15  to send CS-1 and CS-2 to Venezuela, correct?

16  A.  Yes.

17  Q.  That was your choice?

18  A.  Yes.

19  Q.  And when you did that you had conversations with CS-1

20  beforehand, correct?

21  A.  Yes.

22  Q.  You gave him specific instructions for this case, correct?

23  A.  Yes.

24  Q.  And one of these instructions was that he was supposed to

25  record the conversations he had with targets, correct?

GB85flo3                          Gonzalez – cross

1    A.  Yes.

2    Q.  That's the standard procedure in your investigations,

3    correct?

4    A.  You record the drug conversations you have with targets,

5    yes.

6    Q.  When you say that you record the drug conversations, does

7    that mean you instructed them that they did not have to record

8    all conversations?

9    A.  Generally, yes.

10   Q.  So, when you send him down there you say don't record all

11   conversations?

12   A.  No.

13   Q.  You told them to record their your communications --

14            Withdrawn.

15            You told them to record their conversations with the

16   targets, right?

17   A.  I say record your meetings with the targets.

18   Q.  Meetings.

19            So, that means they don't have to record telephone

20   calls?

21   A.  If they have a device to record a telephone call.

22   Q.  But in-person conversations they're supposed to record

23   them, correct?

24   A.  Yes.

25   Q.  And they're not supposed to selectively record them,

GB85flo3                            Gonzalez - cross

1   correct?

2   A.   Depends.

3   Q.   It depends on -- withdrawn.

4            In other words, when they're having a meeting with a

5   target it is permissible for them to turn the recorder on and

6   off when they choose?

7   A.   Not necessarily when you are in the middle of a meeting,

8   no.

9   Q.   That's inappropriate, right?

10  A.   It's a safety risk to do it in the middle of a meeting.

11  Q.   So, but it would also be improper to interrupt a

12  conversation that you are having with a target by turning off

13  the recording device, right?

14  A.   What do you mean improper?

15  Q.   Well, it would be a selective recording, you would not be

16  recording the whole context of the conversation, right?

17  A.   I don't think you could turn off a recording device in the

18  middle of a conversation.

19  Q.   Okay.  So, if it happened in this case, that would be --

20  withdrawn.

21           It couldn't have happened in this case, then?

22  A.   It's possible.

23  Q.   It's possible.

24           You say that a lot, that things are possible; does

25  that mean yes or no?

1          MR. BOVE:  Objection.

2          THE COURT:  Sustained.

3   Q.  So, you are aware, are you not, that in fact CS-2 turned

4   off his recording device multiple times during the course of

5   meetings with the defendants, right?

6   A.  I'm not aware that he turned it off.

7   Q.  You think it just malfunctioned?

8   A.  Sometimes when you are manipulating the device it can be

9   turned off.

10  Q.  But the informant wearing the device has the ability to

11  turn it on and off, correct?

12  A.  Yes.

13  Q.  In the middle of a meeting?

14  A.  In theory.

15  Q.  Well, not in theory.  CS-2 did it, correct?

16  A.  It would appear.  Parts of it were turned off, yes.

17  Q.  When you say it would appear, you know that that is true,

18  right?

19  A.  I don't know that he turned it off intentionally, no.

20  Q.  But you know it stopped and then it started again in the

21  same meeting, correct?

22  A.  Yes.

23  Q.  Now, another one of the instructions that you gave to Jose,

24  Sr. before this operation was that he was to have discussions

25  regarding importing drugs into the United States, right?

GB85flo3                          Gonzalez - cross

1    A.  Yes.

2    Q.  And that's something that you very frequently have to do in

3    your cases, correct?

4    A.  Not very frequently, no.  It happens.

5    Q.  Well, if you have your sources talking to someone in a

6    foreign country and they're talking about moving drugs to

7    Europe that, standing on its own, is not a crime that you could

8    prosecute in a U.S. court, right?

9              MR. BOVE:  Objection.

10             THE COURT:  Overruled.

11   A.  Our sources generally don't have conversations about drug

12   trafficking to Europe.

13   Q.  Let's see if you can answer my question.

14             If you have sources talking to someone in a foreign

15   country about moving drugs to Europe, that would not be a crime

16   that you could prosecute in a U.S. Federal Court, correct?

17             MR. BOVE:  Judge, I object.  He is not a lawyer.

18             THE COURT:  Overruled.  He is a Drug Enforcement

19   Administration agent.

20   A.  I don't have sources talking to people about moving drugs

21   to Europe.

22   Q.  I understand you don't.  You wouldn't do that.  I get it.

23   But, the reason why you don't have sources talking about moving

24   drugs to Europe is because you can't charge those crimes,

25   right?

GB85flo3                      Gonzalez - cross

1    A.  Not necessarily if it is part of another conspiracy.

2    Q.  Right.

3    A.  It could be moving drugs here, to the United states.  Money

4    laundering in the United States.

5    Q.  Right.  And that's why I framed the first question to you

6    that you didn't answer about whether standing on --

7              MR. BOVE:  Object to the testimony.

8    Q.  -- standing alone on itself, that wouldn't be something you

9    can charge in the United States, right?

10   A.  Standing on its own, no.

11   Q.  So, it is important that the informants ask questions or

12   make references to drugs going into the United States during

13   those conversations with targets, correct?

14   A.  Yes.

15   Q.  And you talked to Jose, Sr. about that during this case,

16   right?

17   A.  Yes.

18   Q.  You asked him questions about whether he got information

19   about the United States on the recording, right?

20   A.  Yes.

21   Q.  You have those questions -- withdrawn.

22         You had those conversations in chat messages with him,

23   correct?

24   A.  Excuse me.  I believe so, sir.

25   Q.  And you had those -- are you tired, sir?

GB85flo3                    Gonzalez - cross

1   A.  No.  I was covering a burp.  Sorry.

2   Q.  Okay.

3           THE COURT:  Must have been from the cafeteria.

4   Q.  And you also had those conversations with him when you

5   debriefed him in early November in Virginia, right?

6   A.  Yes, sir.

7   Q.  Now, you don't need to have these conversations in a case

8   where you seize drugs in the United States, correct?

9   A.  No.

10  Q.  It is particularly important that your informants have such

11  conversations in a sting operation, correct?

12  A.  Not necessarily.

13  Q.  Now, you've reviewed the recordings that Jose, Sr. and

14  Jose, Jr. played during the course of this investigation prior

15  to your testimony, correct?

16  A.  Yes.

17  Q.  You reviewed both the recordings and the transcripts that

18  were made, correct?

19  A.  Yes.

20  Q.  And when is the first time you did that, that you actually

21  listened to the recordings that were made?

22  A.  I don't remember, sir.

23  Q.  It was not when they were down in Caracas, right, because

24  you didn't have the devices yet, correct?

25  A.  Correct.

GB85flo3                        Gonzalez - cross

1   Q.  The first time you got the devices was when they came back

2   to the United States in that early November meeting in

3   Virginia, right?

4   A.  Yes.

5   Q.  Whenever it was that you listened to the recordings for the

6   first time you heard some discussions about the U.S. in the

7   recordings, right?

8   A.  Yes.

9   Q.  And when you heard that you heard that all the references

10  to bringing drugs into the United States were uttered by Jose,

11  Sr., correct?

12          MR. BOVE:  Objection.

13          THE COURT:  Overruled.

14  A.  I don't recall the entire conversation, no.

15  Q.  Jose, Sr. initiated all the conversations about moving

16  drugs into the United States, correct?

17  A.  I believe so.

18  Q.  Now, how many times did you go to -- I'm not asking you

19  where Jose, Sr. and Jose, Jr. lived but how many times did you

20  go to their home to conduct a spot home inspection?

21  A.  Never.

22  Q.  How many times did you or other agents surveil them when

23  they were at home to monitor their activities?

24  A.  None.

25  Q.  How many times did you administer a polygraph examination

GB85flo3                        Gonzalez - cross

1   to CS-1 during the period of time when he was working with you

2   to determine if he was telling the truth about his activities?

3   A.   Never.

4   Q.   And how many times did you give him a drug test to see if

5   he was actually using illegal substances?

6   A.   Actually, Mr. Rody, that brings up a good point.  I do

7   agree --

8           MR. RODY:  Your Honor, I move to strike.  That is a

9   yes or no question I posed.

10          THE COURT:  I will allow it.  Go ahead.

11  A.   Looking back, there were lessons to be learned from this.

12  I agree that there are some CS handling issues, but randomly

13  showing up to his house is a safety risk.  We don't know if any

14  of his neighbors or even his family sometimes -- family members

15  don't know they're working as informants.

16          Polygraphing, as a practical matter, isn't likely, but

17  drug testing informants is something maybe to look back on as a

18  possibility but --

19  Q.   Should have been done, right?

20  A.   Yes.

21  Q.   Would have been a good idea, right?

22  A.   Well, it is not the practice, no, but I realize it could be

23  implemented.

24  Q.   It would have been a good idea, right?

25  A.   Yes.

GB85flo3                          Gonzalez - cross

1   Q.  And you say polygraphing is not likely; other federal law

2   enforcement agencies polygraph their sources, correct?

3           MR. BOVE:  Objection.

4           THE COURT:  Sustained.

5   Q.  Why would it be not likely, sir?

6   A.  We don't have that many polygraph examiners and they're

7   busy.

8   Q.  So this is someone that you send around the globe to have

9   conversations about moving multi-ton amounts of drugs, right,

10  and you put him in situations involving actual narcotics and

11  suspected narcotics, correct?

12  A.  Yes.

13  Q.  And you don't think --

14          THE COURT:  When you say multi-ton you mean

15  multi-kilo, don't you?

16  Q.  Well, some of the cases that you do at SOD actually involve

17  very large amounts of cocaine, right?

18  A.  Yes, sir.

19  Q.  And you don't think it would be a good idea to polygraph

20  the agents that you are -- sorry, the informants that you are

21  putting into those situations?

22  A.  Randomly, I don't think it is a practical matter.

23  Q.  Well, maybe it would have helped you catch CS-1 a few years

24  earlier, right?

25  A.  It's possible.

GB85flo3                        Gonzalez – cross

1    Q.  Did you monitor how many different phones, cellular phones

2    Jose, Sr. had?

3    A.  I don't know.

4    Q.  No idea?

5    A.  No, sir.

6    Q.  Isn't that a risk factor, that he has multiple phones to

7    communicate with anybody and everybody?

