GBF5flo1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

                    v.                    15 Cr. 765 (PAC)

EFRAIN ANTONIO CAMPO FLORES and
FRANQUI FRANCISCO FLORES DE FREITAS,

                    Defendants.
------------------------------x

                                          New York, N.Y.
                                          November 15, 2016
                                          9:40 a.m.
Before:

                    HON. PAUL A. CROTTY,

                                          District Judge

                         APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
EMIL J. BOVE III
BRENDAN F. QUIGLEY
     Assistant United States Attorneys

BOIES, SCHILLER & FLEXNER LLP
     Attorneys for Defendant Campo Flores
RANDALL W. JACKSON
JOHN T. ZACH
JOANNA CHRISTINE WRIGHT

SIDLEY AUSTIN LLP
     Attorneys for Defendant Flores de Freitas
DAVID M. RODY
ELIZABETH A. ESPINOSA
MICHAEL D. MANN

ALSO PRESENT:

HUMBERTO GARCIA
MERCEDES AVALOS
ERIKA DE LOS RIOS
MIRTA HESS
Spanish Interpreters

GBF5flo1

1           (Trial resumed; jury not present)s

2           THE COURT:  Well, I have your letters.  Do we have an

3      agreement now on not so much of the jury charge as details with

4      the verdict form?

5           MR. JACKSON:  Yes, your Honor.

6           MR. QUIGLEY:  Your Honor, I think we are going to want

7      the lesser included offense submitted to the jury.  That is our

8      position.

9           THE COURT:  So we are not in agreement,

10     notwithstanding what Mr. Jackson says.

11          MR. QUIGLEY:  I think that's right, your Honor.

12          MR. JACKSON:  Judge, I'm slightly perplexed because

13     they submitted a two-page letter last night.

14          THE COURT:  Yes.

15          MR. JACKSON:  The second page of the letter said that

16     they would be okay with the -- that they would reconsider their

17     position if the defense was willing to have a verdict sheet

18     that had no special quantity inquiries and just didn't mention

19     the quantity.  And we said okay.  And now I'm hearing that we

20     don't have agreement and that's a little confusing.

21          THE COURT:  Well, it is confusing to me because the

22     letter from the government says:  Finally, if the defendants

23     truly want a stipulation on drug quantity, there is no reason

24     for the verdict form or the Court's charge to contain any

25     discussion of quantity at all.  To the extent the defendants

GBF5flo1

are willing to consent to such a charge and verdict form, the
government will reconsider its position.

And then I received this letter this morning:
Defendants respectfully submit this letter in joint response to
the government's letter of November 14th -- which I just
quoted -- regarding the verdict sheet.  In its letter, the
government states it will adopt the position that no special
quantity inquiries are necessary.  The defendants are willing
to consent to a charge and verdict form that does not contain
any discussion or quantity at all.  Defendants are fine with
the government's proposal.

MR. QUIGLEY:  Judge, I said we said we would
reconsider it.  We have thought about it.  We have talked, done
some more research.  I think we would like, as is consistent
with the general practice, the special verdict form given that
enhanced count provision of the charge.

THE COURT:  I guess we will take this up later.

MR. JACKSON:  Your Honor, may I just say one more
thing about this?

THE COURT:  Yes, certainly.

MR. JACKSON:  This is an issue that we have obviously
briefed a lot with the Court.

THE COURT:  Yes.

MR. JACKSON:  The position of the government does not
comport with common sense.  We are saying we will stipulate to

GBF5flo1

 1    the quantities and they want to submit a question to the jury

 2    that the defendants are saying there is no question, and the

 3    only thing it relates to is whether or not the statutory

 4    mandatory minimum applies.  There is no reason for it.

 5            THE COURT:  Okay.  We will take this up when we do the

 6    jury charge.

 7            MR. JACKSON:  Thank you, Judge.

 8            THE COURT:  I don't want to rule on it now.  I will

 9    rule on it tomorrow whenever we get to the jury charge.

10            Now, with regard to Carlos Gonzalez, who wants to be

11    heard on that?  You, Mr. Jackson or Mr. Rody?

12            MR. ZACH:  May I be heard on that?

13            THE COURT:  Mr. Zach.

14            MR. ZACH:  Our concern is, and I think their letter

15    amplifies it, that this witness' testimony is entirely

16    irrelevant to the case.  I think we should take it sort of set

17    by set.

18            The first piece that they want to introduce is

19    apparently Mr. Gonzalez partook in a meeting sometime in

20    October of 2015 that included Sentado, three Mexicans who have

21    never come up in this case at all who would be confusing and

22    within which reference was made to Venezuelans with no

23    specificity at all.  So, it is an entirely separate meeting

24    with people completely divorced from this case and that

25    Mr. El Sentado set up.  So, that would be confusing to the jury

1   and it doesn't advance the ball one iota.

2           The second piece of this testimony, your Honor, is

3   this meeting that they have a recording of from November 5th in

4   which no one -- none of the defendants is present at, just

5   El Sentado, another informant who is going to testify at this

6   trial, and a co-defendant who hasn't been extradited yet.

7   Again, nothing occurs in that meeting that touches one iota on

8   the defendant's knowledge or intent in this case.

9           And then the third meeting, this witness even at, and

10  that's the one that they're alleging that Mr. Flores is at and

11  they have a recording for that and they have CS-3 who is going

12  to testify about it.

13          So, this witness doesn't literally touch on any aspect

14  of this case and much of what he is going to introduce is going

15  to be hearsay and be extremely confusing.

16          THE COURT:  Government?  Oh Mr. Rody, excuse me.

17          MR. RODY:  I just want to say, again, it is my client

18  that is allegedly at the November 6th meeting.  He is not at

19  the November 5th meeting.  These guys pass each other in the

20  night.  The witness they want to put on is not there when my

21  client is there.  My client is not there when he is there.  So,

22  I don't see how he can say anything whatsoever about what is in

23  the heads and what is known to these two defendants.  And the

24  danger is that he elicits a bunch of information about his

25  conversations with Sentado and, again, Sentado is not a

GBF5flo1

1    conspirator, Sentado is a government agent.

2         THE COURT:  I have that point.

3         Mr. Bove?

4         MR. BOVE:  Your Honor, we don't plan to elicit from

5    Mr. Gonzalez statements by Sentado other than some very minimal

6    statements that led to the scheduling of meetings, both what we

7    are seeking to elicit is the scheduling of this mid-October of

8    2015 meeting and the November 5th, 2015 meeting.  So, I think

9    the concerns about eliciting statements of Sentado for their

10   truth are misplaced and that's not what we intend to do.

11        With respect to the mid-October 2015 meeting, we have

12   laid out in our letter what we think are the evidentiary bases

13   for a finding that these are co-conspirator statements in

14   furtherance of the conspiracy.  Specifically, what we are

15   talking about here, your Honor, is approximately one or two

16   weeks after the opening meeting with Sentado and after Campo

17   sent the text to Sentado that's in evidence under 3508-38 where

18   he said I want to work, I'm ready to work.  There is a meeting

19   involving Mexican drug traffickers who Mr. Gonzalez will say he

20   recognized and they talk about sending a Gulfstream, which is

21   one of the planes that the defendants discussed on recordings,

22   down to Venezuela to pick up cocaine.  They mention and said

23   that the Venezuelans had control of the airport in Venezuela.

24   That's a unique feature and characteristic that we submit

25   supports a finding by the preponderance of the evidence was a

GBF5flo1

1   reference to these defendants.  And so, on the mid-October

2   meeting, Judge, our position is set forth in the letter, there

3   is a basis here to find that those are statements in

4   furtherance of the conspiracy and statements against interest

5   by the Mexican declarants as well as Mr. Soto who is

6   undisputedly, I think, a co-conspirator as a result of his

7   participation in the November 6 meeting with Flores.  So,

8   that's our position on the mid-October meeting.

9           Turning to the November 5th meeting, I think a point

10  more generally here, your Honor, one of the elements of this

11  offense is that a conspiracy existed.  We are entitled to

12  establish the nature and the features of that conspiracy.  In

13  Mr. Zach's opening at page 64 he asserted that Sentado got a

14  special deal from the government and that Sentado wasn't in a

15  position to inculpate or set up any of his co-conspirators in

16  Honduras and so he instead targeted these supposedly hapless

17  defendants in Venezuela.  Part of the testimony of Mr. Gonzalez

18  tends to rebut that assertion which is incorrect -- Sentado did

19  bring in other unwitting criminal co-conspirators who have in

20  fact been pursued and prosecuted by this office.  More

21  importantly, this November 5th meeting that we are talking

22  about, Judge, is one that the defendants made every effort to

23  be represented at and that's set out, for example, at

24  Government Exhibit 305-T, these are communications between

25  Mr. Santos Peña and Campo where Campo is explaining, step by

GBF5flo1

1    step, that he sent these drug pilots to meet with Gonzalez and

2    Soto to discuss the plan.  They didn't make it that day, Judge,

3    that is undisputed, but if you look at page 2 of 305-T, the

4    pilots made it to Honduras, they just couldn't get out of the

5    airport.  That was some of the testimony that I think

6    Mr. Jackson referred to them as narco pilots during the

7    cross-examination of Special Agent Gonzalez.  We cite that

8    portion of the transcript in our letter.

9          So, on the basis of Government Exhibit 305-T and that

10    testimony from Special Agent Gonzalez, there is a basis here to

11    find that both Mr. Gonzalez, the cooperating witness, and Soto,

12    are co-conspirators and that those statements at the November

13    5th meeting should come in as statements in furtherance of the

14    conspiracy.

15          Now, they're particularly probative here, your Honor,

16    because Mr. Gonzalez will explain that there was actually a

17    plan in place to receive this cocaine load at the airport in

18    Roatan.  Again, that goes to our ability to establish there was

19    in fact a conspiracy in place that -- that there was a

20    conspiracy in place that extended beyond the defendants at

21    trial.  We are permitted, especially in response to argument,

22    that the planned cocaine shipment was infeasible, impractical

23    or not realistic, it was none of these things, your Honor.  As

24    Mr. Gonzalez will explain, there was a firm plan in place with

25    multiple personnel at this airport to receive the drug load on

GBF5flo1

November 15th.  What happened, instead, was that the defendants
were arrested a few days after the meeting and so that the load
was never shipped.

          THE COURT:  All right.

          MR. BOVE:  So, on that basis, your Honor, we do seek
to offer this testimony, we think it is helpful to the jury.
We think the statements from the October meeting are admissible
on the basis we cited in the letter.  And, the testimony about
the November 5th meeting is helpful to the jury to explain what
the plan was to receive the shipment.

          THE COURT:  I have your point.

          MR. ZACH:  Your Honor, can I briefly respond --

          THE COURT:  Yes.

          MR. ZACH:  -- in particular to the October meeting?

          So, you know, this October meeting, we don't know when
it happened but it probably happened after the Sentado meeting
that's been at issue in this case.  And as has been very clear
from the government's theory, Sentado was instructed to record
that meeting.  They then introduced CS-1 into their sting
operation.  This meeting that they're trying to have Gonzalez
testify about includes a completely separate set of Mexicans.
They have nothing to do with who the DEA intended to include in
the sting.  Also, there is nothing in Special Agent Gonzalez'
3500 material reporting on that meeting.  This meeting wasn't
recorded.  This is something wholly far afield that El Sentado

GBF5flo1

```
 1    was working on.  So, I think it is entirely confusing to

 2    introduce this piece.

 3            The second thing, your Honor, is with respect to the

 4    November meeting, again, it is a government constructed

 5    operation at the airport.  We have never argued that El Sentado

 6    didn't control that airport or that it was infeasible for

 7    things to move in and out of that airport.  But, what they are

 8    doing is it is a completely constructed government plot in

 9    Honduras to set up those other people.

10            What is relevant here is what these defendants knew

11    and they had a recording of exactly what was told to them and

12    they have a witness that was actually met with the defendants,

13    apparently at least one of the defendants and introducing this

14    guy who has never met anyone, either defendant, is completely

15    confusing.

16            MR. RODY:  Just one last point, Judge.

17            THE COURT:  I have read your letters carefully and I

18    don't mind you making these arguments but I think I understand

19    the arguments.

20            MR. RODY:  I just want to say, Judge, I would say that

21    if the testimony is relevant, it is by a hair.  There is a big

22    403 problem here.  It is much more prejudicial.  The singly,

23    most hotly contested issue in the case is whether these

24    defendants intended to import drugs into the United States or

25    knew anything about that.  If this guy gets up and says, oh
```

GBF5flo1

yes, that was the plan all along, well, that may be great but

that's whatever was in his head and that separate conspiracy

and it has nothing to do with what was in their head and I

think it is going to be highly prejudicial to the defendants.

THE COURT:  I understand.

The defendants' motion to preclude the testimony of

cooperating witness Carlos Gonzalez is denied.  He can testify

as outlined in Mr. Bove's argument.

The jury is here, Marlon?

THE DEPUTY CLERK:  Yes, your Honor.

THE COURT:  Call the witness CS-1.  Put him on the

stand and we will call in the jury.

Do you have the book up here that you want,

Mr. Jackson?

MR. JACKSON:  You know, your Honor?  Let me grab the

copies of the recordings and I will put that up there.

(Continued on next page)

GBF5flo1                          Santos Peña – cross

1          (Jury present)

2          THE COURT:  Good morning.  Please, be seated.

3          I remind the witness that he is still under oath.

4          Yesterday, after you left, we admitted into evidence

5   the documents that Mr. Jackson was offering, Exhibits 658, 659,

6   660, 661 and 662 received in evidence.

7          (Defendant's Exhibits 658, 659, 660, 661 and 662

8   received in evidence)

9          THE COURT:  Go ahead, Mr. Jackson.

10         MR. JACKSON:  Thank you very much, your Honor.

11    JOSE SANTOS PEÑA, resumed.

12   CROSS EXAMINATION (Cont'd)

13   BY MR. JACKSON:

14   Q.  Sir, the documents that the Judge was just referencing, you

15   remember that those are confidential source agreements that you

16   signed?

17   A.  I'm sorry.  I don't understand what it is that you said.

18   Q.  I just want to briefly just show you again DX- 661.

19         MR. JACKSON:  May I approach, your Honor?

20         THE COURT:  Yes, you may.

21   A.  Yes.

22   Q.  Sir, if you just will look at the second page of this, all

23   right?

24   A.  Yes, sir.

25   Q.  Do you see that there is a signature on this document?

GBF5flo1                          Santos Peña – cross

1    A.  Yes, sir.

2    Q.  That's your signature, right?

3    A.  Yes, sir.

4    Q.  And when you signed that, you knew that you were already in

5    the process of violating everything in this agreement, correct?

6    A.  I didn't understand.

7    Q.  Sir, you have pled guilty, right?

8    A.  Yes, sir.

9    Q.  One of the crimes that you pled guilty to was 18 U.S.C.

10   Section 1001, correct?

11   A.  Yes, sir.

12   Q.  That is a statute that you are charged with because you

13   lied for years to the federal government, correct?

14   A.  Yes, sir.

15   Q.  One of the lies that you told was on this document,

16   DX- 661.  You signed this knowing that you were lying to the

17   DEA as you signed it, right?

18   A.  Yes, sir.

19   Q.  Thank you.

20            Now, at this time I would like to play for you a

21   portion of a recording which is marked as DX- 534R.  I just

22   want you to tell me, when we play it, is that your voice?  I

23   have a few questions for you.  First I want you to recognize

24   the voices.  First, let's play it.

25            (Audiofile played)

GBF5flo1                    Santos Peña – cross

1             MR. JACKSON:  Can we stop this?

2    Q.  Did you recognize anyone who was speaking on that

3    recording, that portion of the recording?

4    A.  Yes, sir.

5    Q.  Who was speaking?

6    A.  Me.

7    Q.  And that's you speaking over a phone line from prison,

8    right?

9    A.  I think so.

10   Q.  Right.

11            You are aware that the Bureau of Prisons has provided

12   you with a specific access code, right, for you to make calls,

13   right?

14   A.  Yes, sir.

15   Q.  And you were given, before you were given that access code,

16   a number of instructions about the restrictions on calls being

17   placed from that correctional facility, weren't you?

18   A.  Yes, sir.

19   Q.  One of the restrictions that you were given is you were not

20   supposed to let other inmates use your line, correct?

21   A.  Yes, sir.

22   Q.  And the reason for that is you were told it is for security

23   reasons, these are supposed to be monitored, right?

24   A.  Yes, sir.

25   Q.  Right.

GBF5flo1                    Santos Peña – cross

1          But you didn't think anyone would monitor your calls

2   because you are special, right?

3   A.  No, sir.

4   Q.  Another restriction that you were given is that you were

5   not supposed to call out and make three-way calls in order to

6   subvert the attempt to monitor who you were calling, correct?

7          INTERPRETER:  To subvert what?

8          (Record read)

9   A.  I don't understand.

10  Q.  You were told, right, you were not supposed to call out to

11  a third-party and have them make another call, right?

12  A.  No, sir.

13  Q.  Nobody ever told you that?

14  A.  No, sir.

15  Q.  But you understood that that was a violation, didn't you?

16  A.  No, sir.

17  Q.  I see.

18         MR. JACKSON:  Your Honor, at this time I would like to

19  hand out to the jury transcripts that we have discussed.

20         THE COURT:  Yes.

21         MR. JACKSON:  Thank you.

22         Your Honor, first I am going to distribute to the jury

23  DX- 534.

24         THE COURT:  Do you have a copy for the Court?

25         MR. JACKSON:  Yes, I do, your Honor.  I will pass it

GBF5flo1                          Santos Peña – cross

1    right up.

2    BY MR. JACKSON:

3    Q.  If we could play the beginning of this call 534 first, and

4    I will have a question for the witness.

5              THE COURT:  On page 2, Mr. Jackson?

6              MR. JACKSON:  Yes, your Honor; on page 2.

7              THE COURT:  Okay.

8              (Audiofile played)

9              MR. JACKSON:  Thank you.  Stop it.

10   Q.  Now, the process that we just heard, that's the process of

11   you entering your special code into the system, right?

12   A.  Yes, sir.

13   Q.  And then entering the access code that corresponds with

14   that first code that you have, right?

15   A.  Yes, sir.

16   Q.  And then we heard someone say a name, didn't we?

17   A.  Yes, sir.

18   Q.  Who was that speaking?

19   A.  It seems like my son.

20   Q.  Right.

21        This is a call where you were letting your son

22   initially use your access code after you put the access code in

23   to start making a call, right?

24   A.  I think so.

25   Q.  Right.

GBF5flo1                          Santos Peña – cross

1            Can you continue playing it, please?

2            (Audiofile played)

3   Q.  Can we pause?

4            Now, that is your son talking, correct?

5   A.  Both of them are my sons.

6   Q.  Right.

7            Your son is talking -- your son who is in jail with

8   you is talking to another one of your sons, correct?

9   A.  Yes, sir.

10  Q.  What is that son's name?  First name?

11  A.  Cesar.

12  Q.  Okay.

13           Now, let's continue playing.

14           (Audiofile played)

15  Q.  Just one moment?

16           (pause)

17  Q.  Let's pause that.

18           I want to advance to -- first of all, let me ask you:

19  Do you know why your son was calling your other son on your

20  line on this day?

21  A.  Probably he didn't have any remaining money on his account.

22  Q.  That's your testimony?

23  A.  Yes, sir.

24  Q.  I want to advance to page -- I want to advance to page 5,

25  line 12.  Can you play the portion that starts there?

GBF5flo1                    Santos Peña - cross

1              (Audiofile played)

2    Q.  Can you stop it?

3              Now, what just happened here is that your son told

4    Cesar that you were right there, right?

5    A.  Yes, sir.

6    Q.  And then he said that he was going to put you on the phone,

7    right?

8    A.  Yes, sir.

9    Q.  Okay.

10             That's the first indication of a lie that you told

11   yesterday, correct?  Yes or no.  Yes or no?

12   A.  No, I'm going to clarify.

13   Q.  No.

14             Now, can we continue playing the clip?

15             (Audiofile played)

16   Q.  Okay.

17             Now I want to advance to a portion that starts at page

18   13, if I could.  Back up to the beginning, right at line 8

19   where it says:  No, no.  We're doing okay.

20             Can we play that?

21             (Audiofile played)

22   Q.  Can you stop it there?

23             This is a portion with you talking, right?

24   A.  Yes, sir.

25   Q.  Who are you talking to?  What's the first name of the

GBF5flo1                        Santos Peña – cross

1  person are you talking to?

2  A.  Hilario.

3  Q.  Where is Hilario situated when you are talking to him?

4  What state he is in?

5  A.  In Sinaloa in Los Mochis.

6  Q.  So, you are talking to Hilario back in Sinaloa and what you

7  are saying to him is you are talking to your lawyer and you are

8  waiting on some presentation of evidence in September, right?

9  A.  Yes, sir.

10 Q.  And what you say to him is that depending on what happens,

11 you might be able to get out of jail by November.  That's your

12 expectation, right?

13 A.  That's what I was telling him, that's all, just for him to

14 have information about what's going on.  He is just a normal

15 person.

16 Q.  I see.  You know what?  That's your answer, sir.

17        Now, the second thing you say to him is we are going

18 to come out real clean.  That's what you said, right?

