UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                             :

UNITED STATES OF AMERICA,               :

                                             :

           - v. -               :   S5 15 Cr. 765 (PAC)

                                             :

EFRAIN ANTONIO CAMPO FLORES and    :
FRANQUI FRANCISCO FLORES DE FREITAS,  :

                                           :

            Defendants.          :

                                         :
------------------------------------------------------------X

## DEFENDANTS' JOINT POST-TRIAL RULE 29(C) MOTION FOR JUDGMENT OF ACQUITTAL AND RULE 33 MOTION FOR A NEW TRIAL

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ......................................................................1

LEGAL STANDARD ......................................................................................2

ARGUMENT ....................................................................................................5

I.      A NEW TRIAL IS REQUIRED BECAUSE OF THE PERJURY OF CS-1 ...............5

        A.      Applicable Law ..........................................................................5

        B.      False Testimony Was Introduced. ..............................................6

        C.      The False Testimony Was Known or Should Have Been Known To
                The Government. ........................................................................9

        D.      The Government Failed to Correct CS-1's False Testimony. ...........13

        E.      There Is a Reasonable Likelihood That the False Testimony Could
                Have Affected the Judgment of the Jury. ..................................18

II.     THERE WAS INSUFFICIENT EVIDENCE AT TRIAL TO SUPPORT A
        CONVICTION. ...........................................................................................19

        A.      There Was Insufficient Evidence of Agreement. ..........................20

        B.      There Was Insufficient Evidence of Specific Intent to Target The
                United States. ..........................................................................25

        C.      Because Any Suggestion of a U.S. Nexus to the Conspiracy Was
                Entirely Introduced by the Government, There Was Insufficient
                Evidence Presented and a Judgment of Acquittal Is Required Under
                the Manufactured Jurisdiction Doctrine. ...................................28

        D.      The Testimony of CS-1, Who The Government Concedes Was Lying
                On the Stand, Cannot Be Relied Upon as a Matter of Law. ...........29

III.    THE GOVERNMENT FAILED TO DISPROVE ENTRAPMENT AS A MATTER
        OF LAW. ...................................................................................................30

        A.      The Defendants Were Induced To Participate In The Sting Operation.........31

        B.      The Government Failed to Meet Its Burden of Proving Predisposition
                Beyond a Reasonable Doubt. ....................................................33

1. The Defendants' Lack of Experience and Sophistication Demonstrates that They Were Not Predisposed to Commit the Charged Crime. ........................................................................34

2. The Government's Attempts To Prove Predisposition Failed. ............36

C. The Interests of Justice Require that the Verdict Be Set Aside on the Basis of the Government's Failure to Meet Its Burden With Respect to Entrapment. ....................................................................................42

IV. THE EVIDENCE OF CONSCIOUS AVOIDANCE WAS INSUFFICIENT BECAUSE THERE WAS NO EVIDENCE THAT THE DEFENDANTS DELIBERATELY CHOSE NOT TO CONFIRM WHETHER THE CONSPIRACY TARGETED THE UNITED STATES. ................................................................43

A. Conscious Avoidance Requires Not Just the Defendants' Awareness of a High Probability of a Fact, But Also that the Defendants *Decided* Not to Learn the Fact. .......................................................................44

B. The Government Repeatedly Failed to Identify Any Evidence Demonstrating that the Defendants *Consciously Avoided* Determining Whether the Conspiracy Targeted the United States. .....................................46

C. There Was No Evidence that the Defendants *Consciously Avoided* Determining Whether the Conspiracy Targeted the United States. ...............47

D. Given the Insufficiency of the Evidence, a Conscious Avoidance Instruction Should Not Have Been Given, and a New Trial Is Required. ........................................................................................48

CONCLUSION ........................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Drake v. Portuondo,*
    553 F.3d 230 (2d Cir. 2009)..................................................................10, 16, 18

*Global-Tech Appliances, Inc. v. SEB S.A.,*
    563 U.S. 754 (2011)..........................................................................................45, 46

*Iannelli v. United States,*
    420 U.S. 770 (1975)..................................................................................................20

*Ingram v. United States,*
    360 U.S. 672 (1959)..................................................................................................26

*Jackson v. Virginia,*
    443 U.S. 307 (1979)....................................................................................................3

*Jacobson v. United States,*
    503 U.S. 540 (1992)..................................................................................................40

*Jeffreys v. City of New York,*
    426 F.3d 549 (2d Cir. 2005)....................................................................................30

*Jenkins v. Artuz,*
    294 F.3d 284 (2d Cir. 2002)....................................................................................14

*Mesarosh v. United States,*
    352 U.S. 1 (1956)......................................................................................................30

*Mooney v. Holohan,*
    294 U.S. 103 (1935)....................................................................................................5

*Salinas v. United States,*
    522 U.S. 52 (1997)....................................................................................................20

*Shih Wei Su v. Filion,*
    335 F.3d 119 (2d Cir. 2003).............................................................................*passim*

*Turner v. Schriver,*
    327 F. Supp. 2d 174 (E.D.N.Y. 2004) ....................................................................11

*United States v. Abreu,*
    342 F.3d 183 (2d Cir. 2003)....................................................................................47, 48

*United States v. Agurs,*
   427 U.S. 97 (1976)................................................................5, 6, 18, 19

*United States v. Aina-Marshall,*
   336 F.3d 167 (2d Cir. 2003).............................................................45

*United States v. Al Kassar,*
   660 F.3d 108 (2d Cir. 2011).............................................................28

*United States v. Arbane,*
   446 F.3d 1223 (11th Cir. 2006) ...........................................22, 25, 26, 27

*United States v. Archer,*
   486 F.2d 670 (2d Cir. 1973)..........................................................28, 29

*United States v. Autuori,*
   No. 3:96-CR-161(EBB), 1998 WL 774232 (D. Conn. Aug. 28, 1998)...........4, 30

*United States v. Bala,*
   236 F.3d 87 (2d Cir. 2000)...........................................................31, 33

*United States v. Brand,*
   467 F.3d 179 (2d Cir. 2006)............................................................31

*United States v. Brown,*
   43 F.3d 618 (11th Cir. 1995) .......................................................40, 41

*United States v. Brunshtein,*
   344 F.3d 91 (2d Cir. 2003).............................................................33

*United States v. Ceballos,*
   340 F.3d 115 (2d Cir. 2003)............................................................21

*United States v. Cepeda,*
   768 F.2d 1515 (2d Cir. 1985)...........................................................21

*United States v. Cherico,*
   No. 08 CR 786 CM, 2012 WL 1755749 (S.D.N.Y. May 16, 2012)...............30

*United States v. Cianchetti,*
   315 F.2d 584 (2d Cir. 1963)............................................................21

*United States v. Colombo,*
   869 F.2d 149 (2d Cir. 1989).............................................................6

*United States v. Conroy,*
   589 F.2d 1258 (5th Cir. 1979) .........................................................26

*United States v. Coriaty*,
 No. 99 CR 1251, 2001 WL 1910843 (S.D.N.Y. July 16, 2001) ...............................................4

*United States v. Cromitie*,
 727 F.3d 194 (2d Cir. 2013) .............................................................................33, 40, 41

*United States v. Desimone*,
 119 F.3d 217 (2d Cir. 1997) .......................................................................................22

*United States v. Espaillet*,
 380 F.3d 713 (2d Cir. 2004) .........................................................................................3

*United States v. Ferguson*,
 246 F.3d 129 (2d Cir. 2001) .......................................................................................3, 6

*United States v. Ferguson*,
 49 F. Supp. 2d 321 (S.D.N.Y. 1999) ...........................................................................4, 5

*United States v. Ferrarini*,
 219 F.3d 145 (2d Cir. 2000) .....................................................................................45, 48

*United States v. Gaggi*,
 811 F.2d 47 (2d Cir. 1987) ...........................................................................................5

*United States v. Geer*,
 923 F.2d 892 (1st Cir. 1991) .......................................................................................26

*United States v. Goff*,
 847 F.2d 149 (5th Cir. 1988) .......................................................................................22

*United States v. Gore*,
 154 F.3d 34 (2d Cir. 1998) ..........................................................................................23

*United States v. Guang*,
 511 F.3d 110 (2d Cir. 2007) ..........................................................................................4

*United States v. Harvey*,
 991 F.2d 981 (2d Cir. 1993) .........................................................................................31

*United States v. Iennaco*,
 893 F.2d 394 (D.C. Cir. 1990) .....................................................................................21

*United States v. Jones*,
 393 F.3d 107 (2d Cir. 2004) .....................................................................................3, 38

*United States v. Jones*,
 765 F.2d 996 (11th Cir. 1985) ......................................................................................21

*United States v. Kaplan*,
    490 F.3d 110 (2d Cir. 2007)................................................................8, 48

*United States v. Londono-Villa*,
    930 F.2d 994 (2d Cir. 1991).......................................................................26

*United States v. Lorenzo*,
    534 F.3d 153 (2d Cir. 2008)................................................................19, 20

*United States v. Mason*,
    293 F.3d 826 (5th Cir. 2002) ....................................................................14

*United States v. Melchor-Lopez*,
    627 F.2d 886 (9th Cir. 1980) ....................................................................22

*United States v. Nektalov*,
    461 F.3d 309 (2d Cir. 2006).......................................................................45

*United States v. Nersesian*,
    824 F.2d 1294 (2d Cir. 1987)..................................................................3, 38

*United States v. Penn*,
    131 F.2d 1021 (2d Cir. 1942).....................................................................22

*United States v. Quattrone*,
    441 F.3d 153 (2d Cir. 2006).......................................................................48

*United States v. Reyes*,
    302 F.3d 48 (2d Cir. 2002).........................................................................48

*United States v. Rivera Pedin*,
    861 F.2d 1522 (11th Cir. 1988) .................................................................14

*United States v. Robinson*,
    303 F. Supp. 2d 231 (N.D.N.Y. 2004) .......................................................5

*United States v. Robinson*,
    430 F.3d 537 (2d Cir. 2005).........................................................................4

*United States v. Rodriguez*,
    983 F.2d 455 (2d Cir. 1993).......................................................................44

*United States v. Romero-Padilla*,
    583 F.3d 126 (2d Cir. 2009).......................................................................26

*United States v. Rosenblatt*,
    554 F.2d 36 (2d Cir. 1977).........................................................................21

*United States v. Sam Goody*,
    518 F. Supp. 1223 (E.D.N.Y. 1981) ......................................................13

*United States v. Samaria*,
    239 F.3d 228 (2d Cir. 2001).........................................................19, 26

*United States v. Sanchez*,
    969 F.2d 1409 (2d Cir. 1992)........................................................4, 8

*United States v. Sanfilippo*,
    564 F.2d 176 (5th Cir. 1977) ......................................................13

*United States v. Shabani*,
    513 U.S. 10 (1994).....................................................................20

*United States v. Smith*,
    46 F.3d 1223,1237 (1st Cir. 1995) .............................................48

*United States v. Spivack*,
    376 F. App'x 144 (2d Cir. 2010) ................................................10

*United States v. Steinberg*,
    525 F.2d 1126 (2d Cir. 1975)......................................................21, 23

*United States v. Svoboda*,
    347 F.3d 471 (2d Cir. 2003)........................................................44, 45

*United States v. Tanner*,
    628 F.3d 890 (7th Cir. 2010) ......................................................45

*United States v. Tarango*,
    396 F.3d 666 (5th Cir. 2005) ......................................................4

*United States v. Taylor*,
    464 F.2d 240 (2d Cir. 1972)........................................................3, 38

*United States v. Valle*,
    807 F.3d 508 (2d Cir. 2015)........................................................3, 22

*United States ex rel. Washington v. Vincent*,
    525 F.2d 262 (2d Cir. 1975)........................................................5

**Other Authorities**

Fed. R. Crim. P. 29 ...................................................................................... *passim*

Fed. R. Crim. P. 33 ...................................................................................... *passim*

Fed. R. Crim. P. 47 ................................................................................................6

Burn Foundation, *Safety Facts on Scald Burns*,
    http://www.burnfoundation.org/programs/resource.cfm ........................................8

H. G. Jerrard & D.B. McNeill, *A Dictionary of Scientific Units:  Including*
    *Dimensionless Numbers and Scales* 139 (5th ed. 1986) ........................................8

Glanville Williams, *Criminal Law:  The General Part* (2d ed. 1961).........................................46

Pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure, Defendants Efrain Antonio Campo Flores and Franqui Francisco Flores de Freitas ("the Defendants") respectfully move for judgment of acquittal based on the insufficiency of the evidence. In the alternative, Defendants move for a new trial pursuant to Rule 33 because the verdict was against the weight of the evidence and because allowing the verdict to stand following the admitted perjury of the Government's star witness would constitute a manifest injustice.

