```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 24, 2017
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
: 
UNITED STATES OF AMERICA, :
: S5 15 Cr. 765 (PAC)
    *-against-* :
:
EFRAIN ANTONIO CAMPO FLORES and : **OPINION & ORDER**
FRANQUI FRANCISCO FLORES DE :
FREITAS, :
:
                    *Defendants*. :
------------------------------------------------------------X

HONORABLE PAUL A. CROTTY, United States District Judge:

      On November 18, 2016, following a nine-day trial, a jury convicted Defendants Efrain Antonio Campo Flores and Franqui Francisco Flores de Freitas ("Defendants") of conspiring to (i) import five or more kilograms of cocaine into the United States from a foreign country, in violation of 21 U.S.C. §§ 952(a) and 960(a)(1), or (ii) distribute five or more kilograms of cocaine, knowing and intending that it would be imported into the United States, in violation of 21 U.S.C. §§ 959(a) and 960(a)(3). The thrust of the government's proof was that Defendants agreed to arrange a flight transporting 800 kilograms of cocaine from Venezuela to Honduras, knowing and intending that the cocaine was ultimately bound for the United States. According to the government, Defendants—both nephews of the First Lady of Venezuela—sought to take advantage of their political connections by coordinating a private flight that would appear legitimate and thus be subject to less scrutiny, notwithstanding the illicit drug cargo it would carry.

      On January 23, 2017, Defendants renewed their motion for a judgment of acquittal (Fed. R. Crim. P. 29(c)), and moved in the alternative for a new trial (Fed. R. Crim. P. 33(a)). They

contend that acquittal is warranted because the government failed to present sufficient credible evidence to support conviction and to disprove entrapment. They also contend that a new trial is warranted because of a cooperating witness's perjury and because the Court gave an improper conscious avoidance instruction. For the reasons stated below, the Court denies Defendants' motion.

## DISCUSSION

### I. Motion for a Judgment of Acquittal

Fed. R. Crim. P. 29(a) provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." On a Rule 29 motion, the "defendant bears the heavy burden of showing—when viewing the evidence in the light most favorable to the government, and drawing all inferences in favor of the prosecution—that no rational trier of fact could have found him guilty." *United States v. Gaines*, 295 F.3d 293, 299–300 (2d Cir. 2002). The Court reviews all evidence "in conjunction, not in isolation," *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011), and "may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt," *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (internal quotation marks omitted).

#### A. Conviction

##### 1. Agreement

Defendants argue that the evidence at trial was insufficient to establish beyond a reasonable doubt that they "agreed on the essential nature of the plan." *See United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (citation and alteration omitted).

The government's brief thoroughly details the evidence offered at trial of Defendants' participation in the charged conspiracy.[1]  The evidence showed that in a November 6, 2015 meeting in Honduras with an air traffic controller from the Roatan Airport in Honduras, Flores de Freitas agreed that the cocaine shipment would arrive on November 15, 2015, between approximately 4:30 and 5:20 pm.  *See* GX 222-T at 7–9; GX 223-T at 6.  Thereafter, on November 10, 2015, Defendants traveled to Haiti to pick up their payment from confidential source ("CS") Jose Santos-Pena ("CS-1").  *See* Tr. 379.  At that meeting with CS-1, Defendants confirmed that the shipment would be made on November 15, 2015, *see* GX 231-T at 19, Campo Flores specified that the delivery time was set for between 4:30 and 5:30, *see id.* at 21, and Flores de Freitas indicated that the flight was destined for the Roatan airport, *see id.* at 22.  Defendants even explained that the cocaine was already in suitcases.  *See id.* at 20–21.

Nonetheless, Defendants argue that the trail goes cold here because there was no agreement to send cocaine from Venezuela up through Central America and then on to the United States.  They focus on questions Campo Flores asked CS-1 at the November 10, 2015 meeting about selling cocaine in Canada and Europe, and characterize this discussion as a "counterproposal."  *See* Mot. at 24–25.  But Campo Flores's general questions about other countries, reviewed in the context of the entire discussion at the November 10, 2015 meeting, do not suggest that he was making a counterproposal.  Viewing the evidence in conjunction, and in the light most favorable to the government, the Court does not find the evidence introduced at

---

[1] The government's evidence included transcripts of recorded meetings that Defendants attended, Defendants' text messages, Defendants' confessions, and expert testimony about drug trafficking routes in South America.  Among the Defendants' text messages were photographs from a Gilson Nuevo ("Gilson") of what appear to be firearms, and discussion about the acquisition of those apparent firearms.  *See* GX 407-T at 3–7.  Defendants' evidence included confidential source agreements for a testifying cooperating witness, transcripts of that cooperating witness's prison calls, a photograph of what appears to be Gilson playing paintball on a Venezuelan national team, *see* DX 326, and photographs of hyper-realistic airsoft guns, *see* DX 334–339.