8    A.  No, sir.

9    Q.  Well, you communicated with him over certain devices,

10   correct?

11   A.  Yes, sir.

12   Q.  You had certain numbers for him, right?

13   A.  Yes, sir.

14   Q.  So, any time you wanted to you could have gotten a pen

15   register on those phones, right?

16   A.  I suppose.

17   Q.  And then you would have seen who he was calling and who was

18   calling him, right?

19   A.  Do you mean prior to realizing that he was involved in

20   unauthorized criminal activity?

21   Q.  Correct.

22   A.  Just years ago?

23   Q.  Correct.

24   A.  I assume that is possible.  I could do that to all my

25   informants.

GB85flo3                          Gonzalez - cross

1   Q.  Right; and then would you know if they were talking to

2   unauthorized people, right?

3   A.  Not necessarily.

4   Q.  Well, it would give you an investigative lead, wouldn't it,

5   sir?

6   A.  They could be talking with a lot of people.  Just because

7   they talk to other people other than DEA doesn't mean they're

8   criminals.

9   Q.  Right.

10          And the fact that he was involved in random drug

11  dealing and drug use while working as an active DEA informant

12  doesn't suggest to you that you should have done something like

13  that?

14  A.  Knowing what I know now, yes.

15  Q.  Now, by the way, have you testified in a prior proceeding

16  in this matter, correct?

17  A.  Yes, sir.

18  Q.  And at that time I believe you said that you did not think

19  that your management of Jose, Sr. was improper.

20          Do you recall that testimony?

21  A.  Yes, sir.

22  Q.  And do you stand by that?

23  A.  Yes, sir.

24  Q.  You think that your management of Jose, Sr. was A-okay?

25  A.  Yes, sir.

GB85flo3                          Gonzalez - cross

1   Q.  Top notch?

2   A.  Yes, sir.

3   Q.  A model example of how to handle a source?

4   A.  Again, I did the best I could.  I did not live next to him.

5   Q.  You never even did a quarterly debriefing of him, right?

6   A.  I can't say if I did or not.  I participated in debriefings

7   with him.

8   Q.  You also -- well, let me ask you, do you also acknowledge

9   that your management in October and November of 2015 of

10  El Sentado was less than stellar?

11  A.  No.

12  Q.  You think that was great too?

13  A.  Given the circumstances, yes.

14  Q.  And, as you sit here today, you have no idea whether, in

15  October or November -- well, let's just say the whole fall of

16  2015, whether he was continuing his illegal narcotics

17  trafficking, correct?  You have no idea?

18  A.  By "he" you are referring to Mr. Santos Peña?

19              (Continued on next page)

20

21

22

23

24

25

GB89FLO4                    Gonzalez – cross

1   Q.  No.  No.  No.  I'm sorry.  Let me ask the question again.

2   As you sit here today you have no idea whether Sentado was

3   continuing his narcotics trafficking activities throughout the

4   summer and fall of 2015?

5   A.  No, I do not know.

6   Q.  Mr. Jackson asked you some questions about how you were

7   unable to get ahold of Sentado at times.  Both you and Jose

8   Senior recognized that he was unreliable, right?

9   A.  Yes.  It was difficult to get ahold of him.

10  Q.  And you referred to him as unreliable?

11  A.  I believe so.

12  Q.  After he met with the defendants in October he failed to

13  turnover any audio recording that he made correct?

14  A.  Who is he?

15  Q.  Sentado.

16  A.  Correct.

17  Q.  And he only sent you the one picture, right?

18  A.  Yes, sir.

19  Q.  He never sent you his chats, correct?

20  A.  He sent some chats, yes.

21          MR. RODY:  One moment, Judge.

22          (Pause)

23  Q.  Prior to this case you reviewed some of your communications

24  with Sentado, right?

25  A.  Yes, sir.

GB89FLO4                    Gonzalez - cross

1    Q.  And you made notations on those communications, correct?

2    A.  I believe so.

3    Q.  Again showing you 3508-44, page ten -- it's actually page

4    eleven of the chat.  Take a look at this and let me know if

5    that refreshes your recollection that Sentado never sent you

6    the chats he was supposed to send you.

7    A.  The earlier chats, yes.

8    Q.  The earlier chats meaning what?

9    A.  Meaning that he did send me some chats later on, cut and

10   pasted into our conversations.

11   Q.  But he never sent you the chats regarding communications

12   that he had in early October, correct?

13   A.  I'm not sure if the chat that he sent me later on and the

14   picture of the chat he sent me were of early October or not.

15   Q.  You commented that he never sent you the chats, right?

16   A.  Yes.  That's written in there.

17   Q.  Now isn't it also true that he misidentified photographs of

18   the defendants?

19   A.  Yes.

20   Q.  So you sent him photographs to see are these the guys you

21   met with, correct?

22   A.  Yes.

23   Q.  And he said, yes, those are the guys I met with, right?

24   A.  Yes.

25   Q.  And it was dead wrong, correct?

GB89FLO4                    Gonzalez - cross

1    A.  Yes.

2    Q.  Let me ask you a question about how long have you worked

3    with SOD?

4    A.  Six years.

5    Q.  And prior to that when you worked in San Diego and San

6    Ysidro were those regular field divisions of the DEA?

7    A.  Yes.

8    Q.  And had you made applications during your time in San Diego

9    or San Ysidro to get into SOD?

10   A.  No, sir.

11   Q.  When was the first time you applied to SOD?

12   A.  I believe a year before my foreign tour was completing.

13   Q.  That was your foreign tour in Caracas?

14   A.  Yes, sir.

15   Q.  So when you were in Caracas your were not a member of SOD?

16   A.  No, sir.

17   Q.  But when you were in Caracas you applied to become a member

18   of SOD, correct?

19   A.  When you're coming back from a foreign assignment you

20   submit a list of offices and preferences you would like to go.

21   SOD was one of those offices.

22   Q.  And SOD again stands for special operations division,

23   correct?

24   A.  Yes, sir.

25   Q.  And that is one of the elite units of the DEA, correct?

GB89FLO4                      Gonzalez - cross

1   A.  It's a large field division.

2   Q.  But you do big international cases, right?

3   A.  Yes.  Everybody does, yes.

4   Q.  Pardon?

5   A.  All offices do international cases.  Ours -- they also do

6   domestic cases.  Our office primarily focuses on international.

7   Q.  And is that the BIU, the bilateral investigations unit

8   focuses on international cases or all of SOD focuses on

9   international cases?

10  A.  Just the bilateral investigations unit.

11  Q.  Right.  You don't do domestic cases, right?

12  A.  Not really, no.

13  Q.  Field office here in New York, right now they are up in

14  Washington Heights sitting on bodegas, right?

15          MR. BOVE:  Objection.

16          THE COURT:  Sustained.

17  Q.  So you went to SOD to do these bigger cases, right?

18  A.  I went to SOD because it was close to home.

19  Q.  Okay.  That's the only reason?

20  A.  Yes, sir.

21  Q.  Not because it's an elite unit?

22  A.  No, sir.

23  Q.  So why didn't you just go to the local Virginia field

24  office?

25  A.  Because this office was closer.

GB89FLO4                          Gonzalez – cross

1    Q.  Purely convenience.  Got it.

2            Now SOD deals with some of the national intelligence

3    agencies; is that correct?

4            MR. BOVE:  Objection.  Relevance.

5            THE COURT:  I'll let it go for a while.  Overruled.

6            THE WITNESS:  What do you mean?

7    Q.  SOD conducts investigations in conjunction with the United

8    States intelligence agencies, correct?

9    A.  Some agencies –– I'm not sure if they conduct

10   investigations.

11   Q.  Okay.  But they provide you with information that you use

12   in your investigations, correct?

13           MR. BOVE:  Judge, I object and I ask that this matter

14   be taken up at the break.  It is a critical objection.

15           THE COURT:  Sustained.  I don't understand the

16   relevance of it.

17           Go on to something else Mr. Rody.

18           MR. RODY:  Okay.

19   Q.  Early in this investigation when Sentado indicated to you

20   that he had had a meeting with people that he believed were

21   related to the First Lady of Venezuela you were excited about

22   that, right?

23   A.  Not really.

24   Q.  You could take it or leave it, right?

25   A.  It wasn't confirmed at the time.

GB89FLO4                    Gonzalez - cross

1    Q.  Okay.  When it was confirmed that the targets of your

2    investigation were related to the First Lady of Venezuela, you

3    were excited about that, right?

4    A.  Yes.

5    Q.  You were highly interested in pursuing that investigation,

6    right?

7    A.  I'm excited about all my investigations, sir.

8    Q.  Every one of them?

9    A.  Yes, sir.

10   Q.  So this one was no more exciting to you than any other one

11   you've done?

12   A.  Not really.

13   Q.  You didn't think that the two nephews of the First Lady of

14   Venezuela were big fish?

15   A.  I did.

16   Q.  Okay.  You are judged, are you not, in part by the quality

17   of the cases you bring, correct?

18   A.  Not necessarily.

19   Q.  Well, when you are able to make an arrest of a prominent

20   target that's prestigious for you, right?

21   A.  That's what we're expected to do.  I don't know if it's

22   prestigious.

23   Q.  Well, it's important to you to be successful at your job,

24   right?

25   A.  Yes, sir.

GB89FLO4                          Gonzalez - cross

1    Q.  You want to do well, right?

2    A.  Yes, sir.

3    Q.  You want to make big cases, right?

4    A.  Yes, sir.

5    Q.  Now, when you advised Jose Senior who the potential targets

6    of this investigation was he was very excited, right?

7    A.  I believe so.

8    Q.  You said to him that the case involved the First Lady's

9    sons and he said whoa, right?

10   A.  Possible.

11   Q.  It's not possible, it's true?  That's what he said, right?

12   A.  Could have been.  Doesn't surprise me.

13   Q.  You don't recall the conversation?

14   A.  Not exactly, no.

15   Q.  So, 3508-01.  Take a look right here.  Just read down here

16   and let me know if it refreshes your recollection that when you

17   first advised Sentado that the targets of the investigation

18   were the First Lady's sons he said whoa?