19 A.  Yes, sir.

20 Q.  And then you say again:  Real, real clean.

21        Right?

22 A.  Yes, sir.

23 Q.  And what you mean by that is the government is not going to

24 find out about the total expanse of drug trafficking that you

25 are involved with, right?  Yes or no.

GBF5flo1                                Santos Peña – cross

1   A.  I didn't understand.

2   Q.  Okay.

3           Let's just continue playing it.

4           (Audiofile played)

5   Q.  Can you pause it?

6           One of the other things that you say in this call is:

7   Someone said some stupid -- some bullshit over there and we are

8   being sucked into it.  That's it.

9           Right?

10          INTERPRETER:  Would it be possible for me to have a

11  copy of the transcript?

12          MR. JACKSON:  I will get you that; yes, ma'am.

13          INTERPRETER:  Thank you.

14  Q.  The question I am asking, though, is just what he said is:

15  Someone said some bullshit over there and we are being sucked

16  into it.

17  A.  Yes, sir.

18  Q.  What you are referring to there is the fact that another

19  informant told the DEA that you were engaged in massive drug

20  trafficking behind the DEA's back, right?

21  A.  Yes, sir.

22  Q.  And, to be clear, you weren't going to come clean before

23  the other informant told the DEA about all of the deals that

24  you were engaged in importing drugs into the United States

25  behind Agent Gonzalez' back, right?

GBF5flo1                        Santos Peña – cross

1              Let me repeat my question.

2              To be clear, you were not going to come clean before

3    the other informant told the DEA about all of the drug

4    trafficking that you were engaged in behind the DEA's back?

5    A.  Yes, sir.

6    Q.  I'm correct, right?

7    A.  Yes, sir.

8    Q.  Can we continue playing?

9              Just one moment, your Honor?

10             (pause)

11   Q.  We will go to another clip in a second but I want to direct

12   your attention, sir, to page 14 of this transcript.  There is a

13   portion where you say to this other person that you are talking

14   to in Sinaloa that your buddy doesn't know the truth; right?

15   A.  I don't understand what part.

16   Q.  Well, do you see right here, on DX- 534 at 14?

17             THE COURT:  I don't think they have a copy of the

18   transcript.

19             MR. JACKSON:  I'm sorry.  The copy is in front of him?

20             MR. RODY:  There is an extra copy.

21             A JUROR:  Here.

22             MR. JACKSON:  Sorry.  There is a copy in front of you.

23   Thank you.

24             INTERPRETER:  What line is it?

25             THE COURT:  Page 14 at the top.

1              MR. JACKSON:  Yes, your Honor.  Thank you, at the top.

2              THE COURT:  Do you want to repeat your question,

3    Mr. Jackson?

4              MR. JACKSON:  Yes, your Honor.  Thank you.

5    BY MR. JACKSON:

6    Q.  There is a portion here at the top where you are talking to

7    this individual in Sinaloa and you are telling him to -- that

8    your buddy doesn't know the truth, correct?

9    A.  Yes, sir.

10   Q.  And one of the things that you tell him -- the individual

11   in Sinaloa -- is to try to calm the guy down because he'll

12   probably tell your boss, right?

13   A.  Yes, sir.

14   Q.  And by your boss you are referring to one of the people who

15   directs your activities in drug trafficking, correct?

16   A.  No, sir.

17   Q.  Okay.

18   A.  My father.

19   Q.  That's fine.

20              Now, can we go to page 15 at line 17 and can we

21   continue playing?

22              (Audiofile played)

23   Q.  Can you pause it?

24              Now, you have passed the phone back to your son,

25   correct?

GBF5flo1                          Santos Peña – cross

1    A.  Yes, sir.

2    Q.  Who is he talking to?

3    A.  With Hilario.

4    Q.  Right; he is continuing a discussion with Hilario in

5    Sinaloa, right?

6    A.  Yes, sir.

7             MR. JACKSON:  One moment?

8             (pause)

9    Q.  Now, we are at the top of page 16 now and can we continue

10   playing?

11            (Audiofile played)

12   Q.  Okay, so that's the end of page 16.  Do you see that?

13   A.  Yes, sir.

14   Q.  And what your son Jose, Jr. just told the individual in

15   Sinaloa is that Cesar told him this 120 buck customer showed

16   up, correct?

17   A.  The can --

18   Q.  Sir, yes or no, is that correct; that's what your son said

19   right there?

20   A.  Yes, sir.

21   Q.  Okay.  Can we continue playing at the top of 17?

22            (Audiofile played)

23   Q.  Can we stop it?

24            So, what the individual in Sinaloa says is:  Well,

25   he's talking about a situation where someone got him around 140

GBF5flo1                          Santos Peña – cross

1    of that, those pills.

2              Correct?  Yes or no.

3    A.  Yes, sir.

4    Q.  Okay.

5              Can we continue playing?

6              (Audiofile played)

7    Q.  Can we pause it?

8              Yes or no, right there they're discussing contacts

9    with an individual known as Joaquin, right?

10   A.  Yes, sir.

11   Q.  Okay.

12   A.  That's my son.

13   Q.  Right.

14             Can we continue playing?

15             (Audiofile played)

16   Q.  We are at the top of page 18 now?

17   A.  Yes, sir.

18   Q.  Can we continue–

19   A.  But Joaquin is my son.

20   Q.  Can we continue playing?

21             (Audiofile played)

22   Q.  Okay.  There is a portion there where your son refers to

23   the fact, repeatedly, that he is here with big brother, right?

24   A.  Yes, sir.

25   Q.  And what your son is referring to is that he can't be too

GBF5flo1                        Santos Peña – cross

1   explicit about the drug trafficking because the call is being

2   monitored, correct?

3   A.  I didn't understand that.

4   Q.  That's fine.

5           Can we continue playing?

6           (Audiofile played)

7   Q.  Okay.

8           There is a portion there, yes or no, where your son

9   refers to:  And as far as the car, when a customer appears on

10  the scene, 120, 130, whatever comes up, give that money to --

11  give it to.

12          See?  Yes?

13  A.  (In English)  Yes.

14  A.  Yes.

15  Q.  And then the thing he says next is:  You understand me?

16  A.  Yes.

17  Q.  Right.

18          And he says:  That's going to Joaquin.

19          Correct?

20  A.  Yes, sir.

21  Q.  Okay.

22          Just one moment?

23          (pause)

24  A.  That's my son.

25  Q.  Sir, I'm going to ask you to not volunteer information

GBF5flo1                              Santos Peña – cross

 1    unless I pose a question to you.  Do you understand that?

 2              THE COURT:  Do you want it stricken?  Do you want his

 3    comment stricken?

 4              MR. JACKSON:  Yes, your Honor, please.

 5              THE COURT:  Stricken.

 6              THE WITNESS:  Yes, sir.

 7              MR. JACKSON:  Now, I want to turn to a document and a

 8    recording that is marked as DX- 532.  With the Court's

 9    permission, I would like to hand this to the jury, your Honor?

10              THE COURT:  Do you have a copy for the witness?

11              MR. JACKSON:  Yes, your Honor; there is a copy for the

12    witness on the witness stand of DX- 532, and I have a copy for

13    the Court.

14              THE COURT:  Thank you.

15              INTERPRETER:  Counsel, could you direct me to which

16    one?

17              MR. JACKSON:  Yes.  Just one moment:

18    BY MR. JACKSON:

19    Q.  Okay, sir.  I would like to ask you to turn to page 2 of

20    532 and I would like to play the beginning of 532.

21              (Audiofile played)

22    Q.  Can we pause that?

23              Once again, that was you saying "Jose," correct?

24    A.  Yes, sir.

25    Q.  And that was you entering in your specific code and then

GBF5flo1                    Santos Peña – cross

1  access code to utilize the system for calls, correct?

2  A.  Yes, sir.

3  Q.  Can you continue playing this, please?

4          (Audiofile played)

5  Q.  Can we pause it?

6          Sir, what is the first name of the person you are

7  talking to in this call?

8  A.  Cesar.

9  Q.  Is that the same Cesar as before?

10  A.  Yes, sir.

11  Q.  Can we continue playing?

12          (Audiofile played)

13  Q.  Now, on page 3 of this document what Cesar says to you is

14  that he came for the suitcase with Anna?  Yes or no.

15  A.  Yes, sir.

16  A.  (In English)  Give me one second.

17  A.  Give me one second.

18          (pause)

19  A.  (In English)  He said I came, not he came; I came.

20  Q.  Right.  What he said is that I came for the suitcase with

21  Anna, correct?

22  A.  Yes, sir.

23  Q.  And then he says:  Well, because -- well, I'm going to see

24  what I can get with -- with Chavita, correct?

25  A.  Yes, sir.

GBF5flo1                    Santos Peña – cross

1    Q.  Where is Chavita located at the time that this conversation

2    is taking place?  Just the state, please, sir.

3    A.  In California.

4    Q.  Now, what you say to him after that, he says that he is

5    going to leave at 6:00 in the morning, right?

6    A.  Yes, sir.

7    Q.  You say to him:  Well, be careful, buddy.  Be very careful.

8         Correct?

9    A.  Yes, sir.

10   Q.  Then you ask him:  The dude, did he leave happy?  Was he

11   glad when he left?

12        Correct?

13   A.  Yes, sir.

14   Q.  Can we continue playing?

15        (Audiofile played)

16   Q.  That's the end of page 4 we just heard, right?

17   A.  Yes, sir.

18   Q.  One of the things that you said is that you talked to

19   Gordo, right?

20   A.  Yes, sir.

21   Q.  You said you talked to Hilario, correct?

22   A.  Yes, sir.

23   Q.  Then you start giving this person instructions on how you

24   are going to ask them to make a call to another person,

25   correct?

1   A.  Yes, sir.

2   Q.  Right; and by the way, you also told him -- you also tell

3   this person that you sold him the story that we are more

4   crooked than a crankshaft, right?

5   A.  Yes, sir.

6   Q.  And so you start telling him about how you want him to

7   place a call to someone else, right?

8   A.  That when he makes a phone call.

9   Q.  Right; you are going to ask him to make a call to another

10  person, correct?

11  A.  The day that he makes it.

12  Q.  Can we continue playing?

13          (Audiofile played)

14  Q.  Continuing to page 5, and again, you are telling him that

15  it is important that this person that you are on the phone with

16  not listen in to the call that you are about to have in place,

17  right?

18  A.  Yes, sir.

19  Q.  And you say it is because it is bad manners, right?

20  A.  Yes, sir.

21  Q.  Can we continue playing at the top of page 6?

22          (Audiofile played)

23  Q.  Please stop.

24          There is a portion here where you say:  I'm still

25  handling some things with some people.

1              Correct?

2     A.  Yes, sir.

3     Q.  Yes or no; what you are talking about there is the fact

4     that you are still engaging in drug trafficking, right?

5     A.  No, sir.

6     Q.  Okay.

7              Can we continue playing?

8              (Audiofile played)

9     Q.  Okay.  I think we crossed over to the top of page 7.

10    A.  Yes, sir.

11    Q.  At the top of page 7 what you told this individual is:

12    Don't you go partying over there.

13             Correct?

14    A.  Yes, sir.

15    Q.  You are going to work?

16    A.  Yes, sir.

17    Q.  You are going because of what are you doing with Chavita.

18    A.  Yes, sir.

19    Q.  You also said to him:  And be very careful because we don't

20    want -- we don't want surprises now that we are in this

21    difficult situation.

22             Correct?

23    A.  Yes, sir.

24    Q.  Can we continue playing?

25             (Audiofile played)

GBF5flo1                          Santos Peña – cross

1    Q.  There is a point here where you ask him:  Are you going

2    there to put up a patrol watch?

3           Do you see that?

4    A.  Yes, sir.

5    Q.  Can we continue playing?

6           (Audiofile played)

7    Q.  That was you laughing, right?

8    A.  Yes, sir.

9    Q.  Can we continue playing?

10          (Audiofile played)

11   Q.  In there there is a reference to someone giving some cash,

12   right?

13   A.  No, sir.

14   Q.  That's fine.

15          Now I want to direct your attention to the document

16   you should see up there which is DX-533.

17          MR. JACKSON:  Your Honor, with the Court's permission

18   I am going to pass out this one to the jury.

19          THE COURT:  Yes, go ahead.

20   Q.  Can we go to the beginning of this call and I would ask you

21   to turn your attention to page 2 of this document.

22   A.  Yes, sir.

23          (Audiofile played)

24   Q.  Just pause here.

25          Sir, those earlier calls that we listened to, those

GBF5flo1                           Santos Peña – cross

1    are in August, right?

2    A.   I didn't check that.

3    Q.   Do you remember?

4    A.   Yes, it was me.  I don't remember the exact date.

5    Q.   But you remember it was around August?

6    A.   More or less, yes.

7    Q.   Now, this call that we are looking at here, this happens

8    about a month later in September, right?

9    A.   Yes, sir.

10   Q.   And at this point you had a -- you were separated at the

11   correctional facility from your son, correct?

12   A.   Yes, sir.

13   Q.   So, at this point, not only did you have the restriction

14   that you were supposed to abide by yourself, but the prison had

15   physically separated you so that you couldn't be next to each

16   other, right?

17   A.   In the prison they decided to put my son and myself

18   together in the same unit.

19   Q.   You were separated at the point that this second call

20   happens, right?

21   A.   You mean physically?

22   Q.   Yes.

23   A.   I don't remember.

24   Q.   Let's play it.

25            (Audiofile played)

GBF5flo1                    Santos Peña – cross

1   Q.  That's the end of the first page, right?

2   A.  Yes, sir.

3   Q.  Let's continue playing.

4          (Audiofile played)

5   Q.  Now, the person who we hear more family; that's your son,

6   correct?

7   A.  Yes, sir.

8   Q.  And so what happened is –– by the way, you understood that

9   both you and your son were supposed to be witnesses at this

10  trial, right?

11         MR. QUIGLEY:  Objection.

12         THE COURT:  Overruled.

13  A.  Yes, sir.

14  Q.  And so what happens is you made a call to a third-party

15  while your son, from a different part of the prison, also made

16  a call to a third-party and linked you up, right?

17  A.  Yes, sir.

18  Q.  Can we continue playing?

19         (Audiofile played)

20  Q.  Can we pause it?

21         Now, what you are talking about here with your son

22  through this third-party is Paul, right?

23  A.  Yes.

24  Q.  You are talking about Paul, the unauthorized drug

25  trafficker that you brought down to Venezuela without

GBF5flo1                        Santos Peña – cross

1   authorization from the DEA, right?

2   A.  Yes, sir.

3   Q.  And you are talking about the fact that you are getting

4   your story straight with your son about what you are telling

5   the prosecutors about Paul, right?

6   A.  No, sir.

7   Q.  And what your son says, through Cesar, is that he told the

8   whole truth, right?

9   A.  Yes, sir.

10  Q.  And that you said:  Yes, yes, that's not a problem –– I

11  already told, they already know.

12          Right?

13  A.  Yes, sir.

14  Q.  The truth though, sir, is that you and your son had already

15  been arranging, in the jail, what you would consider the whole

16  truth for the prosecutors, right?

17  A.  No, sir.

18  Q.  This was another part of you coordinating the lie that you

19  were going to tell about the third man that you brought, wasn't

20  it?

21  A.  No, sir.

22  Q.  Sir, you knew that you were not supposed to be discussing

23  the case with your son over a phone line in prison connected

24  through a third-party, didn't you?

25  A.  Yes, sir.

GBF5flo1                           Santos Peña – cross

1    Q.  By the way, one of the things that you did while you were

2    in prison is that you also let other inmates use your phone

3    line for calls, right?

4    A.  Yes, sir.

5    Q.  And that was a trade that you did so that you could make

6    unintercepted phone calls on their lines on occasions that we

7    wouldn't even have access to, right?

8    A.  No, sir.

9    Q.  You let other inmates make calls on your line on a number

10   of occasions, right?

11   A.  Yes, sir.

12   Q.  Is it your claim that you did it out of the goodness of

13   your heart?

14   A.  Yes, sir.

15   Q.  I see.

16          Now, how many calls did you make to your son using

17   other inmates' phone lines?

18   A.  I don't understand the question.

19   Q.  You don't understand that at all?

20   A.  No, sir.

21   Q.  That's fine.

22          Can we continue playing?

23          (Audiofile played)

24   Q.  We are at the top of page 5, now.  Can we continue down?

25          (Audiofile played)

GBF5flo1                              Santos Peña – cross

```
1    Q.  Stop the call.
2              This is a part where you are talking about something
3    having to do with a person known as Gordo, right?
4    A.  Gordo is my son.
5    Q.  You are talking about Gordo, right?
6    A.  It's junior.
7    Q.  Fine.
8              Then you say:  Tell him I don't need a long
9    explanation, just a bam-bam-bam summarized.  I don't need that
10   much chatter.
11             That's what you said, right?
12   A.  Yes, sir.
13   Q.  The reason that you were saying that is because you don't
14   want him to say too much about the drug trafficking that you
15   are still engaged in, correct?  Yes or no.
16   A.  No, sir.
17   Q.  Can we continue playing?
18             (Audiofile played)
19   Q.  Now, one of the things that he says to you during this call
20   is that everything remains the same, right?
21   A.  Yes, sir.
22   Q.  And what he is talking about is that your drug trafficking
23   business and the lies that you told to the prosecutors are
24   still in the same place?
25   A.  No, sir.
```

GBF5flo1                    Santos Peña – cross

1   Q.  Can we continue playing?

2           (Audiofile played)

3   Q.  You can stop the recording.

4           I just want to turn your attention to page 7 of this.

5   Do you see that there is a reference made to the one from

6   Honduras, sir, at line 19?

7   A.  Yes, sir.

8   Q.  That's something that you said, correct?

9   A.  Yes, sir.

10  Q.  Now, you can put that transcript down, sir.

11          THE COURT:  Mr. Jackson, would this be a convenient

12  time to take our morning break?

13          MR. JACKSON:  Yes, it would, your Honor.  Thank you.

14          THE COURT:  Ladies and gentlemen, we are going to try

15  to get you lunch so you don't have to go out in the terrible

16  weather.  If you work with Mr. Ovalles, he will get your order.

17          We will resume in 15 minutes.

18          (Continued on next page)

19

20

21

22

23

24

25

GBF5flo1                        Santos Peña – cross

1                    (Jury not present)

2                    THE COURT:  See you in 15 minutes.

3                    (Recess)

4                    THE COURT:  Please, be seated.

5                    Marlon, do you want to get the jury in?

6                    THE DEPUTY CLERK:  Yes.

7                    THE COURT:  If the lunch gets here on time we will

8    break at quarter of one.  If it is later than that, we will

9    keep on going until luncheon.

10                   MR. JACKSON:  Thank you.

11                   (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (Jury present)

2            THE COURT:  Mr. Jackson, do you want to take it down?

3            MR. JACKSON:  It is for a question, your Honor.

4            THE COURT:  Put it up when the jury is here.

5            MR. JACKSON:  Yes, your Honor.

6            THE COURT:  All right, Mr. Jackson.

7            MR. JACKSON:  Thank you very much, your Honor.

8            THE COURT:  You're welcome.

9  BY MR. JACKSON:

10  Q.  Sir, you understand that inmates in the Bureau of Prisons

11  normally are only allowed 300 minutes per month, correct?

12  A.  I don't know.

13  Q.  You talk with other inmates, right?

14  A.  Yes, sir.

15  Q.  And one of the things that you said is you would let other

16  inmates use your line out of the goodness of your heart, right?

17  A.  Yes, sir.

18  Q.  None of them ever told you how many minutes they get per

19  month?

20  A.  No, sir.

21  Q.  Whatever the case may be, you know that you will have made

22  over 90 hours' worth of calls, right?

23  A.  Could be.  Could be.  Yes.

24  Q.  Right.  That's a special benefit that you got, right?

25  A.  I don't know.

GBF5flo1                          Santos Peña – cross

1   Q.  It's a benefit that you abused, correct?

2   A.  I don't know.  I didn't know it was a benefit.

3   Q.  Now, with the Court's permission, your Honor, I would like

4   to place a portion of the transcript of this witness' testimony

5   on the ELMO?

6           THE COURT:  Yes.

7           MR. JACKSON:  Thank you.

8   Q.  Now you remember sir, yesterday, you were asked:

9   "Q  Now, one of the things that the prosecutors told you is

10  that you were not allowed to communicate with your son" --

11  A.  Yes, sir.

12  "Q  -- about your testimony.

13          Right?

14  A.  Yes, sir.

15  Q.  And you said correct?

16  A.  Yes, sir.

17  Q.  And then you said that you understood that that was one of

18  your obligations, right?

19  A.  Yes, sir.

20  Q.  Then the question was posed to you:

21  "Q  But the truth is, you communicated with your son a bunch

22  since you have been in jail, right?"

23  A.  No, sir.

24  Q.  That's not the question that was posed to you?  Yes or no.

25  A.  I don't understand.

GBF5flo1                          Santos Peña – cross

1    Q.  I see.

2              Then there was a question that was posed to you:

3    "Q  Well, you must have at least talked to him since you have

4    been in jail, right?"

5              That's the question that was posed to you, right?

6    A.  Yes, sir.

7    Q.  Your answer was:

8    "A  Only at the moment of arrival, and then we were separated."