## PRELIMINARY STATEMENT

This is the extraordinarily rare criminal case where there can be no dispute that the Defendants' trial was tainted by perjury on the part of the Government's star witness and by expansive illegal conduct in the underlying investigation. Moreover, it is the rare narcotics case where no narcotics were ever obtained by the investigators and the only government actor who ever saw the alleged narcotics was, himself, arrested during the investigation and later perjured himself repeatedly before the jury. These facts, alone, considered in the context of applicable legal precedent, require that the Court take some action to remedy what was quite clearly a flawed trial stemming from a disastrous investigation. By the time of jury deliberations in this case, the jury had been exposed to multiple days of testimony from a witness who demonstrated an utter disregard for the laws of the United States and the basic requirements of truth-telling in federal court. This was the witness (Santos Peña, also referred to as CS-1) through whom the Government introduced its recordings and elicited numerous interpretations of the Defendants' statements in those recordings. As such, CS-1's impact upon the jury's thinking about the case—the impressions that the jurors formed of the Defendants, their statements in the recordings, the alleged drug evidence, and many other aspects of the investigation—was unquestionably extensive. Indeed, it is impossible to assess today the full extent of his influence upon the jurors' verdict. In short, the trial was tainted by CS-1's testimony and his orchestration

of the investigation in ways that are too multifaceted to be fully discerned.  Accordingly, CS-1's misdeeds alone necessitate that the Court grant the Defendants either a judgment of acquittal or at minimum a new trial.

But even if the Court could put these serious matters aside, the Government simply failed to meet its burden of proof through the recordings and other evidence introduced at trial.  No reasonable jury could have concluded, beyond a reasonable doubt, that the Defendants knew or believed that the narcotics in question were being brought into the United States, for several reasons.  This was a case in which the recordings conclusively revealed that, even in the moments just before their arrest, the Defendants were still posing questions to the informants that evidenced insufficient knowledge and understanding with respect to this critical element.  Moreover, no reasonable jury could have found that the Government met its burden to disprove entrapment in light of the complete lack of evidence supporting the Government's predisposition arguments.

The essential question of this motion is whether the Court can somehow ignore all of the problems of this case and allow a conviction to stand that is tainted in so many different ways.  The Defendants jointly submit that the Court should not.  The Defendants here were denied the most basic requirements of justice both during the underlying investigation and throughout their trial.  Even when viewed in the light most favorable to the Government, the evidence produced at trial fell well short of the Government's steep burden.  For all of the reasons explained in more detail below, the Court should grant the Defendants' motion for judgment of acquittal or, alternatively, the Court should order a new trial.

## **LEGAL STANDARD**

Rule 29 requires the Court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  The Court's function is

"to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). The Court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004) (quoting *Jackson*, 443 U.S. at 319).

A jury's guilty verdict must be supported by "substantial evidence," *United States v. Nersesian*, 824 F.2d 1294, 1324 (2d Cir. 1987), and a jury may not draw "specious inferences" or "be permitted to conjecture . . . or to conclude upon pure speculation or from passion, prejudice or sympathy." *United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004); *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972). Moreover, "[a] court must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that [each element of the offense] is established beyond a reasonable doubt." *United States v. Valle*, 807 F.3d 508, 522 (2d Cir. 2015). "If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *Id.* If a court finds that "reasonable jur[ors] must necessarily have . . . a [reasonable] doubt, the judge must require acquittal, because no other result is permissible within the fixed bounds of jury consideration." *Taylor*, 464 F.2d at 243.

Rule 33 empowers the court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). This rule grants the court "broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992)); *see also id.* at 134 ("the trial court has broader discretion to grant a

new trial under Rule 33 than to grant a motion for acquittal under Rule 29"). The Court, in exercising the discretion conferred by Rule 33, "is entitled to 'weigh the evidence and in so doing evaluate for itself the credibility of the witnesses.'" *United States v. Robinson*, 430 F.3d 537, 543 (2d Cir. 2005) (quoting *Sanchez*, 969 F.2d at 1413); *see also United States v. Coriaty*, No. 99 CR 1251, 2001 WL 1910843, at *2 (S.D.N.Y. July 16, 2001) ("the judge is not required to view the evidence in the light most favorable to the prosecution"). For example, "[w]here testimony is patently incredible or defies physical realities, it may be rejected by the court, despite the jury's evaluation." *Sanchez*, 969 F.2d at 1414. The ultimate test under Rule 33 is whether it would be a "manifest injustice to let the guilty verdict stand." *United States v. Guang*, 511 F.3d 110, 119 (2d Cir. 2007). "Manifest injustice" may exist in a number of circumstances, including where "the judge is prepared to answer 'no' to the following question: 'Am I satisfied that competent, *satisfactory* and sufficient evidence in this record supports the jury's finding that this defendant is guilty beyond a reasonable doubt?'" *Sanchez*, 969 F.2d at 1414 (emphasis added); *see, e.g.*, *United States v. Autuori*, No. 3:96-CR-161(EBB), 1998 WL 774232, at *29 (D. Conn. Aug. 28, 1998), *aff'd in relevant part,* 212 F.3d 105 (2d Cir. 2000) (considering this question, answering "no," and ordering a new trial in light of highly questionable cooperator testimony).

Courts may set aside a verdict in the interests of justice where the evidence at trial, while tangentially supporting a guilty verdict, actually "preponderates sufficiently heavily against the verdict [such] that a serious miscarriage of justice may have occurred." *United States v. Ferguson*, 49 F. Supp. 2d 321, 323 (S.D.N.Y. 1999); *accord United States v. Tarango*, 396 F.3d 666 (5th Cir. 2005). In light of this broad standard, courts have granted new trials for a variety of reasons, including where the court finds that the verdict was against the weight of the

evidence or fundamentally unfair.  *See, e.g.*, *United States v. Robinson*, 303 F. Supp. 2d 231, 233

(N.D.N.Y. 2004); *Ferguson*, 49 F. Supp. 2d at 323, 328-29.

## ARGUMENT

### I.     A NEW TRIAL IS REQUIRED BECAUSE OF THE PERJURY OF CS-1.

#### A.     Applicable Law

"Since at least 1935, it has been the established law of the United States that a conviction

obtained through testimony the prosecutor knows to be false is repugnant to the Constitution."

*Shih Wei Su v. Filion*, 335 F.3d 119, 126 (2d Cir. 2003) (reversing conviction where prosecution

witness offered false testimony at trial).  The Supreme "Court has consistently held that a

conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must

be set aside if there is any reasonable likelihood that the false testimony could have affected the

judgment of the jury."  *United States v. Agurs*, 427 U.S. 97, 103 (1976).  "A new trial is required

if the government uses perjured testimony that is uncorrected and reasonably likely to have

affected the outcome."  *United States v. Gaggi,* 811 F.2d 47, 59 (2d Cir. 1987); *see also Mooney

v. Holohan*, 294 U.S. 103, 112 (1935) (prosecution has a duty to refrain from eliciting and

relying upon testimony known to be perjurious); *United States ex rel. Washington v. Vincent*,

525 F.2d 262, 267-68 (2d Cir. 1975) (reversing where prosecution used perjured testimony, even

where it was known to the defendant and not challenged in court, because there was a possibility

the perjured testimony impacted the verdict).

In the context of a direct appeal or habeas proceeding, the Second Circuit has instructed

courts to consider the following factors in determining whether a defendant is entitled to relief on

account of the introduction of perjured testimony at trial:  "(1) whether false testimony was

introduced, (2) whether that testimony either was or should have been known to the prosecution

to be false, (3) whether the testimony went uncorrected, and (4) whether the false testimony was

prejudicial in the sense defined by the Supreme Court in *Agurs*." *Shih Wei Su*, 335 F.3d at 127. The Second Circuit has explained that the use of perjured testimony must negate a guilty verdict "because, in order to reduce the danger of false convictions, we rely on the prosecutor not to be simply a party in litigation whose sole object is the conviction of the defendant before him. The prosecutor is an officer of the court whose duty is to present a forceful and truthful case to the jury, not to win at any cost." *Shih Wei Su*, 335 F.3d at 126. Although this four-point test applicable to direct appeals and habeas proceedings is more rigid and demanding than the "broad discretion" that this Court has under Rule 33 "to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice," *Ferguson*, 246 F.3d at 133, the factors considered by the Second Circuit are nevertheless instructive in guiding the Court's exercise of its considerable discretion under Rule 33.

Finally, in assessing a timely Rule 33 motion involving false testimony, the Court is permitted to rely on evidence such as testimonial affidavits and declarations. *See, e.g.*, *United States v. Colombo*, 869 F.2d 149, 152 (2d Cir. 1989) (remanding to district court to determine whether new trial was required where affidavit submitted in support of Rule 33 motion established that juror had perjured herself in voir dire); *see generally* Fed. R. Crim. P. 47(b) ("A motion may be supported by affidavit.").

### B.       False Testimony Was Introduced.

There can be little question that false testimony was introduced at the Defendants' trial. *See Shih Wei Su*, 335 F.3d at 127 (noting that the first question in the inquiry as to whether the introduction of perjury requires a new trial is "whether false testimony was introduced"). Indeed, the false testimony was prolonged and wide-ranging in scope.

Without question, CS-1 testified falsely regarding his continuing drug trafficking activity in prison, his expectations post-trial, the scope of his coordination with his co-defendant in prison, and other matters.  (*See* Tr. 950-84; *e.g.*, Tr. 929 ("Q. But the truth is, you communicated with your son a bunch since you have been in jail, right?  A. No, sir.  Q. Well, you must have at least talked to him since you have been in jail, right?  A. Only at the moment of arrival and then we were separated."); Tr. 972 ("Q. And so what happens is you made a call to a third-party while your son, from a different part of the prison, also made a call to a third-party and linked you up, right?  A. Yes, sir. . . .  Now, what you are talking about here with your son through this third-party is Paul, right?  A. Yes.  Q. You are talking about Paul, the unauthorized drug trafficker that you brought down to Venezuela without authorization from the DEA, right?  A. Yes, sir.")).  In short, there is no dispute that specific questions were put to CS-1 on the witness stand, and that he gave perjurious answers.

CS-1 also offered false testimony regarding his handling of evidence in the underlying investigation.  Most significantly, CS-1 offered false testimony regarding his supposed identification of a white powdery substance as cocaine.  (Tr. 692 ("Q. Sir, what were you doing with the kilo of cocaine there?  A. I was checking it out to evaluate the quality and to make sure that it was cocaine.  Q. How were you doing that?  A. I took a little bit with my hands.  I smelled it to see if it smelled of cocaine.  I looked at the color to see what kind of color it had.  I rubbed it a little on my hand so that it would release the oils on my hand and see how much oil it would release.")).  Here, CS-1 simply lied.  The attached Declaration from an expert in the field of identification of controlled substances definitively shows that CS-1 could not have identified cocaine in the manner he claimed.  (*See* Declaration of Dr. Andrea Holmes ¶¶ 1-7 (hereinafter "Holmes Decl.") (explaining, among other facts, that (1) there is no "oil" that would have been

emitted from cocaine hydrochloride, and (2) the test CS-1 purported to have conducted could not have yielded any rational conclusion as to whether the substance in question was in fact cocaine); *cf. United States v. Kaplan*, 490 F.3d 110, 118 (2d Cir. 2007) (reversing conviction where cooperating government witness offered lay opinion that was not "rationally based on the perception of the witness"); *Sanchez*, 969 F.2d at 1414 ("Where testimony is patently incredible or defies physical realities, it may be rejected by the court [considering a Rule 33 motion], despite the jury's evaluation.").