trial so meager that no reasonable jury could have found Defendants agreed on the essential terms of the conspiracy.

### 2. Specific Intent

Defendants assert that even if a criminal agreement existed, there was still insufficient evidence of their knowledge or intent that the destination of the cocaine would be the United States. *See United States v. Londono-Villa*, 930 F.2d 994, 999 (2d Cir. 1991); *United States v. Romero-Padilla*, 583 F.3d 126, 129 (2d Cir. 2009). They argue that "there is no evidence that the Defendants even heard, much less understood or agreed to, the informants' supposed decision to target the United States." Mot. at 27. The Court disagrees.

First, the government introduced evidence through the expert testimony of Drug Enforcement Administration ("DEA") Special Agent Daniel Mahoney that approximately 80 percent of the cocaine sent from Venezuela along the Central American corridor (*i.e.*, "traveling through Central America and along its shores up into Mexico into the United States") is destined for the United States. *See* Tr. 544, 562. And cocaine that travels along the Central American route bound for Canada also goes over land through the United States. *See* Tr. 584. Further, Special Agent Mahoney offered his expert opinion that drug traffickers as well as "a fair amount of the population" in South America have knowledge of these drug routes. *See* Tr. 578–79.

Second, the two CSes discussed importing drugs to the United States at least 13 times in recorded conversations with Defendants. While Defendants are correct that they never explicitly manifested their agreement to target the United States in those recordings, an explicit manifestation is not required. Both Defendants conceded in their confessions that CS-1 had told them that the drugs were bound for the United States. *See* Tr. 152–53, 161.

In light of Special Agent Mahoney's testimony, the CSes' repeated statements about the United States, and Defendants' own confessions, Defendants have failed to show that there was insufficient evidence at trial to support the verdict on this basis.

### 3. Manufactured Jurisdiction

Defendants next argue that jurisdiction was manufactured because the "references to the United States were unilaterally supplied by persons working on behalf of the Government, *not* the Defendants." *See* Mot. at 28. They contend that "[i]n the absence of evidence of a 'voluntary action' on the part of the Defendants implicating the United States nexus . . . there has been a failure of proof as to an essential element of the offense, and a judgment of acquittal should be entered." *See id.* at 29 (citation omitted).

"The unproved-element theory of manufactured jurisdiction is that if the government unilaterally supplies an essential element of a crime, the government has in effect failed to prove that element as to the defendant." *United States v. Al Kassar*, 660 F.3d 108, 120 (2d Cir. 2011). However, "jurisdiction is not manufactured if the defendant then takes voluntary actions that implicate the government-initiated element." *Id.* (internal quotation marks and alteration omitted).

Even if the government unilaterally introduced the concept of targeting the United States, the unproved-element theory still would not apply here because Defendants subsequently took a number of voluntary actions in furtherance of the conspiracy. Those actions include: (1) continuing to meet and discuss the arrangement, and even bringing what the evidence indicates was a brick of cocaine to one of the meetings; (2) attempting to send pilots to Honduras to continue discussions about logistics; (3) traveling on November 6, 2015 to Honduras for further discussions about the logistics of unloading the 800 kilograms of cocaine; and (4) flying to Haiti on November 10, 2015 to pick up money for the deal and to finalize details.

5

### 4. CS-1's Testimony

Defendants contend that CS-1's trial testimony should be "wholly disregarded for purposes of the sufficiency analysis" because it is unreliable as a matter of law. *See* Mot. at 29. "Rule 29 does not provide the trial court with an opportunity to substitute its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Truman*, 688 F.3d 129, 139 (2d Cir. 2012) (internal quotation marks and alteration omitted). The Court called the jury's attention to the fact that CS-1 had lied and instructed them that they were "quite free to reject all or any part of his testimony." Tr. 1481–82. Thus, "[a]ssessing his credibility was the province of [the] jury," and the Court declines Defendants' invitation to usurp the jury's function. *See Truman*, 688 F.3d at 140.