19   A.  You mean Mr. Santos Peña?

20   Q.  Correct.  When CS-1 -- when you first told CS-1 that the

21   targets were the First Lady's sons, he said whoa, right?

22   A.  Yes, sir.

23   Q.  That's what he said, right?

24   A.  Yes.

25   Q.  And you said I have a good job for you, right?

GB89FLO4                    Gonzalez - cross

1   A.  Yes.

2   Q.  He said those are the ones I like, right?

3   A.  Yes.

4   Q.  Because his motivation in all of this is making money,

5   right?

6   A.  Yes, sir.

7   Q.  You said something yesterday about how he was working for

8   monetary compensation, right?

9   A.  Yes.

10  Q.  That's a fancy term for making money, right?

11  A.  I don't know if it's fancy.  It's a term, yes.

12  Q.  So he knows that the bigger the target he is able to help

13  you arrest the more money he will make, correct?

14  A.  It's possible.

15  Q.  What do you mean possible?

16  A.  It all depends on the scope of the investigation.

17  Q.  But if he enables you to arrest a high profile target he

18  will make a lot of money, right?

19  A.  Yes.

20  Q.  If you arrest a worker for some drug organization who is

21  not a high level guy in the organization that doesn't give him

22  as much money as if you arrest the boss, correct?

23  A.  Correct.

24  Q.  And if you arrest someone who is a high profile person,

25  that is a more prestigious case for him, correct?

1   A.  I don't know if cases are measured in prestige for him but

2   it's a more important case.

3   Q.  It's just money for him, right?

4   A.  Yes, sir.

5   Q.  And the DEA sets it up that way so that the incentive is

6   very clear for the informants, right?

7   A.  Not necessarily.

8   Q.  Well what other incentive does he have?  He's a paid

9   informant at the time he was working on this investigation,

10  right?

11  A.  Mm-hmm.

12  Q.  What other incentive does he have?

13  A.  Depends on the nature of the investigation.  Some

14  investigations are longer term, shorter term, there is no

15  clear-cut monetary guidelines for how money is paid.

16  Q.  I'm not asking how the money is paid.  The only reason he's

17  doing it is to make money, correct?

18  A.  Yes, sir.

19  Q.  Now, just to be clear that is different for a cooperating

20  witness, right?

21  A.  Correct.

22  Q.  Someone like, for example, Sentado, right?

23  A.  Correct.

24  Q.  When you were talking to Sentado in say October of 2015 a

25  cooperating witness like him is trying to avoid getting sent to

GB89FLO4                    Gonzalez – cross

1    prison, right?

2    A.   Not necessarily avoid getting sent to prison, no.

3    Q.   Well forget about Sentado.   A cooperating witness

4    generally, as you understand it, is someone who has been

5    charged with crimes, right?

6    A.   Yes, sir.

7    Q.   And they either have pleaded guilty or are going to plead

8    guilty to those crimes, correct?

9    A.   Yes.

10   Q.   And they are trying to get a reduced sentence at the end of

11   the day, right?

12   A.   Yes.

13   Q.   So they're not working for money?

14   A.   No, sir.

15   Q.   Now when you -- withdrawn.

16          When the investigation was happening in October of

17   2015 and particularly during the period when Jose Senior and

18   Junior were in Venezuela they were really your eyes and ears

19   for the investigation, right?

20   A.   What was going on in Venezuela, yes.

21   Q.   You weren't down there, right?

22   A.   No, sir.

23   Q.   So you were having very frequent communications with Jose

24   Senior about what was going on, right?

25   A.   I don't know if it was very frequent.

GB89FLO4                          Gonzalez - cross

1  Q.  Well it was everyday, right?

2  A.  Yes.

3  Q.  I mean --

4          MR. RODY:  May I approach, your Honor?

5          THE COURT:  Yes, you may.

6  Q.  They were down there from the 19th through about the

7  30th, right?

8  A.  29th, I believe.

9  Q.  If you take a look in this exhibit which I'll leave up here

10  for your convenience.  You look through here --

11          MR. BOVE:  Judge, that document is not in evidence.

12          MR. RODY:  I'm asking him a question -- I'm asking him

13  a question about whether it refreshes his recollection that he

14  had communications --

15          MR. BOVE:  I'm addressing the judge with an objection.

16          MR. RODY:  Okay.  Sure.

17          THE COURT:  Go ahead.

18          MR. RODY:  The question is take a look through this

19  and let me know if it refreshes your recollection that you had

20  communications with him on a daily basis when they were down in

21  Venezuela.

22          THE WITNESS:  Yes.

23  Q.  Now when you were communicating -- sorry.  When you were

24  communicating with Jose Senior about the course of the

25  investigation you were asking him how the meetings were going,

GB89FLO4                          Gonzalez - cross

1    correct?

2    A.  I believe so.

3    Q.  And you were asking him questions to find out about what

4    the targets of the investigation were like, correct?

5    A.  I believe so.

6    Q.  And you very quickly came to the conclusion that they were

7    amateurs, right?

8    A.  I'm not sure if I very quickly came to that conclusion or

9    not.

10   Q.  But you came to that conclusion, right?

11   A.  Yes.

12   Q.  And you discussed that with Jose Senior, right?

13   A.  Possibly.

14   Q.  Well, you called them idiots in your communications with

15   him, correct.

16   A.  It's possible.

17   Q.  I direct you to page 60 of the exhibit you have there.  Do

18   you see in the middle of the page.  Let me know if that

19   refreshes your recollection that you thought they were idiots.

20   A.  Yes.

21   Q.  And you did think they were idiots, right?

22   A.  That's not why I said that.

23   Q.  So you said he was an idiot not because you thought he was

24   an idiot?

25   A.  Not because he was an amateur, no.

GB89FLO4                      Gonzalez – cross

Q.  How about on page 180.  Take a look at that conversation in
the middle of the page there and let me know if that refreshes
your recollection that you did believe that they were idiots.

            MR. BOVE:  Judge, he has not said that he doesn't have
a recollection of this.  There is not a question about a
statement.

            MR. RODY:  Your Honor, he said it was possible.

            MR. BOVE:  And then there was a question --

            THE COURT:  Well, okay.  He can refresh his
recollection.

            Go ahead.

            THE WITNESS:  Yes.

Q.  Does that refresh your recollection that there you were
referring -- you were calling one of the defendants an idiot
because of something they did that got others involved,
correct?

A.  Correct.

            MR. RODY:  One moment, Judge.

            (Pause)

BY MR. RODY:

Q.  Now you testified earlier today that you recognize that
Jose -- withdrawn.

            You testified earlier that you recognize that your
communications with Jose Senior were vulgar, correct?

A.  Yes.

GB89FLO4                          Gonzalez - cross

1    Q.  And you said that he was vulgar so you had to talk like

2    him, right?

3    A.  I didn't have to.

4    Q.  But you did?

5    A.  Yes, sir.

6    Q.  But there were occasions when you introduced the vulgarity

7    into the conversation, correct?

8    A.  I'm not sure.

9    Q.  Do you recall -- one moment, Judge.

10           Now do you recall having a conversation with Jose

11   about when he attended an outing at a club with the defendants?

12   A.  Yes.  I remember him telling me about that.

13   Q.  And he said to you that they respected Mexicans, meaning

14   the Venezuelans he met in the club respected Mexicans.  Do you

15   recall that?

16   A.  No.  I don't recall that.

17   Q.  Isn't it true that when he said that to you, you said:  Ha,

18   ha, suck your dick.  Right?  Isn't that what you said?

19           MR. BOVE:  Objection, judge.

20           THE COURT:  Strike it.  This is not a politically

21   correct version of conducting a criminal investigation so

22   you're going to have to go on to something else.

23           MR. RODY:  I will, Judge.

24           THE COURT:  The language may be deplorable.  It's got

25   nothing to do with the law charges that we are confronting

GB89FLO4                     Gonzalez - cross

1    here.

2             MR. RODY:  I would ask to be heard.  Maybe we can take

3    it up at the next break.

4             THE COURT:  Not now.

5             MR. RODY:  That's fine.

6    Q.  Now you made a bet with Jose Senior that he couldn't get

7    the defendants to actually go to Haiti to pick up the money,

8    correct?

9    A.  Correct.

10   Q.  You bet him dinner for that, right?

11   A.  Correct.

12   Q.  And you two laughed about it, right?

13   A.  Correct.

14   Q.  In chat messages, right?

15   A.  Yes.

16   Q.  Because you didn't think he was going to actually be able

17   to get these two defendants to fly to Haiti to pick up money,

18   right?

19   A.  Correct.

20   Q.  And the reason you didn't think that is because real drug

21   dealers wouldn't do that, right?

22   A.  No.

23   Q.  It was stupid of them to actually think that they were

24   going to get $11 million -- $20 million upfront in Haiti

25   without delivering any drugs, right?

GB89FLO4                          Gonzalez - cross

1    A.  No.

2    Q.  Now, previously the arrangement that Jose proposed -- Jose

3    Senior proposed to the defendants was that they would deliver

4    drugs to him in Honduras and he would pay part of the money at

5    that time, right?

6              MR. BOVE:  Objection.  Hearsay.

7              THE COURT:  Overruled.

8              THE WITNESS:  Can you repeat the question, please.

9    Q.  Sure.  Previously before the Haiti meeting the arrangement

10   that Jose proposed to the defendants was that they deliver

11   narcotics to Honduras, right, and that he -- that Jose would

12   pay them part of the money at that time, right?

13             MR. BOVE:  Same objection.

14             THE COURT:  Sustained.

15   Q.  You gave Jose Senior instructions about what to propose to

16   the defendants, right?

17   A.  I believe the part about the payment was already

18   established.  I didn't have to give him instructions about

19   that.

20   Q.  And the part about the payment was that they would receive

21   partial payment at the time the drugs were received, right?

22             MR. BOVE:  Objection.  Hearsay.

23             THE COURT:  Overruled.

24             THE WITNESS:  Can you repeat the question.

25   Q.  You said the part about the payment was already

GB89FLO4                          Gonzalez – cross

1  established, right?

2  A.  Yes.

3  Q.  And the part about the payment was originally that they

4  would receive partial payment upfront when they turned over the

5  drugs, right?

6  A.  No.

7  Q.  That was the initial arrangement?

8  A.  No, it was not.

9  Q.  So the initial arrangement was they would deliver the drugs

10  and get the payment later?