9              Correct?  That was your answer, yes?

10   A.  Yes, sir.

11   Q.  Yes or no, when you said that yesterday, right here in this

12   courtroom, that was a lie?

13   A.  No, sir.

14   Q.  Okay.

15             MR. JACKSON:  Your Honor, at this time I would like to

16   offer in evidence DX- 529 through 531, recordings and

17   accompanying transcripts DX- 532 through 534.

18             MR. QUIGLEY:  No objection.

19             THE COURT:  They're received in evidence 529, through

20   531, 5932 through 534?

21             MR. JACKSON:  Yes, your Honor.

22             THE COURT:  They're received in evidence.

23             (Defendant's Exhibits 529 through 531 and 532 through

24   534 received in evidence)

25   BY MR. JACKSON:

GBF5flo1                      Santos Peña – cross

1    Q.  Now, sir, one of the other things that you told us during

2    the course of your testimony is that you had a number of text

3    message communications with Mr. Campo Flores?

4    A.  Yes, sir.

5    Q.  And it was your practice to periodically delete those

6    messages after you had forwarded them to Agent Gonzalez,

7    correct?

8    A.  Yes, sir.

9    Q.  And you did delete the messages between you and

10   Mr. Campo Flores several times, right?

11   A.  After sending them to Agent Gonzalez, yes.

12   Q.  Right.  So there is no record at this point that we can go

13   to to verify that you actually sent all of the communications

14   between you and Mr. Campo Flores to Agent Gonzalez, is there?

15   A.  I don't know.

16   Q.  Right.

17        You deleted those messages, right?

18   A.  No, sir.  I deleted the messages after sending them to

19   Agent Gonzalez.

20   Q.  Correct.

21        You deleted the messages, right?

22   A.  Yes, sir.

23   Q.  And it is your testimony that you sent them all to Agent

24   Gonzalez, right?

25   A.  Yes, sir.

GBF5flo1                        Santos Peña – cross

1    Q.   But they no longer exist on your phone, right?

2    A.   No, sir.

3    Q.   They no longer exist in any device that you have access to,

4    right?

5    A.   I don't have access to them.

6    Q.   Did you turn over your phone to the DEA?

7    A.   Yes, sir.

8    Q.   Now, one of the other things that we know is that you were

9    hoping for a huge reward, correct?

10   A.   Yes, sir.

11   Q.   It was your plan to buy a house with the reward that you

12   were hoping to get for this case, correct?

13   A.   Yes, sir.

14   Q.   And even after you got arrested for lying, you communicated

15   with others about how you still expected to get a reward,

16   right?

17   A.   I don't remember.

18   Q.   You have no recollection of that?

19   A.   No, sir.

20   Q.   It's possible?

21   A.   Yes, sir.

22   Q.   Because at one point you were still hoping to get a reward

23   even after you got arrested, right?

24   A.   No, sir.

25   Q.   That's just a lie, then, that you might have told to some

GBF5flo1                    Santos Peña - cross

1    people?

2    A.  No, sir; it's true but not from this case.  I was waiting

3    for things from other jobs but I don't think so, nothing is

4    going to come.

5    Q.  I see.

6         So, one of the other things that you will now admit,

7    sir, is that you approached this entire investigation with a

8    deep, very personal bias against Mr. Campo Flores and his

9    family, correct?

10   A.  I don't understand the question.

11   Q.  Well, you had a deep, personal type of anger, at

12   Mr. Campo Flores, who you didn't know, and his family, right?

13   A.  No, sir.

14   Q.  You have no personal animosity towards my client or his

15   family?

16   A.  Nothing personal.

17   Q.  I have one question on that:  Why -- why did you tell Agent

18   Gonzalez that you were going to, quote, fuck my client's mother

19   and that you were going to seize her by the vagina -- using a

20   four letter expletive for that.  Why did you say that?

21   A.  I would need to read that message to remember it with those

22   words.

23   Q.  You don't remember saying that?

24   A.  No, sir.

25   Q.  I want to show you what's been marked as DX- 629 and I want

GBF5flo1                      Santos Peña – redirect

1    to ask you if that refreshes your recollection.

2    A.  Yes, sir.

3    Q.  Does that refresh your recollection?

4    A.  Yes, sir.

5    Q.  Why did you say that?

6    A.  Because Agent Gonzalez was looking at the possibility that

7    I might be able to interview Mr. Campo Flores' mother.

8    Q.  Okay.

9         The $1 million that you received from the DEA, how

10   much of that did you invest in drug trafficking?

11   A.  I don't remember.  I don't know.

12   Q.  Sir, it is a fact that you destroyed the sample of alleged

13   cocaine that you obtained in this case after you realized that

14   it was not real cocaine, isn't it?

15   A.  What drug are you referring to?

16         MR. JACKSON:  Your Honor, I have no further -- just

17   one moment.

18         (Counsel conferring)

19         MR. JACKSON:  Your Honor, I have no further questions

20   for this witness.

21         THE COURT:  Mr. Quigley?

22         MR. QUIGLEY:  Thank you, your Honor.

23   REDIRECT EXAMINATION

24   BY MR. QUIGLEY:

25   Q.  Sir, you were told repeatedly that if you lied, your

GBF5flo1                          Santos Peña – redirect

1    cooperation agreement would be ripped up and you wouldn't get a

2    5K letter, correct?

3    A.  Yes, sir.

4    Q.  And you now understand that your cooperation agreement is

5    getting ripped up, correct?

6    A.  No, sir.

7    Q.  You understand that you are not getting a 5K letter,

8    correct?

9    A.  No, sir.

10   Q.  You should.

11              No further questions, your Honor.

12              THE COURT:  Okay.  You are excused.

13              (Witness excused)

14              THE COURT:  Next witness.

15              MR. BOVE:  Your Honor, with the Court's permission at

16   this time, we are going to publish to the jury some of the

17   transcripts that are in evidence.

18              THE COURT:  Yes.

19              MR. BOVE:  Thank you, your Honor.

20              I will ask the jurors to take their binders out,

21   please.

22              Mr. Calabrese, if we could bring up 408-T, page 1,

23   please?

24              THE COURT:  What number, Mr. Bove?

25              MR. BOVE:  408-T, your Honor.

GBF5flo1                          Santos Peña – redirect

 1              THE COURT:  Thank you.

 2              MR. BOVE:  That's are WhatsApp chats between Defendant

 3     Campo using the 3083 line, and Pepe using the 3275 line.  Can

 4     you please turn to page 3 and I will ask Mr. Calabrese to help

 5     me read these back?  I will read the part of Campo:

 6              "CAMPO:  Talk to me, buddy.  Where are you?

 7              "PEPE:  I am with Frank.  Where are we meeting?

 8              "CAMPO:  Where are you guys?  Buddy are you --

 9              "PEPE:  Yes, dude.

10              "CAMPO:  Mayweather Jr. available.

11              "PEPE:  I have the cat, bro, ready.  And what do you

12     have?

13              "CAMPO:  I told -- that I was going to tell you to do

14     it and he told me that you can get it.

15              "PEPE:  Done.  He is to the pilot and co-pilot.

16              "CAMPO:  Buddy, I am keeping an eye on all that.  Here

17     we go, this is going to work out for us.

18              "PEPE:  Dude, now it is all in your hands, dude.

19              "CAMPO:  Yes.  All right.  I called the man and he is

20     out on duty working.  I do not know where.  He told me when he

21     arrives he is going to holler at me so we can meet up.

22              "PEPE:  Let's do this."

23              MR. BOVE:  We are on page 6 now:

24              "CAMPO:  Did you talk to the people?

25              "PEPE:  Yes, dude.

GBF5flo1                         Santos Peña – redirect

1            "CAMPO:  What did they tell you?  Tonight I will meet
2       up with the other thing.
3            "PEPE:  I ran into Frank by chance and I talked
4       directly to him.
5            "CAMPO:  They're going to my house to talk and to
6       finalize things so we can start working.
7            "PEPE:  That is good, dude.
8            "CAMPO:  When?
9            "PEPE:  I will be going on a trip today very early in
10      the morning.  Last night we met in El Cine.
11           "CAMPO:  El Cine Restaurant?
12           "PEPE:  Yes.
13           "CAMPO:  Ah-ha.  What did he tell you?  Because I
14      haven't met him.
15           "PEPE:  Nothing.  Just to hand over a mill and we can
16      talk with money in our hand.
17           "CAMPO:  Then we have to send a big gift to the big
18      guys, sort of open up the door because last time I was made to
19      look bad.  Do you understand?
20           "PEPE:  Of course, dude.  I told them."
21           MR. BOVE:  Going on to page 8 of this Exhibit:
22           "PEPE:  Since we were talking so much I let myself go.
23           "CAMPO:  Ah-ha.  I see.  Yes, Frank told me about that
24      already.
25           "PEPE:  Ah-ha.  Dude, I will tell them millions then,

GBF5flo1                          Santos Peña – redirect

1   and after they pay the mill they'll hand out anything more so

2   if we are going to work with them.

3           "CAMPO:  Tell them 2 mill.  I will try to make it

4   lowest possible so we have something left over for us.  They

5   are the same ones for the job.

6           "PEPE:  Yes, dude.  He was there when we were talking

7   about what we are going to do and he told me that they've had

8   that in hand and if we could take it out for him.

9           "CAMPO:  And one thing led us to the other.

10          "PEPE:  Keep track of our stuff and on credit.

11          "CAMPO:  Where are you at?  Traveling over there.

12          "PEPE:  In the damn ship.  We just went through a

13  storm.  I want to go back to CCS at once.  I am getting

14  everything going to ahead over here.

15          "CAMPO:  They can take us on credit with how much?

16          "PEPE:  We will set up -- we will set that up but they

17  will have to suck -- if they can deal with that it won't be

18  just once.  We need to go for it here.

19          "CAMPO:  Ah-ha.  But for how much are they taking us?

20          "PEPE:  Dude, at least 300.  I am going to ask them

21  for 500.  I have not talked to them but that is what I'm going

22  to ask for.

23          "CAMPO:  Ok.  I like that number, 500.

24          "PEPE:  Dude, I take care of our side.

25          "CAMPO:  But the thing is that they're practically

GBF5flo1                        Santos Peña – redirect

1    doing everything because if they take it and they place it,

2    then they are only going to pay us that bunch of money just for

3    the tickets.

4          "PEPE:  Are we DHL?  We are businessmen.  We are in

5    the game, we do not do freight.  We have the contact for the

6    freight, we are not making any money from that.

7          "CAMPO:  That is the attitude.  Well, all right.

8    Let's do it.  It is just that you being so far, I do not like

9    that, my brother.  Besides, the tickets, something has to be

10   paid in advance.  That was the condition.

11         "PEPE:  And if they do not like that they can go

12   somewhere else and see if they can give them the same

13   assurances that we do.

14         "CAMPO:  If they tried to play smart do you know how

15   to locate them?

16         "PEPE:  Of course.  They must pay as soon as the nose

17   starts lifting, otherwise there is no deal.  After we get that

18   out of them they can suck our -- dude.  Yes, of course is the

19   convict's people.  We get him it/out to hang him/it.  I told

20   him to give it to us on credit, that we will be responsible for

21   it.  Until it goes out at the arrivals is on them.  That is

22   their responsibility.  We are only responsible to ship it out.

23   I have not mentioned any amount to them.

24         "CAMPO:  500 here, a mill of security.

25         "PEPE:  Let's do it.

1          "CAMPO:  Afterwards, how long for us to get paid?

2          "PEPE:  We will talk about those things after the

3     arrival.  Those are just menial details.

4          "CAMPO:  No, buddy, those are not menial details, that

5     is the part that I am interested in the most, my brother.

6          "PEPE:  Elio, buddy, the thing with the G is, it is a

7     done deal and there is never going to be a single problem.

8          "CAMPO:  Okay, okay, okay.  They say they are at 1,000

9     percent.

10         "PEPE:  Ah-ha.  Talk and tell me then the steps to

11    take to begin setting up the G because that is a done deal.

12    The only thing missing is for them to be ready and -- dude, if

13    I didn't know them I wouldn't waste the time, I can assure you

14    Elio, be ready and --

15         "CAMPO:  Buddy, the power went out here.  It is

16    impossible to leave the house.  Tomorrow I'm going over to the

17    guys very early to see if they have the whole million ready and

18    I will message you.

19         "PEPE:  Go for it.  Set it up for tomorrow so you can

20    start taking care of everything.

21         "CAMPO:  Yes, buddy.  I understand, my brother.  And

22    the truth is because of you is that we are doing this because

23    we have done this a couple times already and the last time they

24    left us hanging and we had to pay some money for the pork

25    chops.  Understand me?  This was your friend Juan Carlos.  So,

1    it pisses me off to work, to have problems.  Do you understand

2    me?  That is why I prefer you to come back here.

3            "PEPE:  With the Portuguese guy.

4            "CAMPO:  The one that is locked cut up some people

5    there for us.  And the at the end it was all baloney.

6            "PEPE:  Yes, we will do that when I'm over there.

7    When I get to Miami I will change the ticket.

8            "CAMPO:  A friend led us to him.  He took us to

9    someone and things hit the fan and nobody wanted to take any

10   responsibility."

11           MR. BOVE:  Now on page 15 of the Exhibit:

12           "CAMPO:  Look, what's the name of the dude that is

13   locked up?

14           "PEPE:  Hermagoras Gonzalez.

15           "CAMPO:  Okay.

16           "PEPE:  Okay.  Buddy, I am already back.  I will get

17   there this week where you are.  I am talking to the people,

18   they want us to sell them the chairs for the party, then they

19   will give us the papers.

20           "CAMPO:  But remember, what we had talked about, that

21   we are businessmen, we are not messengers, buddy.

22           "PEPE:  You are relaxed and I am nervous, dude.  That

23   is the first thing I will tell him.  How much do I tell them

24   for the first 1,000?  They wanted 3.

25           "CAMPO:  No, dude.  I already asked and they told me

GBF5flo1                         Santos Peña – redirect

1    that it was a lot.  We will talk about it when you are on land.

2                "PEPE:  Go for it.  We will take care of that there.

3                "CAMPO:  When are you arriving?  I am broke.  You are

4    going to have to give me a loan, jerkoff.

5                "PEPE:  Dude, with that deal we will have something

6    left for us.  We can charge them 200 per unit.  If it is 1,000

7    we will be left with 200,000.

8                "CAMPO:  No, but that is our buddy's move, not ours,

9    dude.  Like we told them, they should go and get FedEx.  Come

10   over and let's talk about it."

11               MR. BOVE:  Let's stop there and turn to Government

12   Exhibit 515-T, please?  Mr. Calabrese, can we put up page 1?

13               These are WhatsApp messenger communications between

14   Defendant Flores using the line ending in 5405, and someone

15   referred to as PPR and that phone, using that same number

16   ending in 3275.  Now, if we can take a look at page 2?

17   Mr. Calabrese, if you can help me again I will read Flores and

18   if you can read Pepe?

19               "FLORES:  Try to set up the thing with our buddy in

20   jail.  We can use that coin for work.

21               "PPR:  Done.  I'm going to write to him.  I forgot

22   about it.

23               "FLORES:  Now is a good moment, our people are ready

24   to go.

25               "PPR:  Let's do this.

GBF5flo1                              Santos Peña – redirect

1        "FLORES:  We are ready to go.

2        "PPR:  I'll talk, and I will pass on to you the

3   information they give me.

4        "FLORES:  Let's do it.

5        "PPR:  The one putting the money wants to take one out

6   with 3,000, too.  I just sent you the screenshot but you have

7   not got them.

8        "FLORES:  Let's see.  Where do we send a G5 to?  You

9   have to come to handle that here in person.  I need to sell a

10  Ferrari that I have around somewhere.  He might have a client.

11  Dirt cheap.

12       "PPR:  Buddy, with the 3,000 they'll give us credit,

13  we won't have to put down anything.

14       "FLORES:  Perfect.

15       "PPR:  It is going for el sombrero.  That was the

16  condition on credit.  Ah-ha, buddy, we give them some for el

17  preso so they put down the mill up front and the rest when he

18  comes out.

19       "FLORES:  I will write to you right back.  I'm going

20  to meet with a magistrate and Efra now.

21       "PPR:  Let's do this.  Buddy, how long will it take to

22  go out?  Please, they're asking me about that.

23       "FLORES:  Okay, okay.  I will give you an answer in 15

24  minutes.  So, we know the time we should retake the case how.

25  And dough is needed to retake the case.

1    "PPR:  But we can give him an estimate.  How much

2    should I tell them?

3    "FLORES:  Tell me if I offer that million that they

4    have in hand right away in order to start the negotiation

5    because we cannot come back empty-handed.

6    "PPR:  I will ask Elio now.  They already have the

7    mill but they want to have an idea about how much it is going

8    to be to avoid looking bad.

9    "FLORES:  Of course, but for me to be able to talk

10   about that subject again, buddy, I have to offer this to open

11   the door.  Do you understand?  I told you the other day.  It's

12   Efrain, buddy.

13   "PPR:  Let's throw out an approximate amount.  If it

14   is more than what we tell them they are going to get it out and

15   time to sort out the --

16   "FLORES:  What do I know?  Should I tell them that I

17   have that in hand plus one more?  I don't know.

18   "PPR:  What should I tell him?  2 mill?  If it is more

19   they will get it out.  They have a GV with 3,000 to take it out

20   whenever we tell them to and they are giving us credit without

21   putting anything down.

22   "FLORES:  This is Frank's private number, hee hee."

23   MR. BOVE:  Now going on to page 7.

24   "PPR:  Mayweather, Jr.  Buddy.  Look, the cap says

25   that we have a 402 available and a 404.

GBF5flo1                         Santos Peña – redirect

1          "FLORES:  What's up?  I was in a meeting with them.

2          "PPR:  Ask them which one of the two is good for that.

3     Those are the ones which are available.  Buddy, they said they

4     have those two lifts and ask if that model can make it to ramp.

5     I said yes but ask your friend.

6          "FLORES:  Okay.  Okay.  Coming.  404 is perfect.  Both

7     of them work.

8          "PPR:  All right.

9          "FLORES:  That's the one with more room for passengers

10    would be best.

11         "PPR:  Go for it.  They are going to get me the cap's

12    number now to work out all the details with him.

13         "FLORES:  Perfect.  Very good.  We are ready, buddy.

14         "PPR:  Good morning, buddy.  How is it going?

15         "FLORES:  Buddy, I'm on it.  We'll have an answer by

16    noon.

17         "PPR:  Go for it.

18         "FLORES:  Buddy, it won't work out that way, it has to

19    be bigger.  A lot of calls have to be made for that.  No

20    pistons, it has to be a turbine.  No propeller.

21         "PPR:  I'll tell them to get moving on that, buddy.

22    Mayweather, Jr., yes, sure.  I understand.  I'm on the move

23    already for a big one with turbines.  I am waiting for some

24    answers.  I am on the move already.

25         "FLORES:  Well, buddy, we are just waiting for you.

1    Okay.  Let's wait.

2              "PPR:  Good.  Better that way, we can fit more.  The

3    other big lift is ready.  I will meet with the friend on

4    Wednesday to leave on Friday.

5              "FLORES:  Perfect.  Awesome.

6              "PPR:  Let's do it.

7              "FLORES:  We are waiting to purchase one as soon as we

8    are able to.

9              "PPR:  Oh, okay.  This dude already sent me the

10   picture let's start, though, working on it."

11             MR. BOVE:  Let's stop there with this exhibit and,

12   Mr. Calabrese, if you can put up the first page of 405?  These

13   are WhatsApp messages between Defendant Campo using the line

14   ending in 3803 and Defendant Flores using the line ending in

15   5405.  Let's take a look at page 6 of Government Exhibit 405-T,

16   please?  Mr. Calabrese, if you can help me out here I will read

17   Flores and if you can read Campo, please?  Beginning at the top

18   of page 6.

19             "FLORES:  Dude, the meet with Pepe.

20             "CAMPO:  I've been talking to him.  He told me he is

21   going on a trip later.  I have been waiting to meet up with

22   Munoz.  He did not say anything about the meeting.

23             "FLORES:  About the friend of his that he wanted to

24   get out of prison.  Talk to him about that?

25             "CAMPO:  Yeah.  Sure, we talked about that.  He told

GBF5flo1                        Santos Peña - redirect

me not to make any moves until he has the money in hand.  If
you want, tell him we can meet at 10 at the gas station after
rush hour.  Or should I tell him?  But he told me he is leaving
for a trip very early in the morning.

   "FLORES:  Okay, I will tell him.

   "CAMPO:  He said he will give me another number that
he will be using over there.

   "FLORES:  Okay.

   "CAMPO:  Let me know what he tells you.

   "FLORES:  Nothing.  Just that he talked to the guy
already, that we will talk once he has the money in his hand.

   "CAMPO:  Exactly.  That is what we had talked about.
I already talked with him yesterday or the day before.  I do
not remember exactly and I told him they would have to send a
million to be able to reinitiate that conversation because they
had left me hanging once already.  Are you there?  PING.

   "FLORES:  Talk to me.

   "CAMPO:  I just left the meet.

   "FLORES:  Which one?

   "CAMPO:  The one that I had pending.

   "FLORES:  Oh.  I will be right there.

   "CAMPO:  Yes.

   "FLORES:  Give me the good news.