In her Declaration, Dr. Holmes explains that powder cocaine would not begin to emit any "oil" until it reached its melting point, 208 degrees Fahrenheit.  (Holmes Decl. ¶ 5).[1]  Dr. Holmes further explains that even if one could somehow elevate the temperature in their hands to this extraordinarily high temperature, they still would not be able to visually identify the oil as cocaine.  (Holmes Decl. ¶ 5).  In addition, Dr. Holmes explains that, to identify the odor of cocaine, Santos Peña would have needed to be in possession of a canine-level sense of smell.  (Holmes Decl. ¶ 6).  Dr. Holmes also explains that, through the method that Santos Peña described, it would have been impossible to assess that the purity of the supposed cocaine was 95 to 97 percent.  (Holmes Decl. ¶ 7).

All of this points to the objective falsity of CS-1's testimony.  Indeed, the only potential argument that CS-1 was not engaged in pure perjury with regard to this testimony would be the notion that he was simply mistaken about the complex cocaine testing method that he described.  But the Court cannot accept the idea that a witness with this level of experience in cocaine trafficking, who had engaged in this much deception of his law enforcement handlers, was

---

[1] Water boils at 212 degrees Fahrenheit.  *See* H. G. Jerrard & D.B. McNeill, *A Dictionary of Scientific Units:  Including Dimensionless Numbers and Scales* 139 (5th ed. 1986).  Human beings will experience third degree burns in seconds if exposed to 140 degree water.  *See* Burn Foundation, *Safety Facts on Scald Burns*, http://www.burnfoundation.org/programs/resource.cfm (last visited Jan. 23, 2017).

simply making an innocent mistake when he offered what was unquestionably some of the most important testimony in the trial. CS-1 lied, and his lie was the basis for establishing that the only alleged cocaine that was ever seen during the investigation was, in fact, cocaine.

**C.    The False Testimony Was Known or Should Have Been Known To The Government.**

The second prong of the Second Circuit's test is easily met because, in this case, the evidence demonstrated that at least a substantial portion of the false testimony was known to the Government before the conclusion of the trial. (Tr. 985 ("you now understand that your cooperation agreement is getting ripped up, correct?"). *See Shih Wei Su*, 335 F.3d at 127 (describing second prong of inquiry as determination of "whether [the] testimony either was or should have been known to the prosecution to be false"). The full scope of the false testimony should have been known to the Government far sooner. Where the Government chose to call a witness who repeatedly lied to them, defrauded DEA agents, previously offered false testimony at a pretrial hearing, and very recently pleaded guilty to violations of Section 1001, the Government had an obligation to take the minimal steps necessary to assure that this witness was not engaged in a continuing fraud on the Court.

Even putting aside CS-1's lies and fraud during the investigation, the Government was on notice that CS-1 had serious credibility problems and was withholding information from law enforcement when the prosecutors discovered during the suppression hearing that he had withheld critical information about the unauthorized third-party drug dealer ("Paul") whom CS-1 and his son had brought with them to Venezuela. (*See* Tr. at 729-30). Indeed, given the frequency with which the Government obtains the prison calls of *defendants* in the course of other investigations and trials, the Government's failure to obtain the prison calls of its highly suspect *informants* represents a degree of negligent or willful blindness that is disfavored by the

courts.  *See United States v. Spivack*, 376 F. App'x 144, 145-46 (2d Cir. 2010) (observing that prosecutor's failure to prevent false testimony of witness, even when it was unknown to the Government but should have been, constitutes misconduct, writing "[w]e conclude that allowing the government's witness to testify falsely in a material way, albeit unknowingly, constituted severe misconduct").

Moreover, given the witness's background, the Government should have taken some minimal steps to assure that his testimony was consistent with basic scientific reality.  *See Drake v. Portuondo*, 553 F.3d 230, 243 (2d Cir. 2009) (noting with disapproval that, although "[prosecutor] had never heard of [false science described by witness] until [perjurious witness] mentioned it, he did not contact any other mental health professional to inquire about the concept").  Here, the Government did not take any steps to determine whether CS-1's methods for purportedly testing the cocaine were even remotely plausible.  It is a fact—not an opinion—that an individual cannot turn cocaine hydrochloride into an oil by mashing it in his palm.  It is, moreover, a fact that an individual cannot determine that a substance is cocaine simply by looking at it, mashing it into his palm, and casually sampling its aroma.  As Dr. Holmes's Declaration makes quite clear, the melting point of cocaine is 208 degrees Fahrenheit, nearly the temperature of boiling water—an impossible temperature to achieve through the use of pressure in one's palm.  (*See* Holmes Decl.  ¶¶ 1-8).  Moreover, this case was investigated and staffed by the DEA, who are charged with enforcing the federal narcotics laws.  It is unfathomable that none of the agents supervising CS-1 took the minimal step of checking the reliability of CS-1's supposed test.  Instead, the Government knew that it was dealing with a proven liar and chose to elicit critical testimony from this witness rather than consult with any of the legion of chemists at the Government's disposal.

The court in *Turner v. Schriver*, 327 F. Supp. 2d 174, 184-86 (E.D.N.Y. 2004), dealt with a similar situation. In *Turner*, the prosecution called as a witness in a robbery case the purported victim of the crime. *Id.* at 177-78. During his testimony, the victim was asked if he had "ever been arrested" and if he had "[e]ver been convicted of crime," both of which the victim denied. *Id.* at 78. After the defendant was convicted, he obtained affidavits from the victim and another individual indicating that this testimony was false. *Id.* at 180. In considering the defendant's habeas petition, the district court criticized the prosecution's failure to take minimal steps to assure that the testimony of its witness was not false, writing that the circumstances of the case "all pointed to the need to check Mr. Clarke's record before offering him as a witness, and indeed offering him as a witness *without a record*." *Id.* at 185 (emphasis in original). The district court held that "[t]he information [establishing the falsity of the testimony] was readily available to the prosecution had it made the most modest effort." *Id.* The court thus granted the petition and vacated the conviction, observing that, "[a]s the Court of Appeals for the Second Circuit recently held, saying it was applying established principles of Supreme Court law, 'before a prosecutor puts to the jury evidence that a witness made no deal with the government, he or she has a fundamental obligation to determine whether or not that is so.'" *Id.* (quoting *Shih Wei Su*, 335 F.3d at 127). The court noted that "concluding that the prosecutor *should have known* of the perjury requires no drawing of subtle lines; it is obvious." *Id.* at 187 (emphasis added).

Here, similarly, the question of whether the prosecution "should have known" of CS-1's perjury regarding his bogus identification of the white powdery substance requires no difficult analysis. In opposing the Defendants' motion for a *Daubert* hearing, the Government essentially represented to the Court that it had determined the testimony to be reliable. Given the massive

scale of CS-1's misconduct up to that point, particularly in light of the fact that the Government

had already charged him with lying repeatedly to federal officers, the Government was under a

clear obligation to take some minimal steps to assure that his testimony regarding the alleged

cocaine was not patently false.  No such steps were taken and the Holmes Declaration

demonstrates that DEA staff with even a minimal understanding of cocaine's chemistry should

have known CS-1's test was pure fiction.  Regardless, even putting the unknown substance

identification testimony aside, the Government was clearly aware of CS-1's false testimony

regarding the other matters discussed above, as this awareness was the apparent basis for the

invalidation of CS-1's cooperation agreement.  Ultimately, between what the Government knew

and should have known regarding the false testimony of CS-1, this prong of the test described in

*Shih Wei Su* is easily met.[2]

---

[2] Indeed, the Government *still* has not fulfilled its responsibilities with regard to the witness at issue.  During the trial, the Defendants requested by letter that the Government provide the Defendants with full disclosure of CS-1 and CS-2's false communications to Government agents in other investigations, pursuant to the Government's *Brady* and *Giglio* obligations.  The Government has yet to respond to this request.

### D.    The Government Failed to Correct CS-1's False Testimony.

While the Government indicated to the jury, in arguably improper testimony on the part of the prosecutor, that it was "ripping up" the witness's cooperation agreement, (Tr. 984-85), the Government failed to actually correct the false testimony and indeed improperly relied upon the testimony in summation even after discovering the witness's perjury. *See Shih Wei Su*, 335 F.3d at 127 (new trial is required if false testimony "went uncorrected" by the Government); *United States v. Sanfilippo*, 564 F.2d 176, 178 (5th Cir. 1977) (reversing conviction due to prosecutor's failure to affirmatively correct false testimony of witness, and observing that actions of defense counsel in light of false testimony are irrelevant, since "[t]he cases hold that the duty to correct the false testimony of a Government witness is on the prosecutor") (citing *Napue v. Illinois*, 360 U.S. 264, 270 (1959)); *United States v. Sam Goody*, 518 F. Supp. 1223, 1225 (E.D.N.Y. 1981) (reversing conviction because Government agent offered false testimony that was discovered during trial and "prosecutor[ ] fail[ed] to correct this false testimony prior to the conclusion of the Government's case even though the Court furnished to the prosecutor authority in this Circuit requiring the Government to do so").[3]

The law is clear that, regardless of the arguments of defense counsel and regardless of the instructions of the Court, once the prosecutors recognized that their witness had offered false testimony, the Government had an obligation to affirmatively stand before the jury and explain in unambiguous language what specific testimony was false and what was the truth.  This never

---

[3] In *Sam Goody*, the court further noted that the prejudice to the defendants from the Government's failure to immediately, fully, unambiguously, and affirmatively correct the false testimony was amplified because, by the time the Government finally did affirmatively correct the testimony, many days after the false testimony had been given, "much, if not all, of the significance of the falsity of the testimony may well have escaped the jury." *Sam Goody*, 518 F. Supp. at 1226.  Here, similarly, the Government never made any affirmative statement to the jury correcting the false testimony but instead simply asked vague questions regarding the witness's expectation that his cooperation agreement would be ripped up.  To a lay jury, much of the significance of this statement may have been lost without an affirmative correction from the prosecution, and, regardless, this questioning did not constitute appropriately *correcting* the significant false testimony.

occurred, and therefore a new trial is required.  Indeed, courts have rejected the idea that the

Government can be relieved of this burden simply because other aspects of the trial may have

allowed the jury to infer the truth or the nature of the false testimony.  *See United States v.*

*Mason*, 293 F.3d 826, 829 (5th Cir. 2002) (reversing conviction after false testimony of

informant regarding nature of plea agreement, and rejecting argument that additional clarifying

testimony and defense counsel's capacity to address false testimony relieved Government of

duty, observing "defense counsel's failure to avail himself of the policy making the plea

agreement available does not relieve the government of its affirmative responsibility to correct

false testimony").  Indeed, the courts have rejected arguments that the failure to affirmatively

correct false testimony could be excused simply because defense counsel had effectively

demonstrated the lack of credibility of the witness on cross-examination.  *See United States v.*

*Rivera Pedin*, 861 F.2d 1522, 1530 (11th Cir. 1988) (reversing conviction for failure to

affirmatively correct false testimony of government witness while noting, "[w]e acknowledge

that Ream's credibility had been eroded due to the testimony the defense elicited from him on

cross-examination").

     Even if the prosecution had corrected the false testimony, or even if the Government's

failure to elicit further false testimony on redirect examination could be viewed as in some way

correcting the testimony, a new trial would nevertheless be required on this prong because of the

Government's use and failure to appropriately disavow CS-1's false testimony in their

summations even after its falsity was apparent.  *See, e.g.*, *Jenkins v. Artuz*, 294 F.3d 284, 293 (2d

Cir. 2002) (affirming grant of habeas petition where prosecutor's summation, although

technically accurate, failed to clarify falsity in witness's testimony and effectively "placed the

State's credibility behind [the witness's] untruthful testimony").

In the Government's principal summation, the prosecutor argued:

> So, let's take a look at Government Exhibit 210-S.  And Campo also jokes around about how he was going to send this kilo back to the hotel because he is obviously not going to do that with cocaine . . . .  And he takes it out of the bag and they inspect the kilo . . . And after they get done with the kilo inspection, Campo helps tape up *the cocaine* and everyone in the room discusses the market for two other drugs.