## B. Entrapment

"Entrapment is an affirmative defense that requires a defendant to prove by a preponderance of the evidence the government's inducement to commit the crime." *United States v. Taylor*, 475 F.3d 65, 69 (2d Cir. 2007) (alteration omitted). If a defendant satisfies this burden, the government "must show predisposition beyond a reasonable doubt." *United States v. Bala*, 236 F.3d 87, 94 (2d Cir. 2000).

### 1. Inducement

Defendants argue that they were induced to commit the charged crime. Viewing the evidence in the light most favorable to the government, however, the Court cannot agree.

In their confessions, both Defendants admitted that they were introduced to an individual called Negrito or El Flaco (a/k/a Cesar Orlando Daza ("Daza")), by a Venezuelan contact called Hamudi. *See* Tr. 149–50, 162–63, 180. The evidence shows that Daza, in turn, introduced Defendants to Carlos Amilcar Leva Cabrera (a/k/a Sentado), *see id.*, and Sentado, who was cooperating with the government, contacted the DEA about Defendants, *see* Tr. 167, 169, 172.

Notwithstanding this chain of introductions, Defendants take the position that Sentado instigated and orchestrated the entire sting operation, all the way down to selecting Defendants as targets. *See* Reply at 35. Since there is no evidence that Sentado contacted Defendants, Defendants rely on a theory of derivative entrapment to argue that Sentado used his "henchmen" to "lure" Defendants into the conspiracy. *See id.* at 34.

"A defendant is entitled to a derivative entrapment defense . . . when the government's inducement was directly communicated to the [defendant] by an unwitting middleman." *United States v. Pilarinos*, 864 F.2d 253, 256 (2d Cir. 1988) (internal quotation marks omitted). There is simply no evidence here, however, that Sentado—either acting alone or through his "henchmen"—initiated the crime or set Defendants' participation in the conspiracy in motion. *See United States v. Brand*, 467 F.3d 179, 190 (2d Cir. 2006).

The government, however, points to evidence that Defendants sought to coordinate a similar drug trafficking arrangement with an individual identified as Pepe. That arrangement was apparently slow in coming together, and on September 29, 2015—four days before Defendants met with Sentado—Flores de Freitas explained to Pepe, "[i]f we don't have anything by tomorrow efra [*i.e.*, Campo Flores] is already looking to figure something out elsewhere." GX 515-T at 19. Then on October 4, 2015—the day after meeting with Sentado—Pepe wrote to Flores de Freitas that "[w]e will meet tomorrow morning to finalize things," to which Flores de Freitas responded, "we already did it somewhere else." *Id.* at 26. This undercuts Defendants' contention that they were induced, and instead provides context for the reasonable conclusion that Defendants themselves actively sought out the charged conspiracy.

The evidence (or the lack of it) that Defendants rely on to show inducement is (1) Sentado's failure to record his October 3, 2015 meeting with Defendants; and (2) the DEA's

purported mismanagement of Sentado, including its failure to obtain all evidence from Sentado relating to that meeting. The inference Defendants seek to draw from this is that Sentado intentionally withheld (or failed to create) evidence because he wanted to curry favor with the government and knew that his meeting with Defendants would show that there was no case against them. *See* Mot. at 36. After weighing the government's evidence against this inference, however, the Court concludes that a reasonable jury could have found that Defendants failed to sustain their burden of proving, by a preponderance of the evidence, that they were induced.

### 2. Predisposition

Even if Defendants were induced, they cannot sustain their burden of showing that the government's predisposition evidence was insufficient. The government may prove predisposition "by demonstrating: (1) an existing course of criminal conduct similar to the crime for which the defendant is charged, (2) an already formed design on the part of the accused to commit the crime for which he is charged, or (3) a willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement." *United States v. Al-Moayad*, 545 F.3d 139, 154 (2d Cir. 2008) (internal quotation marks and alteration omitted).