11          MR. BOVE:  Objection.

12          THE COURT:  Sustained.

13          MR. RODY:  I'm going to the agent's instructions to

14  the source.

15          THE COURT:  Let's take our afternoon recess.  We'll

16  resume at 2:30.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1          (Jury not present)

2          (Witness excused)

3          THE COURT:  I want no more questions about the

4    vulgarity of the law enforcement team or the CS-1 or CS-2.  The

5    record is established now that people use vulgarity.  I don't

6    think there's a politically correct way of conducting an

7    investigation and it's not going to start here.  So that -- I

8    mean it helps portray people for what they are.  The jury can

9    form an impression based on what they have.  I'm going to have

10   no more of this offensive language in order to establish a

11   point.

12          MR. JACKSON:  Excuse me.

13          THE COURT:  Yes, Mr. Rody.

14          MR. RODY:  I'm trying to actually go towards something

15   totally different which is the relationship between the agent

16   and his source.

17          THE COURT:  Yes.

18          MR. RODY:  Which I --

19          THE COURT:  You don't have to ask him those questions.

20          MR. RODY:  Understood.  But part of it involves -- and

21   I can make a proffer of what some of the things are.  I mean

22   it's -- you know, about he, the agent, views himself as being,

23   you know, part of a team with the sources and things of that

24   nature.  And I think it affects his -- it goes to his bias and

25   motive.

1          It's core bias and motive testimony.  The jury is

2     going to have to rely on his credibility for lots of things but

3     some very important testimony that he gave about the defendants

4     in this case, and so his bias and interest in this case, his

5     interest in achieving a conviction here, in supporting the

6     efforts of his CS are critical to our defense.

7          And so this is what I'm going at.  That one comment

8     was to refute about the -- and I won't say what it was but the

9     last comment that you sustained was to refute his earlier

10    testimony that the CS was vulgar and that he wasn't because

11    that was a situation where he introduced the vulgarity in the

12    conversation.

13         I will not do anymore of those, Judge.

14         THE COURT:  Thank you.  If you do and there's an

15    objection, I'm going to sustain it.

16         MR. RODY:  Understood.

17         THE COURT:  Yes, Mr. Jackson.

18         MR. JACKSON:  Thank you, your Honor.

19         I understand the Court's desire to limit discussion of

20    vulgarity.  I personally was attempting to limit the discussion

21    of vulgarity in not using some of the specific language that's

22    actually used in the communications.

23         My question, your Honor, is understanding your ruling

24    with regard to this witness and the law enforcement witnesses,

25    your Honor is not saying that we can't ask the confidential

GB89FLO4                    Gonzalez - cross

1    source about his bias, right, as it relates to comments that he

2    made specifically about the family members of our defendants?

3            THE COURT:  I'm not ruling on anything that hasn't

4    happened in the courtroom yet.

5            MR. JACKSON:  That's great, your Honor.  I just wanted

6    that clarification.  Thank you, Judge.

7            THE COURT:  What's your objection, Mr. Bove to the

8    line of inquiry that Mr. Rody was in?

9            MR. BOVE:  I think we were trending towards an area

10   that could implicate some classified information.

11           MR. RODY:  I'm done with that area, Judge.

12           THE COURT:  All right.

13           And there was another issue you made objections just

14   before we took a break.

15           Going to have the court reporter read back the last

16   three questions.

17           MR. RODY:  I'm fine going forward.  I don't have any

18   other.

19           MR. JACKSON:  I just want to say one thing about what

20   Mr. Bove just said.  It's classified is not an objection in a

21   federal court.  Now if he wants to raise an issue that relates

22   to something apart from that, that's a completely separate

23   issue but --

24           THE COURT:  What's the relevance of it all?  I mean --

25           MR. RODY:  I'll tell you what the relevance is.

1          THE COURT:  It's attenuated.  And you have to -- this

2    is a short -- this is a proceeding.  It's got to be conducted

3    with some expedition.  And you're asking about the

4    confidentiality of other agencies and whether or not they're

5    the same standards of the DEA.

6          Ask him about the DEA.  I have not sustained an

7    objection to when you're asking about the DEA.

8          MR. RODY:  I apologize.

9          THE COURT:  To get into other intelligence agencies

10   and how they use intelligence and how the DEA interfaces with

11   them, I don't see how that's relevant.  And I've made my

12   rulings on that.

13         Yes.  Mr. Bove.

14         MR. BOVE:  Just in response to Mr. Jackson.  It is

15   actually an objection pursuant to the Classified Information

16   Procedures Act Section 7(c).

17         THE COURT:  I'm not making it about the Classified

18   Information Procedures Act.  I'm making the ruling based on

19   relevance.  I don't think it's relevant.

20         MR. BOVE:  Thank you.

21         THE COURT:  Mr. Rody.

22         MR. RODY:  I'm done.  Can we have two minutes, Judge?

23         THE COURT:  Yes.  Sure.  Take ten minutes.  We'll

24   resume at 25 of 3.

25         MR. JACKSON:  Thank you, your Honor.

GB89FLO4                         Gonzalez – cross

1                    (Recess)

2                    THE COURT:  Marlon, will you call in the jury.

3                    THE DEPUTY CLERK:  Yes, your Honor.

4                    (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 (Jury present)

 2                 THE COURT:  All right, Mr. Rody.

 3                 MR. RODY:  Thank you, Judge.

 4                 THE COURT:  You're welcome.

 5   BY MR. RODY:

 6   Q.  Agent Gonzalez, when Jose Senior and Junior were down in

 7   Caracas, Jose Senior thought he was doing a pretty good job,

 8   right?

 9   A.  Yes, sir.

10   Q.  And he repeatedly referenced Hollywood, right?

11   A.  Yes, sir.

12   Q.  He did that many times in conversations with you, right?

13   A.  I believe so.

14   Q.  And by doing that he was saying that he was conducting

15   these meetings like a Hollywood movie?

16   A.  No, sir.

17   Q.  Well he was complimenting himself for how well he was

18   setting up the defendants, right?

19   A.  No, sir.

20   Q.  Well, sir, you -- didn't you say to him, you recall having

21   a conversation with him where you said:  Who besides me is

22   going to make you look more bad ass in a movie?