   "CAMPO:  The man is in with us.

   "FLORES:  What did he tell you?

GBF5flo1                         Santos Peña - redirect

1          "CAMPO:  When are we starting.

2          "FLORES:  Should we call him to meet up?  And this --

3     is leaving today?

4          "CAMPO:  Not now.  Let me write him and see when he

5     will be arriving.  Cut that.  When did they tell you for?  When

6     can they give them to you.

7          "FLORES:  In 15 days."

8          MR. BOVE:  Let's turn onto page 8 and read this page.

9          "FLORES:  I want us to start working.

10         "CAMPO:  And me too.  I gave that earful to Pepe.  I

11    told him let's talk here and also don't be sending me any

12    messages or be straight with me and I will do it through

13    another channel, buddy.

14         "FLORES:  Yes.  What did he say?

15         "CAMPO:  I am broke because of you.  I am broke

16    because of you because from the moment that I had that arranged

17    I would have made some gains.

18         "FLORES:  And the days keep going by, nothing.

19         "CAMPO:  The -- part is that that's ours.  No.  Either

20    I'm going to call or you are going to check this out.  No.  It

21    is ours.

22         "FLORES:  Yes, dude."

23         MR. BOVE:  Let's stop there for now.

24         MR. QUIGLEY:  Your Honor, the government calls Kimojha

25    Brooks.

GBF5flo1                          Brooks – direct

1            THE DEPUTY CLERK:  Agent Brooks, can you please state

2    your name and spell your name for the record?

3            THE WITNESS:  Kimojha, K-I-M-O-J-H-A, Brooks,

4    B-R-O-O-K-S.

5     KIMOJHA BROOKS,

6         called as a witness by the Government,

7         having been duly sworn, testified as follows:

8            THE COURT:  Mr. Quigley?

9            MR. QUIGLEY:  Thank you, your Honor.

10   DIRECT EXAMINATION

11   BY MR. QUIGLEY:

12   Q.  Sir, where you do you work?

13   A.  Special agent with the Drug Enforcement Administration.

14   Q.  Where are you currently assigned?

15   A.  Currently assigned to the New York strike force.

16   Q.  What is your focus of your work at the strike force?

17   A.  We investigate drug trafficking organizations that work

18   both domestically and internationally.

19   Q.  How long have you been with the strike force?

20   A.  Approximately three years.

21   Q.  Have you worked in other parts of DEA?

22   A.  Yes, sir.

23   Q.  Where did you work before you got the strike force?

24   A.  I was assigned to the Port of Spain -- country office in

25   Port of Spain Trinidad, and before that I was assigned to the

GBF5flo1                          Brooks – direct

1    New York field division, Group D-32.

2    Q.  I want to direct your attention to November 10th, 2015;

3    were you working that day?

4    A.  Yes, sir.

5    Q.  And where were you working?

6    A.  I was in Port-Au-Prince, Haiti.

7    Q.  And why did you go to Haiti?

8    A.  I was assisting the SOD BIU unit in its meet and possible

9    arrest operation.

10   Q.  The SOD BIU is the Special Operations Division?

11   A.  Yes, sir.

12   Q.  Were people arrested in Haiti that date?

13   A.  Yes, sir.

14   Q.  And what, if any involvement, have you had in this

15   investigation before you went to Haiti?

16   A.  None.

17   Q.  How did you get involved in the case?

18   A.  I was contacted by Special Agent Sandy Gonzalez and Group

19   Supervisor Rob Zach and I was asked to participate in the

20   operation.

21   Q.  And where were you on the morning of November 10th, 2015?

22   A.  On the morning of November 10th we were at the hotel, and

23   then from there we were transported to the Port-Au-Prince

24   embassy.

25   Q.  Where did you go after that?

GBF5flo1                        Brooks – direct

1   A.  After that we went to the BLTS unit.

2   Q.  Is that a Haitian police organization?

3   A.  Yes, sir.

4   Q.  Did you actually participate in the arrest?

5   A.  No, sir.

6   Q.  Who actually did the arrest?

7   A.  The Haitian police.

8   Q.  And did you go to near where the arrest happened?

9   A.  Yes, sir.

10  Q.  What did you do after that?

11  A.  After the arrest was completed and the defendants were

12  transported back to the BLTS unit, and then we also went as

13  well.

14          MR. QUIGLEY:  Your Honor, may I approach?

15          THE COURT:  Yes, you may.

16  Q.  Sir, I am handing you some exhibits, Government's Exhibits

17  100, 101, 111 and 110 and some other exhibits, if you can keep

18  these the two side for now.

19          What, if any evidence, did you receive that day?

20  A.  I seized the four telephones and then also passports of the

21  two defendants.

22  Q.  And so, directing your attention to Government's Exhibits

23  100 and 101 and the other two phones there, do you recognize

24  those?

25  A.  Yes, sir.

GBF5flo1                        Brooks - direct

1    Q.  What are they?

2    A.  These are the four cell phones that were seized at the

3    arrest.

4           MR. BOVE:  Your Honor, the government offers

5    Government Exhibit 100, 101, 111 and 112.

6           MR. RODY:  Voir dire, your Honor?

7           THE COURT:  Go ahead, Mr. Rody.

8    VOIR DIRE EXAMINATION

9    BY MR. RODY:

10   Q.  Agent Brooks, did you personally seize those phones?

11   A.  Yes.  They were originally seized by Haitian police and

12   then subsequently turned over to me.

13   Q.  So, you took them from a Haitian police officer?

14   A.  I'm not -- I can't recall exactly who gave it to me.  It

15   would have either been the Haitian police officer or one of the

16   members of our Port-Au-Prince country office.

17   Q.  Were you present when they were taken from the defendants,

18   allegedly?

19   A.  No.

20   Q.  You didn't observe it happen?

21   A.  I wasn't there when the arrest happened.

22          MR. RODY:  One moment, Judge?

23          (Counsel conferring)

24          MR. RODY:  Your Honor, we have no objection to the

25   physical phones themselves being admitted.

GBF5flo1                          Brooks - direct

 1              THE COURT:  All right.

 2              MR. QUIGLEY:  100, 101, 111, and 112.

 3              THE COURT:  They are received in evidence.

 4              MR. RODY:  Just the phones.

 5              THE COURT:  There is four phones; is that right,

 6    Mr. Quigley?

 7              MR. QUIGLEY:  That's correct, your Honor.

 8              THE COURT:  They are received in evidence.

 9              (Government's Exhibits 100, 101, 111, and 112 received

10    in evidence)

11              MR. QUIGLEY:  Thank you, your Honor.

12    BY MR. QUIGLEY:

13    Q.  Now, what types of phones are 111 and 112?

14    A.  Both of those are iPhones.

15    Q.  With respect to the two iPhones, do you know whether search

16    warrants were obtained for those phones in this investigation?

17    A.  Yes, they were.

18    Q.  Was the government able to obtain any information off those

19    phones?

20    A.  No, sir.

21    Q.  Up there you also have -- you testified about some

22    passports you received.  What, if any photographs, did you take

23    while at the BLTS compound?

24    A.  I took photographs of the two defendants' passports as well

25    as the other individuals that traveled with them to Haiti.

GBF5flo1                            Brooks - direct

1    Q.   From where?

2    A.   From their passports as well.

3    Q.   If you would take a look at Government's Exhibits 106 to

4    109?

5    A.   Yes, sir.

6    Q.   What are those?

7    A.   These are the pictures that I took of the passports of the

8    other individuals that traveled with the defendants.

9            MR. QUIGLEY:  Your Honor, the government offers

10   Government's Exhibits 106 through 109.

11           MR. RODY:  No objection.

12           MR. ZACH:  No objection.

13           THE COURT:  They will be received in evidence.

14           (Government's Exhibits 106 through 109 received in

15   evidence)

16   BY MR. QUIGLEY:

17   Q.   Agent Brooks, when was the first time you had interaction

18   with the defendants that day?

19   A.   When we were at the tarmac of the international airport.

20   Q.   Was that before or after you were at the BLTS compound?

21   A.   After.

22   Q.   What happened just before you boarded the plane?

23   A.   Before we boarded the plane, a photograph was taken of

24   members of the Port-Au-Prince country office and the Haitian

25   police as we did the handover from the Haitians to the

GBF5flo1                      Brooks – direct

1   Americans.

2   Q.   And what were your responsibilities once you got on the

3   plane?

4   A.   Prisoner security, and also to copy the bio data of the

5   defendants.

6   Q.   Why did you need to obtain -- what do you mean by the bio

7   data?

8   A.   Date of birth, height, weight, address, family information.

9   Q.   Why did you need to obtain that information?

10  A.   It is necessary to complete the arresting process for DEA.

11  It is also utilized by CBP which is Customs and Border

12  Protection, U.S. Marshals service, and also Bureau of Prisons

13  on their intake.

14  Q.   Which of the defendants did you obtain that information

15  from first?

16  A.   Mr. Flores de Freitas.

17  Q.   Did there come a time when the defendants moved locations

18  on the flight?

19  A.   Yes, sir.

20  Q.   At what point?

21  A.   At some point Special Agent Gonzalez and Mr. Campo Flores

22  went from where we were sitting to where group supervisor Rob

23  Zach was sitting.

24  Q.   Did there come a time when the defendants moved positions

25  again?

GBF5flo1                        Brooks – direct

1    A.  Yes, sir.

2    Q.  What happened?

3    A.  Special Agent Gonzalez and Mr. Campo Flores returned to

4    where we were sitting and then Special Agent Gonzalez and

5    Mr. Flores de Freitas went to where Group Supervisor Rob Zach

6    was sitting.

7    Q.  During the time you were on the flight, did you see anyone

8    yell an the defendants?

9    A.  No, sir.

10   Q.  Did you see anyone threaten the defendants?

11   A.  No, sir.

12   Q.  Did you see anyone physically strike the defendants?

13   A.  No, sir.

14   Q.  Did you see anyone display any weapons?

15   A.  No, sir.

16   Q.  Did the flight stop anywhere between Haiti and New York?

17   A.  No, sir.

18   Q.  How did the flight end?

19   A.  We arrived at the Westchester County Airport and were met

20   on the tarmac by members of my group, and also CBP.

21   Q.  Have you ever flown on a G2 aircraft?

22   A.  No, sir.

23   Q.  Are you familiar with the G2 aircraft?

24   A.  Yes, sir.

25   Q.  About how long is it?

GBF5flo1                          Brooks - cross

1    A.  It is about 80 feet long.

2            MR. QUIGLEY:  One moment, your Honor?

3            (pause)

4            MR. QUIGLEY:  No further questions.

5            THE COURT:  Mr. Rody?

6            MR. RODY:  Thanks, Judge.

7    CROSS EXAMINATION

8    BY MR. RODY:

9    Q.  Good afternoon, Agent Brooks.

10   A.  Good afternoon.

11   Q.  You were not the case agent for this matter; is that

12   correct?

13   A.  Correct.

14   Q.  You're essentially the New York-based agent handling this

15   matter; is that right?

16   A.  Yes.  Yes.

17   Q.  So, it is originally an SOD case, correct?

18   A.  Correct.

19   Q.  And they needed an agent in New York to liaison with,

20   correct?

21   A.  Correct.

22   Q.  And that's you, right?

23   A.  Yes.

24   Q.  Where were you physically in Haiti when the defendants were

25   arrested?

GBF5flo1                        Brooks - cross

1   A.  I was at a nearby spot to the actual target location in a

2   parking lot.

3   Q.  Okay.  You were in a parking lot of the hotel where they

4   were arrested?

5   A.  No, sir.  It was at another location, I can't remember the

6   name of it, but close to the actual arrest location but not

7   physically at the arrest location.

8   Q.  And at some point after they were arrested you were given a

9   number of cell phones, right?

10  A.  Yes, sir.

11  Q.  And passports, right?

12  A.  Correct.

13  Q.  And that's because you were supposed to be the evidence

14  custodian for this case, right?

15  A.  Yes, sir.

16  Q.  And you understood that those items had been taken from the

17  defendants?

18  A.  Yes, sir.  Well, at the time there was the defendants'

19  items as well as the other individuals that traveled with them.

20  Q.  Okay.

21          How many other individuals had traveled with them?

22  A.  I can't -- I think it's three or four.  I'm not a hundred

23  percent.

24  Q.  And did you end up arresting any of those other three or

25  four?

GBF5flo1                          Brooks - cross

1    A.  No.

2    Q.  They went home, right?

3    A.  Well, we -- we didn't arrest them, the Haitians arrested

4    them -- not them, but the two defendants.

5    Q.  Right.

6          So, you flew back to New York with the two defendants,

7    right?

8    A.  Correct.

9    Q.  But you know that the other three or four people were let

10   go by the Haitians, right?

11   A.  I don't know what happened.  After the two defendants was

12   transported over to us, we left.  So, the last time I saw them,

13   they were still with the Haitians.

14   Q.  When you received the personal items of the other three or

15   four people, you didn't end up keeping the other people's

16   items, right?

17   A.  Correct.

18   Q.  You gave them back to the Haitians?

19   A.  Yes.

20   Q.  Now, did you search the plane that the defendants flew to

21   Haiti on?

22   A.  No, I didn't.

23   Q.  Do you know if any other DEA agents searched the plane that

24   they flew to Haiti on?

25   A.  The agents that were with me did not.

GBF5flo1                          Brooks - cross

1   Q.  Okay.

2           But you, as the evidence custodian, weren't given any

3   guns that day, right --

4   A.  No.

5   Q.  -- to take back to New York, right?

6   A.  No.

7   Q.  You weren't given any drugs that day to take back to New

8   York, right?

9   A.  No, sir.

10  Q.  And you learned that there were no guns or drugs found on

11  the plane the defendants flew in on, right?

12  A.  That's not correct.

13  Q.  You never learned that?

14  A.  I never asked that, nor was I told.

15  Q.  Okay, but you know that you weren't given any such evidence

16  as part of this case, right?

17  A.  I didn't receive any of that evidence but I think your

18  question was did I learn that.

19  Q.  Yes.

20  A.  And I never asked that nor was I told that information.

21  Q.  Okay.

22          Mr. Calabrese, if you don't mind, could we have

23  Government Exhibit, I think it is 57, please?  Thanks.

24          Agent Brooks, is this a photograph of the plane that

25  you flew back from Haiti to New York on with the defendants?

GBF5flo1                        Brooks – cross

1    A.  Yes, sir.  It looks like it is.

2    Q.  Okay.

3          Well, even if it is not the exact same plane, does

4    that look like the same type of plane that you flew back in?

5    A.  I mean, it looks similar to it, it is just an inside photo

6    so I mean I would have to see the tail number and know what

7    type of plane it is to say it is okay, the exact.

8    Q.  Understood.

9          Can you let us know, in this photograph we can see

10   seats in the foreground of the photo, right, and seats in the

11   background of the photo, right?

12   A.  Correct.

13   Q.  Now, the seats that are in the foreground, the one on the

14   left, it is next to like an orange-looking, I don't know what

15   that is, pouch.

16          Do you see that?

17   A.  Yes, sir.

18   Q.  And the seat on the right in the foreground ground right

19   behind it, there is some kind of yellow bag or something,

20   right?

21   A.  Correct.

22   Q.  And then in the background you can see two seats in behind

23   them, there is two orange things; do you see that?

24   A.  Yes.

25   Q.  Do you know if those are life preservers or something?

GBF5flo1                          Brooks - cross

1   A.  I don't know the plane.

2   Q.  Okay.

3           When you were on the plane coming back with the

4   defendants, everybody on the plane except the pilots was in the

5   seats that we can see in this photograph, right?

6   A.  You are asking as far as everybody that was on the plane;

7   me, my colleagues, and the defendants?

8   Q.  Correct.

9   A.  Yes?

10  Q.  So the pilots are, I think, behind where the person who

11  took the picture would be, is that right?

12  A.  I don't know.  Like I said, again I'm --

13  Q.  Well, the pilots are at one end or the other, right?

14  A.  Exactly.

15  Q.  But on the plane were two defendants, right?

16  A.  Yes.

17  Q.  And four DEA agents, right?

18  A.  Yes.

19  Q.  And here we have one, two, three, four -- five sort of

20  seats that will fit one person, right?

21  A.  Correct.

22  Q.  And then there is a bench seat where you can have two

23  people side by side, right?

24  A.  Correct.

25  Q.  And that's where, except for the pilots, everybody else on

GBF5flo1                    Brooks - cross

1   the plane was seated in the confines depicted in this

2   photograph, right?

3   A.  Correct.

4   Q.  And there came a time when Agent Gonzalez took

5   Mr. Campo Flores into the bench seat that we see in the lower

6   left of the photograph, right?

7   A.  I can't recall exactly whether it was a bench seat or the

8   seat next to it.  What I can tell you is that in the beginning

9   the four of us, Special Agent Gonzalez, myself, and the two

10  defendants, were sitting in the four seats facing each other.

11  Q.  Got it.

12          So, the four seats, we can see the backs of two of

13  those seats and the front of two of those seats that are at the

14  far vantage point of photograph, right?

15  A.  Correct.

16  Q.  And that's where when the flight started you, Agent

17  Gonzalez, and the two defendants were seated, right?

18  A.  Correct.

19  Q.  And then I take it that Agent Zachariaswicz and Agent

20  Habayeb were somewhere in these two front seats that are in the

21  foreground of the photograph, right?

22  A.  Correct.

23  Q.  At some point you switched things up and Agent Gonzalez

24  comes to the front bench seat with Mr. Campo Flores, right?

25  A.  Correct.  Well, again, like I said, that area.  Whether it

GBF5flo1                    Brooks – cross

1    is the bench or the seat next to the bench.

2    Q.  Okay, but at that time you stayed in the back seats?

3    A.  I was still with the other defendant.

4    Q.  Do you know which of the back seats you were in?

5    A.  No, sir.  I just -- wherever -- whichever one it was it was

6    directly across from the second defendant.

7    Q.  Mr. Flores?

8    A.  Mr. Flores de Freitas.

9    Q.  Right; and you were taking pedigree information from him,

10   right?

11   A.  Correct.

12   Q.  And you speak Spanish well enough to take -- to write down

13   pedigree information from someone like Mr. Flores, correct?

14   A.  Correct.

15   Q.  But you are not fluent in Spanish, correct?

16   A.  I have a working knowledge of Spanish.  I can ask

17   questions.  I have participated in debriefings in Spanish so

18   enough to get the type of information that was needed on the

19   DEA-202.  Yes, I was.

20   Q.  Gotcha.

21        And the DEA-202 is the pedigree form, right?

22   A.  Correct.

23   Q.  Have you taken the DEA Spanish language qualification test?

24   A.  No, sir.

25   Q.  Okay.

1          Just one last question on this line.  Do you remember

2     when Agent Gonzalez was talking to Mr. Campo Flores, was your

3     back to them or were you facing them wherever you were sitting?

4     A.  At what point?  When it was just the two of them speaking?

5     Q.  Yes.

6     A.  They were across from me.  Like I said, the four of us were

7     sitting in the chairs, me and Special Agent Gonzalez were

8     parallel to each other and the two defendants were directly in

9     front of us.

10    Q.  Right, but then they moved and Agent Gonzalez and --

11    A.  That's what I was asking, at which point.  At the point

12    where he was speaking only to Mr. Campo Flores he was right

13    next to me.

14    Q.  Okay.  But then eventually they moved to the front part of

15    the plane, right?

16    A.  Correct.  That's when he moved -- he went from where we

17    were sitting to where Group Supervisor Rob Zach was.

18    Q.  Okay.

19          So, my question is, when Mr. Campo Flores moved to the

20    front part of the plane, were you sitting so that you were

21    facing him or was your back to him?

22    A.  I was facing him.  I could see the three of them talking;

23    Special Agent Gonzalez, Group Supervisor Rob Zach and

24    Mr. Campo Flores.

25    Q.  Got it.  Okay.

GBF5flo1                        Brooks - cross

1              Now, do you know if Agent Gonzalez or Agent

2    Zachariaswicz recorded their interview with Mr. Campo Flores?

3    A.   I do not know that.

4    Q.   You don't know that.

5              But there was certainly nothing that would have

6    prevented them from recording the interview, right?

7    A.   Would you have to ask them that.  I can't speak for them.

8    Q.   Okay.

9              The defendants were handcuffed in front, right?

10   A.   Yes.

11   Q.   Then they had leg irons on, right?

12   A.   Yes, sir.

13   Q.   Now, when you are in leg iron and handcuff restraints like

14   that, are they both chained to the waist?

15   A.   No, sir.  They can be but it depends on the actual

16   apparatus.

17   Q.   And in this case did you have them chained from the hands

18   to the waist to the waist to the feet?

19   A.   I don't recall but I don't think so.  I don't think --

20   Q.   But you know their legs were in leg irons, right?

21   A.   Correct.

22   Q.   And the hands were handcuffed, right?

23   A.   Yes.

24   Q.   So there certainly was no security or safety reason why

25   Agent Zachariaswicz couldn't have recorded the interview,

GBF5flo1                          Brooks - cross

1   right?

2   A.  That's not correct.

3   Q.  Well, Agent Zachariaswicz -- could we have, Mr. Calabrese,

4   I believe it is 58?  No.  59 let's try.

5           Is this, Agent Brooks, another look at the bench seat

6   that we just saw from a slightly different angle?