(Tr. 1312-13).  Later, in the Government's rebuttal summation, the Government continued:

> Now, at the beginning of the trial I did say that these two men were caught red-handed.  This is what I was talking about.  *That is Efrain Campo Flores holding a kilo of cocaine in his hand.*"
>
> ****
>
> "A lot has been said about Mr. Santos Peña.  I'm not going to say much more.  I stand by what I said in the beginning of the trial.  It is going to be up to you to decide which witnesses' testimony to credit and which not to credit.  We trust you with respect to that decision for all of our witnesses including with Mr. Santos Peña, stand by the decision that was made during his testimony, and we ask you to evaluate it pursuant to the Court's instructions.

(Tr. 1438, 1449).

Thus, the trial ended without any clear statement from the prosecutors to the jury that CS-1 had offered false testimony and without any affirmative explanation of either the nature of the false testimony or the details of the truth.  Quite to the contrary, the trial ended with the jury hearing at the last that the prosecution "[stood] by what [it] said in the beginning of the trial" with regard to Mr. Santos Peña and the other witnesses.  (Tr. 1449).  This was problematic, since in the opening statement the prosecution had by implication endorsed the truth of various of CS-1's statements, and there was no way for the jury at the time of the rebuttal summation to know what testimony the Government indicated should now be believed or disbelieved.

The Government's statement left the jury to sort out what aspects of CS-1's testimony were to be credited and which should have been rejected.  Such deference was appropriate for a

jury instruction from the Court, but it was not appropriate for a prosecutor fully aware that the

witness had perjured himself with regard to multiple aspects of his testimony, particularly where

the prosecution had made no correction whatsoever to guide the jury as to what aspects of the

testimony should not have been credited.  This is not a matter of mere technical error, though the

technical error here is grave.  Rather, upon learning that its cooperating witness had engaged in a

campaign of flagrant perjury and fraud on the Court, the prosecutors had an obligation to review

his testimony and determine precisely which aspects of it the jury should be instructed to

disavow.  The prosecutors had an obligation to at least attempt to debrief the witness and discern

the full extent of the perjury.  As far as the record reflects, this never occurred.  Due process

required the Government to do more than allow the jury to attempt to sort out the truth from the

lies by assessing the testimony and the defense's arguments.  Due process required the

Government to explicitly and unambiguously correct the testimony of its witness.

Indeed, putting aside the failure to correct all of CS-1's testimony regarding his dealings

with his co-defendant (his son) and continued drug trafficking in jail, the failure to correct his

cocaine identification testimony was particularly egregious.  *See Drake*, 553 F.3d at 247

(reversing conviction where prosecution elicited opinion testimony of witness that was not based

in reason and witness lied in other aspects of his testimony).  In light of CS-1's demonstrated

unreliability, through his repeated false statements and perjury, the scientific impossibility of his

supposed "method" of determining that the substance he observed was cocaine, and the fact that

the DEA surely should have known that the purported test was bogus, it was inappropriate for

the Government to use CS-1's testimony to suggest to the jury that the substance was, in fact,

cocaine.  (Tr. 1438 ("That is Efrain Campo Flores holding a kilo of cocaine in his hand.")).

Indeed by indicating that he stood by what he had said at the outset of the trial, the prosecutor

suggested that the quantum of proof regarding the substance was unchanged from the opening

statement.  (Tr. 49, 52 (prosecutor's opening statement that Defendant brought a sample "of

cocaine" to one of the meetings, and later "You'll see Campo with that kilo of cocaine").  CS-1's

testimony was the only testimony in the record to that effect—the only testimony that

affirmatively identified the substance as cocaine.

Even if the Government wished to argue that there was other evidence allowing the jury

to infer that the substance viewed was cocaine, the language of the prosecutor's rebuttal

summation was not couched as an argument for an inference to be drawn—that is, the words "I

submit," "you can infer," or similar qualifying language were noticeably absent from the

argument.  Instead, the implication of the argument was that there was direct evidence in the

record establishing that the substance in question was, in fact, cocaine.  Moreover, the prosecutor

failed to delineate between whatever inferential sources he might have relied upon and the false

Santos Peña testimony.  At a minimum, given the flagrant perjury, the Government had an

obligation to disavow this portion of the testimony in stating to the jury that the substance in

question was cocaine.  The Government failed to do so.  That the Government later argued in

rebuttal that, "it doesn't matter whether there was actually cocaine in that package," in no way

cured the failure to correct CS-1's false testimony.  (Tr. 1455).  The rebuttal began with the

Government insisting that there was, in fact, cocaine in the package and the later statement only

allowed the jury to accept this portion of Santos Peña's testimony if they so chose.  This error

had a significant impact on the Defendants.  The Government failed to offer any correction, at

any time, of CS-1's testimony.  A new trial is required.

E.    **There Is a Reasonable Likelihood That the False Testimony Could Have Affected the Judgment of the Jury.**

In these circumstances, the final prong of the Second Circuit's test is easily met. *Shih Wei Su*, 335 F.3d at 127 (court must ask "whether the false testimony was prejudicial in the sense defined by the Supreme Court in *Agurs*"); *see Agurs*, 427 U.S. at 103 (conviction obtained through perjury "must be set aside if there is *any reasonable likelihood* that the false testimony could have affected the judgment of the jury"); *Drake*, 553 F.3d at 246-47 (finding false testimony of expert witness to meet materiality standard of *Agurs* even where substantial other testimony existed in record supporting defendant's conviction).

Here, CS-1's statements that he had not coordinated with his co-defendant-son and had not engaged in additional drug trafficking from jail could easily have affected the judgment of the jury.  Although the cross-examination of the witness and the Government's redirect examination undermined CS-1's credibility, members of the jury could still have found the recordings evincing his misconduct equivocal or discredited them as aspects of the defense.  The jury therefore may have placed undue value on his other testimony, explaining numerous statements in the Government's recordings and disavowing the destruction of evidence critical to the Defendants' entrapment defense.  Again, the Government elicited numerous interpretations from CS-1 regarding the Defendants' statements on the recordings.  By the time of deliberations, this testimony was entrenched in the jurors' minds.  Without a clear disavowal of all of the false aspects of CS-1's testimony by the prosecution, this testimony continued to carry significant weight.  It simply cannot be said that there is *no* reasonable likelihood that the false testimony in this case *could have affected* the judgment of the jury.  As the courts have made clear, this is a relatively low threshold once the other components of the test for a new trial stemming from perjury have been met.

Indeed it is highly likely—particularly given the Government's insistence that the substance CS-1 alone handled was cocaine—that the jury was significantly affected by the false testimony establishing that the substance was in fact cocaine. CS-1's entire "test," however, was nonsense. Not only did it sound implausible and unreasonable, it in fact depended on multiple scientifically impossible components. As is now obvious, CS-1 was simply lying about his determination that the substance in question was cocaine because he believed it would aid him in his attempt to secure the favor of the Government. This testimony was baked into the trial record by the time of summations, and the prosecutors' summations further solidified that testimony as a part of the record upon which the jury could rely. CS-1's testimony on this issue was an important and dramatic part of the case—it was the only testimony that established that actual cocaine had been produced in the course of the investigation. This situation therefore easily meets the low threshold described in *Agurs*. A new trial is required.

## II. THERE WAS INSUFFICIENT EVIDENCE AT TRIAL TO SUPPORT A CONVICTION.

Separate and apart from the serious errors and misconduct described above, the evidence presented at trial was wholly insufficient to establish beyond a reasonable doubt that the Defendants had the mental state necessary to enter into a conspiracy—*i.e.*, that they "agreed on the essential nature of the plan." *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (citation omitted). In addition, and even if *arguendo* there had been sufficient evidence of agreement, the Government also wholly failed to present sufficient evidence of a specific intent to commit the crime charged—*i.e.*, that the Defendants had "the specific intent to commit the offenses that were the objects of the conspiracy." *United States v. Samaria*, 239 F.3d 228, 234 (2d Cir. 2001) (quoting *United States v. Monaco*, 194 F.3d 381, 386 (2d Cir. 1999)).

A.      **There Was Insufficient Evidence of Agreement.**

No reasonable juror could have concluded, beyond a reasonable doubt and based on the

evidence presented at trial, that the Defendants entered into an *agreement* to violate the narcotics

laws of the United States.  Rather, because the evidence, even viewed in the light most favorable

to the government, gives equal support to a finding that the Defendants did *not* in fact reach an

agreement either among themselves or with any other party as to essential terms of any supposed

conspiracy, a judgment of acquittal must be entered.

The "essence" of any conspiracy is the "agreement to commit an unlawful act."  *Iannelli*

*v. United States*, 420 U.S. 770, 777 (1975); *see also United States v. Shabani*, 513 U.S. 10, 16

(1994) ("The prohibition against criminal conspiracy . . . does not punish mere thought; the

criminal agreement . . . is the *actus reus*[.]").  Critically, "[t]he partners in the criminal plan must

agree to pursue the *same* criminal objective."  *Salinas v. United States*, 522 U.S. 52, 63 (1997)

(emphasis added).  Thus, while each and every member of a conspiracy need not necessarily

know every single detail of the plan, "[t]o convict a defendant as a member of a conspiracy, the

government must prove that the defendant agreed on the essential nature of the plan, and that

there was a conspiracy to commit a particular offense and not merely a vague agreement to do

something wrong."  *Lorenzo*, 534 F.3d at 159 (citations and internal quotation marks omitted).

As the Second Circuit has repeatedly emphasized:

> Proof of the *essential nature of the plan* is required because the gist
> of [conspiracy is] the agreement, and it is therefore essential to
> determine what kind of agreement or understanding existed as to
> each defendant.  The importance of making this determination
> cannot be overstated.  Agreement is the essential evil at which the
> crime of conspiracy is directed and it remains the essential element
> of the crime.  *Nobody is liable in conspiracy except for the fair*
> *import of the concerted purpose or agreement as he understands it.*

*United States v. Rosenblatt*, 554 F.2d 36, 39 (2d Cir. 1977) (citing and quoting authorities) (emphasis added); *see also United States v. Cepeda*, 768 F.2d 1515, 1517, 1517 n.1 (2d Cir. 1985) (citation omitted) ("two or more persons . . . [must] come to an understanding" and the Government must present "proof, whether or not by circumstantial evidence, of a specific agreement to deal").

"Association with a conspirator, without more, is insufficient to establish the requisite degree of participation in a conspiratorial venture." *United States v. Steinberg*, 525 F.2d 1126, 1134 (2d Cir. 1975). "There must be something more than [m]ere knowledge, approval of or acquiescence in the object or the purpose of the conspiracy; the [coconspirator]'s 'attitude towards the forbidden undertaking must be more positive . . . . he must in some sense promote their venture himself, make it his own, have a stake in its outcome,' or make 'an affirmative attempt to further its purposes.'" *United States v. Ceballos*, 340 F.3d 115, 124 (2d Cir. 2003) (citations omitted).

Similarly, it is well established—indeed, it is a matter of common sense—that "[e]xploratory and inconclusive or preliminary discussions and negotiations are not sufficient to establish an agreement." *United States v. Iennaco*, 893 F.2d 394, 398 (D.C. Cir. 1990) (Ginsburg, J.) (internal quotation marks omitted). Because "negotiations, solicitations and counteroffers" do not constitute agreement for purposes of conspiracy, "[n]o . . . agreement exists if the parties to the alleged conspiracy raise objections and impose unaccepted preconditions on their agreement." *Id.* at 397-98. Similarly, "equivocal statements," in the absence of a "fixed agreement," are insufficient. *Steinberg*, 525 F.2d at 1134; *accord United States v. Cianchetti*, 315 F.2d 584, 588 (2d Cir. 1963) ("equivocal" statements do not "reveal[ ]" the necessary "stake in the [conspiratorial] venture"); *see also United States v. Jones*, 765 F.2d

996, 1003 (11th Cir. 1985) (defendant's proposals to undercover narcotics agent, which required

acceptance the agent never gave, did not constitute a criminal conspiracy); *United States v. Goff*,

847 F.2d 149, 168 n.28 (5th Cir. 1988) (reversing conviction for conspiracy to import cocaine

where conversations concerned only "the possibilities of getting a deal together"); *United States*

*v. Melchor-Lopez*, 627 F.2d 886, 891-92 (9th Cir. 1980) (conditions attached to conditional

agreement and "agreement to negotiate [ ] a purchase" rather than agreement to purchase did not

constitute conspiracy); *cf. United States v. Desimone*, 119 F.3d 217, 229 (2d Cir. 1997) (in

sentencing context, distinguishing "negotiations" that were "sufficiently specific as to logistical

concerns" from "exploratory discussion or 'mere puffery'").