Defendants focus again on the lack of evidence from the October 3, 2015 meeting with Sentado in Honduras. They argue that "the recording would have demonstrated how naïve and unsophisticated the Defendants were" and also would have undermined the government's argument that Defendants readily responded to any inducement. *See* Reply at 39. Any lack of sophistication or experience in the drug trade, however, is not hardly dispositive. There is a beginning for everything, and nothing excuses a crime, even if it is the first time. More importantly, the suggestion that the October 3, 2015 meeting would have shown that Defendants did not readily respond to any inducement is seriously undercut by the evidence introduced at trial.

8

There was significant evidence of Defendants' ready response to any inducement, and thus of Defendants' willingness to commit the charged crime. Immediately after their October 3, 2015 meeting with Sentado in Honduras, Defendants were eager to proceed full steam ahead with the scheme:

- As discussed above, on October 4, 2015, Flores de Freitas told Pepe that Defendants "already did it elsewhere." GX 515-T at 26.

- On October 4, 2015, Defendants discussed "security logistics" and purchasing several new BlackBerrys. GX 402-T at 2–3; GX 510-T at 16.

- On October 5, 2015, Flores de Freitas reached out to one of Sentado's associates, Rayo, to complain that "[t]he man has not given the name of the contact to primo." *See* GX 504-T at 2.

- On October 5, 2015, Campo Flores explained to Sentado that "[w]hat I want is to start work because the electoral campaign is almost here and I always contribute . . . [w]ith money if you know what I mean that is why I want to start work." GX 3508-38-T; Tr. 475.

- On October 12, 2015, Flores de Freitas asked Rayo "[w]hat happened to the man he hasn't been in touch with *el primo* for a while and we're ready;" then subsequently explained that "[e]verything is good brother just waiting to receive your visit over here." GX 504-T at 3.

The evidence also shows that once Defendants concluded that the scheme with Sentado was not progressing fast enough for them, they called it off. On October 16, 2015, Rayo and Flores de Freitas had the following text exchange:

| | |
|---|---|
| Rayo: | The man says for you to contact him |
| Flores de Freitas: | Brother we called that off because we have a huge issue with communication |
| Flores de Freitas: | There's no communication and we can't do it that way brother the man always has a lot of things to do |
| Flores de Freitas: | When he has the time required for this we will always be here |
| Flores de Freitas: | But he has not written to *primo* |
| Flores de Freitas: | He says he's been waiting several days for your answer |

9

GX 504-T at 5. Once things started to move more rapidly, however, the evidence is that Defendants re-engaged with the scheme.

They met with CS-1 and his son, Jose Santos-Hernandez ("CS-2"), in Caracas on October 23, 2015, at which time Campo Flores explained that because no one had visited, he "started to look around elsewhere" and even "met up separately" with someone else. *See* GX 203-T at 10–11. Then, between October 23, 2015 and November 10, 2015 (the day of Defendants' arrests), Defendants met with CS-1 and CS-2 in a Caracas office building on two additional occasions, including the October 27, 2015 meeting to which Campo Flores brought a brick of cocaine; Flores de Freitas traveled to Honduras to iron out delivery and logistics; and Defendants traveled to Haiti to finalize details of the cocaine shipment and pick up payment.

In light of this sequence of events, the Court concludes that there was sufficient evidence for a reasonable jury to find that Defendants were predisposed.

### 3. Interests of Justice

Citing no authority, Defendants argue that even if there were sufficient evidence disproving entrapment, the jury's verdict should still be set aside in the interests of justice because of (1) "the overall unreliability of the Government's case;" and (2) "a glut of evidence that the Government pursued the Defendants for reasons wholly unrelated to the charges in this case." Mot. at 42–43. At bottom, this is yet another invitation for the Court to usurp the role of the jury. Once again, the Court must decline. The Court is not in any better a position than the jury was to find the facts of this case, nor do the interests of justice require that the verdict be set aside.

## II. Motion for a New Trial

Pursuant to Fed. R. Crim. P. 33(a), "the court may vacate any judgment and grant a new trial if the interest of justice so requires." The Court has "broad discretion to set aside a jury

verdict," but "[t]he ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *United States v. Ferguson*, 246 F.3d 129, 133–34 (2d Cir. 2001) (alteration omitted).  The Court "must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances." *Id.* at 134 (internal quotation marks omitted).