23   A.  Possibly.

24   Q.  Well you said it, right?

25   A.  Yes, sir.
```

GB89FLO4                        Gonzalez – cross

1    Q.  You two are friends, right?

2    A.  No, sir.

3    Q.  You are close colleagues, right?

4    A.  No, sir.

5    Q.  You wished him a happy Thanksgiving, right?

6    A.  Yes, sir.

7    Q.  You wished him a Merry Christmas, right?

8    A.  Yes, sir.

9    Q.  You wished him a Happy New Year, right?

10   A.  Yes, sir.

11   Q.  You're not friends with him?

12   A.  No, sir.

13   Q.  You think you're a team with him though, right?

14   A.  Sometimes.

15   Q.  Well you thought of each other as being parts of the same

16   team, right?

17   A.  Yes.

18   Q.  You recall him asking you to give him more cases for

19   Spiderman, referring to himself as Spiderman?

20   A.  I don't remember that part, no.

21   Q.  Could you take a look at that exhibit you have there at

22   page 204 and see if it refreshes your recollection that he

23   asked you to give more difficult cases to Spiderman.

24   A.  Yes, sir.

25   Q.  That's what he said, right?

1   A.  Yes, sir.

2   Q.  And then he said:  Or is it that you and I are the shit,

3   right?

4   A.  Something like that, yes.

5   Q.  And you agreed with him, right?

6   A.  Yes.

7   Q.  You said:  That's true.  Nobody escapes us.

8          Right?

9   A.  Yes.

10  Q.  And he told you at one point we're a team, right?

11  A.  I don't remember that.

12  Q.  Take a look at page 219 of the same exhibit.

13  A.  Yes.

14  Q.  And you agreed with him there, right?

15  A.  Yes.

16  Q.  You said:  We're a fucking amazing team, right?

17          MR. BOVE:  Objection.

18          THE COURT:  Sustained.

19  Q.  You agreed you were a good team with him, right?

20  A.  Yes.

21  Q.  He said you made him happy, right?

22          MR. BOVE:  Objection.  Relevance.

23          THE COURT:  Overruled.

24          MR. RODY:  Let me be more specific.

25          THE COURT:  I said I overruled the objection, but you

GB89FLO4                        Gonzalez - cross

1    can withdraw it.  That's fine too.

2    Q.  In discussions about money you were going to pay him, he

3    said:  You made me happy, right?

4    A.  I don't remember that.

5    Q.  Take a look, please, at page 191.

6    A.  Yes, sir.

7    Q.  So he did say that you made him happy, right?

8    A.  Yes.

9    Q.  And you told him you deserve it, right?

10   A.  Yes.

11   Q.  He said you too, right?

12   A.  That was in reference to me saying he did a good job.

13   Q.  And then he said you too, right?

14   A.  Yes.

15   Q.  And you gave him the thumbs up emoticon, right?

16   A.  Yes.

17   Q.  And he told you that he made you look good on this job,

18   right?

19   A.  I don't see that there.

20   Q.  Well I'm not saying it's there.

21   A.  Oh.

22   Q.  He told you that he made you look good on this job, right?

23   A.  I don't remember that.

24   Q.  Take a look at page 184 and see if that refreshes your

25   recollection.

GB89FLO4                          Gonzalez – cross

1    A.  Yes.

2    Q.  And he did say that he made you look good on this job,

3    right?

4    A.  Yes.  He did say that.

5    Q.  And you believe that's true, correct?

6    A.  No.  Not necessarily.

7    Q.  You disagree with what he said?

8    A.  He did his job.  That doesn't make me look good.  Makes him

9    look good.

10   Q.  You lost your objectivity in this case, right?

11   A.  No, sir.

12   Q.  You got too close to Jose Senior, right?

13   A.  No, sir.

14   Q.  And isn't that why you failed to detect all of his lies and

15   drug dealing?

16   A.  No, sir.

17   Q.  Now, when you finally confronted -- withdrawn.

18           The DEA finally confronted Jose Senior about his

19   illegal activity in late June of 2015, correct?

20   A.  I'm not sure of the exact time but it was in 2016.

21           THE COURT:  You said -- Mr. Rody, you said 2015.  Did

22   you mean 2016?

23           MR. RODY:  I mean 2016.  I apologize, Judge.  You're

24   correct.

25           THE COURT:  Don't apologize.

GB89FLO4                    Gonzalez - cross

1    Q.   Late June of 2016.  That's when you confronted Jose Senior

2    for the first time about his illegal activities, right?

3    A.   I'm not sure of the exact month, sir, but it was around

4    that time.

5    Q.   Now, it was a few months earlier in April of 2016 that you

6    first received information that Jose Senior was involved in

7    illegal activity, right?

8    A.   Yes.

9    Q.   And that came from some other confidential source, right?

10   A.   Yes.

11   Q.   Another confidential source that he had tried to recruit

12   into illegal activity, right?

13   A.   I don't think so.

14   Q.   That was someone you referred to as CS-6?

15   A.   I'm not sure what CS number.

16   Q.   But in any event it was in late June that you first

17   confronted Jose Senior about his illegal activity, right?

18   A.   Again, I'm not sure what month, sir.

19          MR. RODY:  May I approach, your Honor?

20          THE COURT:  Yes, you may.

21   Q.   If we take a look at this exhibit.  I want to direct you to

22   page 266 through 268 and let me know if that refreshes your

23   recollection that you confronted him about his illegal activity

24   on June 29, 2016.

25   A.   We met with him in June but I'm not sure if that's when we

GB89FLO4                    Gonzalez - cross

1    first confronted him.

2    Q.  Keep going and take a look at page -- what I said there,

3    the end of that exhibit, all the way through 268.

4           Do you see communications -- let me direct you to a

5    page.

6           I'm directing you to page 268 and that line, does that

7    refresh your recollection that you confronted him on June 29?

8    A.  No, it does not.

9    Q.  Let me direct you to page 270.  Take a look at that line.

10   And let me know if that refreshes your recollection that you

11   confronted him on June 29.

12   A.  Yes, that does.

13   Q.  And so you did confront Jose Senior on June 29, right?

14   A.  Yes, sir.

15   Q.  Now, the DEA did not arrest Jose Senior or Jose Junior on

16   June 29, correct?

17   A.  No, sir.

18   Q.  You let him go home, right?

19   A.  Yes, sir.

20   Q.  Why?

21   A.  Their information was incomplete.  We wanted to follow up

22   on it, develop additional evidence, and speak with our

23   prosecutors.

24   Q.  They admitted to you that they were engaging in illegal,

25   unauthorized narcotics trafficking for years, correct?

GB89FLO4                          Gonzalez – cross

1    A.  Yes, partially.

2    Q.  What do you mean partially?

3    A.  We didn't feel that they were being completely honest about

4    the extent of it.

5    Q.  Correct.  And they weren't, right?

6    A.  Correct.

7    Q.  But even based on what they said that wasn't enough to

8    arrest them?

9    A.  We wanted to develop additional evidence.

10   Q.  So you let them go home, right?

11   A.  Yes.

12   Q.  And then you did not arrest them until August of 2016,

13   correct?

14   A.  I'm not sure of the date.

15   Q.  In any event when you let them go home -- withdrawn.

16          On June 29 it wasn't just the DEA that met with Jose

17   Junior and Jose Senior.  It was also the prosecutor's office,

18   correct?

19   A.  I'm not sure if they were in there at the end of June.

20   Q.  Take a look at page 270 again.  Let me know if that

21   refreshes your recollection about whether the prosecutors were

22   also there.

23   A.  On that page it didn't say anything about the prosecutors,

24   no.

25          MR. RODY:  Apologizes, Judge.  May I approach.

GB89FLO4                         Gonzalez - cross

1   Q.   Pointing to a line.  Does that refresh your recollection

2   that you met -- that Jose Senior and Junior met with the

3   prosecutors that day.

4   A.   No.  That does not.

5   Q.   Okay.  Let's try on page 267.  Does that refresh your

6   recollection that on June 29 Jose Junior and Senior met with

7   the prosecutors?

8   A.   Yes, it does.

9   Q.   And they did, correct?

10  A.   Yes.

11  Q.   And the prosecutors were furious at Jose Junior and Senior,

12  correct?

13          MR. BOVE:  Objection.

14          THE COURT:  Sustained.

15  Q.   Well, the prosecutors were at the meeting, correct?

16  A.   Yes.

17  Q.   And after the meeting you comforted Jose Senior, correct?

18          MR. BOVE:  Objection.

19          THE COURT:  Sustained.

20  Q.   Isn't it true, sir, that after the DEA confronted Jose

21  Senior you told him not to worry about it?

22  A.   I don't recall that.

23  Q.   Take a look, please, at 270, page 270, the middle of the

24  page.

25          Does that refresh your recollection?

GB89FLO4                    Gonzalez - cross

1    A.  Yes.

2    Q.  You told Jose Senior don't worry, right?

3    A.  That wasn't about the meeting.

4    Q.  You told Jose Senior he was very angry but he got over it,

5    correct?

6            MR. BOVE:  Objection.

7            THE COURT:  Sustained.

8    Q.  You told Jose Senior that law enforcement was angry at him

9    but that they got over it, right?

10           MR. BOVE:  Objection.

11           THE COURT:  Sustained.

12   Q.  He said to you -- do you recall him saying to you that you

13   had to organize your story very well about the nephews?

14   A.  No.  I don't recall that.

15   Q.  Take a look, please, at page 270.

16   A.  Yes.

17   Q.  So, it's true, is it not, that CS-2 -- sorry.  CS-1, Jose

18   Senior said to you:  We have to organize that thing with the

19   nephews very well, right?

20   A.  Yes.

21   Q.  Essentially so he gets -- so Senior gets forgiven, right?

22   A.  I believe that's what he thought.

23   Q.  Forgiven for his illegal activity, right?

24   A.  I don't know what he was referring to.

25   Q.  Well you were a direct participant in this conversation,

GB89FLO4                          Gonzalez - cross

```
 1   right?

 2   A.  Yes.

 3   Q.  And you're saying you can't interpret what you understood

 4   him to mean by that?

 5   A.  He could have been meaning gotten yelled at.

 6   Q.  And he did get yelled at, right?

 7              MR. BOVE:  Objection.

 8              THE COURT:  Sustained.

 9   Q.  Were you at the meeting that he had with the DEA and the

10   prosecutors?

11   A.  Yes.

12   Q.  And after saying that he had -- that you -- he said we had

13   to organize about the nephews, he said count on me, right?

14   A.  Yes.

15   Q.  And you gave him the thumbs up emoticon, right?

16   A.  Yes.

17   Q.  He was talking about getting his story straight with you

18   about these defendants, right?

19   A.  No.

20              MR. RODY:  One moment, Judge.

21          (Pause)

22   Q.  Now, you participated in a number of long-term

23   investigations that result in the arrests of subjects in

24   foreign countries, correct?