7   A.  Yes, sir.

8   Q.  See where it looks like a coffee cup on the left-hand side

9   there?

10  A.  Yes, sir.

11  Q.  Someone could have taken a phone, right, and just put it

12  right on that ledge where the coffee cup was and recorded the

13  interview, right?

14  A.  Again, sir, I don't know.  I wasn't sitting there so I

15  can't answer that.

16  Q.  Okay, but Agent Zach was sitting right across from Agent

17  Gonzalez and Mr. Campo Flores, right?

18  A.  When they were in where he was located?

19  Q.  Yes.

20  A.  Yes.

21  Q.  I'm sorry, Mr. Calabrese.  Can we go back to 57?  Thank

22  you.

23          And you were seated right in the back there looking at

24  them, right?

25  A.  Yes, sir.

GBF5flo1                          Brooks - cross

1   Q.  And you went to LSU, right, Agent Brooks?

2   A.  Yes, sir.

3           MR. QUIGLEY:  Objection.  Relevance.

4           THE COURT:  He is proud of the fact that he went to

5   LSU, weren't you?

6           THE WITNESS:  Go Tigers.

7   BY MR. RODY:

8   Q.  Go Tigers.

9           Agent Brooks, I'm going to let you brag a little bit.

10  What position did you play for the Tigers?

11  A.  I played linebacker.

12  Q.  You played linebacker for the LSU Tigers; that's in the

13  SEC?

14  A.  Yes, sir.

15  Q.  You still think it is the toughest conference in the

16  nation?

17  A.  It is one of.

18          THE COURT:  Let's go on to something else.

19          MR. RODY:  We will.

20  Q.  I want to talk to you about some of the pedigree

21  information that you took from Mr. Flores, okay?

22  A.  Yes, sir.

23  Q.  Mr. Flores told you that he lived in Caracas in an

24  apartment, correct?

25          MR. QUIGLEY:  Objection, your Honor.  Hearsay.

GBF5flo1                          Brooks - cross

1              THE COURT:  Overruled.

2  Q.  Mr. Flores told you that he lived in an apartment in

3  Caracas, correct?

4  A.  I don't have the 202 in front of me, but whatever

5  information that was inputted on that 202 are also the notes

6  that would have been what he told me that day.

7  Q.  Okay.  Hang on one second.

8              MR. QUIGLEY:  Your Honor, I think this is an attempt

9  to offer a client's statements, they're not statements of party

10  opponents and coming in for the truth of the matter asserted.

11             THE COURT:  We haven't gotten to that point yet.

12             MR. RODY:  May I approach, your Honor?

13             THE COURT:  Yes, you may.

14  BY MR. RODY:

15  Q.  Take a look at this and I will ask if that refreshes your

16  recollection.

17             MR. RODY:  One moment, your Honor?

18             (Counsel conferring)

19  Q.  Mr. Calabrese, you can take that photo down.  Thanks.

20             Mr. Flores told you that he lived in Caracas, correct?

21             MR. QUIGLEY:  Objection.  Hearsay.

22             THE COURT:  Sustained.

23  Q.  Sir, you took pedigree information in part to learn the

24  relationships between the defendants, right?

25  A.  Correct.

GBF5flo1                          Brooks - cross

1   Q.  And to learn about their familial relationships, correct?

2   A.  Correct.

3   Q.  So, you learned that Mr. Flores had a 7-year-old son,

4   correct?

5           MR. QUIGLEY:  Objection.  Hearsay.

6           THE COURT:  Sustained.

7   Q.  And you learned that Mr. Flores did not live with

8   Mr. Campo, correct?

9           MR. QUIGLEY:  Objection.  Hearsay.

10          THE COURT:  Sustained.

11  Q.  You learned, instead, that he lived with a roommate, right?

12          MR. QUIGLEY:  Objection, your Honor.

13          THE COURT:  Sustained.

14  Q.  Now, did you participate in debriefing the government's

15  confidential sources in this case?

16  A.  At what stage?  I'm sorry.

17  Q.  At any stage.

18  A.  Yes, I did, at the very end.

19  Q.  I didn't hear you.

20  A.  Yes, I did, at the day of the arrest.

21  Q.  The day of the arrest.

22          And they were arrested on August 4th, 2016?

23  A.  Yes, sir.

24  Q.  Were you present when the DEA spoke to them on June 29th,

25  2016?

GBF5flo1                          Brooks - cross

1   A.  No, sir.

2   Q.  You were aware that the DEA learned that the confidential

3   sources were involved in illegal activity in April 2016,

4   correct?

5   A.  Was I aware in April that they had participated in illegal

6   activity?

7   Q.  Correct.

8   A.  Yes, sir.

9   Q.  And then when -- okay, so you were not present when the DEA

10  confronted CS-1 and CS-2 on June 29th, correct?

11  A.  No, sir.

12  Q.  But you were there when they were arrested on August 4th,

13  correct?

14  A.  Correct.

15  Q.  And did you participate in the interviews of the defendants

16  on August 4th?

17  A.  Yes, sir.

18          THE COURT:  Of the defendants?

19          MR. RODY:  If I said defendants that was incorrect.

20  Q.  Did you participate in the interviews of CS-1 and CS-2 on

21  August 4th, 2016?

22  A.  Yes, sir.

23  Q.  And so, the DEA recorded those interviews on audio and

24  video, correct?

25          MR. QUIGLEY:  Objection.  Relevance.

1    THE COURT:  Overruled.

2  A.  I think that the briefing was recorded audio.  I don't

3  think it was recorded video.

4  Q.  Do you remember how it was recorded?

5  A.  Yes, sir.

6  Q.  It was recorded with some of the DEA's surreptitious

7  recording devices, correct?

8  A.  It was a recording device, yes.

9  Q.  But it wasn't like someone took a tape recorder and put it

10 in the middle of the table and pressed play and said tell us

11 now what you did, right?

12 A.  It was a speciality device if that's what you are getting

13 at.  It was a speciality device.  Like you said, it wasn't a

14 tape recorder.

15 Q.  Right.

16    You said a speciality device, so CS-1 and CS-2 did not

17 know they were being recorded, correct?

18 A.  I don't believe so.

19 Q.  It is the same type of equipment that informants would use

20 in another meeting when they were sitting with a target having

21 a conversation with a target, correct?

22 A.  It's the type of device that undercover officers and

23 informants would use.

24 Q.  Okay, sure.

25    But it is surreptitious so the person who is speaking

GBF5flo1                         Brooks – cross

1     doesn't know they're being recorded, right?

2     A.   Correct.

3     Q.   And you don't know whether it was an audiovisual recorder

4     or just an audio recorder?

5     A.   I'm familiar with the device, that's why I am saying I

6     think it was just audio.

7     Q.   Okay.  You have not seen the video of that recording?

8               MR. QUIGLEY:  Objection, your Honor.

9               MR. RODY:  It is a yes or no question.

10              THE COURT:  You can answer.

11    Q.   You have not seen the video of that recording?

12    A.   No, sir.

13              MR. RODY:  A moment, your Honor.

14              (Pause)

15              THE COURT:  Mr. Rody?

16              MR. RODY:  A moment, your Honor?

17              (Counsel conferring)

18    BY MR. JACKSON:

19    Q.   Agent Books, I want to show you something.  I want to see

20    if that refreshes your recollection about a video of the

21    recording?

22              MR. QUIGLEY:  Your Honor, I don't think he said he

23    lacked recollection.

24              THE COURT:  Objection sustained.

25              (Continued on next page)

GBF9FLO2                        Brooks – cross

1   Q.  So that was in August, correct?

2   A.  Correct.

3   Q.  But you filed some affidavits for search warrants in this

4   case, correct?

5   A.  Correct.

6   Q.  And one of those was in December 2015, right?

7   A.  Correct.

8   Q.  And that was a search warrant to allow the DEA to access

9   information on some of the phones; is that right?

10  A.  Yes, sir.

11  Q.  And then you filed another search warrant affidavit in this

12  case on May 2, 2016; is that right?

13  A.  Correct.

14  Q.  And that was also related to accessing phone information,

15  correct?

16  A.  Yes, sir.

17  Q.  And in that affidavit you referenced that the information

18  was based in part on information you had learned from CS-1 and

19  CS-2, correct?

20  A.  Yes, sir.

21  Q.  And you said that the information provided by CS-1 and CS-2

22  had proven to be reliable, right?

23  A.  Yes, sir.

24  Q.  Now, this was after the DEA had learned from another source

25  that they were involved in illegal narcotics trafficking,

GBF9FLO2                         Brooks - redirect

1    correct?

2    A.  Yes, sir.

3    Q.  Okay.

4            MR. RODY:  No further questions, Judge.

5            THE COURT:  Anything from you, Mr. Jackson, Mr. Zach?

6            Mr. Jackson, Mr. Zach?

7            MR. ZACH:  No, your Honor, no questions.

8            MR. QUIGLEY:  Very briefly, your Honor.

9    REDIRECT EXAMINATION

10   BY MR. QUIGLEY:

11   Q.  Agent Brooks, right at the end there Mr. Rody asked you a

12   question about whether you thought CS-1 and CS-2 were reliable

13   when you swore out that search warrant in early May.

14   A.  Yes, sir.

15   Q.  Do you recall that?

16   A.  Yes.

17   Q.  On what were you basing that reliability testimony?

18   A.  I was basing it on the evidence that the CSs had provided

19   regarding to the defendants, the consensual recordings.  That

20   information we were able to corroborate.  So that information

21   was reliable.

22           MR. QUIGLEY:  No further questions, your Honor.

23           THE COURT:  You're excused, Agent Brooks.  Thank you

24   very much.

25           THE WITNESS:  Thank you, sir.

1           (Witness excused)

2           THE COURT:  Next witness.

3           MR. BOVE:  Our next witness is Carlos Gonzalez.

4           THE COURT:  Mr. Quigley.

5           MR. QUIGLEY:  No problem.  Got it.

6           MR. BOVE:  May I approach, your Honor?

7           THE COURT:  Yes, you may.

8           Ladies and gentlemen, why don't we take a break now.

9           MR. BOVE:  Judge, I'm sorry.  We've addressed that

10    issue.  If you'd like to take a break, obviously.  But I think

11    we can present the witness now.

12          THE COURT:  Okay.  We'll go until the lunch hour.

13      CARLOS GONZALEZ,

14         called as a witness by the Government,

15         having been duly sworn, testified through the Spanish

16    interpreter as follows:

17          THE COURT:  All right.  Mr. Bove.

18          MR. BOVE:  Thank you, your Honor.

19    DIRECT EXAMINATION

20    BY MR. BOVE:

21    Q.  Sir, where are you from?

22    A.  From Honduras.

23    Q.  Where do you live right now?

24    A.  In prison.

25    Q.  How did you end up in jail?

GBF9FLO2                          C. Gonzalez – direct

1  A.  Honduran police officers approached me to let me know that

2  I had problems with the U.S. authorities.

3  Q.  What did you do after you learned that?

4  A.  I traveled to the U.S. to surrender voluntarily.

5  Q.  What happened when you got to the U.S.?

6  A.  DEA agents arrested me and transferred me to jail.

7  Q.  Sir, have you pleaded guilty to a federal crime?

8  A.  Yes, sir.

9  Q.  What crime did you plead guilty to?

10  A.  Of conspiracy of shipping five kilos of cocaine or more to

11  the U.S.

12  Q.  Did you enter that guilty plea pursuant to a cooperation

13  agreement?

14  A.  That's correct.

15  Q.  Before you surrendered where did you live in Honduras?

16  A.  In Roatan.

17         MR. BOVE:  Mr. Calabrese, could we place take a look

18  at Government Exhibit 27 in evidence.

19  Q.  Do you see Roatan on the map in front of you, sir?

20  A.  Yes, sir.

21  Q.  Please tell the jury where it's located.

22  A.  It's on the top of the map.  It's on the north of Honduras.

23  It's the largest island.

24  Q.  Before you surrendered where did you work?

25  A.  At the Roatan Airport.

GBF9FLO2                          C. Gonzalez - direct

1   Q.  What's the name of that airport?

2   A.  Juan Manuel Gálvez.

3   Q.  Sir, what was your job there?

4   A.  Air traffic controller.

5           MR. BOVE:  May I approach, your Honor.

6           THE COURT:  Yes, you may.

7   Q.  I'm showing you a document marked for identification as

8   Government Exhibit 29.  Do you recognize this?

9   A.  Yes, sir.

10  Q.  What is it?

11  A.  It's a photo of the map of the Roatan Airport.

12          MR. BOVE:  The government offers Government Exhibit

13  29, your Honor.

14          MR. ZACH:  No objection.

15          MR. RODY:  No objection.

16          THE COURT:  29 is in evidence.

17          (Government's Exhibit 29 received in evidence)

18          MR. BOVE:  Could we please publish 29, Mr. Calabrese.

19  Q.  What's the airport code at the airport where you worked?

20  A.  ROA.

21  Q.  Where is the ROA airport on this photograph?

22          THE INTERPRETER:  I'm sorry, counsel.  Can you repeat

23  the question again.

24  Q.  Where is the ROA airport on this photograph?

25  A.  It's in the middle of the photo.  You can see the airstrip.

GBF9FLO2                          C. Gonzalez – direct

1    Q.  Could you please give the jury an estimate of the flight

2    volume at ROA around the time of your surrender?

3    A.  Is one of the largest -- three largest airports of the

4    country in Honduras.  And it's the one that receives one of the

5    most amount of tourism to the country in Honduras.

6    Q.  You surrendered this past summer, correct?

7    A.  Yes, sir.

8    Q.  Were those volumes that you just described similar in

9    October and November of 2015?

10   A.  Yes, sir.

11   Q.  Did you commit any crimes while you were working at this

12   airport?

13   A.  Yes, sir.

14   Q.  Generally speaking what did you do?

15   A.  I received and dispatched planes associated with drug

16   trafficking.

17   Q.  Did you ever meet a man named Sentado?

18   A.  Yes, sir.

19   Q.  When approximately did you meet Sentado?

20   A.  Approximately three years ago.

21   Q.  What is your understanding of what Sentado did for money in

22   2014 and 2015?

23   A.  Drug trafficking, sir.

24        MR. BOVE:  Mr. Calabrese, can we take a look at

25   Government Exhibit 65, please.

GBF9FLO2                          C. Gonzalez – direct

1    Q.  Do you recognize the man in this photograph?

2    A.  Yes, sir.

3    Q.  Who is this?

4    A.  Roberto Soto, sir.

5    Q.  What is your understanding of what Soto did for money in

6    2014 and 2015?

7                MR. RODY:  Objection.  Basis.

8                THE COURT:  Overruled.

9                THE WITNESS:  Drug trafficking, sir.

10   Q.  Do you recognize this photograph?

11   A.  Yes, sir.

12   Q.  Where is the picture from?

13   A.  It was taken at a restaurant where we met; Soto, myself,

14   and Mr. Sentado.

15   Q.  Before we talk about that meeting let's take a step back.

16   When approximately did you start working as an air traffic

17   controller at the Roatan Airport?

18   A.  In the year 2015 --

19                THE INTERPRETER:  I'm sorry.  2005.

20                Correction by the interpreter.

21   Q.  Focusing now on 2015.  What were some of your duties and

22   responsibilities as an air traffic controller at that airport?

23   A.  Establish contact with the planes, guide them, separating

24   them and helping them in landing.

25   Q.  When you say separating them, what do you mean?

1    A.   Separating them from other airplanes.

2    Q.   Now, in 2015 what were some of the things that a plane

3    needed to land at the airport in Roatan?

4    A.   First of all, the entry permit to the country.  Then the

5    flight plan of the plane.  And then the documents of the

6    pilots, the passports and the licenses.

7    Q.   So you mentioned a permit?

8    A.   Yes, sir.

9    Q.   How is the permit obtained?

10   A.   Request is sent to the civil aeronautics agency of

11   Honduras.

12   Q.   Is there a deadline for submitting that request?

13   A.   It needs to be sent 24 hours before the flight.

14   Q.   Now you mentioned a flight plan.

15   A.   Yes, sir.

16   Q.   What's a flight plan?

17   A.   These are documents that include the ten number

18   registration of the plane, the origin airport, the time of the

19   flight, and it also includes names of passengers and passports.

20   Q.   Now how is a flight plan typically submitted?

21   A.   The pilot must submit it at the origin airport.

22   Q.   Who do the pilots submit flight plans to at the origin

23   airport?

24   A.   To a flight plan officer or to a flight dispatcher.

25   Q.   Now when you were working as an air traffic controller in

1   Roatan, how would you get access to flight plans for incoming

2   aircraft?

3   A.   Through a flight plan officer or a controller of a central

4   air division.

5   Q.   When you were working at this airport what would happen if

6   a plane made contact with the air traffic control tower but it

7   lacked a permit or a flight plan?

8   A.   The service, control service was provided.  The landing was

9   authorized.  And then once on land the Honduran airport

10  authorities would be in charge of the investigation.

11  Q.   And what were some of the things that the Honduran airport

12  authorities typically did in an investigation under those

13  circumstances?

14          MR. ZACH:  Objection.

15          THE COURT:  Overruled.

16          THE WITNESS:  They would investigate the origin,

17  whether it had a flight plan or permit; whether the pilot had

18  legal documents; and they would conduct a search of the plane

19  in case there was some trace of drugs or anything else.

20  Q.   When did you get involved in drug trafficking?

21  A.   Around 2008.

22  Q.   Focusing on 2014 and 2015.  Who were some of the drug

23  traffickers that you were working with at the Roatan Airport?

24  A.   Mr. Marcos Merren was there.  He was an associate of

25  Mr. Sentado's.  And with Roberto Soto.

GBF9FLO2                         C. Gonzalez - direct

1  Q.  Staying in that same timeframe 2014 and 2015.  What was

2  your basic role in these drug trafficking activities?

3  A.  To organize the airport to receive and dispatch planes

4  associated with drug trafficking.

5  Q.  In that same timeframe about how many people at the Roatan

6  Airport were you working with to commit drug trafficking

7  crimes?

8  A.  More than ten people at the airport.

9  Q.  Were there other air traffic controllers involved?

10  A.  Yes, sir.

11  Q.  What about flight plan officials?

12  A.  Also.  As well.

13  Q.  What was the role of the flight plan officials?

14  A.  Helping us with the entry permits and the flight plans.

15  Q.  Were there runway inspectors involved?

16  A.  Yes, sir.

17  Q.  What did they do?

18  A.  To prevent runway inspections if there would be an

19  inspection with planes associated with drug trafficking.

20  Q.  What about members of the Honduran national police?

21  A.  Yes, sir.

22  Q.  What was their role?

23  A.  Not to interfere with the drug trafficking operations that

24  were being carried out at that time.

25  Q.  Were there any Honduran military personnel involved?

1    A.  Yes, sir.

2    Q.  Which branch?

3    A.  There were captains of the air -- Honduran Air Force and

4    also soldiers.

5    Q.  What was the role of the Air Force personnel?

6            MR. ZACH:  Objection.  Need to lay a foundation.

7            THE COURT:  Overruled.

8            THE INTERPRETER:  What was the question again?

9    Q.  What was the role played by the Honduran Air Force

10   personnel?

11   A.  The same.  Not to intervene with the drug trafficking

12   operations that were taking place.

13   Q.  Do you know all of this because you helped to coordinate

14   these activities?

15           MR. RODY:  Objection.  Form.

16           THE COURT:  Overruled.

17           THE WITNESS:  That's correct, sir.

18   Q.  What were the two main types of drug trafficking activities

19   at the airport in Roatan?

20   A.  The first one was to receive and dispatch planes with

21   illegal fuel.  That were headed to South America to pick up

22   drug loads.  And the other one was to receive planes with drug

23   loads at the -- drug loads -- planes with drug loads at the

24   Roatan Airport.

25   Q.  And you mentioned loading fuel on the planes?

GBF9FLO2                          C. Gonzalez - direct

1    A.  Yes, sir.

2    Q.  Please describe how that worked at the Roatan Airport.

3    A.  Usually the planes get to Roatan illegally from Mexico or

4    Guatemala.  They would enter the ramp.  They would pick up

5    legal fuel on the wings.  Then it was directed to the end of

6    the runway No. 25 for illegal fuel.

7    Q.  What would happen at the end of the runway?

8    A.  The illegal fuel was loaded in 15-gallon drums.  The tail

9    number was erased and replaced with a new one.  On some

10   occasions there was a switch of crews or pilots.

11           MR. BOVE:  Mr. Calabrese, can we take a look at

12   Government Exhibit 29, please.

13   Q.  I'm going to show you a document we marked for

14   identification as Government Exhibit 30.  Do you recognize

15   that?

16   A.  Yes, sir.

17   Q.  What is it?

18   A.  It's a photo of the end of the runway no. 25 of Roatan.

19           MR. BOVE:  The government offers Government Exhibit

20   30, your Honor.

21           MR. RODY:  No objection.

22           MR. ZACH:  No objection.

23           THE COURT:  It's received in evidence.

24           MR. BOVE:  Mr. Calabrese can we keep 29 on the left

25   and put 30 on the right.

GBF9FLO2                          C. Gonzalez – direct

1      (Government's Exhibit 30 received in evidence)

2  Q.  So on the right this is a photo of the end of the runway

3  that you were describing?