      A conspiracy does not exist merely because two or more persons discuss the *possibility* of

committing a crime.  "Men do not conspire to do that which they entertain only as a possibility;

they must unite in a purpose to bring to pass all those elements which constitute the crime."

*United States v. Penn*, 131 F.2d 1021, 1022 (2d Cir. 1942) (Learned Hand, J.); *see United States*

*v. Arbane*, 446 F.3d 1223, 1229 (11th Cir. 2006) ("The crux of the agreement element in a

conspiracy case is that the government must prove a 'meeting of the minds' to achieve the

unlawful result.").  That is why, for example, a conditional offer to engage in a crime does not

constitute a meeting of minds sufficient for conspiracy liability to attach.  *Melchor-Lopez*, 627

F.2d at 891-92.  *Cf. Valle*, 807 F.3d at 522-23 (affirming grant of Rule 29 motion, despite

extensive evidence of conversations about criminal activity, because "no reasonable juror could

conclude beyond a reasonable doubt that [the defendant] possessed the specific intent to [commit

the offense] or that he and his alleged co-conspirators ever formed an agreement to *actually*

*carry out* [the offense]") (emphasis added).

Case 1:15-cr-00765-PAC   Document 157   Filed 01/23/17   Page 32 of 59

Nor can ambiguous or equivocal statements by a defendant support a conspiracy conviction.  For example, in *United States v. Gore*, 154 F.3d 34, 40 (2d Cir. 1998), the government sought to rely on ambiguous statements as proof that the defendant joined a narcotics conspiracy.[4]  Such remarks, the Second Circuit held, were "legally insufficient to show a conspiratorial agreement to distribute drugs" and "too thin a reed to support the essential element of a conspiracy—the agreement."  *Id.* at 40-41.

Here, evidence of a true agreement—in other words, a meeting of the minds—was wholly lacking, and the Government consequently failed to produce evidence sufficient to establish beyond a reasonable doubt that either Defendant had "a stake in the outcome," *Steinberg*, 525 F.2d at 1134, of the plots alleged in the Indictment.  Although the recordings and testimony at trial provide a record of negotiations, counteroffers, and objections on the part of the Defendants, at *no point* do the Defendants ever manifest an intent to agree to the essential nature of the alleged scheme.  (*See* GX 203-T 6:1-8 (Oct. 23, 2015) (no response by Defendants

---

[4]  In a tape-recorded statement, the defendant in *Gore* said, "I don't want to lose face with that dude man because he always has something decent and he always comes up right.  Never tapped, never in a bag, never messed up, yeah so I should do him right."  *Id*. at 38.

manifesting comprehension or agreement when CS-1 or CS-2 referenced the United States);[5] GX 201-T 5:27-40 (Oct. 23, 2015) (same); GX 206-T 33:10-29 (Oct. 26, 2015) (same)).

Rather, the evidence establishes that as late as November 10, 2015—*i.e.*, the very last day of the supposed conspiracy, when the plot should have been at its most fully-formed and well-established state—there *still* was not agreement on the fundamental aspects of the alleged partnership. Specifically, in response to CS-1's suggestion that he operated in the United States, Mr. Campo-Flores asked questions presenting a counterproposal regarding Canada. (*See* GX 230-T, 4-6 (Nov. 10, 2015) (emphasis added)):

| Campo: | *What price are they paying you for that in Canada?* |
|---|---|
| CS-1: | Uh, in Canada, buddy, you will fall off your chair. |
| Campo: | *Oh.* |
| CS-1: | I, I sell very little in Canada, I sell almost everything in the United States, the East Coast, New York, see . . . all of, Chicago . . . |
| Campo: | *And how much are they paying for that in Canada?* |
| CS-1: | Look, in, in, in Canada it depends, look, in New York, a kilo in California, in California through the Pacific . . . |
| Campo: | Mm-hm. |
| CS-1: | . . . as soon as it crosses Mexico it goes for twenty-six thousand dollars. |
| Campo: | Mm-hm. |
| CS-1: | On the market, in small quantities. |
| Campo: | Sure, no [U/I]. |
| CS-1: | [U/I] one, five. |
| Campo: | One at a time. |
| CS-1: | One five up . . . up to ten. |

---

[5] *See* GX 203-T 6:1-8 (Oct. 23, 2015):

| CS-1: | What, what is happening . . . and I understand you, I understand you perfectly and you are entirely right. The problem and the situation over there . . . I'm the person who buys everything from him . . . and I am the person who is responsible for taking everything to the United States, I am the one who works on [U/I]. The problem that they have there right now in, in that town you went to in Honduras, is that they have [U/I] son of a bitch [U/I] there are very good [U/I] understand them, but if, uh, uh, uh, the . . . I scold him sometimes because he is one of these people who sometimes . . . because he is extremely cautious, and it's good that he is . . . |
|---|---|
| Campo: | Not [U/I] |
| CS-1: | . . . that sometimes he disappears on me for two, three days. |
| Campo: | Of course. |

| | |
|---|---|
| Campo: | Sure, the more the cheaper. |
| CS-1: | If it goes up to twenty, then it will go down to twenty-five and a half [U/I]. |
| Campo: | Sure, it goes down a bit, and so on. |
| CS-1: | With more, you won't sell it for less than twenty-four, unless there is a transaction with thirty, forty, which is very rare because you have to be very careful that it's not . . . then . . . |
| Campo: | *And you don't like working in Europe?* |
| CS-1: | Uh, excuse me?  In . . . |
| Campo: | *In Europe.* |
| CS-1: | No, not there I don't, I don't work there.  Because it, it requires too much from me . . . |
| Campo: | I used to have some contacts there and . . . what happened is that we got a bit nervous because . . . |
| CS-1: | Yes. |
| Campo: | . . . [U/I] over there, [U/I] find crooked people. |
| CS-1: | See?  That's the problem, I had a, an arrival there via boat but it had to depart from Panama and from Panama . . . |
| Campo: | No, those boats make me a little nervous as well because if they get intercepted . . . |

There can be no serious question that the essential nature of a conspiracy "to violate the narcotics laws of the United States," (Indictment ¶ 1), would necessarily include agreement on which country to target.  *See, e.g.*, *Arbane*, 446 F.3d at 1230 n.10 ("In a conspiracy to import drugs into the United States, the essential nature of the conspiracy is the importation of narcotics into the United States.").  The equivocal, inconclusive statements made by the Defendants in the recordings—indeed, their questions and preliminary discussions regarding entirely different plans—are simply insufficient to establish the existence of an agreement.

### B. There Was Insufficient Evidence of Specific Intent to Target The United States.

Furthermore, even if *arguendo* there had been sufficient evidence of *some* sort of criminal agreement presented at trial, the evidence at trial could not have permitted a reasonable jury to find, beyond a reasonable doubt, the existence of the specific type of agreement that the Government had to prove as an essential element of the charged conspiracy—an agreement to

25

target the United States.  "It is fundamental that a conviction for conspiracy . . . cannot be sustained unless there is proof of an agreement to commit an offense *against the United States*." *Ingram v. United States*, 360 U.S. 672, 677-78 (1959) (emphasis added).  Conspiracy "is a specific intent crime, requiring that the government establish beyond a reasonable doubt that the defendant had the specific intent to violate the substantive statute." *Samaria*, 239 F.3d at 234.  Thus, "[j]ust as a defendant cannot be convicted of . . . conspiracy without knowledge that the substance he was carrying was controlled, . . . so the government must meet the burden of showing that the conspiracy to import was directed at the United States." *United States v. Conroy*, 589 F.2d 1258, 1270 (5th Cir. 1979).

"[I]n order to establish the offenses defined in §§ 952, 960, and 963, the government is required to prove that the defendant knew or intended that the destination of the narcotics would be the United States." *United States v. Londono-Villa*, 930 F.2d 994, 999 (2d Cir. 1991).  "[I]n order to obtain a conviction for an offense under § 959(a), the government must prove the defendant's actual knowledge or intent beyond a reasonable doubt." *United States v. Romero-Padilla*, 583 F.3d 126, 129 (2d Cir. 2009); *see also United States v. Geer*, 923 F.2d 892, 894 (1st Cir. 1991) ("[T]he government must present clear evidence sufficient to establish beyond a reasonable doubt that an agreement to commit the substantive offense actually existed, and that the individual defendant knew of the agreement, had intent to agree, and had intent to commit the substantive offense.") (quotation omitted).

*Arbane*, 446 F.3d at 1230, is instructive.  The defendant, Arbane, was convicted of conspiring to import cocaine into the United States.  At trial, evidence established that Arbane had been "engaging in various illegal conduct throughout Central America, South America, and Mexico."  *Id*. at 1226.  Nevertheless, there was no evidence that Arbane and another person

(other than the government informant) had a shared understanding that the drugs would be imported to the United States.  As the Eleventh Circuit held:

> The most basic element of [a federal narcotics conspiracy] is an agreement between two or more persons to violate federal narcotic laws.  Of course, conspiracy to possess drugs in Ecuador, to export drugs from Ecuador, or to distribute drugs in South America are not crimes in the United States.  The government was therefore obligated to prove that two co-conspirators agreed to a United States crime—to be precise, the crime charged in the indictment.
>
> . . . .
>
> The government may have proved a conspiracy to possess drugs in Ecuador or export them from Ecuador to any number of South American countries, but that was not the conspiracy charged, nor could the United States criminalize such conduct without a jurisdictional basis. For these reasons, we must conclude that the government did not present sufficient evidence of an agreement between Arbane and Lopez-Posada to import drugs to the United States.

*Id.* at 1232.  Stray remarks referencing the United States cannot, without more, support a finding beyond a reasonable doubt of specific intent to distribute or import drugs into the United States. The Court therefore should grant the Defendants' motion for acquittal under Rule 29(c).

As noted above, there is no evidence that the Defendants even heard, much less understood or agreed to, the informants' supposed decision to target the United States.  (*See* GX 203-T 6:1-8 (Oct. 23, 2015) (no response by Defendants manifesting comprehension or agreement when informants referenced United States); GX 201-T 5:27-40 (Oct. 23, 2015) (same); GX 206-T 33:10-29 (Oct. 26, 2015) (same)).  Indeed, far from agreeing to target the United States, the Defendants instead raised questions regarding the importation of drugs into Canada, Europe, and other locations.  *See* (GX 230-T, 4-6 (Nov. 10, 2015)).

C.     **Because Any Suggestion of a U.S. Nexus to the Conspiracy Was Entirely Introduced by the Government, There Was Insufficient Evidence Presented and a Judgment of Acquittal Is Required Under the Manufactured Jurisdiction Doctrine.**

As explained above, *supra* II.A-B, the Government failed to provide sufficient evidence such that a rational jury could conclude, beyond a reasonable doubt, that the Defendants intended to target the United States and that they entered into an agreement to violate the laws of the United States.  To the extent the record includes *any* mention of the United States at all (which was required to establish jurisdiction, (Tr. 357), those references to the United States were unilaterally supplied by persons working on behalf of the Government, *not* the Defendants.  Thus, in addition to being insufficient to establish agreement on the part of the Defendants to the essential terms of the alleged criminal agreement, the proof in this case also falls within the Second Circuit's rulings regarding the "manufactured jurisdiction" doctrine.

"The unproved-element theory of manufactured jurisdiction is that if the government unilaterally supplies an essential element of a crime, the government has in effect failed to prove that element as to the defendant."  *United States v. Al Kassar*, 660 F.3d 108, 120 (2d Cir. 2011); *see also United States v. Archer*, 486 F.2d 670, 682 (2d Cir. 1973) (holding that there was a failure of proof "where the federal officers themselves supplied the interstate element and acted to ensure that an interstate element would be present").  Accordingly, in this case the jury was instructed, correctly, that "[i]t is not dispositive if the individuals acting at the direction of the government introduced the concept of the drugs being imported into the United States as long as the defendant you are considering then took a voluntary action in connection with the conspiracy."  (Tr. 1503).