### A. Perjury

"A conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Cromitie*, 727 F.3d 194, 221 (2d Cir. 2013) (alteration omitted).  "In order to be granted a new trial on the ground that a witness committed perjury, the defendant must show that (i) the witness actually committed perjury; (ii) the alleged perjury was material; (iii) the government knew or should have known of the perjury at the time of trial; and (iv) the perjured testimony remained undisclosed during trial." *Id.* (alteration omitted).

At trial, CS-1 testified that in his lay opinion a brick of a white powdery substance that Campo Flores brought to an October 27, 2016 meeting in Caracas, Venezuela was good quality cocaine. *See* Tr. 693.  CS-1 testified, "I took a little bit with my hands.  I smelled it to see if it smelled of cocaine.  I looked at the color to see what kind of color it had.  I rubbed it a little on my hand so that it would release the oils on my hand and see how much oil it would release." Tr. 692.  Defendants attempt to show through the declaration of Dr. Andrea Holmes that CS-1 committed perjury in describing his purported test.

Dr. Holmes is an Associate Professor of Chemistry at Doane University, located in Crete, Nebraska.  Declaration of Dr. Andrea Holmes ("Holmes Decl."), Dkt. 159, ¶ 1.  She challenges CS-1's ability to identify the white powdery substance as cocaine because CS-1 could not, with heat generated from his hands alone, "turn powder cocaine into an 'oil.'" *See id.* ¶ 5.  Dr.

11

Holmes states that "the process [CS-1] [described] is the phase transition of a solid substance, here a white powder, to a liquid, here supposedly an 'oil.'" *Id.* Interesting; but that was not CS-1's trial testimony. CS-1 did not testify that he altered the physical state of the white powdery substance; rather, he testified that when he rubbed the substance, it released oils on his hand, and that the oil was "buttery" and "greasy." *See* Tr. 692–93, 922–23. Dr. Holmes' declaration is silent as to whether cocaine, in its solid state, can be oily, buttery, or greasy when rubbed.

Dr. Holmes also explains that color is not a reliable method for identifying cocaine as "there are numerous similar looking types of white powders or crystalline substances, such as caffeine, sugar, baking soda, corn starch, talcum powder." Holmes Decl. ¶ 4. And she thinks it is implausible that CS-1 would have been able to identify cocaine based on smell "unless his olfactory system [was] somehow well developed like one of a sniffing dog."[2] *Id.* ¶ 6. But Dr. Holmes takes these sensory examinations in isolation. CS-1 did not testify that sight, touch, or smell—standing alone—would have been sufficient to determine that the substance was cocaine. This is an important distinction. While an individual might not be able to distinguish, for example, between powdered sugar and talcum powder based on sight alone, with the benefit of smell and touch, it seems highly likely that that individual would be able to do so. Taking the three sensory tests holistically, the Court cannot conclude that CS-1 perjured himself when he provided his lay opinion that the substance was good quality cocaine.[3]

---

[2] Dr. Holmes also asserts that CS-1 could not have determined that the substance was cocaine with a purity of 95 to 97 percent using his test. *See* Holmes Decl. ¶¶ 7–8. But CS-1 did not testify at trial that the purity of the cocaine was between 95 and 97 percent. *See* Tr. 693. Instead, CS-1's statement about the purity percentage range of the substance was made during his recorded conversation with the two Defendants in Caracas, at the meeting where Campo Flores produced the sample. *See id.* His testimony at trial was only that the cocaine was good quality. *See id.*

[3] The Court also notes that even if CS-1 committed perjury in describing his test for identifying the substance, as described in greater detail above, the Government offered sufficient evidence to support the verdict. The Court is therefore not "left with a firm belief that but for the perjured testimony, the defendant[s] would most likely not have been convicted." *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991) (alteration omitted).

To be sure, there is no doubt that CS-1 testified falsely at trial. The clearest instance of perjury was CS-1's testimony that he did not communicate with his son, CS-2, while they were in jail. *See, e.g.*, Tr. 929. Defendants effectively put the lie to CS-1's testimony when they played recorded prison calls plainly showing that CS-1 and CS-2 communicated in jail. *See, e.g.*, Tr. 955–57. There is substantial reason to believe that, in light of CS-1's continuous pattern of lying, the government should have known about the contents of CS-1's prison calls. Nonetheless, the Court cannot conclude that the false testimony is so related to Defendants' offense conduct such that there was a "reasonable likelihood that these lies could have affected the judgment of the jury." *See Cromitie*, 727 F.3d at 223 (internal quotation marks omitted). This is especially true because Defendants exposed CS-1's false testimony on cross-examination, *see, e.g.*, Tr. 955–57, the government responded by functionally ripping up CS-1's 5K1 letter in front of the jury, Tr. 984–85, and the Court instructed the jury that the government told CS-1 "that he would not receive a 5K1 letter because he had lied," Tr. 1481–82.