25   A.  Yes.
```

GB89FLO4                        Gonzalez – cross

1    Q.  And the goal of SOD is to disrupt and dismantle major

2    narcotics organizations, correct?

3    A.  That's one of them, yes.

4    Q.  And you want to seize drugs when you can, right?

5    A.  Yes.

6    Q.  You want to arrest the key members of the organization,

7    right?

8    A.  Yes.

9    Q.  You want to seize their assets or their property, right?

10   A.  Yes.

11   Q.  Now, when you arrest someone in a foreign country, one of

12   your primary goals is to try to get them to cooperate in your

13   investigation, right?

14   A.  That's one of them, yes.

15   Q.  And if not cooperate you'd like to get a postarrest

16   statement from them, correct?

17   A.  That's not either or.

18   Q.  Okay.  So in addition to cooperating you'd like to get them

19   to confess to the crime, right?

20   A.  Yes.

21   Q.  Now, these arrests in foreign countries are meticulously

22   planned out by the DEA, right?

23   A.  Sometimes.

24   Q.  So sometimes they're just haphazard?

25   A.  Sometimes other countries plan them.

GB89FLO4                          Gonzalez - cross

1   Q.  The operation in this case in Haiti was meticulously

2   planned out by the DEA, right?

3   A.  I wouldn't say meticulously, no.

4   Q.  So it was medium planned out by the DEA?

5   A.  It was planned out.

6   Q.  The Haitians had no evidence that these men had committed

7   any crime, correct?

8   A.  Not to my knowledge.

9   Q.  And so the only reason they were affecting the arrest was

10  on the word of the DEA, right?

11  A.  Yes.  And the arrest warrant that we showed them.

12  Q.  By the way --

13          MR. RODY:  Mr. Calabrese, could we just get GX69 again

14  up.

15  Q.  This is the photo of the plane that you saw during prior

16  cross-examination, right, Agent?

17  A.  Yes, sir.

18  Q.  And just to be clear the DEA didn't seize any planes from

19  the defendants in this case, correct?

20  A.  No, sir.

21  Q.  And your investigation turned up no evidence that either

22  defendant owns any planes, correct?

23  A.  No, sir.

24  Q.  No, they don't own any planes, correct?

25  A.  Correct.

GB89FLO4                        Gonzalez – cross

1            MR. RODY:  Okay.  You can take that down.  Thanks.

2   Q.  Now you said on the day of the arrest in Haiti that you saw

3   four or five of these BLTS officers go into the hotel to effect

4   the arrest, right?

5   A.  Yes, sir.

6   Q.  And these guys are heavily armed guys with helmets and long

7   guns and pistols, right?

8   A.  Yeah.  They had a long gun and pistol, I believe.

9   Q.  They've got masks covering their faces, right?

10  A.  I don't know if all of them did.

11  Q.  Some of them did, right?

12  A.  Yes, sir.

13  Q.  And this was -- withdrawn.

14           Now, you said before you yourself came to the

15  conclusion that these guys were amateurs, right?

16  A.  No.

17  Q.  You didn't say that earlier in your testimony today?

18  A.  You said I came to the conclusion.

19  Q.  You did not come to the conclusion that the defendants were

20  amateurs?

21  A.  At one point I believed that but the conclusion I came to

22  is that they're not.

23  Q.  But you knew they weren't dangerous, right?

24  A.  I did not know that, no.

25  Q.  Well, the BLTS understood that they were not dangerous,

1    correct?

2    A.   I don't know what he understood.

3              (Continued on next page)

1   BY MR. RODY:  (continuing)

2   Q.  Well, there was no need for four or five officers to come

3   in, in full military gear to arrest these two men, was there?

4           MR. BOVE:  Objection.

5           THE COURT:  Sustained.

6   Q.  When you effect arrests like this overseas, is it one of

7   the purposes of the method of arrest to better enable to you

8   get a statement from them afterwards?

9           MR. BOVE:  Objection.

10          THE COURT:  Sustained.

11  Q.  After the defendants were arrested they were separated

12  immediately into different cars, right?

13  A.  I'm not sure if they were in two different cars or the same

14  car.  I don't recall.

15  Q.  They were driven to a BLTS building somewhere, correct?

16  A.  Yes, sir.

17  Q.  And they were separated in that building, right?

18  A.  Yes, sir.

19  Q.  And you knew that they were scared, right?

20  A.  I believe they were scared, yes.

21  Q.  You acknowledged to Jose that the defendants were scared

22  shitless, right?

23  A.  Yes, sir.

24  Q.  Now, meanwhile, while the defendants were being processed

25  in Haiti or just sitting there in a Haitian building, DEA

GB85flo5                        Gonzalez – cross

1   agents went and looked at the plane they had just flown in on,

2   right?

3   A.  No, sir.

4   Q.  The BLTS officers looked at the plane?

5   A.  Yes, sir.

6   Q.  And they found no drugs, right?

7   A.  Not that I'm aware of, no.

8   Q.  They found no weapons, right?

9   A.  Not that I'm aware of.

10  Q.  Well, you would be aware of it if they had found anything,

11  right?

12  A.  I assume they would have told me.

13  Q.  Now, Senior had told you that defendants had drugs packed

14  in suitcases, right?

15  A.  Yes.

16  Q.  He said check them well, right?

17  A.  I don't know if he said check them well.

18  Q.  He said check them because they have moved drugs, right?

19  A.  I don't remember if he said that.

20  Q.  Well, they didn't have any drugs on that plane, right?

21  A.  No, sir.

22  Q.  You said earlier today that, I believe you said that you

23  never discovered evidence that the defendants ever sent a load

24  of drugs to the U.S. directly.

25          Do you recall that?

GB85flo5                         Gonzalez - cross

1    A.  Yes, sir.

2    Q.  Well you never found any evidence to suggest that they sent

3    drugs to the U.S. indirectly either, right?

4    A.  There is evidence that we obtained about drug shipments.  I

5    don't recall where the location was.

6    Q.  You concluded, did you not, that the defendants were never

7    going to produce any 800 kilos of drugs, right?

8    A.  No, I did not conclude that.

9    Q.  Well, they came to pick up the money, right?

10   A.  Yes.

11   Q.  And you arrested them at that time, right?

12   A.  Yes, sir.

13   Q.  And you didn't wait for them to deliver the drugs, right?

14   A.  No, sir.

15   Q.  And when they were removed from Haiti they were expelled

16   from Haiti, correct?

17   A.  I believe so.

18   Q.  They were not extradited from Haiti?

19   A.  I don't believe that was the Haitian paperwork, no.

20   Q.  You talked about how you did not want the defendants to

21   make a phone call home because you said that would risk

22   interference by the Venezuelan government; is that right?

23   A.  Yes, sir.

24   Q.  But, you know, meaning like the Venezuelan government

25   trying to prevent them from being extradited to the United

GB85flo5                      Gonzalez – cross

1    States?

2    A.  Yes.

3    Q.  And extradition is a formal legal process where you can

4    fight your removal to another country, right?

5         MR. BOVE:  Objection.

6         THE COURT:  Sustained.

7    Q.  The DEA did not -- withdrawn.

8         You chose expulsion over extradition, right?

9         MR. BOVE:  Objection.

10        THE COURT:  Overruled.

11   A.  I don't believe we chose it.

12   Q.  That was a decision made by the DEA, right?

13        MR. BOVE:  Objection.

14        THE COURT:  Overruled.

15   A.  I believe it is a decision by the Haitians.

16   Q.  You said that after the defendants were arrested other DEA

17   agents went to some office in Haiti to try to apply to get the

18   defendants expelled, right?

19   A.  Correct.

20   Q.  So that was something the DEA did, right?

21   A.  Yes.  DEA wrote that letter, yes.

22   Q.  You made the application, right?

23   A.  I believe so, yes.

24   Q.  Because you didn't want to allow them to go through

25   extradition, correct?

GB85flo5                          Gonzalez - cross

1         MR. BOVE:  Objection.

2         THE COURT:  Sustained.

3   Q.  Mr. Calabrese, can we get Exhibit 56?  Thanks.

4         So, this is a photograph that shows the defendants

5   before they boarded the DEA plane to get brought to the United

6   States, correct?

7   A.  Yes, sir.

8   Q.  And did you take this photograph?

9   A.  I'm not sure if I took it.  I took some photos, other

10  people took photos of that same event right there.

11  Q.  Right; and there were a number of photos taken of that

12  event as you just described it, right?

13  A.  I believe so.

14  Q.  Did you provide those photos to the U.S. Attorney's office?

15  A.  Yes, I did.

16  Q.  You provided all of them?

17  A.  Yes, sir.

18  Q.  Who else took photos besides you?

19  A.  I'm not sure.

20  Q.  Other DEA agents?

21  A.  I believe so.

22  Q.  You don't know?

23  A.  No, I don't know.

24  Q.  There were strangers standing there taking photographs?

25  A.  No, there weren't any strangers there.

GB85flo5                        Gonzalez - cross

1   Q.  The only people there were DEA agents and BLTS officers,

2   correct?

3   A.  Yes.

4   Q.  So who took the other photographs?

5   A.  I assume the other DEA agents.  I wasn't watching what they

6   were all doing.

7   Q.  Now, you see how it says "police" on the front of their

8   uniforms there?

9   A.  Yes, sir.

10  Q.  Mr. Calabrese, I apologize.  Can we get Government Exhibit

11  50, please?

12          Now, in this photo, sir, it says "police" on the back

13  of all the uniforms, right?

14  A.  Yes.

15  Q.  Do you see the one guy -- well, there is two guys facing

16  forward; it doesn't say "police" on the front of them, right?

17  A.  I don't see that.  No.

18  Q.  Then can we go back to 56, Mr. Calabrese?  Thanks.

19          It says it on the front here, right?

20  A.  Yes, it does.

21  Q.  Police.

22          Did those officers take those patches off and put them

23  on the front for purposes of that photograph?

24  A.  I don't recall them doing that, no.

25  Q.  Did you tell them to do that?

GB85flo5                          Gonzalez – cross

```
 1   A.  No, sir.
 2   Q.  Because if it didn't say "police" on the front and you saw
 3   those men coming at you dressed like that, you wouldn't know
 4   who was arresting you, right?
 5           MR. BOVE:  Objection.
 6           THE COURT:  Sustained.
 7   Q.  You said that there were a number of pictures taken of this
 8   event.  The DEA takes pictures like this every time they arrest
 9   a subject in a foreign country, right?
10   A.  I wouldn't say every time.
11   Q.  Almost every time.
12   A.  It's possible.  I don't know, I'm not present at all the
13   arrests outside of the United States.
14   Q.  Good point.
15           Nobody else's cases, just your cases.  Whenever
16   possible, you take photos like that, right?
17   A.  Sometimes yes, sometimes no.
18   Q.  We can take that down, please.
19           And the purpose of taking those photos, those are like
20   trophy photos for the DEA agents, right?
21           MR. BOVE:  Objection.
22           THE COURT:  Sustained.
23   Q.  Are there other photos like that, that you recall seeing,
24   with other DEA agents with the defendants on the tarmac?
25           MR. BOVE:  Objection.
```

1          THE COURT:  With these defendants?

2          MR. RODY:  Correct.

3          THE COURT:  The objection is overruled.

4    A.  No, sir.

5    Q.  No, no other photos exist?

6    A.  Your question is if I recall seeing any other photos with

7    other DEA agents there?

8    Q.  And you don't recall any such photos?

9    A.  No, sir.

10   Q.  Okay.

11          Is it possible there are?

12   A.  I don't think so, no.

13   Q.  Now, when the defendants got on the plane finally at around

14   4:30, this had been about at least five or six hours after they

15   were arrested at the hotel, correct?

16   A.  I believe it is about four and a half, five hours.

17   Q.  Okay.

18          And, as far as you know, they had not eaten; correct?

19   A.  They ate at the hotel, yes.

20   Q.  You know they ate at the hotel?

21   A.  Yes, sir.

22   Q.  How do you know they ate at the hotel?

23   A.  Because when I went inside there to meet with CS–1 the

24   table was full of cutlery and half eaten food and scraps.

25   Q.  So, they had nothing to eat from around 11:15 until 4:30,

1  right?

2  A.  Unless the Haitians gave them food.  I don't know.

3  Q.  You don't know, right?

4  A.  No, sir.

5  Q.  And when you -- then you get on the plane, right, and you

6  took off, correct?  At some point you say that you conducted an

7  interview of both Mr. Campo and Mr. Flores, right?

8  A.  Yes, sir.

9  Q.  And you gave them an advice of rights form in Spanish,

10 right?

11 A.  Yes, sir.

12 Q.  And that advice of rights form, could we see, for example,

13 103, Mr. Calabrese, please?

14        Now, that's the advice of rights form you showed to

15 Mr. Flores de Freitas?

16 A.  Yes.  That's what I gave him.

17 Q.  Right.

18        Nowhere on it does it advise of him of his right to

19 consult with an official from the Venezuelan consulate before

20 his departure -- or speaking with you, correct?

21        MR. BOVE:  Objection.

22        THE COURT:  Sustained.

23 Q.  Are you aware of DOJ requirement --

24        MR. BOVE:  Objection, Judge.

25        THE COURT:  Let him finish the question.

GB85flo5                        Gonzalez – cross

1              MR. RODY:  I haven't finished the question, Judge.

2              THE COURT:  Let him finish the question.

3  Q.  Are you aware of the DOJ requirement that arrestees of

4  foreign countries are to be advised of their right to consult

5  with someone from their consulate?

6              MR. BOVE:  Objection.

7              THE COURT:  Sustained.

8  Q.  You can pull that down, Mr. Calabrese.

9              Now, when you were interviewing the defendants, as

10  Mr. Jackson asked you, you were interviewing them in Spanish,

11  correct?

12  A.  Yes, sir.

13  Q.  But you took your notes in English, right?

14  A.  Yes, sir.

15  Q.  So, you were simultaneously translating from

16  Spanish-to-English, right?

17  A.  Yes, sir.

18  Q.  And are you qualified as a translator?

19  A.  I have been before, yes.

20  Q.  And when you are doing that simultaneous translation you

21  are not actually writing down what they're saying, correct?

22  A.  What do you mean?

23  Q.  You are not writing down the actual words they are saying,

24  right?

25  A.  I'm translating the words they're saying.  Do you mean in

GB85flo5                        Gonzalez – cross