4  A.  Yes, sir.

5  Q.  Now I believe you said the other type of drug trafficking

6  activity that took place at this airport was to receive cocaine

7  loads?

8      THE COURT:  Excuse me.  Now we're going to take a

9  break.  The lunch is a little bit delayed but we've been

10 sitting now for almost two hours so we need a break.

11      Luncheon ought to be served by 1:15 so if you don't

12 mind we'll excuse you now.  Lunch will be served in the jury

13 room as soon as it arrives.  We'll resume 45 minutes after

14 you've had lunch.  Thank you.

15      (Continued on next page)

16

17

18

19

20

21

22

23

24

25

GBF9FLO2

1          (Jury not present)

2          THE COURT:  Everybody is very good at writing letters.

3    What I'd like to know now, Mr. Quigley and counsel for the

4    defendants, what are the consequences of ripping up a K1 letter

5    in front of the jury.  What should they do?  Think about that

6    and submit your views tonight.  Thank you.

7          MR. JACKSON:  Thank you, your Honor.

8          (Luncheon recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GBF9FLO2

                           AFTERNOON SESSION

                               2:15 p.m.

 3          (Jury not present)

 4          THE COURT:  The government wants to take something up.

 5  Please be seated.

 6          MR. BOVE:  Yes, your Honor.  Thank you.

 7          THE COURT:  Yes.

 8          MR. BOVE:  With respect to the witness on the stand we

 9  disclosed prior to trial that in approximately 2014 he was a

10  perpetrator of a domestic violence incident in Honduras that

11  led to his arrest.  I don't think that he's entirely clear

12  about the procedure of what happened after that.  But I'm

13  assuming for purposes of this argument that it did result in

14  some kind of conviction.  We submit that that -- that incident

15  is not probative of this witness's character for truthfulness

16  or any other matter that should be fairly -- on

17  cross-examination.  And so we're asking the Court to preclude

18  cross into that area.

19          MR. ZACH:  We think the conviction is relevant.  We're

20  not going to delve into it.  But the fact is it needs to come

21  out.  It's a prior conviction.  It's relevant.  No one is going

22  to dwell on it but it needs to come out.

23          MR. RODY:  The only thing I would add is there's been

24  a bunch of questions already focusing on the time period of

25  2014 and 2015 and his activities then in drug dealing.

GBF9FLO2

1          THE COURT:  I'm going to allow the cross-examination

2     limited, as Mr. Zach suggests, into the criminal conviction.

3          MR. ZACH:  Thank you, your Honor.

4          MR. RODY:  Thank you.

5          THE COURT:  Do we have the jury?  Get the witness

6     first.

7          Marshal.

8     CARLOS GONZALEZ, resumed

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GBF9FLO2                         C. Gonzalez - direct

1             (Jury present)

2             THE COURT:  All right, Mr. Bove.

3             MR. BOVE:  Thank you, your Honor.

4             THE COURT:  You're welcome.

5  DIRECT EXAMINATION CONTINUED

6  BY MR. BOVE:

7  Q.  Now before the break I asked you about the two main types

8  of drug trafficking activities at the Roatan Airport.

9  A.  Yes.

10            MR. BOVE:  Mr. Calabrese, could we take a look at

11  Government Exhibits 29 and 30.

12  Q.  So on the right here in Government Exhibit 30 is the end of

13  the runway at the airport?

14  A.  Yes.  It is the end of the runway.

15  Q.  And right before the break I asked you about whether there

16  were times where planes carrying cocaine arrived at this

17  airport.

18  A.  Yes, sir.  They did arrive.

19  Q.  Approximately how many times did you participate in a drug

20  trafficking incident like that where the cocaine actually made

21  it to the airport?

22  A.  Two times.

23  Q.  And when approximately did that occur?

24  A.  In 2010.

25  Q.  Please describe how those two drug loads worked at the

1    airport.

2              MR. RODY:  Objection.

3              MR. ZACH:  Objection.  Relevance.

4              THE COURT:  Overruled.

5    A.  The aircraft left from the international airport from South

6    America to Roatan.  The aircraft was given instructions to

7    land.  It was -- it landed and it was guided to the end of

8    runway 25.

9    Q.  What happened at the end of runway 25?

10   A.  The drugs were unloaded from the aircraft.

11   Q.  By who?

12   A.  The personnel at that time.  It was Mr. Marco Merren.

13   Q.  And where were those people located while they waited for

14   the plane to land?

15   A.  They were in the land that's right next, in the photograph

16   next to where the two red roofs are.

17   Q.  That's over on the right side of the photo?

18   A.  Yes.  On the right side of the picture.

19   Q.  What happened after the drugs were taken off the plane?

20   A.  The drugs were transferred to the lower part of the runway.

21   You can see it on the picture.  It's on the lower part of the

22   picture on the bay.  And there was a go-fast waiting there to

23   transport it.

24   Q.  What's a go-fast?

25   A.  A go-fast is a boat with engines.

GBF9FLO2                          C. Gonzalez – direct

1   Q.   Where did the go-fast take the cocaine?

2   A.   To the coast of Honduras.

3   Q.   Now, when you participated in these types of activities at

4   the Roatan Airport were you typically paid?

5   A.   Yes, sir.

6   Q.   How would you get paid?

7           THE INTERPRETER:  Did you say how?

8           MR. BOVE:  How.

9           THE WITNESS:  In cash.

10  Q.   What kind of cash?

11  A.   In U.S. dollars.

12  Q.   About how much were you paid for each drug trafficking

13  incident?

14  A.   On these two operations it was two hundred thousand dollars

15  per operation.

16  Q.   Was that two hundred thousand dollars all for you?

17  A.   No, sir.  It was for the entire airport.

18  Q.   I would like to direct your attention to October of 2015.

19  Were you working on a cocaine shipment at that time?

20  A.   That's right, sir.

21  Q.   How did you get involved?

22  A.   Mr. Soto called me telling me that Mr. Sentado wanted to

23  meet with us to receive a drug load.

24  Q.   When approximately did Soto contact you?

25  A.   Approximately the third week of October.

GBF9FLO2                          C. Gonzalez - direct

1   Q.   What happened after Soto reached out?

2   A.   The following day we traveled to San Pedro Sula to the

3   meeting.

4   Q.   Who is we?

5   A.   Soto and I.

6   Q.   What happened when you got to San Pedro Sula?

7   A.   They took us to a house so we could wait.

8   Q.   Who took you?

9   A.   Mr. Merren's personnel.

10  Q.   Did you leave the house at some point?

11  A.   Yes, sir.  When we went to the meeting.

12  Q.   Where was the meeting?

13  A.   At a house belonging to Mr. Sentado.

14  Q.   Who participated in the meeting at Sentado's house?

15  A.   Mr. Sentado was there.  There were three Mexicans, Soto,

16  myself, and a police officer from Honduras.

17  Q.   Did you recognize any of the three Mexicans at the meeting?

18  A.   Only one.

19  Q.   How did you recognize that person?

20  A.   He had gone to Roatan to organize a drug trafficking -- an

21  incident.

22  Q.   What type of incident?

23  A.   For us to organize dispatch of an aircraft with fuel to go

24  and pick up drugs.

25  Q.   Now during this meeting at Sentado's house did any of the

1   Mexicans speak?

2   A.  Yes, sir.

3   Q.  What were some of the things that they said?

4           MR. ZACH:  Objection.

5           THE COURT:  Overruled.

6   A.  They wanted us to receive an aircraft from South America

7   coming into Roatan with a drug shipment.

8   Q.  Did any of the Mexicans say what type of aircraft they

9   wanted you to receive?

10          MR. RODY:  Objection.  Hearsay.

11          THE COURT:  Overruled.

12  A.  A jet, GII.

13  Q.  Did the Mexicans say anything more specific about where the

14  drugs would be sent from?

15  A.  They were going to be sent from Venezuela to Roatan.

16  Q.  And did the Mexicans say anything about the people in

17  Venezuela who they expected to send the plane?

18  A.  No.

19  Q.  Did they say anything about access to the airport in

20  Venezuela?

21          MR. ZACH:  Objection.  Leading.

22          THE COURT:  Overruled.

23  A.  Yes, sir.

24  Q.  What did the Mexicans say about gaining access to the

25  airport in Venezuela?

1  A.  One of the things they mentioned is that the airplane was

2  going to be dispatched from the presidential hangar.

3  Q.  What, if anything, did Soto say during this meeting about

4  the drug load that was going to be sent to Roatan?

5  A.  He was told about the timing at the airport.  And also

6  about the passengers that they were advised to bring on the

7  aircraft.

8  Q.  So those are some of the things that Soto said during the

9  meeting?

10  A.  Yes, sir.

11  Q.  What happened after the meeting?

12  A.  They took us back to Mr. Merren's house.

13  Q.  Were you paid any money that day?

14  A.  Yes, sir.

15  Q.  Approximately how much?

16  A.  Five hundred dollars for Mr. Soto and me.

17  Q.  So that five hundred dollars was split between the two of

18  you?

19  A.  Yes.

20  Q.  Where did you sleep that night?

21  A.  At Mr. Merren's house.

22  Q.  What happened the next day?

23  A.  The following day I went back to Roatan Island.

24  Q.  How did you get there?

25  A.  I was driven by car to Ceiba.  I was driven by car to Ceiba

1    by Mr. Merren's personnel and from Ceiba to Roatan I took a

2    ferry.

3              MR. BOVE:  Mr. Calabrese, can we take a look at

4    Government Exhibit 27 in the main window, please.

5    Q.  Do you see San Pedro Sula on the map, sir?

6    A.  Yes, sir.

7    Q.  It's a little bit left of center near the big green dot?

8    A.  It's on the west side of the map.

9    Q.  Where is Ceiba on the map?

10   A.  To the center and on the upper part of the map.

11   Q.  So just south of Roatan on the coast?

12   A.  That's right.

13   Q.  Did Soto go back to Roatan with you that day?

14   A.  No, sir.

15   Q.  When you got back to Roatan did you do anything with

16   respect to the information that was discussed at the meeting?

17   A.  Yes.  We spoke to the airport personnel regarding the

18   shipment that we were going to receive.

19   Q.  What kind of shipment?

20   A.  The drug shipment that was going to be received.

21   Q.  Is that the one that you had discussed at the meeting with

22   Sentado and the Mexicans?

23   A.  That's right, sir.

24   Q.  Who did you talk with at the airport about this planned

25   cocaine shipment?

1    A.  I spoke to Mrs. Danitza.  She was the flight plan officer.

2    With Mr. Galindo, who was the chief of security at the airport.

3    And I also mentioned it to Mr. Urquia who was a coworker in the

4    control tower.

5    Q.  Why did you talk to these people?

6    A.  To confirm what days we had available to receive the drug

7    shipment.

8    Q.  Did you talk with Soto again about the drug shipment?

9    A.  Yes, sir.

10   Q.  When approximately did you next speak to him about that

11   shipment?

12   A.  Approximately three or four days later when he came back.

13   Q.  After that conversation did you speak with him again?

14   A.  Yes, sir.

15   Q.  And was that in approximately early November of 2015?

16   A.  Approximately, sir.

17   Q.  What did Soto tell you in early November 2015?

18   A.  He called me to tell me that Mr. Sentado wanted to meet

19   with us again regarding the drug shipment.

20   Q.  What, if anything, did you do based on that information

21   from Soto?

22   A.  Just get ready to travel.

23        MR. BOVE:  At this point, your Honor, I request

24   permission to publish some of the transcripts that are in

25   evidence.

GBF9FLO2                              C. Gonzalez – direct

1                THE COURT:  Yes.

2                MR. BOVE:  Ask the jurors to pick up the binders,

3    please.

4                If we could first turn to Government Exhibit 303-T.

5                THE INTERPRETER:  We don't have a copy up here.

6                MR. BOVE:  Your Honor, may I bring a binder up,

7    please.

8                THE COURT:  Yes.

9                303-T?

10               MR. BOVE:  Yes, your Honor.

11   Q.  So these are BlackBerry messenger communications between

12   defendant Campo and Santos Peña.  The date on the top of the

13   exhibit is November 4 of 2015.  I'm going to ask Mr. Calabrese

14   to help me read these back.  I will read the part of Campo.

15               "CAMPO:  That there's a storm around there and they

16   have to change course and that will take 30 minutes and that's

17   what the control tower there is informing them.  That they'll

18   arrive 30 minutes later meaning that instead of arriving at 5

19   they'll arrive at 5:30.

20               "CS-1:  Okay.  Got it.

21               "CAMPO:  The flight plan is done and everything.

22   They're leaving.  Let me know if there are any problems.  The

23   thing is that they are going to take 30 minutes longer to

24   arrive.  That's all.

25               "CS-1:  No problem.  My guys will be there when God

GBF9FLO2                              C. Gonzalez – direct

 1    allows them to.

 2              "CAMPO:  Okay.  They will be there at 5:30 then.

 3              "CS-1:  No problem.  I'll let them know.  Right away.

 4    Soon.  Sir.  Thanks for letting them know.

 5              "CAMPO:  No sir I will always keep you informed to

 6    avoid any margin for error.  Okay then.  They will be there at

 7    5:30.

 8              "CS-1:  Yes, sir."

 9              MR. BOVE:  If we could now turn to Government Exhibit

10    510-T.

11              These are WhatsApp messenger communications between

12    defendant Flores using a 5405 WhatsApp account and defendant

13    Campo using the 5397 WhatsApp account.

14              If you could turn to page 25 of Government Exhibit

15    510-T, please.

16              Mr. Calabrese, if you could help me here.  I will read

17    the part of Campo.

18              "CAMPO:  I just got back from la guaira.

19              "CS-1:  How did it go.  We're signed up.

20              "CAMPO:  It's on.  Beautiful.

21              "CS-1:  All good.  Talk to me.

22              "CAMPO:  Buddy I've been calling you for a while.  I'm

23    in a tight bind and I keep calling you and you don't answer me.

24    The mechanics that we sent to check out are not even going to

25    be able to get there.  A bit of rain and you don't answer my

1    calls.  And I don't know where to message you.

2            "CS-1:  Where do I meet you right now.  Tell me.

3    Ping.

4            "CAMPO:  It's raining over there.

5            "CS-1:  I'll call you right away.

6            "CAMPO:  Let me see.

7            "CS-1:  What are you going to see.

8            "CAMPO:  If you can come.

9            "CS-1:  Okay.  Okay.

10           "CAMPO:  Nothing for now.  They're going to check

11   tomorrow.  The mechanics are not going today.  Tomorrow.

12           "CS-1:  Tell me.  Should I go.

13           "CAMPO:  The thing is that apparently they won't be

14   able to see them tomorrow.  The other key.  And the other thing

15   about the GPS.  We need to have that guy handy now.  Spoiled.

16           "CS-1:  Ready.  Waiting for you to give me the

17   coordinates.

18           "CAMPO:  Well that.  If you want come over and we'll

19   talk to them.  Bring the GPS thing and the key.

20           "CS-1:  Okay.  Okay.  I'll get ready and leave.

21           "CAMPO:  Let me know when you're arriving to put on

22   some pants.

23           "CS-1:  Okay.  Okay."

24           MR. BOVE:  If we can now please turn in the binders to

25   Government Exhibit 305-T.

1            305-T reflects BlackBerry messages between defendant

2    Campo and Mr. Santos Peña.  The date at the top of the exhibit

3    is November 5, 2015.

4            If we could take a look at page 2, please.  And let's

5    start by reading lines 1 through 9 here and I'll read the party

6    of Mr. Campo.  Mr. Calabrese, if you could read the other.

7            "CAMPO:  Sure we'll be in touch in an hour sir.

8            "CS-1:  Great sir.

9            "CAMPO:  They're already there buddy.  Sir.  They're

10   already there and they're going through immigration."

11           MR. BOVE:  Now if we could take a look at page three,

12   lines 24 through 34 and I'll read the part of Campo again.

13           "CAMPO:  All right sir I'll let the cousin know so

14   they don't worry.

15           "CS-1:  Okay sir.

16           "CAMPO:  The most trust worthy is the bald pilot and

17   the old man with them is with whom they're going to talk sir to

18   let them know over there.

19           "CS-1:  So the deal is with the old man?

20           "CAMPO:  Yes.  And the bald guy.  They're the two

21   pilots.  The others are the passengers."

22           MR. BOVE:  Now, lastly, if we could take a look at

23   page 5 of Government Exhibit 305 and we're going to read lines

24   17 through 25.

25           "CAMPO:  How dare they put everything at risk like

GBF9FLO2                          C. Gonzalez – direct

1    that over there.  I already gave the cousin an earful and he's

2    going to call over there now.  This sucks man.  Wait till I see

3    them.  This is not their first time working.  They are nuts

4    man."

5    BY MR. BOVE:

6    Q.  Mr. Gonzalez, before we started to read those transcripts

7    you said that you went to San Pedro Sula for a second meeting?

8    A.  Yes, sir.

9         MR. BOVE:  Mr. Calabrese, if you could publish 65,

10   please.

11   Q.  What happened when you got to San Pedro Sula for this

12   meeting?

13   A.  Mr. Merren's workers transferred me to house to wait.

14   Q.  Were you with anyone else from Roatan?

15   A.  Yes, sir.  With Mr. Soto.

16   Q.  How long did you wait?

17   A.  It was several hours.

18   Q.  What happened after those several hours?

19   A.  Mr. Merren's workers transferred me and Mr. Soto to a

20   restaurant for the meeting.

21   Q.  Who was at the restaurant when you got there?

22   A.  Mr. Sentado's security people were there, Mr. Soto, and

23   myself.

24   Q.  Did someone else join the meeting at some point?

25   A.  After a short while a Colombian person joined.

GBF9FLO2                    C. Gonzalez – direct

1   Q.  Did you get the Colombian man's name?

2   A.  No, sir.

3   Q.  Let's refer to him as Juan Gomez, okay?

4   A.  Okay.

5   Q.  And what was your understanding of why Gomez came to the

6   meeting?

7   A.  He was the representative of the owners of the drug load

8   that was going to be sent to Roatan.

9           MR. BOVE:  Now if we could take a look at Government

10  Exhibit 215-T in the binders.  The cover page here indicates

11  that this is from a November 5, 2015 meeting in San Pedro Sula.

12  The participants are listed there.

13          If the jurors could please turn in the transcript to

14  page 5.  We're going to start to play the corresponding

15  recording 215-S.  The text should pick up on row 29 on page 5.

16          Mr. Calabrese, could you please from 2:32 to 3:37 on

17  Government Exhibit 215-S.

18          (Recording played)

19          MR. BOVE:  Your Honor, I apologize I'm tardy in

20  requesting the Court's permission to give the limiting

21  instruction that we proposed earlier.

22          THE COURT:  Ladies and gentlemen, you're about to see

23  evidence relating to a meeting in Honduras –- we've already

24  started that –- on November 5 and 6 of 2015.  The statements in

25  the recordings by the defendants and their alleged

1    coconspirators, including Gonzalez, who is referred to in the

2    transcript as CW- 2, Soto, and Daza may be considered by you

3    against both of the defendants.  The statements of Juan Gomez,

4    who is referred to in the transcripts is CS-3, and Sentado, who

5    is referred to in the transcripts as CW-1, must not be

6    considered for their truth.  Rather, the statements of Gomez

7    and Sentado are being admitted for the very limited purpose of

8    providing you context for the statements of Flores and the

9    defendants' alleged coconspirators and to permit you to

10   understand how, when, and under what circumstances Flores and

11   the defendants' alleged coconspirators made the statements that

12   appear in the recordings.

13           MR. BOVE:  Thank you, your Honor.

14   BY MR. BOVE:

15   Q.  Mr. Gonzalez, if you could please take a look at page 6,

16   row 1.  It's at that row CW-1 or Sentado says "They are the

17   ones in charge."  Do you see that?

18   A.  Yes, sir.

19   Q.  Who did you understand Sentado to be referring to at that

20   point?

21   A.  To Soto and myself.

22   Q.  Now if you look at row 7 on page 6.  You say, "It's just

23   that we work with shifts."  Do you see that?

24   A.  Yes, sir.

25   Q.  What did you mean by that?

1   A.   That we worked in shifts to receive the load shipments --

2   the drug shipments.

3   Q.   Shifts at the airport?

4   A.   Yes, sir.

5   Q.   Now if you could please take a look at row 19.  You said

6   that "the reason why they are closing at six is because Roatan

7   does not have lights on the runway right now."  Do you see

8   that?

9   A.   Yes, sir.

10  Q.   Was that true?

11  A.   Yes, sir.

12  Q.   What had happened with the lights?

13  A.   There was a blackout at the airport in Roatan and a fuse

14  wasn't working and so the lights were out of service.

15          MR. BOVE:  Mr. Calabrese, if we can now play from 3:44

16  in the video to 5:28.

17          (Recording played)

18  Q.   If we could please take a look in the transcripts at page

19  7, row 4.  In that row Gomez referred to as CS-3 says, "It's

20  coming clean."  Do you see that?

21  A.   Yes, sir.

22  Q.   What did you understand Gomez to mean when he said, "It's

23  coming clean"?

24  A.   That the plane had entry permits to the country, the flight

25  plan, and the documents of the pilots.