Here, CS-1 and CS-2 were under orders from their DEA handlers to introduce references to the United States.  (Tr. 355:23-356:1 ("Q.  Now, another one of the instructions that you gave

28

to Jose, Sr. before this operation was that he was to have discussions regarding importing drugs into the United States, right?  A.  Yes.")).  Agent Gonzalez testified that CS-1 "initiated all the conversations about moving drugs into the United States."  (Tr. 359 ("Q.  Jose, Sr. initiated all the conversations about moving drugs into the United States, correct?  A.  I believe so."); *see also* Tr. 861 (Santos Peña) ("Q.  Sir, isn't it true that you're the one who brought up the United States in the conversations?  A.  Yes, sir.")).  In the absence of evidence of a "voluntary action" on the part of the Defendants implicating that United States nexus—wholly lacking in the evidence presented at trial—there has been a failure of proof as to an essential element of the offense, *Archer*, 486 F.2d 670, and a judgment of acquittal should be entered.

> **D.     The Testimony of CS-1, Who The Government Concedes Was Lying On the Stand, Cannot Be Relied Upon as a Matter of Law.**

Finally, the Defendants submit that the testimony of CS-1 must be wholly disregarded for purposes of the sufficiency analysis.  For reasons explained in greater detail elsewhere in this brief, *supra* Part I, the Government cannot be permitted to meet its burden of proof by pyramiding a series of inferences drawn from the testimony of a wholly discredited witness. There is no question that CS-1 was caught in a lie regarding multiple material matters at trial.  In short, *no rational juror* could have credited CS-1's testimony.  And yet CS-1's testimony regarding the United States was critical to the Government's case.  CS-1 played a key role in providing highly prejudicial "spin" on otherwise ambiguous or vague comments, explaining to the jury that certain references supposedly were to narcotics (*e.g.*, Tr. 613 ("the business"), 665 ("putting anything into"), 691 ("bring it to your people")), or to the United States (*e.g.*, Tr. 654 ("the extraditables"), 691 ("the other side")).  This was crucial to the Government's case.  In the absence of his testimony, there was insufficient evidence to establish guilt beyond a reasonable

doubt.  At a minimum, in the absence of CS-1's testimony, the jury's verdict would be "highly doubtful." *Autuori*, 212 F.3d at 121.

In extraordinary circumstances, the Court may disregard the testimony of wholly non-credible witnesses and then test the sufficiency of whatever evidence might be left.  *See Autuori*, 212 F.3d at 121 ("[W]e agree that the credibility of the principal witnesses was weak and that the soundness of the verdict is highly doubtful.  We therefore conclude that it was no abuse of the district court's discretion to order a new trial."); *see also United States v. Cherico*, No. 08 CR 786 CM, 2012 WL 1755749, at *4 (S.D.N.Y. May 16, 2012) (in Rule 29 context, looking to whether "a reasonable trier of fact could have concluded that the Government's witnesses were credible"); *cf. Mesarosh v. United States*, 352 U.S. 1, 9 (1956) ("[The witness's] credibility has been wholly discredited . . . .  No other conclusion is possible.  The dignity of the United States Government will not permit the conviction of any person on tainted testimony.  This conviction is tainted, and there can be no other just result than to accord petitioners a new trial."); *Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005) (concluding that "testimony—which was largely unsubstantiated by any other direct evidence—was 'so replete with inconsistencies and improbabilities' that no reasonable juror would undertake the suspension of disbelief necessary to credit" that testimony for purposes of summary judgment).

## III.  THE GOVERNMENT FAILED TO DISPROVE ENTRAPMENT AS A MATTER OF LAW.

At trial, the Defendants each strongly asserted that they were entrapped by the Government into participating in the scheme crafted by the DEA and its informants.  (*See* Tr. 1389-91; Tr. 1433-34).  Prior to their arrest, neither Defendant had a criminal history.  Both were viewed by the DEA and its operatives as novices lacking even basic knowledge of the drug trade.  At the same time, the vast majority of the Government's evidence was derived from a

choreographed sting operation that was helmed by two corrupt informants who admitted their financial and personal motives to ensnare the Defendants. In response, the Government offered scant argument to disprove that the entrapment defense was established. (*See* Tr. 1301-02; Tr. 1438-39). That is because, despite the centrality of the entrapment defense to this case, the evidence introduced by the Government was "insufficient to permit the jury to rationally conclude that [the Defendants were] . . . predisposed to commit the crime" charged in the Indictment. *United States v. Harvey*, 991 F.2d 981, 992 (2d Cir. 1993).

This insufficiency of evidence is incurable because of a central flaw in the Government's investigation: the DEA failed to record the critical initial meeting that launched the entire sting operation. The failure to record that meeting—standing alone—is sufficient to establish that the Defendants were induced into participating in the scheme. But the failure to record the meeting has more far-reaching implications than just the threshold question of inducement. As set forth below, the failure to record the meeting is fatal to the Government's attempt to rebut entrapment by proving the Defendants' predisposition beyond a reasonable doubt. *See United States v. Bala*, 236 F.3d 87, 94 (2d Cir. 2000) ("If a defendant presents credible evidence of government inducement, then the prosecutor must show predisposition beyond a reasonable doubt"). The DEA's other investigative failures, and the Government's unwarranted reliance upon non-incriminating text messages, further demonstrate that a rational jury could not have found that predisposition was proven beyond a reasonable doubt.

### A. The Defendants Were Induced To Participate In The Sting Operation.

As an initial matter, there is no question that a rational juror must have found that Government agents induced the Defendants to participate in the conduct for which they were criminally charged. *See United States v. Brand*, 467 F.3d 179, 189 (2d Cir. 2006) (holding that entrapment is an affirmative defense that requires a defendant to make an initial showing that the

government induced him to commit the charged crime). As the Court's instructions to the jury make clear, if the jury "find[s] some evidence that a Government agent initiated the criminal acts charged in the indictment, then [it] must decide if the Government has satisfied its burden to prove beyond a reasonable doubt that the defendant [it is] considering was predisposed to commit the crime in the way necessary for it to constitute a crime under federal laws when the opportunity presented itself." (Tr. 1507-8).

There is, without a doubt, "some evidence that a Government agent initiated the criminal acts" that were charged in this case. The entire sting operation was instigated and later crafted by a Government agent, Sentado, who was himself a large-scale narcotics trafficker located in Honduras. According to Agent Gonzalez, the DEA had never even heard of the Defendants prior to Sentado telling Agent Gonzalez that he was setting up a meeting with them. (Tr. 172). When Sentado advised Agent Gonzalez that he was going to have a meeting with the Defendants, Agent Gonzalez claimed that he instructed Sentado both to record the meeting with his phone and to bring another cooperating witness to the meeting to observe what happened. (Tr. 173-74). Sentado failed to accomplish either task. (*Id.*) Instead, this critical meeting—the first interaction the Government or any of its operatives had with the Defendants—went entirely unrecorded. Accordingly, there is a complete absence of evidence about what occurred at that meeting and how the Defendants were induced to participate in the scheme. The record is clear, from subsequent meetings, that Government operatives dangled the prospect of earning $20 million for doing almost nothing in front of the Defendants to obtain their participation. As was revealed at trial, this inducement was an extraordinary amount of money to offer the Defendants in these circumstances. Agent Gonzalez admitted that he had never heard of that amount being offered in a sting operation. (Tr. 290). Likewise, the DEA's own expert witness conceded that he had

never observed that large of an amount of money advanced in a narcotics transaction. (Tr. 575). Add to that the fact that CS-1 repeatedly boasted about how easy it was to manipulate the Defendants (Tr. 914-15) and there can be no dispute that the Government induced the Defendants. Accordingly, the lack of a recording the initial meeting, the amount of money offered the Defendants, and the manipulative efforts of the informants is enough evidence to demonstrate the Government "initiated the Government acts." A reasonable juror would undoubtedly have so found, and would thus have gone on to the next step of examining whether the Government met its burden of proving predisposition beyond a reasonable doubt.

### B. The Government Failed to Meet Its Burden of Proving Predisposition Beyond a Reasonable Doubt.

After a defendant puts forth evidence of inducement by a Government agent, the burden then shifts to the Government to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime. *See Bala*, 236 F.3d at 94 ("If a defendant presents credible evidence of government inducement, then the prosecutor must show predisposition beyond a reasonable doubt."). Predisposition may be shown by evidence of: "(1) an existing course of criminal conduct similar to the crime for which [the defendant] is charged, (2) an already formed design on the part of the accused to commit the crime for which he is charged, or (3) a willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement." *United States v. Brunshtein*, 344 F.3d 91, 101-02 (2d Cir. 2003); *see also United States v. Cromitie*, 727 F.3d 194, 205 (2d Cir. 2013). As the Court instructed the jury, "a person is predisposed when he is ready and willing to commit a crime without any persuasion, and was awaiting a favorable opportunity to do so." (Tr. 1508). At trial, the Government utterly failed to present sufficient evidence to establish predisposition beyond a reasonable doubt.

1. **The Defendants' Lack of Experience and Sophistication Demonstrates that They Were Not Predisposed to Commit the Charged Crime.**

To start, the record is clear that the Government knew, at the time of the October 3rd meeting between the Defendants and Sentado, that the Defendants were unsophisticated and inexperienced and that they lacked the capability of actually carrying out the scheme.  This is the very opposite of the proof necessary to establish predisposition.  The Defendants had no prior criminal history.  Despite having extensive law enforcement operations and a network of informants in Venezuela and throughout South and Central America, the DEA's elite international narcotics unit had never heard of the Defendants before.  And the Defendants never actually procured the large amount of cocaine alleged in the charged crime.  Rather, at best, the agent in charge of the investigation, Agent Gonzalez, viewed the Defendants as amateurs. (*See* Tr. 376 ("Q.  And you very quickly came to the conclusion that they were amateurs, right?  A. I'm not sure if I very quickly came to that conclusion or not.  Q.  But you came to that conclusion, right?  A.  Yes.")).  Likewise, the record is replete with evidence that the Government's other operatives—many of whom were lifelong, major narcotics traffickers— considered the Defendants to be utter novices who did not know what they were doing.  For example, while discussing the Defendants among each other, Agent Gonzalez and CS-1 referred to the Defendants as "idiots."  (*Id.*).  This perception of the Defendants as novices with a total lack of experience culminated when Agent Gonzalez and CS-1 actually engaged in a bet with one another as to whether the Defendants would fall for the absurd scenario the agents had set up and travel to Haiti to obtain millions of dollars in cash (Tr. 378, 870-72)—a scenario that no experienced drug dealer would have found plausible.

In addition to having a total lack of experience in the narcotics trade, the Defendants repeatedly demonstrated that they did not have the means to carry out the charged crime.  At the

outset, Government operatives attempted to try and have the Defendants provide a plane to transport narcotics. Those operatives quickly realized, however, that the Defendants did not in fact have access to an aircraft. (Tr. 299). Likewise, those operatives sought to have the Defendants supply 800 kilograms of cocaine—cocaine the Defendants never produced. What the evidence did show was a series of changing offers by the Government and its operatives to drag the Defendants into the conspiracy. At one point, the offer was for Sentado to provide the narcotics and the money while CS-1 would supply a plane. (GX 201 & 202). That offer changed so that CS-1 was providing everything. (GX 208). And then, in a series of discussions, the proposal again changed with the informants offering large amounts of cash for the Defendants to provide the actual narcotics (which of course they never actually supplied). (GX 203, 206, 230, 231).

The Defendants' utter lack of experience and know-how established that they were not the large-scale narcotics traffickers that the Government painted them to be. It also demonstrated that the Defendants were plainly not predisposed to commit the crime charged: the importation of hundreds of kilograms of cocaine into the United States. Accordingly, in light of the proof, Sentado's decision not to record the October 3 meeting in Honduras is a critical failure that necessarily raises a reasonable doubt with respect to the issue of predisposition. Sentado, whom the Government concedes was a sophisticated narcotics trafficker (Tr. 169), was highly motivated to lure the politically-connected Defendants into the sting. This is supported not just by common sense, but also by the fact that Sentado repeatedly failed to preserve essential evidence and flat out refused to transmit proof to the DEA despite the agent's unambiguous instructions to do so. (*See* Tr. 318-20 (refusing to send photographs of the first meeting); Tr. 366 (failing to forward evidence to the DEA)). Indeed, Sentado was viewed as unreliable by both the

DEA and CS-1, who certainly was no paragon of trustworthiness himself.  (Tr. 365).