### B. Conscious Avoidance Instruction

Defendants contend that they never agreed to import or distribute cocaine in the United States. "A conscious avoidance instruction may only be given if (1) the defendant asserts the lack of some specific aspect of knowledge required for conviction, and (2) the appropriate factual predicate for the charge exists . . . ." *United States v. Svoboda*, 347 F.3d 471, 480 (2d Cir. 2003) (internal quotation marks and alteration omitted). The second prong of the test "has two components—there must be evidence that the defendant (1) was aware of a high probability of the disputed fact and (2) deliberately avoided confirming that fact." *Id.* "A factual predicate may be established where a defendant's involvement in the criminal offense may have been so overwhelmingly suspicious that the defendant's failure to question the suspicious circumstances

establishes the defendant's purposeful contrivance to avoid guilty knowledge." *United States v. Lange*, 834 F.3d 58, 78 (2d Cir. 2016) (internal quotation marks and alteration omitted).

Defendants contend that the Court erred in giving a conscious avoidance instruction because there was no evidence that Defendants deliberately avoided confirming that the conspiracy targeted the United States. The Court disagrees. A conscious avoidance instruction was appropriate because the evidence that the government introduced at trial supported inferences both that Defendants had actual knowledge, and had consciously avoided confirming, that the conspiracy targeted the United States.

The government presented evidence that Defendants made a tactical decision not to confirm that the cocaine was bound for the United States. There are at least 13 recorded instances where the CSes made statements about taking drugs to the United States. Yet in all of those instances, Defendants never really respond to the CSes' statements. Campo Flores appears to have provided the explanation for why. In his confession, Campo Flores initially took the position "that he did not know the drugs were going to the United States and that those words never came out of his mouth." Tr. 152. However, after DEA Special Agent Sandalio Gonzalez explained to Campo Flores that "there are recordings of his meetings and that [Campo Flores] didn't necessarily have to say it himself but he knew that the Mexican individual had said that," Campo Flores responded "yes, but I didn't emphasize it." Tr. 153. This is strong evidence that, in order to maintain deniability, Defendants made a conscious attempt to avoid confirming that the target of the conspiracy was the United States. And in fact, because Defendants did not respond to the CSes' repeated references to the United States, the defense was able to use as a theme throughout the trial that Defendants did not know the target of the conspiracy was the United States.

The structure of Defendants' plan also supports the conclusion that they intentionally avoided confirming that the target of the conspiracy was the United States. As Special Agent Mahoney testified, drug traffickers send drugs up through the Central American corridor in order "to recede from their role in getting the cocaine to the United States." *See* Tr. 544. Thus, approximately 80 percent of the cocaine sent from Venezuela along the Central American corridor is bound for the United States. *See* Tr. 562. And in Special Agent Mahoney's expert opinion, drug traffickers and "a fair amount of the population" in South America have knowledge of drug routes. *See* Tr. 578–79. Here, Defendants agreed to help move 800 kilograms of cocaine up the Central American corridor, from Venezuela to Honduras, and Special Agent Mahoney's testimony shows that Defendants likely knew that there was a high probability the cocaine would go to the United States. The fact that Defendants did not explicitly confirm that the cocaine would be destined for the United States (especially after the CSes' myriad references to taking drugs to the United States) establishes their "purposeful contrivance to avoid guilty knowledge." *See Lange*, 834 F.3d at 78.

## CONCLUSION

Accordingly, the Court DENIES Defendants' Rule 29 and Rule 33 motion. The government must promptly produce any *Brady* and *Giglio* materials responsive to Defendants' November 14, 2016 letter request. *See* Dkt. 166-1. Sentencing is scheduled for June 26, 2017 at 11:30 a.m. The Clerk of Court is directed to close the motion at docket number 158.

Dated: March 24, 2017  
      New York, New York

SO ORDERED

_____  
PAUL A. CROTTY  
United States District Judge