```
 1    Spanish?
 2              THE COURT:  I think his question is you are not
 3    writing down the Spanish that the two defendants were using.
 4              THE WITNESS:  No, sir.
 5              THE COURT:  Is that what you wanted to know?
 6              MR. JACKSON:  Correct, Judge.  Thanks.
 7    BY A JUROR:
 8    Q.  You are not writing down in Spanish, right?
 9    A.  No, sir.
10    Q.  You are writing down the English and you are doing this in
11    real-time as you are talking to them, correct?
12    A.  Yes, sir.
13    Q.  You are posing questions, right?
14    A.  Yes, sir.
15    Q.  They're answering, right?
16    A.  Yes, sir.
17    Q.  You are translating and writing it down, right?
18    A.  Yes, sir.
19    Q.  And then you were posing another question, right?
20    A.  Yes, sir.
21    Q.  And, fair to say, things get lost in translation when you
22    are translating from one language to another, correct?
23              MR. BOVE:  Objection.
24              THE COURT:  Overruled.
25    A.  Not in this case, no.
```

GB85flo5                          Gonzalez – cross

1   Q.  You did it perfectly?  That's your testimony?

2   A.  Yes, sir.

3   Q.  It is a perfect translation?

4   A.  Yes, sir.

5   Q.  We don't know, though, right?

6   A.  Yes, we do.

7   Q.  Because you said so?

8   A.  Yes, sir.

9   Q.  Well, we don't have a recording to see what they said,

10  right?

11  A.  Actually, there is evidence that corroborates the

12  information they provided to me in those post-arrest

13  statements.

14  Q.  But there is no recording of them saying it in Spanish to

15  prove that, as you just put it, your translation was perfect.

16  A.  No.  There is no recording.

17  Q.  Let me ask you a question about that.

18          Mr. Calabrese, can we have Government Exhibit 59?

19          Is this the seat where you interviewed both

20  defendants?

21  A.  Yes, sir.

22  Q.  So, this is like a bench seat and there is another seat on

23  the other side of the photograph, right, that's a mirror image

24  of those seats; is that correct?

25  A.  No, it is not a mirror image.

GB85flo5                        Gonzalez – cross

1    Q.  So, how many seats are on the other side facing those two

2    seats?

3    A.  None are facing that seat.

4    Q.  So, what is across from those two seats?

5    A.  It's another seat facing forward, I believe.

6    Q.  So, you said that you -- and when you were interviewing

7    both defendants, which seat were they sitting in and which seat

8    were you sitting in?

9    A.  I believe I was on the seat to the right and they were in

10   the seat to the left.

11   Q.  So, as we look at the photograph, you were on the seat to

12   the right or you were on the seat to the right as you sat on

13   the seats?

14        Do you understand my question?

15   A.  Yes, I do.

16        As we look at it, I believe I was sitting on the right

17   and they were seated on the left.

18   Q.  Got it.

19        So, you were in the seat closer to that orange thing,

20   whatever that is?

21   A.  I believe so.

22   Q.  And they were in the seat closer to the coffee cup, right?

23   A.  I believe so.

24   Q.  Okay.  And where was Agent Zach?

25   A.  In the seat in front of us facing forward.

GB85flo5                         Gonzalez - cross

1   Q.  I am going to try to draw on this thing.  It is not going

2   work.

3           Is that the seat in the lower right-hand portion of

4   the photograph?

5   A.  Yes, sir.

6   Q.  And he is right there when you are interviewing them,

7   right?

8   A.  Yes, sir.

9   Q.  And you said that both defendants -- you interviewed them

10  one at a time, correct?

11  A.  Yes, sir.

12  Q.  And both defendants were handcuffed and in leg irons,

13  right?

14  A.  Handcuffed in the front and leg irons, yes.

15  Q.  Right.

16          And let's take Mr. Campo Flores, for example.  With

17  the Court's permission, can we have Mr. Campo Flores stand up?

18          THE COURT:  Yes.

19  Q.  Can you stand up, sir, please?

20          He is what, 5'6"?  5'7"?

21  A.  About my size.

22  Q.  How tall are you?

23  A.  5'7".

24  Q.  And he is about what, 120 pounds?

25  A.  He looks a little heavier than that.

1    Q.  Okay.  And so you are saying --

2            You can sit down, thanks very much.

3            And so you are sitting in the right-hand seat and he

4    is in the left-hand seat?

5    A.  Yes, sir.

6    Q.  And Agent Zach is right across from you, right?

7    A.  Yes, sir.

8    Q.  And he is a bigger guy, right, Agent Zach?

9    A.  Not as burly as you but he is bigger than me.

10   Q.  By the way, on the other side the seat you have Kimojha

11   Brooks, right?

12   A.  He was all the way in the rear.

13   Q.  And Kimojha Brooks is a big giant man, right?

14   A.  He is a big man, yeah.

15   Q.  He played college football, right?

16   A.  I believe so.

17   Q.  At LSU, right?

18   A.  Yes, sir.

19   Q.  So your testimony, I believe was, that you couldn't record

20   your interview in that circumstance for a safety reason?

21   A.  Yes, sir.

22   Q.  So you could have taken your phone, for example, and just

23   put it on record and, for example, put it where that coffee cup

24   is, right, and just left it there, right?

25   A.  I could have.

GB85flo5                    Gonzalez - cross

1    Q.  Then you would have had both of your hands, right?

2    A.  Well, I am actually writing so I don't have both of my

3    hands.

4    Q.  You are writing but Agent Zach is right across from you,

5    right?

6    A.  Yes.

7    Q.  And he could have been at the ready in case anything

8    happened, right?

9    A.  I guess he was sitting in his seat.

10    Q.  Okay.

11            And Mo Brooks is just on the other side of those

12    seats, right?

13    A.  No.  He is in the rear of the plane.

14    Q.  It is a small plane, sir?

15    A.  Not that small.

16    Q.  You can take that down.

17            Agent, can you admit, under oath here, that you made

18    up the excuse about the safety concern?

19            MR. BOVE:  Objection.

20            THE COURT:  Sustained.

21    Q.  Isn't it true, sir, that you wanted to control what

22    information would come out of those interviews?  Isn't that

23    right, sir?

24    A.  No, sir.

25    Q.  You didn't want there to be a recording, isn't that right?

1    A.  No, sir.

2    Q.  Well, you made a decision not to record it, right?

3    A.  Yes.

4    Q.  Because you wanted to control what the story was that came

5    out of those statements, right?

6    A.  No, sir.

7    Q.  And with respect to Mr. Flores, you interviewed him for a

8    very short period of time, correct?

9    A.  Yes, sir.

10   Q.  You said that the form was signed at 7:37; is that right?

11   A.  I believe so.

12   Q.  And the plane landed at about 8:10; is that correct?

13   A.  I believe so.

14   Q.  And you had to stop questioning sometime before landing to

15   go through the landing procedure, right?

16   A.  We stopped right about the time we were on approach to

17   land.

18   Q.  Right; and that is several minutes before you actually

19   land, right?

20   A.  Not that much.

21   Q.  How many minutes before you landed did you stop talking to

22   him?

23   A.  A minute or two.  It was pretty close.

24   Q.  You were already almost on the ground before you stopped

25   talking to him?

1  A.  Yes, sir.

2  Q.  And when the plane landed in White Plains on November 10th,

3  that was the only time that anything having to do with this

4  case occurred in the United States, right?

5  A.  Other than negotiations.

6  Q.  Well, sir, all of the conversations that the CSs had with

7  the defendants took place in foreign countries, right?

8  A.  Yes, sir.

9  Q.  So, when they -- when the plane landed in White Plains,

10  that's the first time anything actually happened on U.S. soil,

11  right?

12  A.  Yes, sir.

13  Q.  Now, you learned, did you not, that prior to this

14  investigation Mr. Flores had made a trip to the United States,

15  correct?

16  A.  I don't recall when I learned that.

17  Q.  At some time you learned it?

18  A.  Yes, sir.

19  Q.  You had his passport, correct?

20  A.  Yes, sir.

21  Q.  And you saw that he came to Florida between August 9th and

22  23rd, 2015, right?

23  A.  I believe those are the dates.  I'm not a hundred percent

24  sure.

25  Q.  And through your investigation you learned that he had gone

1    to universal studios, correct?

2              MR. BOVE:  Objection.

3              THE COURT:  Overruled.

4    A.  I don't recall where he went, sir.

5    Q.  But you -- you don't recall where he went.

6              Well, you looked at some of the contents of his phone,

7    correct?

8    A.  Yes, sir.

9    Q.  And you saw photographs of him in universal studios with

10   his son, correct?

11             MR. BOVE:  I object to this line on hearsay ground.

12             THE COURT:  I will let it go on for a little while

13   longer.

14             Go ahead.  The objection is overruled.

15   A.  I remember him being in Miami.  I don't remember photos.

16   Q.  Now, I want to focus on the period of time after Jose, Sr.

17   and Jr. left Caracas.  You mentioned earlier that you met with

18   them in early November at SOD headquarters, correct?

19   A.  It wasn't at our building but it was in the general area.

20   Q.  Okay.

21             But it was in the general area of your building

22   because that's where you were located, right?

23   A.  Yes, sir.

24   Q.  And this was your chance to debrief Jose, Sr. and Jose, Jr.

25   about what had occurred when they were in Caracas, right?

GB85flo5                         Gonzalez - cross

1    A.  Yes, sir.

2    Q.  And did you debrief them at the same time together?

3    A.  I don't recall.

4    Q.  Well, proper informant practice would be to debrief sources

5    separately, right?

6    A.  Not necessarily.

7    Q.  Well, if you debrief sources together in the same room then

8    they hear what each other is saying, right?

9    A.  Yes.

10   Q.  You wouldn't want two witnesses to hear what the other is

11   saying, correct?

12   A.  There were recordings of what they were doing so I don't

13   recall if they were both there together or not.

14   Q.  Right; but you were not just asking them about what

15   occurred on the recordings, were you, sir?

16   A.  I believe so.

17   Q.  So you didn't ask them any questions about any of their