1  Q.  In which plane did you understand CS-3 to be referring to?

2  A.  The plane that was going to come with the drug load.

3  Q.  If you could take a look at row 24 on page 7.  Soto says,

4  "If the plane arrives we have ten minutes there."  Do you see

5  that?

6  A.  Yes, sir.

7  Q.  What did you understand Soto to mean when he said that?

8  A.  That was the time that had been estimated to unload the

9  drugs from the plane.

10        MR. BOVE:  Could we take a look at Government Exhibit

11  30, please.

12  Q.  Does this photograph depict the area that you understood

13  Soto to be referring to when he said "there," page 7, row 24?

14  A.  Yes, sir.

15  Q.  And then later on in row 24 Soto says, "This thing is

16  unloaded and then loaded in a speed boat."  Do you see that?

17  A.  Yes, sir.

18  Q.  What did you understand Soto to mean when he said that?

19  A.  The drugs get unloaded and they would get loaded on the

20  go-fast.

21  Q.  Now at this point on November 5 of 2015 had you discussed

22  the plan with others for what to do with this cocaine shipment?

23  A.  With the same people that I had spoken previously, yes.

24  Q.  So what was your understanding of what would happen with

25  those drugs after they were loaded on the speed boat?

1    A.  They were going to be transported to the Honduran coast.

2    Q.  Where were the drugs going to be taken from the Honduran

3    coast?

4            MR. ZACH:  Objection.  Foundation.

5            THE COURT:  Overruled.

6    A.  They were going to be transported by car to San Pedro Sula,

7    from San Pedro Sula to Mexico, and then to the United States.

8    Q.  Now if we could take a look in the transcript at page 8,

9    lines 23 and 33 you say "The next week end."  And then at row

10   33, "Sunday in the afternoon."  What did you mean by those

11   comments?

12   A.  That that was the day and the shift that we had to receive

13   the drug shipment.

14   Q.  Now if we could take a look at page 9, row 9.  Soto said,

15   "It's one of the best days that we have always worked without

16   any problems."  Do you see that?

17   A.  Yes, sir.

18   Q.  What did you understand Soto to mean when he said that?

19   A.  That that was the day that we had worked the best because

20   there was not too much airplane traffic.

21   Q.  And you just used the term "worked."  What did you mean

22   when you said that?

23   A.  To work with planes related to drug trafficking, with drug

24   loads.

25           MR. BOVE:  Mr. Calabrese, if we could go back to

1    215-S, please, and play starting at 7:19 on the video.  And for

2    the jurors this will start at page 12, row 5.

3              (Recording played)

4              MR. BOVE:  Thank you.

5    Q.  If we could take a look at page 12, row 17.  Soto says "The

6    money and such, that's, that is the least of it."  Do you see

7    that?

8    A.  Yes, sir.

9    Q.  What did you understand Soto to mean when he said that?

10   A.  That the money issue was not relevant that day at the

11   meeting because we would handle that with Mr. Sentado.

12   Q.  Now at row 27, CS-3, Mr. Gomez, says "He is going to cross

13   north in, in a matter of two, three days."  Do you see that?

14   A.  Yes, sir.

15   Q.  What did you understand CS-3 to mean when he said that?

16   A.  That the drugs were going to be brought to the United

17   States in two or three days.

18   Q.  Now, before CS-3 said that during the meeting what was your

19   understanding of where this cocaine load was going to be

20   brought?

21   A.  To the United States, sir.

22   Q.  Was there any doubt in your mind about that?

23   A.  No, sir.

24   Q.  Why not?

25   A.  Because practically all the drugs that come through my

1  country, Honduras, end up in the states, in the United States.

2  Q.  You said that previously you had met with some Mexicans.

3  A.  Yes, sir.

4  Q.  How, if at all, did the presence of Mexicans in these

5  negotiations impact your assessment of the destination of the

6  drugs?

7          MR. ZACH:  Objection, your Honor.

8          THE COURT:  Overruled.

9          THE INTERPRETER:  Counsel would you repeat the

10  question for the interpreter, please.

11  Q.  How, if at all, did the involvement of Mexicans impact your

12  analysis or thinking about where these drugs were destined for?

13  A.  It consolidated even more my certainty that the drugs were

14  coming to the United States.

15  Q.  Let's take a look at page 12, row 29.  Sentado says "They

16  leave the same day from there to here, San Pedro."  Do you see

17  that?

18  A.  Yes, sir.

19  Q.  What did you understand Sentado to mean when he said that?

20  A.  That the drug load was going to be transported from Roatan

21  to San Pedro Sula.

22  Q.  Now if we could take a look at page 13, row 9.

23          Soto refers to God in that row.  Do you see that?

24  A.  Yes, sir.

25  Q.  What did you did you understand him to be referring to when

GBF9FLO2                          C. Gonzalez - direct

1    he used the term God?

2    A.   Some weather-related event that could have an impact on the

3    load.  On the drug load.

4    Q.   And in that same row Soto refers to gringos.

5    A.   Yes, sir.

6    Q.   What did you understand Soto to be referring to when he

7    used the term gringos?

8    A.   To the DEA, sir.

9    Q.   And so here at row 9 Soto says "There are two things we

10   can't arrange for you.  One is God and the other one are the

11   gringos."  Do you see that?

12   A.   Yes, sir.

13   Q.   What did you understand Soto to mean by that comment?

14   A.   That we couldn't control or arrange any weather-related

15   event, neither we could control or arrange the DEA.

16   Q.   What do you mean by control or arrange?

17   A.   I mean we controlled the Honduran authorities.  We paid

18   them so that they wouldn't interfere with our drug operations.

19   But the DEA, the climate, we couldn't control.

20   Q.   Are you familiar with the Spanish term guero?

21   A.   Yes, sir.

22   Q.   What do you understand that term to mean?

23   A.   It refers to the U.S. citizen.

24   Q.   Could you please take a look at page 13, row 13.  Soto says

25   "He arranges everything and everything is ready to, to, to

1    receive it.  Do you understand?"

2              Do you see that?

3              THE INTERPRETER:  Page 13, line 13?

4              MR. BOVE:  Right in the middle of the sentence

5    beginning with "because."

6    A.  Yes, sir.

7    Q.  When Soto referred to "he" who did you understand him to be

8    referring to?

9    A.  He was referring to myself.

10   Q.  And what did you understand Soto to mean when he made this

11   comment during the meeting?

12   A.  That I would organize the entire airport to receive a drug

13   shipment.

14             MR. BOVE:  So if we could now go back to 215-S and

15   just resume where we are.  This will pick up in the transcript

16   at page 13, row 13.

17             (Recording played)

18             MR. BOVE:  If we could please take a look in the

19   transcript at page 14, row 1.

20   Q.  Soto at that row says "Leave three, four passengers."  Do

21   you see that?

22   A.  Yes, sir.

23   Q.  What is your understanding of why Soto was requesting that?

24   A.  So that the flight with the drugs would come in just as a

25   regular flight and wouldn't raise any suspicions.

GBF9FLO2                        C. Gonzalez - direct

1    Q.  By bringing passengers on the plane?

2    A.  That's correct, sir.

3    Q.  Now in row 5 Soto says "Of course we don't care where it's

4    going."  Do you see that?

5    A.  Yes, sir.

6    Q.  What is your understanding of what Soto was referring to

7    there?

8    A.  He was referring to the plane, sir.

9    Q.  To the plane after it leaves the Roatan Airport?

10   A.  Correct.

11           MR. BOVE:  Now, Mr. Calabrese, if we could skip ahead

12   to 10:09 on the video 215-S.  And for the jurors this should

13   pick up on page 14, row 13.

14           (Recording played)

15   Q.  If we could take a look at the transcripts at page 14, row

16   23.  Soto says, "Instead of one hit that plane can deliver two

17   to you."

18   A.  Yes, sir.

19   Q.  What did you understand Soto to mean by that?

20   A.  That with the same plane they could bring two drug

21   shipments to Roatan.

22   Q.  And did you have an understanding of how that comment

23   related to the one that Soto made about bringing three or four

24   passengers?

25   A.  Yes, sir.

1    Q.   What is your understanding of what Soto meant by making

2    those two comments?

3    A.   That the first drug load would be brought when they brought

4    the first passengers and the second drug load would be brought

5    when they came to pick up the passengers.

6    Q.   Let's take a look at row 1 on page 15, please.  Soto says

7    "It's a matter of having a speed boat and they will be in

8    charge from there of bringing it here."  Do you see that?

9    A.   Yes, sir.

10   Q.   When Soto referred to "they" who did you understand him to

11   be talking about?

12   A.   Mr. Sentado's personnel.

13   Q.   Let's take a look at row 7 on page 15.  CS-3 or Gomez asks,

14   "How far does your responsibility go?"  What did you understand

15   him to mean by that?

16   A.   To what extent the airport personnel would be in charge of

17   the drug load at the airport.

18   Q.   And what did you consider the responsibilities of the

19   airport personnel to be in this transaction?

20   A.   Make sure that the airplane would arrive safely at the

21   airport, the airplane that was bringing the drug load, and that

22   nobody from the airport -- none of the authorities from the

23   airport or from the police would interfere with the arrival of

24   the drugs.

25   Q.   Now at row 9 on page 15 Soto says "with the Americans there

GBF9FLO2                           C. Gonzalez - direct

1   is no responsibilities."  Do you see that?

2   A.  Yes, sir.

3   Q.  What did you understand Soto to mean by that?

4   A.  That we would not be responsible for any operation that the

5   DEA might be holding at the airport.

6            MR. BOVE:  Now if we can resume here at the video.

7   For the jurors this should pick up at page 15, around line 21.

8            (Recording played)

9   Q.  If we could take a look at page 15, row 21 in the

10  transcripts.  Soto refers to an alternate landing strip.  Do

11  you see that?

12  A.  Yes, sir.

13           MR. ZACH:  I'm just going to object.  It's becoming

14  cumulative.

15           THE COURT:  You're objecting?

16           MR. ZACH:  Cumulative.  We're going back over.

17           THE COURT:  It's overruled.

18  Q.  What did you understand Soto to mean when he referred to

19  "an alternate landing strip"?

20  A.  We should have an alternate landing field somewhere in the

21  mountains to receive the airplane with the drug shipment.

22  Q.  Are you familiar with alternate landing strips like that?

23  A.  Yes, sir.

24  Q.  What are they typically made out of?

25  A.  Usually they're made of dirt or mud.

1   Q.  And based on your work at the airport what are some of the

2   risks associated with landing at one of these alternate landing

3   strips as opposed to at a real airport?

4   A.  That with an alternate landing strip when the airplane

5   lands the landing gear would most certainly break and the plane

6   would crash and it would be stuck there.

7   Q.  What would be stuck there?

8           THE COURT:  The plane.

9           THE WITNESS:  The plane would stay stuck there.

10  Q.  If we could take a look at page 16, row 13, please.

11  Sentado makes a reference to Mosquitia.  Do you see that?

12  A.  Yes, sir.

13  Q.  Where is Mosquitia?

14  A.  It's in the Gracias a Dios department in Honduras.

15          MR. BOVE:  Mr. Calabrese, could we take a look at

16  Government Exhibit 27, please.

17  Q.  Do you see the Gracias a Dios department on this map?

18  A.  Yes, sir.

19  Q.  Where do you see it?

20  A.  It's in the eastern part of Honduras on the right side of

21  the screen.

22  Q.  What's the terrain like in that part of Honduras?

23  A.  It's woody area.

24  Q.  If we could take a look at page 16, row 19, please.

25          Soto refers to "That you get identified along the

1    way."  Do you see that?

2    A.  Yes, sir.

3    Q.  What did you understand Soto to mean when he referred to

4    getting identified?

5    A.  That we would have gotten some kind of an alert for the

6    aircraft that was bringing the drug load.

7    Q.  What is your understanding of why a drug plane would be

8    sent to an alternative landing strip in the event of such an

9    alert?

10   A.  It would be sent to the alternate landing strip if the

11   alert said that we couldn't receive the drug -- the plane with

12   the drug shipment in Roatan.

13   Q.  Later in row 19 Soto says "Once there there is no longer a

14   responsibility for that plane."  Do you see that?

15   A.  Yes, sir.

16   Q.  What did you understand him to mean by that?

17   A.  We would not be responsible for the airplane at the

18   alternate landing strip.

19   Q.  Now on page 7, row 10.  Soto says "What we do is to recover

20   the merchandise."

21          I apologize.  It's page 17.

22          THE INTERPRETER:  Row 10 did you say?

23          THE COURT:  Page 17.  He said it wrong.  Row 10.

24   Q.  Soto said "What we do is to recover the merchandise."  Do

25   you see that?

1    A.  Yes, sir.

2    Q.  What did you understand him to mean by that?

3    A.  What we would do would be to recover the merchandise, the

4    drugs.

5          MR. BOVE:  Mr. Calabrese, if we could resume now with

6    the video and this should pick up at page 18, row 13 in the

7    transcript.

8          (Recording played)

9    Q.  Now at page 18, row 19 Soto says, "The alert is, that they

10   give, it's for the same authorities."  Do you see that?

11   A.  Yes, sir.

12   Q.  What did you understand Soto to mean when he said that?

13   A.  If an alert would become up it would be given to the

14   authorities at the airport in Honduras.

15   Q.  What was your understanding of what would happen once the

16   alert was passed to those authorities?

17   A.  The option would be to detour the aircraft to a clandestine

18   airstrip.

19   Q.  Page 18, row 29.  You say "They are already -- they are

20   arranged."  Do you see that?

21   A.  Yes, sir.

22   Q.  What did you mean by that?

23   A.  The Honduran authorities at the airport were already

24   controlled by us.

25         MR. BOVE:  Thank you, Mr. Calabrese.  You can take

GBF9FLO2                          C. Gonzalez - direct

1    that down.

2              THE COURT:  Would this be a convenient place for our

3    afternoon break?

4              MR. BOVE:  Yes, your Honor.  Thank you.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          (Witness not present)

3          THE COURT:  How much more do you have, Mr. Bove?

4          MR. BOVE:  I would say about 15, 20 minutes, Judge.

5          MR. JACKSON:  Excuse me, your Honor.

6          THE COURT:  Yes.  Mr. Jackson.

7          MR. JACKSON:  Your Honor is it okay -- I just want to

8    reiterate and ask if we can just -- we know that we put it into

9    our letter.  But I want to reiterate that we have a standing

10   objection to the manner in which the government is eliciting

11   interpretations of witnesses from -- of people who are not

12   here.  There have been about a million interpretations of what

13   Mr. Soto --

14         THE COURT:  Not a million.

15         MR. JACKSON:  That's an exaggeration, your Honor.

16   You're right.  But there have been numerous interpretations.

17   We understand the Court's rulings.  I just want to be clear

18   we're not objecting every time because that's part of our Sixth

19   Amendment objection.  That's part of our other objections.

20   Thank you, Judge.

21         (Recess)

22

23

24

25

GBF5flo3                          C. Gomez – direct.

1           (Jury present)

2                THE COURT:  All right, Mr. Bove.

3                MR. BOVE:  Thank you, your Honor.

4    BY MR. BOVE:

5    Q.  Sir, before the break we watched a video from a meeting you

6    participated in in Honduras, correct?

7    A.  That's right, sir.

8    Q.  What happened after that meeting?

9    A.  After that meeting Mr. Maron's workers took us back to the

10   house to wait.

11   Q.  Why did you have to wait?

12   A.  Just to wait for the following day because I had to travel

13   the following day.

14   Q.  Why is that?

15   A.  I had to go back to Roatan to my job.

16   Q.  Did you return to Roatan?

17   A.  Yes, sir.

18   Q.  Was that on the day after the meeting?

19   A.  Yes, sir.

20   Q.  Did Soto go back to Roatan with you?

21   A.  No, sir.  He remained in San Pedro.

22   Q.  By the time you got back to Roatan, did you have an

23   agreement to accept payment in exchange for participating in

24   this cocaine shipment?

25   A.  Yes, sir.  We had it.

GBF5flo3                          C. Gomez - direct.

1    Q.  Was that you and Soto?

2    A.  Yes, sir.

3    Q.  How much did you expect to be paid?

4    A.  $600,000, sir.

5    Q.  And was this $600,000 all for you?

6    A.  No, sir.

7    Q.  What, if any plans, did you have in the event that you

8    received the $600,000?

9    A.  Pay all the workers at the airport.

10   Q.  So the meeting was on November 5th, correct?

11   A.  Yes, sir.

12   Q.  And you returned to Roatan on the 6th?

13   A.  Yes, sir.

14   Q.  Did you speak with Soto again about the cocaine shipment?

15   A.  Yes, sir.

16   Q.  When, approximately, did that happen?

17   A.  Approximately one week after the meeting.

18   Q.  And what did Soto say to you at that point?

19   A.  Just that he was waiting for Mr. Sentado to let him know

20   when the drug shipment was going to take place.

21   Q.  Did the drug shipment take place?

22   A.  No, sir.

23   Q.  Now, you testified earlier that you participated in the

24   receipt of two cocaine loads at your airport in approximately

25   2010?

GBF5flo3                          C. Gomez – direct.

1   A.  Seize?

2   Q.  No, successful cocaine loads.

3            INTERPRETER:  I'm sorry, could you repeat the

4   question?  I think the interpreter misunderstood.

5   Q.  You testified earlier that you participated in the receipt

6   of two cocaine loads at the airport in 2010?

7   A.  Yes, sir.

8   Q.  What kind of planes were used in those loads?

9   A.  An Air Commander -- a Turbo Commander was authorized.

10  Q.  What was your understanding of where those cocaine loads

11  were sent from?

12  A.  From an international airport in Colombia.

13  Q.  Did you ever participate in a drug shipment where the plane

14  was diverted away from the Roatan Airport?

15  A.  Yes, sir.

16  Q.  When, approximately, was that?

17  A.  Months after the first drug shipments that were received.

18  Q.  What happened?

19  A.  On that occasion, when the airplane left the international

20  airport, an alert was received and it had to be detoured to an

21  alternate landing strip.

22  Q.  Did you ever participate in a drug trafficking incident

23  involving a G2?

24  A.  Yes, sir.

25  Q.  When, approximately?

GBF5flo3                          C. Gomez – direct.

1   A.   One year -- approximately one year before the meeting we

2   were just watching.

3   Q.   So at some point in 2014?

4   A.   That's right, sir.

5   Q.   What happened with the G2?

6   A.   The G2 arrived legally into Roatan and it left illegally

7   with a fake flight plan to pick up drugs in South America.

8   Q.   Was there any illegal fuel loaded on to that G2 at the

9   airport?

10  A.   The fuel that the airport was carrying was legal.

11  Q.   Did it pick up any fuel drums at the end of the air strip?

12  A.   No, sir.  Not that one.

13  Q.   Why not?

14  A.   Because the G2 has enough fuel to go and come back with a

15  drug shipment.

16  Q.   What was your understanding of the expected size of that

17  cocaine load?

18  A.   Approximately between 1,000 and 1,500 kilos.

19  Q.   Sir, have you ever owned a firearm?

20  A.   Yes, sir.

21  Q.   When, approximately, did you get it?

22  A.   Approximately in 2011.

23  Q.   What kind of gun was it?

24  A.   It was a .9 millimeter.

25  Q.   What did you use the .9 millimeter for?

GBF5flo3                              C. Gomez – direct.

1   A.  For nothing, sir.  I just kept it at home.

2   Q.  Did you ever fire it?

3   A.  Just for practice.

4   Q.  Where is that pistol now?

5   A.  In Honduras.  I sold it in Honduras.

6   Q.  Are you aware of any weapons trafficking activities at the

7   Roatan Airport?

8   A.  Yes, sir.

9   Q.  Please describe what you saw.

10              MR. RODY:  Objection.

11              MR. ZACH:  Objection.

12              THE COURT:  Sustained.

13              MR. BOVE:  Your Honor, this goes to his Giglio.

14              THE COURT:  It goes to who?

15              MR. BOVE:  His Giglio material.

16              THE COURT:  All right.

17              MR. ZACH:  Your Honor, we are still maintaining our

18   objection.

19              THE COURT:  The objection is overruled.

20              MR. BOVE:  May I have one moment to confer with

21   counsel?

22              THE COURT:  Yes.

23              (counsel conferring)

24   Q.  Have you ever been arrested for an incident involving your

25   wife?

GBF5flo3                          C. Gomez – direct.

1    A.  Yes, sir.

2    Q.  What happened?

3    A.  At that time I had drinking problems.  I had a domestic

4    violence incident with my wife.  I struck her and I was

5    incarcerated.

6    Q.  When was that?

7    A.  In 2014.

8    Q.  What happened with that case?

9    A.  Well, I was incarcerated, I paid by doing community

10   service, and I got divorced.

11   Q.  Did anyone ever ask you to participate in human trafficking

12   at the Roatan Airport?

13   A.  Yes, sir.

14   Q.  What happened?

15   A.  It was just conversations.  Nothing actually happened.

16   Q.  So, you did not participate?

17   A.  No, sir.

18   Q.  Now, you testified earlier that you have pleaded guilty to

19   a crime.

20   A.  Yes, sir.

21   Q.  What crime?

22   A.  Conspiracy to send.  Conspiracy to send five or more kilos

23   of drugs to the United States.

24   Q.  What is the most amount of jail time that you can get for

25   that crime?

GBF5flo3                         C. Gomez – direct.