Accordingly, Sentado's dubious conduct, coupled with his transparently self-serving motivations

as a cooperating witness, yields a strong inference that he corruptly persuaded the Defendants to

engage in discussions concerning the scheme—an  inference that the Government failed to rebut.

In sum, to overcome its burden, the Government had to prove beyond a reasonable doubt

that the Defendants were "ready and willing to commit [the] crime without any persuasion, and

[were] awaiting a favorable opportunity to do so."  (Tr. 1508).  The record in this case shows

that, as a matter of law, the Government did not meet that burden.  Without evidence of what

actually occurred at the October 3 meeting, they cannot show that the Defendants were "willing

to commit [the] crime without any persuasion" from Sentado.  Nor can they show that the

Defendants were simply "awaiting a favorable opportunity" because the promises and

representations made by Sentado to them at that meeting, where the opportunity itself was

presented, do not exist.  For the reasons set forth above relating to the Defendants' inexperience

and naiveté, as well Sentado's own proven ulterior motives and untrustworthiness, the lack of

a recording of the October 3rd meeting necessarily raises a reasonable doubt as to predisposition

that requires granting the Defendants' Rule 29 motion.

### 2.    The Government's Attempts To Prove Predisposition Failed.

Despite the lack of proof, the Government nonetheless attempted to meet its burden of

establishing predisposition through two separate arguments.  Both of those arguments fail,

however, because the unwarranted inferences argued by the Government in its jury addresses

demonstrate its inability to prove predisposition beyond a reasonable doubt.

First, in its principal summation, the Government pointed to various text messages that it

asserted demonstrated the Defendants' predisposition to import hundreds of kilograms of cocaine

into the United States.  (Tr. 1297-1301).  Specifically, the Government argued that those text

messages showed that, in the "weeks and months before the defendants ha[d] any communication with anyone working with the DEA they were attempting to facilitate drug shipments using their access to the main airport in Caracas." (Tr. 1301). Those text messages, however, did not support any such conclusion.

In its summation and summary charts, the Government presented a series of unrelated text messages (laid out in chronological order) to the jury in an attempt to create the false impression that the Defendants were generally involved in criminal activity prior to the October 3rd meeting. (*See* GX 715). With respect to those texts messages, the Government did not call a single witness who had any actual knowledge of the messages, nor any witness who could testify as to what was actually being discussed in them. Not a single one of the text messages made any reference to narcotics trafficking. And none of the messages had any references to drug prices, quantities, or any other specific indication that they related to the trafficking of cocaine.

Nonetheless, the Government argued that the messages showed the Defendants' effort "to leverage their connections and their ability to move freely in Venezuela to move cocaine out of the Caracas airport." (Tr. 1298). The primary basis for this assertion, as argued to the jury, was a short text message from Defendant Flores de Freitas's phone, which the Government characterized as follows: "PPR says [a GV plane] is going to el sombrero, which we submit is a reference to Mexican drug traffickers. That was the condition on credit." (*Id.*) Yet even a cursory review of that text message exchange reveals that this was baseless speculation on the Government's part with no grounding in the trial record. There simply was no evidentiary foundation to make the inferential leap from "sombrero" to "Mexican drug traffickers." That is because the actual text message went on to state: "I'll write to you right back / I am going to meet with a magistrate and efra now . . . . I will give you an answer in 15 minutes / so we know

the time we should retake the case." (GX 515 at 2-3). Thus, the full message certainly did not

reference narcotics trafficking or anything remotely like it, as the message referred to a

"magistrate" and a "case." This became even more apparent in light of another text message by

the Defendants a few weeks later that also referenced "el sombrero." PPR wrote:

> "Man the man we need to get us through is ready . . . He's telling
> me for us to send the people who are going to see the construction
> at the beginning of the week and on the weekend. We send the
> engineers at once / The one who needed the permit is ready . . .
> Next week we take out the two and the following week el
> sombrero."

(GX 515 at 24). Thus, there was no reference whatsoever to narcotics trafficking in connection

with "el sombrero." Rather, the text messages were plainly about a construction project

involving a permit—and the Government's proffered inference that "el sombrero" referred to

Mexican drug traffickers was entirely unwarranted. The law is clear that a jury's guilty verdict

must be supported by "substantial evidence," *Nersesian*, 824 F.2d at 1324 (2d Cir. 1987), and it

may not draw "specious inferences" or "be permitted to conjecture . . . or to conclude upon pure

speculation or from passion, prejudice or sympathy." *Jones*, 393 F.3d at 111; *Taylor*, 464 F.2d at

243. That is precisely what the Government invited in its summation. Lacking any actual

evidence of predisposition, the Government instead relied on baseless inferences such as the "el

sombrero" text to meet its burden. That is plainly not the type of evidence upon which a rational

juror is legally permitted to rely.

Second, the Government argued that the Defendants evinced a willingness to commit the

charged crime based on their response to the inducement. That is, the Government focused on

how the Defendants reacted when its operatives proposed the scheme. In the Government's

rebuttal summation, it argued that:

> "the defendants' reactions to the proposal that was made in the
> October 23rd meeting demonstrate that they are guilty that they

> entered this conspiracy, they demonstrate that they were not at all
> entrapped.  These were men who were doing everything they could
> in this time period in the late summer and early fall of 2015 to send
> large loads of cocaine out of the Caracas airport that they
> repeatedly said they controlled, into Central America so that those
> drugs could be brought to the United States."

(Tr. 1459).  That argument is, however, fatally flawed and directly contravenes the Court's

legally correct instructions to the jury on entrapment.  The Court properly instructed the jury that

"the focus of the inquiry is on the defendant's state of mind prior to his first contact with the

Government's agent . . . Although you may consider evidence relating to a defendant's conduct

after he was first approached, you may do so only to the extent that it shows something about the

defendant's state of mind before that point."  (Tr. 1508-09).  Inviting the jury to focus on the

October 23rd meeting in Venezuela—which took place 20 days after the initial meeting on

October 3rd —simply was not probative of the question of predisposition as a matter of law.  The

only appropriate question concerned how the Defendants reacted to the inducement offered at the

*initial meeting*, not afterward.

The Government's argument in rebuttal relied on evidence that was irrelevant to the

question of predisposition in order to make it appear as if it had proof of that issue when it was

fully aware that there was no evidence whatsoever relating to the initial meeting.  The

Government argued repeatedly that the jury could infer predisposition based on the Defendants'

response to the inducement *after* the October 3rd meeting.  The Government argued that,

"Another way you know that they were predisposed to commit this crime is by looking at how

they reacted once they were given the option to work with Santos Peña because you can tell what

was in their heads before that proposal was made by what they did after."  (Tr. 1457:15-22; *see*

*also* Tr. 1458 ("If you have any doubt about predisposition, look at the transcripts of the meeting

on the 26th."))  The Government's rebuttal summation recounted the chronology of the meetings

after the initial meeting with Sentado and argued that the Defendants' responses were evidence

of predisposition. (Tr. 1457-59). That argument—that predisposition can be inferred based on

the Defendants' actions after the initial inducement—is wrong. *See, e.g., Cromitie*, 727 F.3d at

204 (explaining that *Jacobson v. United States*, 503 U.S. 540 (1992) requires that the

"prosecution must prove that the defendant was disposed to commit the criminal act prior to first

being approached by government agents") (internal quotations omitted). The Second Circuit

explained the reason for this rule:

> Although as a general matter a defendant's state of mind . . . can be
> inferred from his actions and statements, a broad application of
> that principle would undermine the entrapment defense by
> permitting any induced conduct to prove predisposition. To guard
> against that risk, the Supreme Court has required that conduct of a
> defendant, after contact by Government agents, offered to prove
> predisposition, must be independent and not the product of the
> attention that the Government had directed at [the defendant].

*Id.* at 208-09 (internal citations and quotations omitted); *see also United States v. Brown*, 43 F.3d

618, 627 (11th Cir. 1995) ("As *Jacobson* emphasized, predisposition has a definite temporal

reference: the inquiry must focus on a defendant's predisposition *before* contact with the

government officers or agents.").

In its rebuttal summation the Government disregarded this clear law and the Court's

instruction and asked the jury to infer predisposition based on the Defendants' conduct after the

initial inducement and related to the sting operation. That was improper. In a case where the

Government's *only* evidence was the result of its choreographed sting operation, such error

merits granting the Defendants' Rule 29 motion, or at minimum, a new trial. Here, the

Government created its own evidence and then argued that it should be interpreted as

independent evidence that was not generated by the "attention that the Government had directed

at [the defendant]," which, of course, flouts the rules set forth by the Supreme Court and clear

Second Circuit precedent.  *Cf. Brown*, 43 F.3d at 624-25 ("Naturally, the more extensive and involved the government's role, the more difficult it becomes to determine a defendant's independent readiness and willingness to commit a crime until, at some point, it becomes impossible to separate a defendant's independent readiness and willingness from the mental state created by the government.").

In its rebuttal summation, the Government also argued that, with respect to the initial meeting in Honduras, there is "no evidence in this case that Daza was acting at the direction of the government."  (Tr. 1438-39).  In doing so, the Government was attempting to argue that it had "offered [evidence] to prove predisposition [that was] independent and not the product of the attention that the Government had directed at [the defendant]."  *Cromitie*, 727 F.3d at 209 (internal quotations omitted).  That claim is not supported by the evidence presented at trial and, in fact, it is clear that Daza was serving as Sentado's henchman and following his instructions. With respect to direct communications between Daza and the Defendants, the Government presented only a single series of chats between Daza and Campo-Flores, none of which indicated how or for what reasons Daza connected the Defendants to Sentado.  (*See* GX 409-T).  Those chats make clear that the Defendants had never even met Daza in person before.  For example, Campo-Flores wrote that they would be meeting "face to face" for the first time at the October 3rd Honduras meeting and that others had "already gave me an idea of what you look like."  (*Id.* at 2).  None of the remaining chats made any reference to narcotics, narcotics trafficking or the United States; nor do they provide any background as to how Daza came to be interacting with the Defendants.  (*See id.*).  Indeed, there was no other witness testimony, text messages,[6] or recordings that pre-dated these text messages to support the Government's assertion that Daza

---

[6]   In fact, in the only recorded meetings where Daza and a defendant were present together, the DEA's own informant admitted that there was no discussion of importing narcotics into the United States.  (Tr. 1179-80).

was not operating at Sentado's instruction and working as his agent in an effort to entrap the Defendants in the scheme.  In short, the Government's assertion that Daza was not acting as part of Sentado's orchestrated effort to ensnare the Defendants is pure speculation.  Inferences the Government argues to the jury must have some basis in the record.  The specific inference that the Government argued in rebuttal—that Daza was not part of the "attention" the Government was directing at the Defendants—is not supported by a shred of evidence.  Even if such an inference were discernible from the evidence, it certainly would not be sufficient for the Government to meet its burden of proving predisposition beyond a reasonable doubt.

Accordingly, for the reasons set forth above, the Government failed to meet its burden of establishing predisposition beyond a reasonable doubt.  The flaws in the investigation, including the lack of a recording of the initial meeting on October 3rd, make carrying that burden impossible.  The Court should, therefore, grant the Defendants' motion for an acquittal under Rule 29.

### C. The Interests of Justice Require that the Verdict Be Set Aside on the Basis of the Government's Failure to Meet Its Burden With Respect to Entrapment.

Even if the Court were to find that there is evidence in the record reasonably supporting the conclusion that a rational juror could determine that the Government met its burden with respect to the entrapment defense, the verdict should still be set aside in the interests of justice on two separate grounds.