18   communications with the defendants aside from the reported

19   meetings?

20   A.  I don't recall.  I wasn't the only person talking to them

21   there.

22   Q.  Well, sir, isn't it proper practice to debrief informants

23   separately?

24   A.  Not necessarily.

25   Q.  In any event, that's not what you did here, right?

1    A.  I don't recall.

2    Q.  You took notes of your meeting with them, correct?

3    A.  I believe so.

4    Q.  Let me approach, if I may, your Honor, with 3508-07?

5         THE COURT:  Yes.

6    Q.  Page 7.  Take a look at the top of the page and let me know

7    if that refreshes your recollection whether you debriefed Jose,

8    Jr. and Sr. together at the same time.

9    A.  Yes.

10   Q.  And you did, correct?

11   A.  Yes.

12   Q.  And also present was Agent Matt Mahoney?

13   A.  Does it say that there?

14        Yes, he was.

15   Q.  Who else was present at that debriefing?

16   A.  What are the initials there?

17   Q.  Let's see if this refreshes your recollection about who

18   else was there.

19   A.  Our intel analyst Jennifer Tall.

20   Q.  You talked, did you not, with Jose, Jr. and Sr. about what

21   they had done down in Caracas, right?

22   A.  Yes, sir.

23   Q.  And they lied to you, right?

24   A.  Yes, sir.

25   Q.  They lied to you about all different kinds of stuff, right?

1    A.  No, sir.

2    Q.  Well, they lied to you about using drugs, right?

3    A.  Yes, sir.

4    Q.  They lied to you about using prostitutes, right?

5    A.  Yes, sir.

6    Q.  They lied to you, most importantly, about bringing an

7    unauthorized man into a meeting, correct?

8    A.  Yes, sir.

9    Q.  Now, you talked during that debriefing session with Jose,

10   Sr. about his efforts to discuss the United States during his

11   meetings with the defendants, correct?

12   A.  I believe I did.

13   Q.  And you documented what he said he -- withdrawn.

14          You documented what Jose, Sr. said had been the

15   conversations about the United States, correct?

16   A.  I would have to see the report to see how it was written

17   but I didn't write the report, so.

18   Q.  I am talking about your notes.

19   A.  Okay, then I would have to see my notes.

20          MR. RODY:  One moment, Judge?

21          (Pause)

22   Q.  So, take a look at this, it is a copy of 3508-07, and let

23   me direct your attention to pages 7 through 11.  If you could

24   just take a look at that and let me know if that refreshes your

25   recollection that Jose, Sr. told you what he said occurred

GB85flo5                          Gonzalez - cross

1    during the meetings with respect to the United States.  All

2    right?

3              Have you had a chance to look at that, Agent?

4    A.  Yes, sir.

5    Q.  Okay, so does that refresh your recollection that one of

6    the things that you talked about was what Jose said occurred in

7    the meetings with regard to the United States?

8    A.  Yes, sir.

9    Q.  And one of the things he told you was that he had stated to

10   Mr. Campo -- or the defendants, not to touch the kilogram --

11   not to touch the kilogram -- because one day it could end up

12   seized in the United States and it would have his prints?

13             MR. BOVE:  Objection.  Hearsay.

14             THE COURT:  Overruled.

15   Q.  Let me direct you to page 11.

16   A.  Yes, sir.

17   Q.  So, senior said to you, now that you have had a chance to

18   look at that, senior told you at the time that he had said to

19   the defendants don't touch the brick without gloves because you

20   could leave prints that would end up in the United States;

21   right?

22   A.  Yes, sir.

23   Q.  And, by the way, at the time that you had this meeting they

24   had just given you the recording devices, right?

25   A.  Yes, sir.

GB85flo5                         Gonzalez - cross

1   Q.  So you had not listened to any of the recordings yet,

2   right?

3   A.  No, sir.

4   Q.  You hadn't, right?

5   A.  No, sir.

6   Q.  Now, when Jose told you that, that was a lie, right?

7   A.  I don't know that to be a lie.

8   Q.  Well, in preparation for your testimony here you have

9   reviewed the recordings, correct?

10  A.  Yes, sir.

11  Q.  And you have reviewed transcripts of those recordings,

12  right?

13  A.  Yes, sir.

14  Q.  And the meeting where the defendants brought the alleged

15  brick was on October 27, correct?

16  A.  I believe that was the date.

17  Q.  Do you have any reason to believe that it was not October

18  27th?

19  A.  There are just a lot of dates.

20  Q.  Are you not good with dates?

21  A.  Sometimes.

22  Q.  So, isn't it true that nowhere on the recording of that

23  actual meeting where they're discussing the alleged brick is

24  there any discussion about not wanting your prints to end up in

25  the United States.  He never says that, isn't that right?

GB85flo5                        Gonzalez - cross

1    A.  I'm not sure.

2    Q.  Well, let me hand you the transcripts of that meeting.

3              THE COURT:  That meeting being October 27th.

4              MR. RODY:  Correct, Judge.

5    Q.  Those are the transcripts of the recording of that meeting;

6    is that correct?

7    A.  Yes, sir.

8    Q.  Let me take it back for a second and I will try to confirm

9    that that's the meeting where they're discussing at least that

10   subject.  Take a look at page 2 of 212T, just to see if that

11   refreshes your recollection that it was in fact the October

12   27th meeting when they were discussing the alleged brick.

13   A.  Yes.

14   Q.  So that was the meeting when they discussed that?

15   A.  Yes, sir.

16   Q.  So, you know, I would ask you to take a look at this, these

17   transcripts, all of them, and see if it refreshes your

18   recollection that nowhere in the actual recording does Jose,

19   Sr. say that your prints will end up in the U.S.

20             THE COURT:  Do you want to go on to another question

21   because this is coming to the end of the day.

22             MR. RODY:  I understand, Judge.

23             THE COURT:  And it is going to take him longer than we

24   have.

25             MR. RODY:  It will.  I will move on to something else.

1    Q.  Let's talk about the other thing that we mentioned.  Why

2    don't you put that aside, Agent.  We will come back to it.

3            The other thing that Jose, Sr. and Jose, Jr. lied

4    about was the fact that they brought this third man to the

5    meeting with them, right?

6    A.  Yes, sir.

7    Q.  And you discussed, I believe on direct testimony, how they

8    traveled to Caracas, right?

9    A.  Yes, sir.

10   Q.  On October 19th, right?

11   A.  Yes, sir.

12   Q.  And the whole time they were lying to you, right?

13   A.  No, not the whole time.

14   Q.  Well, they were lying to you the whole time about the fact

15   that they brought a pal with them to Caracas, right?

16   A.  Yes, they were lying about that.

17   Q.  Some other guy, right?

18   A.  Yes, sir.

19   Q.  Who they refer to as Paul; is that right?

20   A.  I don't know how they refer to him.

21   Q.  And this was a guy that they paid for to come to Caracas

22   with them with DEA money, right?

23   A.  I don't know how they paid.

24   Q.  Well, didn't they admit afterwards that they used DEA money

25   to pay for him to go to Caracas with them?

GB85flo5                       Gonzalez - cross

1   A.  I don't know.  I wasn't present for those interviews with

2   them about that.

3   Q.  But you are the case agent on this case, right?

4   A.  Yes, sir.

5   Q.  And you know that both of these paid informants lied about

6   that, right?

7   A.  Yes, sir.

8   Q.  And not only did they bring him to Caracas with them but

9   they took him to meetings they had with the defendants, right?

10  A.  I believe so.

11  Q.  This was completely unauthorized by the DEA, right?

12  A.  Yes, sir.

13  Q.  You did not know about it, right?

14  A.  No, sir.

15  Q.  You would not have authorized it if you had known about it,

16  right?

17  A.  Correct.

18  Q.  It could have seriously compromised the operational

19  security for the investigation, right?

20  A.  Possibly.

21  Q.  And, you learned, after this all came to light, that he had

22  been staying in the same hotel as them, correct?

23  A.  Yes, sir.

24  Q.  And going back to one thing from yesterday, I believe, you

25  required the CSs to provide you with receipts for their air

1    fare, correct?

2    A.  Yes, sir.

3    Q.  But not any receipts for food for example, right?

4    A.  No.

5    Q.  You just paid them for whatever they told you they had

6    spent on food, right?

7    A.  No.

8         We roughly calculate the amount that we spend when we

9    travel, on food, and we generally give them that amount.

10   Q.  Right.

11        And you have no idea, as you sit here today, whether

12   they used that money to buy cocaine for themselves, right?

13   A.  Correct.

14   Q.  You have no idea whether the two sources and their buddy,

15   whatever his name is, used that money for prostitutes, correct?

16   A.  No, I don't know.

17        THE COURT:  Mr. Rody, is this a convenient time?

18        MR. RODY:  This is fine, Judge.

19        THE COURT:  We are going to break now.  We will resume

20   tomorrow morning at 9:30.  Remember what my instructions are:

21   Keep open minds, don't discuss the case, don't do any

22   independent research.  If you haven't already voted, there is

23   still plenty of time to vote.

24        So, safe home tonight, and we will see you tomorrow

25   morning at 9:30.

GB85flo5                          Gonzalez – cross

1            A JUROR:  Thank you.  Good night.

2            (Continued next page)

GB85flo5                          Gonzalez – cross

1                (Jury not present)

2                THE COURT:  You are still on cross-examination, so

3    please don't talk to the government tonight.

4                THE WITNESS:  Yes, your Honor.

5                THE COURT:  Thank you.  You are excused.

6                (witness steps down)

7                THE COURT:  Is there anything you want to take up?

8                MR. BOVE:  No, your Honor.  Thank you.

9                MR. JACKSON:  Thank you, Judge.

10               (Adjourned to 9:30 a.m., November 9, 2016.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

SANDALIO GONZALEZ

Cross By Mr. Jackson . . . . . . . . . . . . . 258

Cross By Mr. Rody  . . . . . . . . . . . . . 348