1    A.  Life.

2    Q.  As you sit here today, what is the least amount of jail

3    time you can get?

4    A.  10 years.

5    Q.  You said earlier that you entered into a cooperation

6    agreement in connection with your guilty plea?

7    A.  Yes, sir.

8    Q.  What are some of the things that you are required to do

9    under that agreement?

10   A.  Tell the truth, not commit any more crimes, and testify if

11   it is requested of me.

12   Q.  If you do those things, what is your understanding of what

13   the government will do?

14   A.  There is a possibility that the government would write a

15   5K1 letter.

16   Q.  What is your understanding of what would be included in

17   that letter, if the government wrote one?

18   A.  It would include the crimes that I have committed and the

19   cooperation, in other words the good things that I have done.

20   Q.  Has anyone guaranteed that you are going to get that

21   letter?

22   A.  No, sir.

23   Q.  If you do get the letter, what is your understanding of how

24   it will impact the potential penalties for your crime?

25   A.  If I were to receive that letter there is a possibility

1    that the Judge would be able to give me a sentence below the

2    minimum mandatory.

3    Q.  Now, you said a possibility.  Will the Judge be required to

4    give you less jail time?

5    A.  No, sir.

6    Q.  Has anyone made any promises to you about the sentence you

7    will receive?

8    A.  No, sir.

9         MR. BOVE:  No further questions, your Honor.

10         THE COURT:  Mr. Zach?

11         MR. ZACH:  Thank you, your Honor.

12   CROSS EXAMINATION

13   BY MR. ZACH:

14   Q.  Good afternoon, Mr. Gonzalez.

15   A.  Good afternoon.

16   Q.  I want to start off by asking you, you testified for about

17   45 minutes about a meeting that happened on November 5th, 2015

18   in Honduras.  Do you recall that?

19   A.  Yes, sir.

20   Q.  And, to be clear, Mr. Campo Flores was not at that meeting,

21   right?

22   A.  No, sir.

23   Q.  To be clear, Mr. Flores de Freitas was not at that meeting,

24   right?

25   A.  No, sir.

GBF5flo3                          C. Gonzalez – cross

1  Q.  I don't think you were asked this, but you have never met

2  Mr. Campo Flores or Mr. Flores de Freitas in your entire life,

3  have you?

4  A.  No, I don't know them, sir.

5  Q.  You have never seen them before, right?

6  A.  No.

7  Q.  You have never exchanged a text message with them, right?

8  A.  No, sir.

9  Q.  You have never spoken to them on the phone, right?

10  A.  No, sir.

11  Q.  I want to sort of shift to that time period between these

12  meetings which were in October and November of 2015 until the

13  time that you went and spoke to the DEA which was in June of

14  2016, okay?

15  A.  Yes.

16  Q.  During that time period, did you continue to work as an air

17  traffic controller at the Roatan Airport?

18  A.  Yes, sir.

19  Q.  And did you continue to have planes come back and forth

20  that were carrying drug loads or fuel, that you had described

21  earlier?

22  A.  Yes, sir.

23  Q.  And, step back a little bit further.  You pled guilty to a

24  conspiracy to trafficking in cocaine from 2008 to 2016; is that

25  correct, sir?

GBF5flo3                           C. Gonzalez - cross

1  A.  Yes, sir.

2  Q.  All of that conduct, it is your testimony, was done in your

3  role as an air traffic controller at that airport, right?

4  A.  Yes, sir.

5  Q.  Can you give us an estimate, how many total planes do you

6  think were involved in that eight-year period that you allowed

7  to go through?

8  A.  You mean related to drug trafficking?

9  Q.  Yes, exactly.

10 A.  I couldn't give you an exact number.  There were many.

11 Q.  Let's try and get an estimate.  Was it more than 10?

12 A.  Yes, more than 10.

13 Q.  More than 50?

14 A.  Yes.  There could have been more than 50.

15 Q.  More than 100?

16 A.  I wouldn't be sure about that.

17 Q.  So, you agree that it was a lot of planes?

18 A.  Yes, sir.

19 Q.  And for each of those planes you received a bribe,

20 essentially, right?

21 A.  I received payment, yes.

22 Q.  And can you estimate for us, because I don't think this was

23 asked, how much money you received in those payments or bribes?

24 A.  I mean, it varied, but I would receive around $10,000.

25 Q.  Per plane?

GBF5flo3                          C. Gonzalez - cross

1    A.  Yes, sir.

2    Q.  And we are talking at least 50 to 100 planes, right?

3    A.  Yes, sir.

4    Q.  So you became wealthy based on those bribes, right?

5    A.  I didn't become wealthy, sir.

6    Q.  But you would agree with me that 10,000 times 50 is

7    $500,000, right?

8    A.  Yes, sir.

9    Q.  That's a lot of money, right?

10   A.  Yes, sir.

11   Q.  That money goes a long way in Roatan, Honduras, too, right?

12   A.  Yes, that could be the case, sir.

13   Q.  Now, I want to understand a little bit about you going to

14   see the DEA in June of 2016.  As I understood it, on direct you

15   got word that the DEA was looking to talk to you; is that

16   right?

17   A.  Yes, sir.

18   Q.  And so you traveled to meet with the DEA, right?

19   A.  Yes, sir.

20   Q.  And this occurred on June 22nd, 2016, right?

21   A.  Yes, sir.  I'm not sure about the date but, yes.

22   Q.  And when you went to meet with them there was -- how many

23   DEA agents were there?

24   A.  There were two DEA agents that were at the meeting.

25   Q.  And when you met with them you lied to them, right?

GBF5flo3                    C. Gonzalez – cross

1    A.  No, sir.

2    Q.  Well, sir, the first thing they asked you was were you

3    involved with drug trafficking at the airport in Roatan, right?

4    A.  Yes, sir.

5    Q.  And your answer to them was no, right?

6    A.  At first due to my nerves.

7    Q.  Well, your nerves knew that you were going to be in

8    trouble, right?

9    A.  Because I was already in trouble, sir.

10   Q.  Right, but you decided to lie to them and say no, right?

11   A.  At first of the meeting, yes.

12   Q.  That wasn't just it.  Now, you testified about Mr. Soto who

13   was with you at that meeting that we spent all that time at on

14   November 5th, right?

15   A.  In the meeting?

16   Q.  Yes.

17   A.  Yes.

18   Q.  And Mr. Soto is the guy that works with you at the airport

19   in Roatan, right?

20   A.  Yes, sir.

21   Q.  And you had actually known him for many years, right?

22   A.  Yes.  It's been many years.

23   Q.  He was your friend, right?

24   A.  Yes, sir.

25   Q.  And when they asked you about him you said, well, I only

GBF5flo3                          C. Gonzalez – cross

1    know him by the alias Andriano, right?

2    A.   Yes.   That's the nickname that we know him.

3    Q.   Right, but you didn't tell them, oh, that's my friend,

4    right?   You just said, oh, I know this guy by nickname, right?

5    A.   Yes, sir.

6    Q.   And then what happened in that meeting was that the DEA

7    showed you a picture of you from that recording, right?

8    A.   Yes, sir.

9    Q.   And back home your nerves knew that you had actually been

10   recorded, right?

11   A.   That I had been taped.

12   Q.   Right.

13          And once they showed you that picture they asked you

14   whether or not you knew an individual named Sentado, right?

15   A.   Yes, sir.

16   Q.   And your answer is, yeah, I know him, but I only met him

17   that one time at a meeting, right?

18   A.   Yes, at the first -- at the beginning that was my answer.

19   Yes, sir.   At the beginning.

20   Q.   I'm sorry.   I talked over the translator because I talk

21   fast so let me ask the question clearly.

22          You would agree with me that that was a lie, right?

23   A.   Yes, sir.

24   Q.   You had known El Sentado for a number of years, right?

25   A.   Yes, sir.

GBF5flo3                              C. Gonzalez - cross

1  Q.  And El Sentado was a major drug trafficker in Honduras,
2  right?
3  A.  Yes, sir.
4  Q.  And El Sentado was responsible for many of those planes
5  that went in and out of the airport, right?
6  A.  Through Mr. Maron, not directly with Mr. Sentado.  It was
7  through Mr. Maron.
8  Q.  And Mr. Maron worked with Sentado, right?
9  A.  Yes, sir.
10  Q.  Now, also in this meeting you were asked whether or not --
11  let me strike that.
12          Now, during this meeting -- let me back up for a
13  second.
14          You testified on direct about a meeting that you claim
15  happened in October of 2015.  Do you recall that?
16  A.  Yes, sir.
17  Q.  And you said that was a meeting with Sentado, Soto, three
18  Mexicans and a Honduran police officer; is that right?
19  A.  Do you mean the meeting of November the.
20  5th
21  Q.  No, sir.  I'm talking about what you testified about
22  initially in October of 2015 on your direct testimony.
23  A.  October of 2015, yes.
24  Q.  Yes.
25          Do you know what I'm talking about?

GBF5flo3                          C. Gonzalez – cross

1  A.  Yes, sir.

2  Q.  Do you remember testifying about that about an hour ago?

3  A.  Yes, sir.

4  Q.  And you said that, on your direct testimony, that that

5  discussion was about a potential load of cocaine coming to the

6  airport, right?

7  A.  Yes, sir.

8  Q.  And that was an anticipated load of cocaine to come in the

9  future, according to you on your direct testimony, right?

10  A.  Yes, sir.

11  Q.  And you said that as a result of that discussion, you and

12  Soto I think were each paid $500; is that correct?

13  A.  $500 for the two of us.

14  Q.  For the two of you; so you were going to split that $250

15  and $250?

16  A.  Yes, sir.

17  Q.  Now, in that initial meeting with the DEA in June of --

18  well, let me step back.

19        In that June of 2016 meeting you had with the DEA you

20  said you were initially nervous, right?

21  A.  Yes, sir.

22  Q.  But at some point you regained your composure and began to

23  tell the DEA the truth, right?

24  A.  Yes, sir.

25  Q.  At least according to you.

1    A.  Yes, sir.

2    Q.  Isn't it a fact, sir, that you never told the DEA about

3    that October 2015 meeting with Sentado, with Soto, with the

4    three Mexicans, with the Honduran police officer, in that

5    initial meeting with the DEA in Honduras?

6    A.  There was no time.  Not everything was discussed during

7    that meeting.

8    Q.  Oh.  You didn't talk about it because there wasn't enough

9    time to talk about it?

10   A.  At that meeting not everything was discussed, sir.

11   Q.  Well, do you recall if there was time enough to talk about

12   a meeting about a drug deal in September of 2015?  Do you

13   recall that?

14   A.  September of 2015?

15   Q.  Yes, sir.

16   A.  I don't understand the question then.

17   Q.  Well, sir, isn't it a fact that you told the DEA in that

18   first meeting that what occurred was that, in September of

19   2015, a plane actually brought cocaine to the airport in

20   Honduras?

21   A.  I don't remember having said that, sir.

22   Q.  Didn't you ever tell the DEA at that meeting that in

23   September 2015 that that plane came from Venezuela?

24   A.  No, sir.

25   Q.  Isn't it a fact, sir, that you told the DEA that you

GBF5flo3                          C. Gonzalez - cross

1  received $10,000 in return for helping out with that load from

2  Venezuela?

3  A.  In September of 2015?  No plane with drugs had come from

4  Venezuela.

5  Q.  I asked you a different question, sir.

6         Didn't you tell the DEA that you received $10,000 for

7  that load of cocaine coming in September of 2015?

8  A.  No, sir.

9  Q.  Isn't it a fact that you said nothing to the DEA and made

10 no reference to the presidential hangar in Venezuela in that

11 meeting?

12        MR. ZACH:  Your Honor -- sorry.

13        (Counsel conferring)

14        MR. ZACH:  Answer the question, please.

15        THE WITNESS:  Can you repeat the question, please?

16        THE COURT:  Are you going to pay attention now?

17        MR. ZACH:  Sorry.

18        THE COURT:  Do you want to repeat the question or do

19 you want me to read it for you?

20        MR. ZACH:  Will the reporter read it back, please?

21        THE COURT:  Pam, read it back, please.

22        (Record read)

23        THE WITNESS:  I don't remember, sir.

24        MR. ZACH:  Your Honor, may I approach the witness?

25        THE COURT:  Yes, you may.

GBF5flo3                        C. Gonzalez - cross

1   BY MR. ZACH:

2   Q.  Sir, I'm showing you what is referred to as a DEA-6 which

3   is a government report.

4          MR. BOVE:  Judge, I object to the description.  He is

5   just refreshing his recollection.

6          MR. ZACH:  I am just telling him what I am showing

7   him.

8          THE COURT:  Show it to him, point the paragraph out to

9   him, ask him to read it and see if it refreshes his

10  recollection.

11  BY MR. ZACH:

12  Q.  Sir, if you can, please, I would like to direct your

13  attention to that first line.  Would you read that first?

14         INTERPRETER:  Do you want me to interpret it for him?

15         MR. ZACH:  Yes.

16         (interpreting)

17  A.  Yes, sir.

18  Q.  My question is does that refresh your recollection that you

19  told the DEA about a drug deal that occurred in September of

20  2015.

21  A.  Okay.  So, this was discussed in 2015 but it didn't happen

22  in September of 2015.

23  Q.  Let me ask --

24         MR. BOVE:  Can he finish his answer, please?

25         THE COURT:  Mr. Zach, do you want to go back?

GBF5flo3                        C. Gonzalez – cross

1          MR. ZACH:  Your Honor, there is more to go.  I think

2     it is helpful for me to stay here.

3          MR. BOVE:  There is still a pending answer.

4          THE WITNESS:  So, this transaction did not happen in

5     2015.  It was discussed in 2015 but didn't happen in 2015.

6     BY MR. ZACH:

7     Q.  Let me ask my next question.  Does it refresh your

8     recollection, sir, that you told the DEA that an aircraft

9     arrived from Venezuela --

10         MR. BOVE:  Judge, if he is refreshing his recollection

11    he can't read from the document.

12         THE COURT:  Do you want to point it out to the

13    interpreter, have the interpreter translate it for him, and

14    then ask him if that refreshes his recollection?

15    Q.  And the question is does that refresh your recollection.

16    A.  Yes.  I remember what was being discussed but these are

17    different transactions that we are talking about.

18         MR. ZACH:  Would you read him that sentence, please,

19    and ask him if that refreshes his recollection?

20         MR. BOVE:  Judge, he hasn't testified to lack of

21    recollection at this point.

22         THE COURT:  Go ahead.  Read it to him.

23    BY MR. ZACH:

24    Q.  The question is, does that refresh your recollection?

25    A.  Yes, I do remember about the conversations that we held

GBF5flo3                          C. Gonzalez – cross

1   that night but we were talking about different transactions.

2   Q.  So your testimony, sir, is that you had time to discuss a

3   September 2015 discussion but not time to discuss the meeting

4   with El Sentado; is that right?

5   A.  The only things that were discussed, generally speaking,

6   was about the crimes that I had committed.

7   Q.  Sir, they showed you a picture from the meeting with

8   El Sentado, didn't they?

9   A.  Yes, sir.

10  Q.  And that related to your testimony that you just talked

11  about, right?

12  A.  Yes, sir.

13  Q.  And that was shown to you at the beginning of your proffer,

14  right?

15  A.  Yes, sir.

16  Q.  And your testimony is, sir, that despite seeing a picture

17  of that meeting, you did not have time to actually talk about

18  what happened at that meeting at that first proffer?

19              MR. BOVE:  Objection.

20              THE COURT:  Sustained.

21  Q.  Now, I want to ask you, sir, about a slightly different

22  topic.  On your direct testimony you talked about a meeting in

23  October of 2015.  Do you recall that?

24  A.  Yes, sir.

25  Q.  And the way you learned about that meeting is through

GBF5flo3                          C. Gonzalez – cross

1    Mr. Soto, right?

2              THE COURT:  Pam, would you read the question?

3              (Record read)

4    A.  Yes, sir.

5    Q.  And the person who arranged that meeting, according to

6    Mr. Soto, was El Sentado; right?

7              MR. BOVE:  Objection.  Hearsay.

8              THE COURT:  Overruled.

9    A.  Yes, sir.

10   Q.  And so, the reason you traveled to meet up for that October

11   2015 meeting was because El Sentado requested your presence,

12   right?

13   A.  Yes, sir.

14   Q.  And I believe you testified on direct that the meeting

15   occurred at a home where El Sentado was staying, right?

16   A.  Yes, sir.

17   Q.  And when you went to that home he was with bodyguards,

18   wasn't he?

19   A.  They were outside the house.

20   Q.  How many bodyguards did he have outside the house?

21   A.  I'm not sure, sir.

22   Q.  Was it more than five?

23   A.  I don't think so, sir.  I don't remember.

24   Q.  Were the bodyguards carrying firearms?

25   A.  Not by looking at them.

GBF5flo3                        C. Gonzalez - cross

1    Q.  Not by looking at them.

2           Now, when you testified earlier about all of the

3    activity at the airport, right, you talked about runway

4    inspections.  Do you remember that?

5    A.  Yes, sir.

6    Q.  And you talked about planes being diverted, right?

7    A.  Yes, sir.

8    Q.  And you talked about, I think on a couple of occasions,

9    seeing go-fast boats out near the runway, right?

10   A.  They were in the vicinity of the runway, yes.

11   Q.  And you testified about planes coming to pick up fuel to

12   carry on?

13   A.  Yes, sir.

14   Q.  The defendants who you see in this courtroom weren't around

15   for any of that, were they?

16   A.  No, sir.

17   Q.  And you never saw either of them in Honduras at all, did

18   you?

19   A.  No, sir.

20   Q.  And you never --

21          MR. ZACH:  You know what?  Actually, your Honor, this

22   is probably a good place to stop.

23          THE COURT:  It is a good place to stop?

24          MR. ZACH:  Yes.  It is 4:30.

25          THE COURT:  Ladies and gentlemen of the jury, we will

GBF5flo3                          C. Gonzalez – cross

1    break now and resume tomorrow morning at 9:30.  Remember the

2    rules:  No research on this, no discussion of the case, keep an

3    open mind.  See you tomorrow morning at 9:30.  Hope you have

4    better weather tomorrow.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GBF5flo3                        C. Gonzalez – cross

 1              (Jury not present)

 2              THE COURT:  How many more witnesses do you have,

 3  Mr. Bove?

 4              MR. BOVE:  Three, your Honor.

 5              THE COURT:  Will you finish tomorrow, do you think?

 6  Subject to cross?

 7              MR. BOVE:  Yes, your Honor.

 8              THE COURT:  Anything else?

 9              MR. JACKSON:  Your Honor, very briefly?

10              THE COURT:  Yes.

11              MR. JACKSON:  I just want to raise again, your Honor,

12  the verdict sheet issue, because just looking back at the

13  record, the government has now had multiple opportunities to

14  articulate why we should use a verdict sheet, a special verdict

15  sheet, when the Supreme Court has said that special verdict

16  forms are disfavored and are suspect where the defendants are

17  stipulating to the quantity.

18              They have had multiple opportunities.  At the first

19  briefing they said that the issue was premature.  Now we are a

20  day away from the charge conference and the night before --

21  last night -- they presented a proposal which we agreed to and

22  we still have no clear articulation of why.

23              THE COURT:  I am perplexed too, Mr. Jackson.

24              MR. JACKSON:  Excuse me, your Honor?

25              THE COURT:  I am perplexed too.

GBF5flo3                          C. Gonzalez – cross

1            MR. JACKSON:  Thank you, Judge.

2            THE COURT:  I don't know how to resolve this.  I

3    thought a stipulation would be –– I thought that's what you

4    were offering, you said you were willing to stipulate.  The

5    government is not willing to stipulate so I am going to have to

6    wrestle with the situation we have.

7            I understand your point.  I don't know why we have to

8    do it but the government has submitted its views and I will

9    consider it.  We will take it up tomorrow at the charge

10   conference.

11           MR. JACKSON:  Thank you very much, your Honor.

12           THE COURT:  I wish the government would reconsider its

13   position.

14           Okay.  Thank you.

15           (Adjourned to 9:30 a.m., November 16, 2016.)

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                          Page

 3   JOSE SANTOS PEÑA

 4   Cross By Mr. Jackson . . . . . . . . . . . . 951

 5   Redirect By Mr. Quigley . . . . . . . . . . 984

 6   KIMOJHA BROOKS

 7   Direct By Mr. Quigley . . . . . . . . . . . 999

 8   Cross By Mr. Rody . . . . . . . . . . . . .1007

 9   Redirect By Mr. Quigley . . . . . . . . . .1025

10    CARLOS GONZALEZ

11   Direct By Mr. Bove . . . . . . . . . . . . .1026

12   Cross By Mr. Zach . . . . . . . . . . . . .1077

13                    GOVERNMENT EXHIBITS

14   Exhibit No.                            Received

15    100, 101, 111, and 112 . . . . . . . . . .1003

16    106 through 109 . . . . . . . . . . . . .1004

17    29   . . . . . . . . . . . . . . . . . . .1028

18    30   . . . . . . . . . . . . . . . . . . .1036

19                    DEFENDANT EXHIBITS

20   Exhibit No.                            Received

21    658, 659, 660, 661 and 662 . . . . . . . . 951

22    529 through 531 and 532 through 534  . . . . 980

23

24

25
```