First, even if the Court were to determine that the untethered inferences and speculative interpretations of the text messages qualify as proof of predisposition, that does not account for the overall unreliability of the Government's case.  As set forth in more detail above, the Government's deeply flawed investigation featured two corrupt informants who were permitted to operate wholly without adequate supervision; the destruction of evidence; perjured testimony

at a pre-trial hearing and at trial; and serious, unanswered questions regarding the DEA's investigation and treatment of the Defendants. Given the lack predisposition on the part of the Defendants, it is plainly in the interests of justice to set aside the verdict rather than permit this deeply troubling verdict to stand. In that regard, the Court is uniquely situated to understand the implications of what occurred at trial. Almost the entirety of the Government's case was premised on recordings made by CS-1 and his interpretation regarding their meaning. The fact that his involvement in the investigation and prosecution tainted all aspects of the case is apparent. It is a rare occasion when, during trial, the Government rips up a cooperator's agreement. But that is just what happened here. The jury, lacking the Court's institutional understanding of this action, could not have been expected to appreciate and appropriately weigh its gravity and significance.

Second, while there is a lack of evidence with respect to predisposition, there is a glut of evidence that the Government pursued the Defendants for reasons wholly unrelated to the charges in this case. Both the DEA agent in charge of the case and the informants recognized that the Defendants were politically valuable targets by virtue of their relationship to the first family of Venezuela. The informants, in particular, evinced a deep animus against the Defendants and their family and a strong desire to reap the financial rewards of helping to secure the Defendants' arrest. This deep bias taints the Government's flawed sting operation and counsels that the verdict should be set aside.

## IV. THE EVIDENCE OF CONSCIOUS AVOIDANCE WAS INSUFFICIENT BECAUSE THERE WAS NO EVIDENCE THAT THE DEFENDANTS DELIBERATELY CHOSE NOT TO CONFIRM WHETHER THE CONSPIRACY TARGETED THE UNITED STATES.

At trial, the Government argued to the jury that the Defendants were guilty of conspiracy even if they did not know that the conspiracy targeted the United States because the Defendants

supposedly consciously avoided learning that the conspiracy targeted the United States.  But there was insufficient evidence to support a critical element of the Government's conscious avoidance theory.  Conscious avoidance requires *both* the Defendants' awareness of a high probability of a fact *and* the Defendants' *deliberate decision* not to confirm the existence of that fact.  Even if there were evidence that the Defendants were aware of a high probability that the conspiracy targeted the United States, there was no evidence at all—and the Government certainly never cited any to the Court or the jury—that the Defendants *deliberately avoided* confirming that fact.  Instead, the Government simply proceeded as though the second element of conscious avoidance did not exist.  Accordingly, a conscious avoidance instruction should not have been given.  And because an erroneously given conscious avoidance instruction is harmless only where there is overwhelming evidence of actual knowledge—something that was indisputably untrue here, where the evidence of knowledge was hotly and closely disputed—the Defendants are entitled to a new trial.

> ### A.    Conscious Avoidance Requires Not Just the Defendants' Awareness of a High Probability of a Fact, But Also that the Defendants *Decided* Not to Learn the Fact.

For a conviction to rest on a theory of conscious avoidance, the evidence must satisfy "two components—there must be evidence that the defendant (1) was aware of a high probability of [a] disputed fact *and* (2) deliberately avoided confirming that fact."  *United States v. Svoboda*, 347 F.3d 471, 480 (2d Cir. 2003) (emphasis added).  The second element of conscious avoidance is significant "because it capture[s] the thought, essential to the concept of *conscious* avoidance, that the defendant must be shown to have *decided* not to learn the key fact, not merely to have failed to learn it through negligence."  *United States v. Rodriguez*, 983 F.2d 455, 458 (2d Cir. 1993) (emphasis in original).  Conscious avoidance, in other words, requires evidence that a defendant affirmatively decided to avoid acquiring knowledge, because anything less would

effectively permit conviction on a lesser negligence or recklessness standard.  At trial, a conscious avoidance instruction "may only be given if . . . the appropriate factual predicate for the charge exists, *i.e.*, 'the evidence is such that a rational juror may reach [the] conclusion beyond a reasonable doubt . . . that [the defendant] was aware of a high probability [of the fact in dispute] and consciously avoided confirming that fact.'"  *United States v. Ferrarini*, 219 F.3d 145, 154 (2d Cir. 2000) (quoting *Rodriguez*, 983 F.2d at 458); *see also id.* at 157 ("[W]e have held that conscious avoidance cannot be established when the factual context *should have apprised* [the defendant] of the unlawful nature of [his] conduct[,] and have instead required that the defendant have been 'shown to have *decided* not to learn the key fact,' such a result might constitute reversible error.") (emphasis in original).  In particular, as to the second element, the Second Circuit has "emphasized that a conscious avoidance instruction should be issued only where it can be shown that the defendant '*decided* not to learn the key fact, not merely failed to learn it through negligence.'"  *United States v. Aina-Marshall*, 336 F.3d 167, 171 (2d Cir. 2003) (alterations omitted; emphasis in original).

Indeed, because of the potential for a jury to "get the mistaken impression that it may convict on the basis of mere negligence," *United States v. Tanner*, 628 F.3d 890, 904-05 (7th Cir. 2010), a conscious avoidance instruction must be given with caution.  *Id*. at 904.  "[T]he applicability of the doctrine" of conscious avoidance turns "on *what the defendant does* to avoid reaching subjective certainty (mistaken or not) about th[e] proposition" at issue.  *United States v. Nektalov*, 461 F.3d 309, 315 (2d Cir. 2006) (emphasis added).  The instruction, in other words, should be given only where there is a "purposeful contrivance to avoid guilty knowledge." *Svoboda*, 347 F.3d at 480; *accord Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011) ("[A] willfully blind defendant is one who takes deliberate actions to avoid confirming a

45

high probability of wrongdoing and who can almost be said to have actually known the critical facts."); *see also id.* ("A court can properly find willful blindness only where it can almost be said that the defendant actually knew.") (quoting Glanville Williams, *Criminal Law: The General Part* § 57, at 159 (2d ed. 1961)).

### B.   The Government Repeatedly Failed to Identify Any Evidence Demonstrating that the Defendants *Consciously Avoided* Determining Whether the Conspiracy Targeted the United States.

At trial, the Government repeatedly elided the second element of conscious avoidance. Initially, in connection with the charging conference, the Government acted as though the requirement that there be evidence that the Defendants *deliberately* avoided confirming a necessary fact did not even exist.  The Defendants raised this issue in a letter to the Court, pointing out that "[n]o evidence had been adduced that the Defendants ever took any *deliberate* steps to avoid learning information regarding an alleged U.S. nexus."  (*See* Dkt. 123 at 2-3) (emphasis in original).  The Defendants and the Court also discussed the issue during the charge conference, with the Government noting that "it can't be . . . that a high probability is enough," and the Court agreeing that the law required not just that the Defendants were aware of a high probability but also that the Defendants "then shut their eyes to it."  (Tr. 1281-82).  The Government never responded to the argument or cited any evidence to support the proposition that the Defendants shut their eyes to the supposed high probability that the conspiracy had importation into the United States as its object.

Then, even more transparently, the Government argued its conscious avoidance theory to the jury by focusing entirely on the Defendants' supposed awareness of the high probability that the conspiracy targeted the United States, without reference to any evidence that supported the necessary proposition that the Defendants deliberately avoided confirming that fact. Specifically, in the Government's rebuttal summation, the Government advised the jurors that

the Court was going to be instructing them "about something called conscious avoidance." (Tr. 1448). The Government then identified proof that went to the first prong of conscious avoidance—the Defendants' supposed awareness of a high probability that the conspiracy targeted the United States—telling the jurors that when they heard "that instruction" about conscious avoidance, they should "think back" to the "13 times, on tape" when importation into the United States was mentioned. (Tr. 1448). But the Government never addressed the second prong of conscious avoidance at all, not even attempting to identify any proof that the Defendants deliberately avoided confirming the supposed high probability that the conspiracy involved importation into the United States. Thus, the Government invited the jury to convict the Defendants based only on the first element of conscious avoidance, without ever acknowledging or offering proof sufficient to satisfy the second element.

Accordingly, both in arguments to the Court over the jury instructions and in arguments to the jury, the Government proceeded as though the second element of conscious avoidance did not exist. The Government's theory, ultimately, was the patently impermissible one that even if the Defendants did not have actual knowledge that the conspiracy targeted the United States, they were nonetheless guilty because they were negligent or reckless in the face of a high probability that the conspiracy targeted the United States.

### C. There Was No Evidence that the Defendants *Consciously Avoided* Determining Whether the Conspiracy Targeted the United States.

The Government's repeated attempts to ignore the requirements of the second prong of the conscious avoidance standard are understandable, because the Government, in fact, had no evidence that could satisfy that element. Such evidence can take many forms. For example, in *United States v. Abreu*, 342 F.3d 183 (2d Cir. 2003), the Second Circuit approved the use of a conscious avoidance instruction where a defendant in possession of money and drugs admitted to

"doubts" about the origin of the money, and said he "chose not to ask any further questions." *Id.* at 186.  In *United States v. Reyes*, 302 F.3d 48, 51 (2d Cir. 2002), the defendant participated in trafficking in stolen airbags and told agents he "looked away" on the question whether they were stolen.  *Id.* at 52; *see also United States v. Smith*, 46 F.3d 1223,1237 (1st Cir. 1995) (defendant left room saying "I don't think I want to hear this" when his co-conspirators were discussing money laundering).

There was no evidence like that in this case.  Specifically, there was no evidence that the Defendants deliberately avoided conversations, meetings, or documents to prevent confirming suspicions that the destination of the narcotics was to be the United States.  Nor was there any other evidence that could have satisfied the requirement.  In the end, there was simply no evidence that would have allowed a reasonable juror to conclude, beyond a reasonable doubt, that the Defendants deliberately, consciously avoided learning anything.

> **D.      Given the Insufficiency of the Evidence, a Conscious Avoidance Instruction Should Not Have Been Given, and a New Trial Is Required.**

Because there was an insufficient factual predicate for a conscious avoidance instruction, the instruction should not have been given.  *See, e.g., Ferrarini*, 219 F.3d at 154 (a conscious avoidance instruction "may only be given if . . . the appropriate factual predicate for the charge exists").  This error requires that Defendants be given a new trial.  Where a conscious avoidance instruction is given improperly, the "erroneously given . . .  instruction constitutes harmless error [only] if the jury was charged on *actual* knowledge *and* there was '*overwhelming evidence*' to support a finding that the defendant instead possessed actual knowledge of the fact at issue." *Id.* (emphasis added) (emphasis in original); *see also Kaplan*, 490 F.3d at 128 (same); *United States v. Quattrone*, 441 F.3d 153, 181 (2d Cir. 2006) (same).

Case 1:15-cr-00765-PAC   Document 157   Filed 01/23/17   Page 58 of 59

Here, the error plainly was not harmless.  Far from being "overwhelming," the evidence of the Defendants' actual knowledge was—as explained *supra* at II.A-B—not even sufficient in its own right.  At the very least, even if it was sufficient, it was far from the type of overwhelming evidence that would render harmless an improperly given conscious avoidance instruction that permitted the jury (encouraged by the Government in its rebuttal summation argument) to convict the Defendants based on evidence that showed, at most, that the Defendants failed to inquire about where the drugs were going, rather than that they deliberately decided not to inquire.  A new trial should, therefore, be granted.

## **CONCLUSION**

For all of the reasons set forth above, the Defendants' motions pursuant to Federal Rules
of Criminal Procedure 29(c) and/or 33 should be granted.


Dated: January 23, 2017
New York, New York

            Respectfully Submitted,

              /s/ Randall W. Jackson
            _____

            Randall W. Jackson
            John T. Zach
            BOIES, SCHILLER & FLEXNER LLP
            575 Lexington Avenue
            New York, New York 10022
            Telephone:    (212) 446–2300
            Facsimile:    (212) 446–2350

            *Attorneys for Defendant Efrain Antonio*
            *Campo Flores*


              /s/ David M. Rody
            _____

            David M. Rody
            Michael D. Mann
            Elizabeth Espinosa
            SIDLEY AUSTIN LLP
            787 Seventh Avenue
            New York, New York 10019
            Telephone:    (212) 839–5300
            Facsimile:    (212) 839–5599

            *Attorneys for Defendant Franqui Francisco*
            *Flores de Freitas*