UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-                                                      S5 15 Cr. 765 (PAC)

EFRAIN ANTONIO CAMPO FLORES and
FRANQUI FRANCISCO FLORES DE FREITAS,

                                Defendants.

**THE GOVERNMENT'S SENTENCING MEMORANDUM AS TO DEFENDANTS
EFRAIN ANTONIO CAMPO FLORES AND
FRANQUI FRANCISCO FLORES DE FREITAS**

JOON H. KIM
Acting United States Attorney for the
Southern District of New York
*Attorney for the United States
        of America*

Emil J. Bove III
Brendan F. Quigley
    Assistant United States Attorneys
    *Of Counsel*

## TABLE OF CONTENTS

FACTUAL RECORD .................................................................................................... 6

   I. The Trial Evidence ............................................................................................... 6

   II. Additional Conduct Relevant to Sentencing ...................................................... 8

      A. Campo's Solicitation of a $1.5 Million Bribe to Recover a
      Seized Drug-Laden Aircraft .............................................................................. 9

      B. The Defendants' Solicitation of Bribes from PDVSA Debtors ...................... 10

      C. The Defendants' Involvement in Violent Debt-Collection Efforts
      Related to a Prior Failed Drug Deal ................................................................ 11

THE SENTENCING GUIDELINES ........................................................................... 15

   I. Legal Standards at Sentencing ......................................................................... 17

      A. Post-Trial Fact Finding .................................................................................. 17

      B. Evaluation of Relevant Conduct Under Section 1B1.3 of the Guidelines ...... 17

   II. The Scope of the Defendants' Relevant Conduct ............................................. 19

   III. The Offense Involved More than 450 Kilograms of Cocaine .......................... 21

   IV. U.S.S.G. § 2D1.1(b)(1): A Dangerous Weapon Was Possessed During the Offense ........ 23

   V. U.S.S.G. § 2D1.1(b)(2): The Defendants Made Credible Threats to Use Violence ........... 26

   VI. U.S.S.G. § 2D1.1(b)(3)(A): The Defendants Planned to Use Private Aircraft ................. 27

   VII. U.S.S.G. § 2D1.1(b)(11): The Defendants Attempted to Bribe
   Law Enforcement Officials .................................................................................. 29

      A. Section 2D1.1(b)(11) Applies to Bribes to Foreign Law Enforcement Personnel .......... 29

         1. Applicable Law ....................................................................................... 29

            a. Interpreting Sentencing Guidelines................................................... 29

            b. Section 2D1.1(b)(11) and the Fair Sentencing Act............................. 31

         2. Discussion ............................................................................................. 31

      B. The Defendants Attempted to Bribe Law Enforcement Officials.................... 33

   VIII. U.S.S.G. 3B1.1(a):  The Defendants Were Leaders and Organizers ................. 35

      A. Applicable Law .............................................................................................. 35

      B. Discussion ...................................................................................................... 36

         1. Flores Was a Leader and Organizer....................................................... 36

         2. Campo Was a Leader and Organizer ..................................................... 39

         3. The Defendants' Criminal Activity Involved More Than Five Participants and
         Was Otherwise Extensive ..................................................................... 42

   IX. U.S.S.G. § 2D1.1(b)(15)(C):  The Defendants Were Directly Involved in the
   Importation of Cocaine ........................................................................................ 46

X. U.S.S.G. § 3C1.1: The Defendants Attempted to Obstruct Justice In Connection With Their Pretrial Motions ........................................................................................... 47

    A. Relevant Facts ....................................................................................................... 47

        1. Lies Regarding the Defendants' Arrests in Haiti ............................................ 47

        2. Lies Regarding the DEA's Clothing ............................................................... 48

        3. Lies Regarding Threats by the DEA ................................................................ 49

        4. Lies Regarding Alleged Two-Step Interrogation by the DEA ......................... 50

    B. Applicable Law ...................................................................................................... 51

    C. Discussion .............................................................................................................. 52

        1. Flores Attempted to Obstruct Justice Through His Declaration ...................... 52

        2. Campo Attempted to Obstruct Justice Through His Declaration ...................... 53

        3. The Defendants Acted with the Requisite Intent to Obstruct Justice ............... 54

XI. The Defendants' Eleventh-Hour Request for a Hearing Should Be Denied ................ 55

    A. Relevant Facts ....................................................................................................... 55

    B. Discussion .............................................................................................................. 56

THE DEFENDANTS ARE NOT ELIGIBLE FOR SAFETY-VALVE RELIEF ....................... 57

    I. Applicable Law ......................................................................................................... 58

    II. Discussion ............................................................................................................... 59

THE SECTION 3553(a) FACTORS SUPPORT SUBSTANTIAL SENTENCES FOR BOTH DEFENDANTS ................................................................................................. 62

THE COURT SHOULD IMPOSE FINES .............................................................................. 73

CONCLUSION ...................................................................................................................... 77

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| -v.- | S5 15 Cr. 765 (PAC) |
| EFRAIN ANTONIO CAMPO FLORES and FRANQUI FRANCISCO FLORES DE FREITAS, | |
| Defendants. | |

   The Government respectfully submits this memorandum relating to the sentencings of defendants Efrain Antonio Campo Flores ("Campo") and Franqui Francisco Flores de Freitas ("Flores").

   The defendants are convicted drug traffickers. The Probation Office has correctly calculated an applicable Guidelines range of life imprisonment, and recommended sentences of life imprisonment based on aggravating considerations relating to their conduct. Those considerations are myriad. The defendants were presented with more opportunities than most, particularly in Venezuela, to live law-abiding, productive lives. Instead, relying on impunity they long enjoyed, the defendants turned to drug trafficking—months, at least, before the DEA began to target them—in an effort to make $20 million. The defendants embarked on this path for the stated purpose of helping their family maintain political control in Venezuela, through a regime controlled by relatives currently engaged in "a fundamental assault on the freedoms of the Venezuelan people," and to enrich themselves while their countrymen starved in the streets.[1]

---

[1] OFAC, *Treasury Sanctions the President of Venezuela*, July 31, 2017, https://www.treasury.gov/press-center/press-releases/Pages/sm0137.aspx (last accessed September 10, 2017) ("Under Maduro, the Venezuelan government has deliberately and repeatedly

To achieve this goal, the defendants sought to import massive amounts of cocaine into the United States based on a plan that would have created enormously dangerous situations at international airports without regard to people transiting those facilities. The defendants pursued the plan doggedly. They flew around Central America and the Caribbean in private jets, enlisted their bodyguards for assistance, relied on corrupt connections to law enforcement and attempted to bribe these individuals, sought to free incarcerated drug traffickers, and cultivated at least one connection to a designated foreign terrorist organization, the *Fuerzas Armadas Revolucionarias de Colombia* ("FARC"). Recordings captured the defendants declaring that they were at war with the United States, expressing the view that the DEA could not touch them in Venezuela, and joking about their relatives' human rights abuses, such as imprisoning those in Venezuela who dared to oppose their family's authority. The defendants' text messages and Campo's confession demonstrate that they established access to 800 kilograms of cocaine for the first shipment to be dispatched on November 15, 2015. The evidence also shows that the 800-kilogram shipment was to be the first of several until they reached their $20-million goal. Had the defendants been successful with even the initial shipment, they would have sent at least approximately 800,000 one-gram personal-use quantities of cocaine to the United States.

These facts make clear that the defendants were entirely appropriate, wholly predisposed, targets for the DEA sting operation that ultimately led to their arrests. In fact, the

---

abused the rights of citizens through the use of violence, repression, and criminalization of demonstrations. . . . In addition to committing widespread human rights abuses, Maduro's regime has mismanaged the economy and engaged in systemic corruption. Despite having among the world's largest oil reserves, tens of millions of Venezuelans are going hungry . . . .").

defendants were engaged in ongoing drug-trafficking activities before the investigation began. Subsequent efforts by the DEA yielded numerous recordings of the defendants committing the crime, in places such as Caracas that they apparently believed were impenetrable by law enforcement. Finally, persisting in the belief that they were above the law, in connection with the same pretrial motions in which the defendants pressed the specious claim that their kilogram sample contained something other than cocaine, each defendant attempted to obstruct justice by submitting a declaration containing numerous material falsehoods that could only have been designed to result in the unwarranted suppression of their confessions.

The Court saw those declarations for what they were: transparent attempts by the defendants to avoid accountability for their actions. Despite the jury's verdict, nothing from the defendants has changed since they lied in their declarations. They have made no effort to accept responsibility or express remorse. Because of the egregious and inexcusable nature of their offense conduct, a substantial sentence of not less than 30 years is warranted for each man.

Faced with this record, the defendants rehash well-worn and meritless arguments challenging the investigation, seeking leniency based on the acknowledged misdeeds of now-convicted informants. Those men will be sentenced at a later date, and their crimes do not in any way mitigate the defendants' actions. Counsel's continued questioning of the integrity and professionalism of the Government by parroting false claims of Venezuelan officials also remains wholly unavailing.[2] The defendants were politically motivated, not the U.S. Government, and a

---

[2] *See* BBC News, *Venezuela: Maduro says US fabricated drugs case against nephews*, Nov. 25, 2016, http://www.bbc.com/news/world-latin-america-38112948 (last accessed September 10, 2017) ("Mr. Maduro said the case was an 'imperialist attack' against Ms [Cilia] Flores."); Jose de

3

prosecution does not become politically motivated when prosecutors describe statements of defendants based on recordings and text messages whose authenticity is not subject to doubt. (*E.g.*, Dkt. No. 49 at 1). The accurate description of proof adduced at trial, and advocacy for a sentence commensurate with that proof, cannot reasonably be described as "over-reach." (Def. Mem. at 1). And to the extent this case has any "sensationalistic" features (Def. Mem. at 2), they derive from the scope of the criminality and corruption displayed by these two scions of the First Lady of Venezuela, captured in many respects on video.

Counsel's continued attacks on the prosecution are hardly surprising in light of their consistency throughout the case. But their challenge to the integrity of the Probation Office, based on the assertion that the Presentence Investigation Reports ("PSRs") are entitled to "little weight" because Probation failed to act as an independent arm of the Court, breaks new and troubling ground. (Def. Mem. at 1). The Probation Office can hardly be faulted for issuing two PSRs with "nearly identical" descriptions of offense conduct relating to the same conspiracy and two co-defendants convicted at the same trial, particularly where current counsel has submitted nearly every filing in the case—including their "Joint Initial Sentencing Submission"—on a joint basis.

---

Cordoba and Nicole Hong, *Tycoon Funds Maduro Nephews' Drug Defense*, The Wall Street Journal, Sept. 30, 2016, at A9 (statement of defendants' financial benefactor that this prosecution "perturbs the tranquility of the presidential family. You need the president to be calm . . . . I am helping to preserve the constitutional government"), *available at* https://www.wsj.com/articles/venezuelan-tycoon-funds-presidents-nephews-drug-defense-1475192218 (last accessed September 10, 2017); Reuters, *Venezuela PDVSA awards $138 million contract to tackle petcoke problem*, Sept. 23, 2016, *available at* http://www.reuters.com/article/us-venezuela-pdvsa-petcoke/venezuela-pdvsa-awards-138-million-contract-to-tackle-petcoke-problem-idUSKCN11T21U (last accessed September 10, 2017) ($138 million contract awarded to defendants' benefactor less than two months prior to trial).

(Def. Mem. at 1). The defendants were free during the presentence investigation process to identify other evidence supporting their positions and factual objections, but they declined to do so. Finally, there is nothing unreasonable about the Probation Office relying in part on the Government's publicly filed summary of the trial record, which the Court has already found "thoroughly details the evidence offered at trial of Defendants' participation in the charged conspiracy." *United States* v. *Campo Flores*, No. 15 Cr. 765 (PAC), 2017 WL 1133430, at *1 (S.D.N.Y. Mar. 24, 2017). Thus, the Court should reject the defendants' challenges to the factual recitation and Guidelines analysis in the PSRs on the basis of the record developed at the September 2016 suppression hearing and the November 2016 trial as well as the exhibits attached hereto, and deny the defendants' eleventh-hour request for a "hearing" made just one week prior to September 2017 sentencings that have been scheduled since June 20, 2017. (Dkt. No. 179).

The record establishes that the defendants' conduct was brazen and extremely serious, and they have not yet identified any mitigating features of the case or redeeming personal characteristics. The remainder of this submission is organized in the following Sections:

1. The Factual Record: A summary of the trial record and additional evidence relating to the defendants' involvement in drug trafficking, corruption, and violence that is relevant to, *inter alia*, the application of the statutory sentencing factors set forth at Title 18, United States Code, Section 3553(a);

2. The Sentencing Guidelines Recommend Life Imprisonment: A discussion of the application of the Guidelines, which the Probation Office correctly determined results in a capped offense level of 43 and a Guidelines range of life imprisonment;

3. Inapplicability of the Safety Valve. A discussion of the defendants' failure to carry their burden of establishing eligibility for safety-valve relief, in light of their possession of weapons and threats of violence, leadership roles, and failure to disclose to the Government and the Court all information and evidence concerning the offenses that were part of the same course of conduct;

4.  <u>The Statutory Sentencing Factors Warrant Substantial Sentences</u>:  An analysis of the Section 3553(a) factors, which demonstrates that substantial sentences are warranted in light of the nature and circumstances of the defendants and their offense, and the need to achieve specific deterrence of the defendants, to achieve general deterrence of political elites such as the defendants who seek to use their access and power to support large-scale drug trafficking, to impose just punishment, and to promote respect for the law; and

5.  <u>Fines Are Appropriate</u>:  A summary of the defendants' failure to establish their inability to pay a fine in light of the evidence of their extensive wealth, which warrants the imposition of fines within the applicable range of $50,000 to $10 million.

**FACTUAL RECORD**[3]

Set forth below is a summary of the trial record, which is relevant to the application of the Guidelines and the Section 3553(a) factors, and additional evidence relating to the defendants, which is relevant to the application of Section 3553(a) factors.  *See* 18 U.S.C. § 3661 ("*No limitation* shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  (emphasis added)).

## I.  The Trial Evidence

Beginning in at least August 2015, the defendants worked with a core group of co-conspirators, including a man referred to at various times as "Pepero," "Ppr," and "Pepe" ("Pepe"), to capitalize on their political power in Venezuela by sending large loads of cocaine from Simón Bolívar International Airport in Maiquetía (the "Maiquetía Airport").  The defendants and Pepe

---

[3] The evidence at trial is discussed in more detail in the August 15, 2017 Presentence Investigation Report relating to Flores (the "Flores PSR"), the August 15, 2017 Presentence Investigation Report relating to Campo (the "Campo PSR"), and the Government's February 13, 2017 Opposition to the Defendants' Post-Trial Motions (Dkt. No. 162).

first worked with individuals referred to as "Mayweather Jr.," "Elio," and "El Samurai" to free an incarcerated drug trafficker named Hermagoras Gonzalez Polanco ("Polanco"), in exchange for a payment to the defendants of between approximately $1 and $2 million, and to send cocaine-laden aircraft from Venezuela to Mexican drug traffickers referred to as the "taco people" based in "*el sombrero*" (the "Sombrero Organization"). Continuing until at least October 2015, the defendants, Pepe, and members of the Sombrero Organization attempted, but apparently failed, to use Cessna propeller-based aircraft and later a Gulfstream jet to dispatch up to three tons of cocaine from the Maiquetía Airport. This was not a sting, and DEA confidential sources played no role in these activities.

By approximately late-September 2015, a Venezuelan known as "Hamudi" introduced the defendants to a Honduras-based drug trafficker named Cesar Orlando Daza Cardona, a/k/a "Flaco," a/k/a "Negrito," a/k/a "Negrito Nico" ("Daza"). Daza, who was not acting at the direction of the DEA, introduced the defendants to a drug trafficker and associate, Carlos Amilcar Leva Cabrera, a/k/a "Sentado" ("Sentado"), who unbeknownst to the defendants and Daza was attempting to cooperate with the Government at the time. *See United States* v. *Campo Flores*, 2017 WL 1133430, at *3 ("There is simply no evidence . . . that Sentado—either acting alone or through his 'henchmen'—initiated the crime or set Defendants' participation in the conspiracy in motion."). Daza and Sentado met with the defendants in Honduras on October 3, 2015, and they discussed sending hundreds of kilograms of cocaine from the Maiquetía Airport to Juan Manuel Gálvez International Airport in Roatán, Honduras (the "Roatán Airport"). Following the meeting, the defendants and Pepe shifted the focus of their drug-trafficking conspiracy to sending huge amounts of cocaine to the Roatán Airport—which was controlled by, among others, co-defendants

Roberto de Jesus Soto Garcia ("Soto") and Carlos Gonzalez, who later became a cooperating witness—so that CS-1 and his son ("CS-2") could import the drugs into the United States.  The defendants negotiated the deal and provided a cocaine sample to CS-1 and CS-2 during meetings in Caracas on October 23, 26, and 27, 2015.  Flores traveled to Honduras on November 6, 2015 to negotiate final details for the defendants' first 800-kilogram drug shipment involving CS-1 and CS-2, which Flores agreed on behalf of the defendants to dispatch from Venezuela on November 15, 2015.

The evidence showed, however, that the defendants planned to send *multiple* multi-hundred-kilogram cocaine loads from Maiquetía Airport so that the drugs could be imported into the United States.  Campo stated explicitly, on recordings and in electronic communications, that the defendants were motivated not only by personal greed but also by their desire to use drug money to help fund a campaign by Venezuelan First Lady Cilia Flores for a position in the Venezuelan National Assembly.  The defendants traveled to Haiti on November 10, 2015, expecting to pick up millions of dollars to be used in connection with the November 15 shipment. They were instead arrested and expelled from Haiti, and they confessed to their crime while being transported to the United States.

## II.  Additional Conduct Relevant to Sentencing

Phones possessed by the defendants at the time of their arrests in Haiti contained evidence of additional criminal conduct and corruption, some of which is described below.  The Government notified the defense of this evidence during discovery and pursuant to Rule 404(b) by letter dated October 12, 2016.  (*See* Def. Mem. at 34 n.5).

### A. Campo's Solicitation of a $1.5 Million Bribe to Recover a Seized Drug-Laden Aircraft

On or about April 6, 2015, an individual using a WhatsApp Messenger account with the screen name "Jonathan Query" ("Jonathan") wrote to Campo about an opportunity to make some money in connection with recovering an aircraft that had been seized by law enforcement. (*See* Ex. A). After Campo responded "[t]alk to me," Jonathan sent a link to an online news article relating to the March 30, 2015 arrest and detention of Juan Carlos Araujo Duran ("Araujo Duran"). (*See id.* at 2). The article indicated that Araujo Duran, a sergeant from the *Guardia Nacional Bolivariana*,[4] and others, had been arrested in connection with an ongoing investigation relating to the seizure of approximately 450 kilograms of cocaine in the Dominican Republic, on or about March 17, 2015, from a private jet that was dispatched from Venezuela. Several hours after Jonathan sent the article, Campo wrote that he could "set it up but only if I talk to the people directly," and directed Jonathan to "talk to them straight right away that a large amount of money needs to be paid for that . . . . [a]nd it has to be pre-paid ahead of time[.]" (*Id.* at 4). Campo also instructed Jonathan to "be clear when you talk to them that they are doing business with a nephew of someone . . . ." (*Id.*).

On or about April 7, 2015, Campo wrote to Jonathan: "[T]hey are asking me for 1.5 [million] and there is a way to get it out of there[.]" (*Id.* at 14). Messages exchanged between Jonathan and Campo on April 13 and 14 suggest that an associate of Araujo Duran traveled to meet with Campo around that time. (*E.g.*, *id.* at 20). On or about April 16, Campo informed

---

[4] The *Guardia Nacional Bolivariana* is a branch of the Venezuelan armed forces. *See* https://en.wikipedia.org/wiki/Venezuelan_National_Guard (last accessed September 10, 2017).

Jonathan that he had been offered "a house that is worth 4 million," but the offer was "pure bullshit." (*Id.* at 24). Subsequent communications indicate that Araujo Duran did not pay the bribe to Campo.

### B.  The Defendants' Solicitation of Bribes from PDVSA Debtors

During his post-arrest statement, Campo informed the DEA that his cousin, Carlos Erick Malpica-Flores, had rejected a proposed arrangement in which Campo would seek to collect "commissions," *i.e.*, bribes, from debtors of Venezuela's state-run oil and natural gas company, *Petróleos de Venezuela S.A.* ("PDVSA"), in exchange for working with Malpica-Flores to cause PDVSA to approve and make payments on certain debts. (*See* GX 2001 at 4). Communications seized from the defendants' phones corroborate Campo's statement and indicate that the defendants did in fact pursue such a scheme.

On or about June 6, 2015, Flores sent Campo a photograph of a document, and they exchanged the following communications:

| Flores | This is the company that has the debt with pdvsa |
|--------|--------------------------------------------------|
| Campo  | How much is it that they owe ? |
| Flores | Like 38 m[illion] |
| Campo  | Whose is that one? |
| Flores | It's the guy from fonseca |
| Campo  | Un mm ok |
| Flores | That the guy is going on a trip this week and he wants us to say something to him in order to finalize everything now |

(Ex. B at 2).

On or about July 30, 2015, Jonathan informed Campo that he was in communication with a person seeking to collect from PDVSA. (Ex. A at 26). Campo responded: "if it's pdvsa remember that my cousin is in the board and it is through the treasury he is the treasurer . . . . So

that means that I will work either way for us." (*Id.*).  On or about August 8, 2015, Campo communicated to Jonathan that he "spoke with the guy" and that, in exchange for a $2 million "advance"—*i.e.*, up-front bribe—and a further bribe in an amount to total 8% of the debt, PDVSA would repay the remainder of the debt in a series of installments.  (*Id.* at 27; *see also id.* at 28 ("[H]e wanted 2 to start doing that . . . .")).  On or about August 9, Campo explained to Jonathan "the idea is for that [$2 million bribe] to be paid and to set up a meeting with Erick for right now[.]" (*Id.* at 32).

After the debtors communicated to Jonathan that they could not pay the up-front bribe, Campo wrote on responded to Jonathan on August 12:  "No way brother there's no life without paying that [$2 million] . . . . That's a waste of time. . . . Remember I told you that he played dirty and that the dude is serious but if you don't pay him he is not going to start working[.]" (*Id.* at 38-39).  Campo reiterated the following day:  "[T]hey are dealing with the only ones that can solve" the debt, and "there is no one higher than Erick."  (*Id.* at 40).  Campo also directed Jonathan to "[t]ell them that I'm in the middle of it all and the one that executes over there is Carlos Erick [M]alpica [F]lores . . . . That he is my first cousin . . . . He is presently the maximum authority figure there. . . . Because he is a [F]lores."  (*Id.* at 42).  On August 16, Jonathan reported that the debtors were unwilling to pay the bribe.  (*Id.* at 43).

### C.  The Defendants' Involvement in Violent Debt-Collection Efforts Related to a Prior Failed Drug Deal

During an October 2015 meeting in Caracas, Campo told CS-1 and CS-2 about at least one failed drug transaction in which the defendants had participated.  (*See* GX 207-T at 3 (Campo explaining that he "got a bad batch once" from someone who told him he could provide

"'very solid stuff, the best you can get'")).  The defendants' text messages demonstrate that they were working with others to collect a debt related to a failed drug deal as early as June 2015.

On June 16, 2015, Flores and Campo exchanged messages about contacting a "police commissioner" in connection with a meeting of drug traffickers relating to a pending debt. (Ex. B at 3).  Campo remarked that one of the traffickers had threatened that "they were paying a [murder] contract for them" and "had sent his dogs."  (*Id.*).  Flores responded that he "got envious" when the threat was conveyed, and Campo said the debtors "faces" were "[s]o funny" when "he said that to him."  (*Id.*).  Campo criticized another participant in the meeting for having "let[] his emotions take over" by threatening that "even 5 years later we'll still cut him up."  (*Id.* at 4).

On June 20, Flores sent Campo photographs of a male's severed human head and dismembered torso.  (*Id.* at 5).  Flores also forwarded a photograph of two men and a woman (all alive at the time of the photo), and an exchange of messages in which he told an associate that Campo "wants to talk so they won't mess with the girl" and the associate agreed to "see each other later on."  (*Id.* at 5-6).  Campo responded to Flores:  "Don't send that to me . . . .  Tell him that I will speak in person and that if he can't do anything to speak to us frankly and that I will take care of that through another venue but I am not going to let her die like that for no reason[.]"  (*Id.* at 6-7).  The following day, Flores sent Campo messages from an associate who wrote:  "They already murdered a guy that they suspected had also told on him.  They cut him up too[.]"  (*Id.* at 8).

On or about June 30, 2015, an individual using a BlackBerry Messenger account with the screen name "Peter pan & campanita" ("Peter") asked Campo if they could meet in person. (Ex. C at 2).  Campo responded that Flores would attend the meeting and instructed Peter:  "don't

talk about anything over the phone . . . Absolutely nothing . . . Be careful with what you talk about

over the phones." (*Id.* at 2-3).

On or about July 21, 2015, Campo wrote to Peter: "Dude that thing they did made

things more complicated." (*Id.* at 4). Campo then elaborated:

> I had a big problem with my uncle Vladimir who is the Inspector General of the
> CICPC.[5] They took Daniel out of the case and now Daniel is in trouble also, even
> [CICPC] director [Jose Gregorio] Sierra Alta heard about it and he met with Daniel
> and my uncle and the shit hit the fan.  Even though I told them not to do shit now.
> Now my uncle wants to fuck everyone up who has anything to do with that, the guy
> who handles the things at the DIM[6] called him, it's a shit show now, and I have
> the house is on fire and I fucking told them not to do that. . . .
>
> [. . .]
>
> I'm putting pressure to prevent things from getting worse but dude you're getting
> Frank and I in trouble fool and then you only let us know after you do things.  Now
> everyone is talking about us and you do things without consulting us and that's not
> how it works, dude, if that were the case you should have just done things your way
> and not get us involved.  Dude, I'm moving forward with everything but you're
> getting my family in trouble, I'm in really bad terms with my uncle Vladimir right
> now and he's got the case now, everything related to the grenade, the rifles and the
> last thing that happened.  Just know that I can't do anything else for you, and don't
> say I didn't warn you.
>
> [. . .]
>
> [Name of law enforcement officer] filed the police report and named everyone
> including the two of you with names and last names and us 2

(*Id.* at 4-6).  Peter responded:

---

[5] The CICPC is the *Cuerpo de Investigaciones Científicas, Penales y Criminalísticas*, a
Venezuelan national police agency.

[6] The DIM, or DGCIM, is the *Dirección General de Contrainteligencia Militar*, a Venezuelan
military counterintelligence agency.

> Darn buddy it's weird you are telling me this because after we set off the bomb you
> told us not to set off any more bombs and to begin killing and you know that the
> money is not just from the four of us, that money has many owners and in fact we're
> the ones who've stopped many things and even more we're super broke and we
> want to collect that money and you know it

(*Id.* at 6).  Campo replied:

> No dude after the gas station I told you to take it two down because they couldn't
> die now I told you before setting off the bomb that those guys had to be killed I told
> you after when the thing at the las mercedes gas station happened, you shouldn't
> do anything to those guys, right now you shouldn't do it
>
> I told you clearly this cannot die for now
>
> Not now, at least wait a little for things to calm down, but no[t] now because it's
> being investigated and it's the DIM and this would attract more attention, let's wait
> a while

(*Id.* at 7).  Peter then indicated that "here we don't make decisions on our own," elaborating:

> remember how tricky this business is, we only went to you for help at the end
> because remember that the initial plan was to talk to Fernando for him to pay off
> my brother everyone here is broke and fed up and I imagine you're pissed off also
> everyone want to get their money

Campo responded, in part:

> I understand him being upset but that's not an excuse to make rushed decisions
> because things like this are bound to happen now that dude is dead the family is
> throwing accusations and the guy whose name I sent you is hell bent and placed the
> complaint big time I hope that doesn't reach the prosecutors' office.

(*Id.* at 7).  Peter continued:

> Yeah buddy I understand but you know this business is all about honoring one's
> word and you know how Colombians collect their due buddy otherwise tell me how
> can one collect anything anyway the dude that died was a danger for us and for you
> because he asked too many questions and was too much of a jerk off

(*Id.* at 8).  Campo responded, "but this was not the moment because he said a lot of things and now the guy I sent you is running his mouth all over the place . . . . Should have waited."  (*Id.* at 8).  Peter replied:  "No dude I'm not asking around Efrain we trust you brother[.]"  (*Id.*).

In separate communications transmitted via WhatsApp Messenger, Campo sent Flores substantially all of this exchange with Peter, and Flores provided input regarding what Campo should write to Peter.  Subsequently, on August 31, 2015, Campo referenced the failed drug deal that led to this drug debt in communications with Pepe.  (GX 408-T at 14 ("[T]he last time they left us hanging and we had to pay some money for the pork chops understand me.  This was your friend juan carlos")).  Referring to Polanco, Campo explained that "[t]he one that is locked [up] cut up some people there for us and at the end it just was all baloney."  (*Id.*).  The following day, Campo asked Pepe for "the name of the dude that is locked up," and Pepe responded "hermagoras Gonzales," *i.e.*, Polanco, the incarcerated drug trafficker involved in the defendants' negotiations with the Sombrero Organization.  (*Id.* at 15).

## THE SENTENCING GUIDELINES

The Probation Department calculated an offense level of 43 for both defendants based on the following enhancements:

- Drug quantity.  Pursuant to U.S.S.G. §§ 2D1.1(a)(5) and 2D1.1(c)(1), the base offense level is 38 because the object of the conspiracy was to import more than 450 kilograms of cocaine.

- Possession of Firearms.  Pursuant to U.S.S.G. § 2D1.1(b)(1), because dangerous weapons were possessed by the defendants and their bodyguards, two levels are added.

- Threats.  Pursuant to U.S.S.G. § 2D1.1(b)(2), because Campo made credible threats of violence in furtherance of the conspiracy that Flores joined in and were foreseeable to him, two levels are added.

15

- <u>Use of Private Aircraft</u>.   Pursuant to U.S.S.G. § 2D1.1(b)(3)(A), because the defendants' relevant conduct—specifically, the object of the conspiracy—involved using private aircraft during the process of importing cocaine into the United States, two levels are added.

- <u>Attempted bribery</u>.   Pursuant to U.S.S.G. § 2D1.1(b)(11), because the defendants attempted to bribe law enforcement personnel in Venezuela and Honduras to facilitate the commission of the offense, two levels are added.

- <u>Importation</u>.   Pursuant to U.S.S.G. § 2D1.1(b)(15)(C), because an aggravating-role adjustment is appropriate and the object of the conspiracy involved the defendants' direct participation in the importation of a controlled substance, two levels are added.[7]

- <u>Leadership role</u>.   Pursuant to U.S.S.G. § 3B1.1(a), because the defendants were organizers and leaders of criminal activity that involved five or more participants and was otherwise extensive, four levels are added.

- <u>Obstruction</u>.   Pursuant to U.S.S.G. § 3C1.1, because the defendants submitted false affidavits in support of their pretrial motions and the Court already rejected several of their lies, two levels are added.

The offense level is capped at 43.  *See* U.S.S.G. Ch. 5, Part A, app. n.2.  Therefore, based on Criminal History Category I, the Guidelines recommend for both defendants sentences of life imprisonment and fines in the range of $50,000 and $10 million, *see* U.S.S.G. § 5E1.2(c)(4).

Ignoring basic sentencing principles, including post-trial fact-finding procedures and evaluation of relevant conduct under Section 1B1.3 of the Guidelines, the defendants dispute every enhancement applied by the Probation Office.  For the reasons set forth below, their arguments lack merit and the Probation Office's determination of the applicable Guidelines range is correct.

---

[7] The Government agrees with the defendants that only one of the enhancements at Sections 2D1.1(b)(3), 2D1.1(b)(5), and 2D1.1(b)(15)(C) may be applied at sentencing.

## I.  Legal Standards at Sentencing

### A.  Post-Trial Fact Finding

At sentencing, a district court makes findings of fact by a preponderance of the evidence.  *United States* v. *Cossey*, 632 F.3d 82, 86 (2d Cir. 2011).  The Court has "'largely unlimited' discretion," "either as to the kind of information it may consider, or the source from which it may come."  *United States* v. *Cacace*, 796 F.3d 176, 190-91 (2d Cir. 2015) (quoting *United States* v. *Gomez*, 580 F.3d 94, 105 (2d Cir. 2009)).  Moreover, because "it is settled law that the Confrontation Clause of the Sixth Amendment does not apply to evidence received during a sentencing hearing," *United States* v. *Bedell*, 590 F. App'x 86, 88 (2d Cir. 2015) (summary order), the Court can—and should—rely on both defendants' confessions when making fact findings at each of their sentencings.  *See United States* v. *Carmona*, 873 F.2d 569, 574 (2d Cir. 1989) ("It is not a denial of due process for the trial judge, when determining sentence, to rely on evidence given by witnesses whom the defendant could neither confront nor cross-examine.").

### B.  Evaluation of Relevant Conduct Under Section 1B1.3 of the Guidelines

Under the Guidelines, the base offense level, specific offense characteristics, and any adjustments are to be calculated based on, among other things:

(1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

[1](B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were–

(i) within the scope of the jointly undertaken criminal activity,

(ii) in furtherance of that criminal activity, and

(iii) reasonably foreseeable in connection with that criminal activity;

17

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

(2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above *that were part of the same course of conduct or common scheme or plan as the offense of conviction* . . . .

(3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and *all harm that was the object of such acts and omissions* . . . .

U.S.S.G. § 1B1.3(a) (emphases added).

Pursuant to U.S.S.G. § 1B1.3(a)(2), "'[w]ith respect to offenses involving aggregate harms, such as drug offenses, relevant conduct consists of all acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction.'" *United States* v. *Chavin*, 613 F. App'x 80, 81 (2d Cir. 2015) (summary order) (quoting *United States* v. *Pellegrini*, 929 F.2d 55, 56 (2d Cir. 1991)).

For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, *common accomplices*, *common purpose*, or similar *modus operandi*.

[. . .]

Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses. Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include the *degree of similarity* of the offenses, the *regularity (repetitions) of the offenses*, and *the time interval between the offenses*. When one of the above factors is absent, a stronger presence of at least one of the other factors is required.

U.S.S.G. § 1B1.3 app. n.5(B)(i)-(ii) (emphases added).

18

Finally, under U.S.S.G. § 1B1.3(a)(1)(B), "[a] district court may sentence a defendant based on the reasonably foreseeable acts and omissions of his co-conspirators that were taken in relation to a conspiracy." *United States* v. *Getto*, 729 F.3d 221, 234 (2d Cir. 2013). Before applying the Guidelines based on the conduct of co-conspirators, the Court must make "two particularized findings": "(1) that the scope of the activity to which the defendant agreed was sufficiently broad to include the relevant, co-conspirator conduct in question; and (2) that the relevant conduct on the part of the co-conspirator was foreseeable to the defendant." *Id.* (internal quotation marks and alterations omitted).

## II.  The Scope of the Defendants' Relevant Conduct

Pursuant to Section 1B1.3, the Court should apply the Guidelines based on the defendants' drug-trafficking activities with Pepe beginning in August 2015, including their joint efforts to send drugs to Mexico with the Sombrero Organization and their efforts to send drugs directly to the United States with DEA informants. These activities involved overlapping participants, *i.e.*, the defendants and Pepe, and the same methodology: the defendants seeking to capitalize on their political power and access to Maiquetía Airport by dispatching large drug loads from that location. *See Campo Flores*, 2017 WL 1133430, at *3 (describing "evidence that Defendants sought to coordinate a similar drug trafficking arrangement with an individual identified as Pepe"). The Court can also infer by a preponderance of the evidence, based on the trial testimony of Special Agent Daniel Mahoney, that the defendants and Pepe knew or consciously avoided knowing that cocaine sent to Mexico with the Sombrero Organization would be imported into the United States. Finally, when Flores told Pepe in late-September 2015 that the defendants were abandoning negotiations with Polanco and the Sombrero Organization, he assured

19

Pepe "you are with us don't worry about that" with respect to the then-nascent negotiations with Sentado. (GX 515-T at 20). This communication further establishes that the steps taken by the defendants and Pepe related to Polanco and the Sombrero Organization were part of the same course of conduct and scheme as the efforts by the defendants and Pepe to send drug shipments to the DEA informants for importation into the United States.

The Government is not seeking to apply the Guidelines based on the additional drug-trafficking activities of the defendants described above in Part II of the Factual Record Section. However, all of that conduct is relevant to the application of the Section 3553(a) factors and the determination of the appropriate sentence. "Highly relevant—if not essential—to [the judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *United States* v. *Watts*, 519 U.S. 148, 152 (1997) (internal quotation marks omitted). Thus, Congress has decreed that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661; *see also United States* v. *Reese*, 33 F.3d 166, 174 (2d Cir. 1994) ("[W]hen determining sentence, a sentencing court is free to consider hearsay evidence, evidence of uncharged crimes, dropped counts of an indictment and criminal activity resulting in acquittal."). This authority is controlling, and it forecloses efforts by the defendants to prevent the Court from considering relevant evidence before it, whether or not that evidence was offered at trial.

Finally, all of the evidence summarized in the Factual Record section of this submission was described in PSRs that were disclosed to the defendants, in draft form, by May 23,

20

2017. On June 20, the defendants submitted to the Probation Office nearly identical letters containing only broad, non-specific objections to the facts in the PSRs. (*See* Ex. D (the defendants' objection letters)). For example, citing nearly 90 paragraphs of the PSRs, the defendants "object[ed] generally to the factual recitation of the offense conduct." (*Id.* at 1). Notwithstanding the Court's deadline, the defense letters also purported to "reserve[] the right to provide additional detail on all of the objections stated above and to make further objections to the PSR[s] before the final disclosure is issued prior to sentencing." (*Id.* at 4). As far as the Government is aware, the defendants did not even try to provide additional information to the Probation Office, which would have been untimely in any event. Moreover, the defendants' objections were utterly devoid of supporting citations to the trial record or other evidence that might have led the Probation Office to revise the PSRs, and lacked sufficient specificity for the Probation Office to consider them or even advise the Court of the particular facts with which the defendants took issue. Thus, it is defense counsel—not the Probation Office—that failed to abide by rules governing the presentence investigation process, and any remaining factual objections to their PSRs should be deemed waived.

## III.   The Offense Involved More than 450 Kilograms of Cocaine

Pursuant to U.S.S.G. §§ 2D1.1(a)(5) and 2D1.1(c)(1), because the defendants' offense involved more than 450 kilograms of cocaine, the base offense level is 38. "Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance" based on the preponderance of the evidence. U.S.S.G. § 2D1.1 app. n.5; *United States* v. *Rawls*, 523 F. App'x 772, 777 (2d Cir. 2013) (summary order). Here, both Campo and Flores admitted following their arrests that they planned to send at

least one 800-kilogram shipment.  (Tr. 148, 160; GX 2001 at 3 ("CAMPO stated that 'Gocho' only gave him the one (1) kilo; CAMPO had not received the full amount" [of 800 kilograms] yet[.]"); GX 2003 at 2 ("FLORES indicates that [the transaction] was going to involve a total of 800 kilograms[.]")).  During their pre-arrest negotiations, Campo indicated that the defendants wanted to send *multiple* similarly sized loads.  (*E.g.*, GX 301-T at 12:21 (Campo stating "I will send you 800 head of cattle weekly"); GX 205-T at 30:6-21 (Campo indicating that the first load would be "eight hundred" and that they could "purchase" a plane to use "for the second one"); GX 231-T at 15:37 (Campo referring to "the next" cocaine shipment); *see also* Flores PSR ¶ 65 (Flores telling CS-1 that the defendants would "go for the other one," *i.e.*, a second drug shipment, "immediately" after the first); *id.* ¶ 84 (Flores asking for a schedule for the second cocaine shipment "after" the first)).

The defendants claim that the PSR overstates their exposure without providing an alternative basis for making an estimate of the applicable drug quantity.  (Def. Mem. at 3-6).  They are wrong.  First, the defendants argue that the "*agreed upon* weight of the cocaine" was not established.  (Def. Mem. at 4).  But on November 10, 2015 in Haiti the defendants confirmed that "[w]e have it set up for the fifteenth" of November, referring to the first anticipated drug shipment.  (GX 231-T at 19).  After they were arrested that day, they both admitted to the DEA that they planned for the first shipment to involve more than 450 kilograms.  Next, the defendants argue that they were "incapable of providing the amount of cocaine" at issue.  (Def. Mem. at 5).  The authority they cite, Application Note 5 to Section 2D1.1, makes plain that they bear the burden of demonstrating this purported impossibility.  They cannot do so in light of their connection to the FARC, a paramilitary organization that has long been one of the largest producers of cocaine in

the world, and Campo's statement that the defendants had access to someone who could provide cocaine by the "shovelful." (*E.g.*, GX 231-T at 27:3-13; Tr. 149, 555; 207-T at 3:2, 3:18, 4:5). Finally, the defendants claim that the Government "manipulated, and ultimately set the amounts of cocaine that the deal was supposed to involve." (Def. Mem. at 6). They provide no record citation for this argument, and the claim is false. The drug quantity was driven not by the informants, but by the defendants' desire to make $20 million as soon as possible. Campo told CS-1 and CS-2 early in their very first meeting in Caracas on October 23, 2015: "My mom is running for the election and I need . . . twenty million dollars." (GX 203-T at 11). At the October 26 meeting, Campo explained to CS-1 why "I need that quantity for right now." (GX 206-T at 30:18). Accordingly, the offense involved at least 450 kilograms of cocaine, and the base offense level is 38.

## IV.   U.S.S.G. § 2D1.1(b)(1): A Dangerous Weapon Was Possessed During the Offense

Pursuant to U.S.S.G. § 2D1.1(b)(1), two levels should be added because dangerous weapons were possessed during the offense. Both the defendants and their bodyguards possessed firearms during the course of the offense that were used, at least in part, to provide security for their drug-trafficking negotiations.

"The enhancement for weapon possession in [U.S.S.G. § 2D1.1(b)(1)] reflects the increased danger of violence when drug traffickers possess weapons. The enhancement should be applied *if the weapon was present*, unless it is *clearly improbable* that the weapon was connected with the offense." U.S.S.G. § 2D1.1 app. n.11(A) (emphases added). No case cited by the defendants holds that "the enhancement applies only when the firearm is possessed *in connection with the charged conduct*," probably because such a holding would be contrary to the text of the

23

Guideline and the Application Note. (Def. Mem. at 29 (emphasis added)). Indeed, "the requirements for imposing a gun possession enhancement are not especially difficult to meet." *United States* v. *Crawford-Bey*, 401 F. App'x 624, 626-27 (2d Cir. 2010) (summary order).

In light of these standards, the defendants' use of an armed security detail during the course of their offense alone warrants the imposition of the enhancement. *See United States* v. *Lobo*, No. 15 Cr. 174 (LGS), 2017 WL 2838187, at *4 (S.D.N.Y. June 30, 2017) (applying enhancement where passengers in vehicle occupied by defendant possessed firearms); *United States* v. *Suarez*, No. 11 Cr. 836 (KBF), 2014 WL 1998234, at *3 (S.D.N.Y. May 15, 2014) (applying enhancement where "defendant caused members of the conspiracy, including individuals guarding the laboratories at which the cocaine was manufactured (and as to which the defendant had supervisory responsibility) to carry weapons"). The Government offered photographic evidence seized from Flores's phone of one of the armed guards, Jesfran Josnel Moreno Sojo, a/k/a "Tortuga," a/k/a "Tortuha" ("Moreno"). (GX 508-T at 2). Moreno accompanied Flores on his November 2015 trip to Honduras. (*E.g.*, GX 531-C (video from Flores's phone reflecting Flores and Moreno on private jet)). Campo's counsel also argued to the jury that the defendants' "Airsoft" argument "doesn't even matter" because "it is a fact that Mr. Campo Flores and Mr. Flores de Freitas actually did have bodyguards at different points," and "you have to be insane to walk around Caracas without some protection." (Tr. 1434). While the defendants claim they needed protection from kidnapping and "the dangerous environment in Caracas" (Def. Mem. at 31), they cannot show that "it is clearly improbable that the weapon[s] [were] connected with the offense." U.S.S.G. § 2D1.1 app. n.11(A). The defendants sought protection, at least in part, from rival drug traffickers and others who might seek to interfere with

24

their drug-trafficking negotiations and anticipated possession and transportation of large quantities of drugs and drug proceeds. The defendants' intention to use their concededly armed bodyguards in connection with the drug deal—as opposed to just for general security—is demonstrated by their early-October 2015 communications, following the meeting with Sentado, about the particular bodyguards they would recruit to assist them in the drug shipments (including Moreno). (GX 402-T at 2). That is also precisely why Flores brought Moreno to Honduras for a meeting relating to the drug deal he negotiated there on behalf of the defendants. Thus, the defendants cannot establish that it was "clearly improbable" that the bodyguards' weapons were connected to the defendants' crime.

In addition, the defendants' phones contained numerous pictures of firearms that they possessed. (*E.g.*, GX 400 at 224-25; GXs 412-13). Government Exhibit 412, for example, is a picture of a firearm that reflects Campo's shadow as he took the photograph with his phone. Flores's phone contained pictures of both firearms as well as ammunition. (GX 500 at 347-48; GXs 522-24). Campo sent a photograph of himself possessing a "mini uzi," and asked an associate named Gilson to purchase another one. (GX 407-T at 3). In July 2015, Gilson sent Campo a photograph of a case of weapons, including the "mini uzi" Campo requested. (GX 407-T at 5). Flores's phone contained similar pictures of the same weapons. (GXs 523-24). The defendants' arguments regarding replica firearms and paintball teams fail, as they are unsupported by anything in the record. Indeed, the record supports the opposite conclusion. Daniel Ogden, who served in the Marines for six years and in law enforcement for 22 years thereafter, testified that the photographs appeared to depict actual firearms. (Tr. 831, 836-37, 850-51). Campo's requests for a "mini uzi" and a "rifle," coupled with Gilson's concerns about leaving fingerprints on the

25

weapons—which no rational person would have voiced had the defendants and Gilson been discussing replica firearms or paintball guns—strongly support Mr. Ogden's assessment.  (GX 407-T at 9, 12-13).  Based on this evidence, the Court already concluded that the messages from the defendants' phones "appear to be firearms, and discussion about the acquisition of those apparent firearms."  *Campo Flores*, 2017 WL 1133430, at *1 n.1.  Accordingly, because weapons were "present" during the offense, U.S.S.G. § 2D1.1 app. n.11(A), the enhancement applies.

## V.   U.S.S.G. § 2D1.1(b)(2): The Defendants Made Credible Threats to Use Violence

The defendants' relevant conduct also included "credible threat[s] to use violence" under U.S.S.G. § 2D1.1(b)(2).  "The enhancements in subsections (b)(1) and (b)(2) may be applied cumulatively (added together), as is generally the case when two or more specific offense characteristics each apply."  U.S.S.G. § 2D1.1 app. n.11(B).

During the October 26, 2015 meeting in Caracas, Campo suggested—while sitting within feet of Flores—that the defendants would kidnap and murder anyone who interfered with the dispatch of a cocaine shipment, and tell others that a "UFO came and abducted that man."  (GX 207-T at 20:23-21:31 (Campo stating that he would "pinch him over there and send him out in little pieces")).  The defendants cannot avoid the import of this threat with the self-serving claim that Campo was joking.  (Def. Mem. at 34-35).  This is true in light of the evidence of other acts of violence by the defendants' associates in connection with their drug-trafficking activities, including decapitation and dismemberment not dissimilar to violence threatened by Campo involving human beings being cut up into "little pieces."  *See* Factual Record Part II.C, *supra*.

In addition, Campo later made even more explicit threats of violence, which the defendants did not make any effort to address in their submission.  Specifically, after the

defendants' drug pilots failed to travel to Honduras successfully in November 2015, Campo informed CS-1 that he was going to "send . . . photos of those motherfuckers . . . . Because when nice I'm the best boss sir but I'm also the best at being bad." (GX 306-T at 3:11-15). When CS-1 asked what Flores, "[t]he cousin," had said about the situation, Campo responded that "[h]e told me let them get here and I'll personally get them full of lead"—*i.e.*, shoot them—"and take their picture." (GX 306-T at 4:5-15). Campo added: "I swear by god that I will kill those damn pilots I will kill them," "those pilots will not make it pas[t] this week," "as soon as they get off the plane I'll kill them." (GX 306-T at 5:17, 7:10, 7:22). Finally, Campo told CS-1 that the pilots were "going to aruba" and that he was "going to place an alert on that car [*i.e.*, plane] here as soon as they get here they should be brought to me." (GX 306-T at 7:36).

Campo's communications indicated that Flores made similar comments and supported this course of action. *See* U.S.S.G. § 1B1.3(a)(1)(A) (relevant conduct includes acts "counseled" or "commanded" by a defendant)). Moreover, Campo's threats and directions to use violence were reasonably foreseeable, within the scope of the conspiracy, and in furtherance of the conspiracy. Thus, these threats are part of Flores's relevant conduct, and the Court should apply a two-level enhancement to both defendants pursuant to U.S.S.G. § 2D1.1(b)(2).

## VI.   U.S.S.G. § 2D1.1(b)(3)(A): The Defendants Planned to Use Private Aircraft

Pursuant to U.S.S.G. § 2D1.1(b)(3)(A), two levels should be added because the "harm" that was the object of the defendants' conspiracy—and therefore their relevant conduct—involved the use of private aircraft to import cocaine into the United States. *See* U.S.S.G. § 1B1.3(a)(3). Specifically, the defendants agreed to use private jets to transport cocaine from Venezuela to Honduras as part of the process of importing those drugs into the United States.

27

Contrary to the defendants' claim, private aircraft need not have carried drugs over the United States border in order for this enhancement to apply. (*See* Def. Mem. at 8). "[I]mportation 'is a continuous crime that is not complete until the controlled substance reaches its final destination point.'" *United States* v. *Perez-Oliveros*, 479 F.3d 779, 784 (11th Cir. 2007) (quoting *United States* v. *Corbin*, 734 F.2d 643, 652 (11th Cir. 1984)); *United States* v. *MacDougall*, 790 F.2d 1135, 1151 (4th Cir. 1986) ("Those who unload a vessel carrying the imported contraband are an *essential component* of furthering the conspiracy to import." (emphasis added)). Thus, private aircraft can be "used to import" cocaine, U.S.S.G. § 2D1.1(b)(3)(A), even if the drugs were brought into the United States by some other means. *See United States* v. *Iacullo*, 140 F. App'x 94, 103 (11th Cir. 2005) (unpublished opinion) (applying enhancement where private plane was "used to move cocaine from Colombia to Mayaguana Island, where it was then placed on a vessel to smuggle into Florida"). Consistent with this authority, Judge Forrest found in *United States* v. *Suarez* that a defendant was "directly involved in the importation of cocaine," and applied enhancements at U.S.S.G. §§ 2D1.1(b)(3)(A) and 2D1.1(b)(15)(C), where the defendant led a drug-trafficking organization operating in Colombia and Venezuela—far from the U.S. border— responsible for "manufacturing cocaine in laboratories," "transporting cocaine to air strips, loading airplanes with cocaine, receiving money from airplanes on return trips," and "receiving money from trucks . . . and financiers." 2014 WL 1998234, at *3.

In contrast to *Suarez*, the out-of-Circuit authority upon which the defendants rely failed to consider or evaluate the relevant conduct provisions of Section 1B1.3. (Def. Mem. at 6-8). While Section 2D1.1(b)(3)(A) applies where a private plane "was used to import" narcotics, Section 1B1.3 makes clear that all Guidelines enhancements "shall be determined on the basis of,"

*inter alia*, "all harm that was the object of" the defendant's "acts and omissions."  U.S.S.G. § 1B1.3(a)(3).  Thus, because the object of the conspiracy was to complete an act of importation, the two-level enhancement pursuant to U.S.S.G. § 2D1.1(b)(3)(A) applies.

## VII.   U.S.S.G. § 2D1.1(b)(11): The Defendants Attempted to Bribe Law Enforcement Officials

Pursuant to U.S.S.G. § 2D1.1(b)(11), two levels should be added because the defendants attempted to bribe law enforcement officials in Venezuela and Honduras to facilitate the commission of the offense.

### A.   Section 2D1.1(b)(11) Applies to Bribes to Foreign Law Enforcement Personnel

The defendants' legal challenge to the application of the bribery enhancement to foreign law enforcement personnel is based entirely on language from the Fair Sentencing Act of 2010 rather than the text of the Guideline in question.  (*See* Def. Mem. at 41-42).  The Fair Sentencing Act did not, however, require the Sentencing Commission to adopt verbatim the enhancement contemplated by the statute.  And the Sentencing Commission elected not to do so.  The plain language of Section 2D1.1(b)(11) demonstrates that the Commission promulgated a broader enhancement, which applies to all law enforcement personnel foreign and domestic, and Congress ratified the Commission's decision before the enhancement became effective.  Thus, the Fair Sentencing Act does not provide a basis to depart from the text of the Guideline.

#### 1.   Applicable Law

##### a. Interpreting Sentencing Guidelines

"When construing Sentencing Guidelines [courts] employ basic rules of statutory construction . . . ."  *United States* v. *Kleiner*, 765 F.3d 155, 159 (2d Cir. 2014) (internal quotation marks omitted).  The Court "need not resort to background commentary interpretations when the

language of the Guidelines is plain." *United States* v. *Sash*, 396 F.3d 515, 522 (2d Cir. 2005).

When "the language of the Guidelines provision is plain, the plain language controls." *United*

*States* v. *Mingo*, 340 F.3d 112, 114 (2d Cir. 2003); *United States* v. *Demerritt*, 196 F.3d 138, 141

(2d Cir. 1999) ("[W]e must give the words used their common meaning, absent a clearly expressed

manifestation of contrary intent." (internal quotation marks and citation omitted)); *United States*

v. *Millar*, 79 F.3d 338, 346 (2d Cir. 1996) ("As with statutory language, the plain and unambiguous

language of the Sentencing Guidelines affords the best recourse for their proper interpretation

. . . ." (internal quotation marks and citation omitted)).

The Guidelines include three categories of "Commentary." *See* U.S.S.G. § 1B1.7.[8]

The first two categories typically appear in "Application Notes" to a particular Guideline:

(i) Commentary that "interpret[s] the guideline or explain[s] how it is to be applied," *see, e.g.*,

U.S.S.G. § 2D1.1 app. n.11; and (ii) Commentary that "suggest[s] circumstances which, in the

view of the Commission, may warrant departure from the guidelines," *see, e.g.*, U.S.S.G. § 2D1.1

app. n.27.  U.S.S.G. § 1B1.7.  The third category of Commentary is that which "provide[s]

background information, including factors considered in promulgating the guideline or reasons

underlying promulgation of the guideline." *Id.*  Only Guidelines Commentary that fits into the

first category "is authoritative unless it violates the Constitution or a federal statute, or is

inconsistent with, or a plainly erroneous reading of, that guideline."  *Stinson* v. *United States*, 508

U.S. 36, 38 (1993); *United States* v. *Sash*, 396 F.3d at 522 (emphasis added).

---

[8] In addition to Commentary, the other "varieties" of text in the Guidelines Manual are the
guideline provisions, *e.g.*, U.S.S.G. § 2D1.1, and policy statements, *e.g.*, U.S.S.G. § 7B1.1.
*Stinson* v. *United States*, 508 U.S. 36, 41 (1993).

### b. Section 2D1.1(b)(11) and the Fair Sentencing Act

In the Fair Sentencing Act of 2010, Pub. L. 111-220, 124 Stat. 2372 (Aug. 3, 2010) (the "FSA"), Congress directed the Sentencing Commission to, among other things, "review and amend the Federal sentencing guidelines to ensure an additional increase of at least 2 offense levels if . . . the defendant bribed, or attempted to bribe, a Federal, State, or local law enforcement official in connection with a drug trafficking offense." 124 Stat. at 2373. The Commission "respond[ed]" with Section 2D1.1(b)(11), which does not restrict the application of the enhancement to circumstances involving bribes to domestic law enforcement personnel. U.S.S.G. Amendment 748, App. C, Vol. III at 383; *see also* 75 Fed. Reg. 66188-02, at 66189, 66191 (Oct. 27, 2010), *available at* 2010 WL 4218801 (notice of amendments). Rather, the enhancement applies where "the defendant bribed, or attempted to bribe, a law enforcement officer to facilitate the commission of the offense." U.S.S.G. § 2D1.1(b)(11). The only pertinent Application Note states:

> Subsection (b)(11) does not apply if the purpose of the bribery was to obstruct or impede the investigation, prosecution, or sentencing of the defendant. Such conduct is covered by § 3C1.1 (Obstructing or Impeding the Administration of Justice) and, if applicable, § 2D1.1(b)(15)(D).

*Id.* app. n.16.

### 2. Discussion

The text of Section 2D1.1(b)(11) lacks the "domestic" restriction that the defendants seek to impose. By its terms, then, the enhancement applies to foreign law enforcement personnel. The relevant Application Note also lacks limiting language and therefore supports the plain-meaning interpretation of the enhancement. *See* U.S.S.G. § 2D1.1 app. n.16. "A Guideline may apply in situations not contemplated by the background commentary to the Guideline."

31

*United States* v. *Sash*, 396 F.3d at 523.  Thus, even the non-binding Background Commentary to Section 2D1.1 does not compel the result the defendants seek.

Nor does Section 6(1) of the FSA restrict Section 2D1.1(b)(11).  The congressional directive to create an enhancement did not force the Commission—an independent deliberative body—to adopt wholesale the contours proposed in the FSA.  Rather, the Commission complied with the directive in the FSA to "ensure" that there was an enhancement for bribes to domestic law enforcement, and used its authority and expertise to craft language that applied to all "law enforcement," without limitation.[9]  Congress reviewed the broader enhancement promulgated by the Commission before it became effective, and declined to modify or reject Section 2D1.1(b)(11). *See Stinson* v. *United States*, 508 U.S. at 41 ("Amendments to the Guidelines must be submitted to Congress for a 6-month period of review, during which Congress can modify or disapprove them." (citing 28 U.S.C. § 994(p))); *see also id.* at 44 ("The guidelines of the Sentencing Commission, moreover, cannot become effective until after the 6-month review period for congressional modification or disapproval.").  Thus, Congress has passed on the language chosen

---

[9] The Commission departed from the language chosen by Congress in the FSA in other respects. Section 6(2) of the statute directed the Commission to promulgate an enhancement where a defendant "maintained an establishment for the manufacture or distribution of a controlled substance." 124 Stat. at 2373. The Commission responded with an enhancement that applies more broadly to "premises" rather than "establishment[s]." U.S.S.G. § 2D1.1(b)(12). Section 6(3) of the FSA directed the Commission to promulgate an enhancement where an aggravating-role adjustment was appropriate and the offense involved a "super-aggravating factor[]," such as the defendant "knowingly distributed a controlled substance to . . . [a] person over the age of 64 years." 124 Stat. at 2373. The Commission responded with an enhancement that applies to individuals older than 65. U.S.S.G. § 2D1.1(b)(15)(B). Consistent with Section 2D1.1(b)(11), these additional Guidelines amendments in response to the FSA further demonstrate that the Commission does not as a matter of course blindly adopt language proposed by Congress.

by the Commission, which covers bribes to foreign law enforcement personnel, and tacitly approved its breadth. Accordingly, Section 2D1.1(b)(11) applies to bribes and attempted bribes to foreign law enforcement personnel.

### B. The Defendants Attempted to Bribe Law Enforcement Officials

The defendants' relevant conduct includes attempted bribes to law enforcement officials in Venezuela and Honduras.

In late-August 2015, the defendants attempted to extract a multi-million dollar bribe payment from Pepe and associates of the Sombrero Organization, some of which was to be paid to law enforcement officials in an effort to secure Polanco's release from prison. (*See* GX 408-T at 8; GX 515-T at 2-6). On August 31, 2015, for example, Flores wrote to Pepe that the defendants had a meeting with "a magistrate" to discuss Polanco's "case," and Flores asked Pepe whether they could offer the magistrate a "million that they have in hand right away in order to start the negotiation." (GX 515-T at 3-4). Pepe responded that he would ask an associate of the Sombrero Organization, and replied about 15 minutes later that "[t]hey already have the mil." (GX 515-T at 4-5). As late as October 1, 2015, Pepe indicated that the Sombrero Organization was prepared to pay the $2 million bribe. (GX 515-T at 24 ("take out the two")).

The defendants also attempted to bribe law enforcement personnel and other officials at the Roatán Airport in connection with their first drug shipment. During the October 3, 2015 meeting, Sentado told the defendants that it would cost approximately $900,000 for the airport personnel to receive their drug plane. (GX 206-T at 3:29, 4:3, 4:21, 7:26). When Flores met with Soto in Honduras on November 6, Soto said that "everything" and "everyone" was "squared away at the airport," including "[t]he cops." (GX 223-T at 3:25-4:1; *see also* GX 222-T

33

at 10:1-7 (Soto explaining that "all the Hondurans are all set" at the Roatán Airport); GX 223-T at 6:26-28 (Flores responding "O.K." after being told that "everyone that you will see" at the Roatán Airport "is in on it")). Soto also told Flores during the meeting that, "if there is an alarm" to Honduran law enforcement during the drug shipment, he and other co-conspirators would "tell the authorities that we already have with us," who were "the same authorities that we already have made arrangements with." (*Id.*).

Flores said that he understood Soto's plans for airport personnel "perfectly," and he indicated repeatedly during the November 6 meeting that he understood there to be a firm plan for the first drug shipment to arrive in Honduras on November 15, 2015. (GX 223-T at 8:6; *see, e.g.*, GX 223-T at 5:21, 6:8, 8:16, 9:4-8). Following the meeting, Soto told Carlos Gonzalez that the plan was in place, and Gonzalez expected that they would be provided with a $600,000 pool of funds to be used, in part, to bribe law enforcement personnel and other airport workers. (Tr. 1070-71). Flores returned to Venezuela and continued to work with Campo and others to make arrangements for the anticipated November 15 shipment. The defendants then traveled to Haiti to pick up the agreed-upon $11 million payment from CS-1, with $5 million representing the up-front payment Campo demanded during the October 26 meeting to pay for costs associated with dispatching the first cocaine shipment (GX 208-T at 14:20; GX 301-T at 6:11), and the remainder constituting a payment to the defendants that could be used in their discretion to finance additional cocaine shipments (GX 301-T at 10:15, 11:6, 11:26, 18:33-19:7).

Thus, on at least two separate occasions, the defendants took concrete actions in attempting to bribe law enforcement officials in connection with the same course of conduct involving their efforts to dispatch large drug loads from the Maiquetía Airport. In addition, the

efforts and attempts by Soto and Gonzalez to bribe law enforcement personnel at the Roatán Airport are part of the defendants' relevant conduct because those steps were within the scope of the conspiracy, in furtherance of the conspiracy, and reasonably foreseeable to the defendants. *See* U.S.S.G. § 1B1.3(a)(1)(B). Thus, the Court should apply the two-level enhancement pursuant to U.S.S.G. § 2D1.1(b)(11).

## VIII. U.S.S.G. 3B1.1(a): The Defendants Were Leaders and Organizers

Pursuant to U.S.S.G. § 3B1.1(a), four levels should be added because the defendants were organizers and leaders of criminal activity that involved five or more participants and was also extensive.

### A. Applicable Law

Section 3B1.1(a) provides for a four-level increase "[i]f the defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). "Prior to imposing a leadership enhancement under section 3B1.1(a), a sentencing court must make 'specific factual findings that (i) the defendant was an organizer or leader, and (ii) the criminal activity involved five or more participants, or was otherwise extensive.'" *United States* v. *Lu Tian*, 339 F.3d 143, 156 (2d Cir. 2003) (quoting *United States* v. *Escotto*, 121 F.3d 81, 85 (2d Cir. 1997)). The Guidelines, however, "only require that the defendant be an organizer or leader of one or more of those participants for the section 3B1.1(a) enhancement to be appropriate." *Id.* And "one conspirator's leadership role is not dispositive on the question of whether another was also a leader." *United States* v. *Duncan*, 42 F.3d 97, 106 n.6 (2d Cir. 1994).

35

### B. Discussion

The defendants co-led and jointly organized "extensive" efforts, involving many more than five knowing participants, to dispatch large loads of cocaine from the Maiquetía Airport. U.S.S.G. § 3B1.1(a); *see also id.* app. n.4 ("There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy."). The leadership role of both defendants is illustrated by "the degree of discretion exercised by [them], the nature and degree of [their] participation in planning or organizing the offense, and the degree of control and authority exercised over the other members of the conspiracy." *United States* v. *Beaulieau*, 959 F.2d 375, 379-80 (2d Cir. 1992).

### 1. Flores Was a Leader and Organizer

Flores was plainly a leader and organizer with respect to the six bodyguards who he admitted during his confession were participating in the crime, which standing alone is sufficient to warrant application of the four-level enhancement. *See United States* v. *Zichettello*, 208 F.3d 72, 107 (2d Cir. 2000) (noting that defendants "are subject to [section 3B1.1(a)'s] enhancement even if they each managed only one other participant, not five"). Moreover, throughout September 2015, Flores was the main point of contact with Pepe as the defendants tried to set up cocaine shipments with the Sombrero Organization. (*E.g.*, GX 515-T at 7-9). Flores communicated with Pepe about the planes' specifications, and progress toward sending the shipment. (GX 515-T at 8-9 ("No pistons it has to be turbine" // "No PROPELLER"); *id.* at 16-17 (Pepe explaining to Flores that Mayweather's "captain" had not secured a necessary flight permit at the airport)). When the Sombrero Organization failed to properly arrange the logistics,

it was Flores who warned Pepe that "we are looking very bad in front of people who really want to work." (GX 515-T at 19-20).

Flores's text messages with "Rondon Casa Militar" regarding the defendants' departure to Honduras on October 3, 2015 suggested that Flores also supervised this individual at the airport. (*See* GX 518-T at 2). Upon returning from their meeting with Sentado in Honduras on October 3, Flores jointly planned the security team and communications logistics the defendants would use in committing their crime. (*See* GX 503-T at 2). These decisions were particularly significant because they reflect steps by both defendants to recruit accomplices and a shared view that some, but not all, members of the defendants' security detail were sufficiently trustworthy to participate in their crime.

Flores also maintained direct contact with other co-conspirators in Venezuela, such as Gocho (*see* Tr. 162), as well as in Honduras, such as Rayo (*see generally* GX 504-T). In mid-October 2015, for example, Flores informed Rayo that "we," *i.e.*, the defendants, "called that off," referring to the drug shipment, based on "a huge issue with communication" with Sentado (GX 504-T at 5). *See United States* v. *Philippeaux*, No. 16-341-cr, 2017 WL 2375495, at *2 (2d Cir. June 1, 2017) (finding relevant to leadership status a defendant's "exercise of decision making authority in abandon the 2012 deal"). When negotiations resumed during the late-October 2015 meetings in Caracas with CS-1 and CS-2, Campo explained that Flores was his "partner," said that they had "some power" in Venezuela, and indicated that Flores could speak for him "on the day I am not around." (GX 203-T at 21:3, 11; GX 207-T at 7:17-29). Flores's joint leadership of the operation was further illustrated by the manner in which the defendants exchanged electronic communications to keep each other apprised of the status of the conspiracy and the drug-trafficking

negotiations.  (*E.g.*, GX 503-T, 510-T).  Moreover, Flores told CS-1 that, with respect to anticipated drug shipments, "we are present" to lead the operation, "we always are," and "we'll take care of sending it personally."  (GX 201-T at 42:17-25).  The defendants' anticipated presence during drug shipments was critical not only to their effective leadership of their bodyguards and other co-conspirators, but also to ward off military or law enforcement officials who attempted to interfere with their criminal activities.  (*See* GX 201-T at 43:39 (Campo indicating that his "guys can withstand . . . anything" but Flores the defendants necessary "if all of a sudden . . . a bigger goat arrives, let's say a colonel [or] a general")).

Finally, in November 2015, Flores played a "crucial role in the planning, coordination, and implementation of [the] criminal scheme" by traveling to Honduras with Moreno, one of the bodyguards, to negotiate details for the arrival of the first cocaine shipment at the Roatán Airport.  *United States* v. *Paccione*, 202 F.3d 622, 624 (2d Cir. 2000); *see also United States* v. *Philippeaux*, 2017 WL 2375495, at *2 (finding relevant to leadership status a defendant's "extensive efforts organizing and planning both the 2012 and 2013 transactions").  The Court has already described this trip accurately as Flores "travel[ing] to Honduras to iron out delivery and logistics" for the cocaine shipment.  *Campo Flores*, 2017 WL 1133430, at *4.  Flores told the participants in the November 6, 2015 meeting that he and Campo had "full command" at the Maiquetía Airport and could dispatch a drug-laden plane "at whatever time we want."  (GX 222-T at 13:28-14:4; *see also* GX 223-T at 5:21 ("[W]e have the . . . control")).  He negotiated the date and time of the anticipated shipment, and discussed crucial details such as the operations at the Roatán Airport.  He also asserted during the meeting that people at the Roatán Airport would

"receive [the cocaine] *for me*" and "unload the merchandise *for me* immediately." (GX 222-T at 9:23-27 (emphases added)).

In sum, throughout the defendants' course of conduct, Flores exercised decision-making authority, participated in the recruitment of accomplices when he and Campo determined which members of their security team would be involved in the drug shipments, and participated extensively in the planning and organization of the offense (including a meeting in Honduras that he attended without Campo on behalf of both defendants). In doing so, he acted as an "organizer" and "leader" under the Guidelines.

### 2. Campo Was a Leader and Organizer

For the reasons set forth above, and the additional reasons that follow, Campo was also a leader and organizer during the defendants' jointly undertaken course of conduct.

Like Flores, Campo was a leader with respect to the bodyguards' participation in the crime, which is alone sufficient to warrant application of the four-level enhancement. The audio and video evidence at trial demonstrated Campo's leadership role. During the October 27, 2015 meeting in Caracas for instance, Campo called his bodyguards on the radio to ask them for a knife so he could open the one-kilogram cocaine sample that the defendants brought to the meeting. (GX 210-T at 18). The bodyguards addressed Campo as "boss." (GX 210-T at 18:24 ("Yes, boss . . . "); *see also id.* at 20:15 ([Bodyguard:] "Boss, that's a positive over here, sir. Boss, that's a positive, I have the pocket knife here" // [Campo:] Oh good take it to Leonardo and, and tell him to bring it to me, please")).

Moreover, Campo often took the lead role in negotiating with Sentado and with CS-1 and CS-2 on behalf of the defendants. Indeed, Campo told CS-1 and CS-2 that he was "the

one in charge" during the defendants' negotiations with Sentado. (GX 201-T at 34). During the meetings in Venezuela with CS-1 and CS-2, Campo drove much of the discussion, at times using a list of "points" that, based on the conversation at the meeting, he appeared to have written out beforehand with input from Flores. (GX 205-T at 11:25). Campo first raised "the issue in regards to the plane." (GX 205-T at 16:12). Then, after declaring "we are all set with the topic of the car," Campo transitioned to discussing scheduling: "[L]et's get started right away." (GX 206-T at 28:25). Campo referred to the anticipated first cocaine shipment as a "measly ten million dollar deal" and later reiterated that he "need[ed] twenty million by December tenth at the latest," explaining that the money was necessary to pay bribes in Venezuela relating to the upcoming elections. (GX 207-T at 6:16, 30:18-33:4; GX 208-T at 21:16). Campo also demanded a partial upfront payment for the drugs during the meeting at the time the cocaine was sent out of Maiquetía Airport—"at least the two first times" that the defendants dispatched drug loads. (GX 207-T at 4:17, 5:1, 11:18).

Campo's preparation of an explicit agenda for the meeting, and his demand of an up-front payment on behalf of the defendants, thoroughly refutes the defendants' sentencing claim that they "relied entirely" on Sentado and other informants as to discretionary matters. (Def. Mem. at 16). Campo also admitted to participating in "approximately five" in-person meetings with Gocho, the source of the 800 kilograms of cocaine the defendants planned to use in the first shipment. (Tr. 148). And there is certainly no evidence that anyone acting at the direction of the DEA directed the defendants to cultivate a connection to a "high-ranked" FARC commander for purposes of supplying "shovelful[s]" of cocaine, but that is precisely what the defendants did, on their own, as they organized this crime. (GX 230-T at 3; GX 207-T at 4).

Moreover, following the meetings in Venezuela, Campo continued to communicate with CS-1 via BlackBerry messenger, updating CS-1 on the status of the transaction. These communications further show Campo's role as one of the organizers and leaders in the conspiracy. Campo, for instance, coordinated multiple efforts to send drug pilots to Honduras so that they could meet with some of the individuals who would receive the drugs at the Roatán Airport. (*See, e.g.*, GX-302-T at 9:9-11). When the pilots were denied entry into Honduras, including Marco Tulio Uzcategui Contreras (who later accompanied the defendants to Haiti), Campo told CS-1 that he would "kill them" and that Flores would come to Honduras on November 6 "so you guys may see how serious we are." (GX 306-T at 5:17, 6:5-25, 7:25-29, 11:5). In other words, Campo agreed to send his partner and co-leader to Honduras in order to finalize the negotiations in an effort to demonstrate the defendants' commitment to leading the conspiracy and their credibility. He then helped coordinate Flores's trip, writing to CS-1 on November 6, 2015 that Flores would be arriving in San Pedro Sula via a private plane bearing registration number YV-570T, which is the same plane that the defendants took to Honduras on October 3. (GX 307-T at 2; *see also* GX 518-T at 2). Finally, during the November 10, 2015 meeting in Haiti, the defendants confirmed their joint organizer and leadership roles when Flores explained to CS-1: "We have it set up for the fifteenth." (GX 231-T at 19). The comment demonstrates that the defendants had, at least in their view, coordinated all of the steps necessary to dispatch 800 kilograms of cocaine within five days of the Haiti meeting.

In short, the trial evidence showed that Campo, "exercise[d]" a significant degree "of decision making authority" in the charged conduct and played a central role "in planning [and] organizing the offense," as evidenced by the lead role he took in negotiations; "recruit[ed]

41

accomplices," including bodyguards and the pilots who would fly the drug load to Honduras; "claimed," with Flores, the right to $20 million in proceeds from the conspiracy; and exercised control over others, including the bodyguards and the pilots. *See* U.S.S.G. § 3B1.1 app. n 4. Accordingly, Campo, like Flores, acted as an organizer and leader with respect to the defendants' course of conduct.

### 3. The Defendants' Criminal Activity Involved More Than Five Participants and Was Otherwise Extensive

The defendants' criminal activity, including their entire course of conduct, involved more than five participants, including the two defendants,[10] Pepe, Gocho, Daza, Rayo, Soto, Carlos Gonzalez, and at least six bodyguards that Flores admitted "knew about the shipment and were going to help him load the cocaine onto the plane" (GX 2003 at 2; *see also* Tr. 163-64 (Special Agent Gonzalez testifying that Flores specified that approximately six bodyguards were involved)). While not denying the large number of individuals involved in the conspiracy, the defendants contend that the four-point leadership enhancement is not appropriate because other individuals involved in the offense were not knowing participants in the conspiracy. The Court should reject this argument.

The defendants' criminal activity involved, in addition to themselves, at least 12 more knowing participants:

- <u>At least six bodyguards</u>.  Flores admitted to the DEA that there were at least six members of the defendants' security team who "knew [about the shipment] and that they were going to help him load the cocaine onto the plane."  (Tr. 163-64).

---

[10] *See, e.g.*, *United States* v. *Norman*, 776 F.3d 67, 82 (2d Cir. 2015) ("The defendant himself is to be counted as one of the participants.").

- <u>Pepe</u>.  Pepe communicated with the defendants for months about facilitating large drug shipments, included discussions about meeting with members of the Sombrero Organization, the use of private aircraft to transport drugs, and obtaining the 800 kilograms of cocaine to be sent to the United States in November 2015.  (*E.g.*, GX 515-T at 7-11, 16-17, 28-31; GX 408-T at 21-24, 27).

- <u>Gocho</u>.  Gocho agreed to supply the defendants with 800 kilograms of cocaine on credit, without the defendants "putting down a single bolivar."  (GX 515-T at 31). Flores admitted in his post-arrest statement that "he had talked to Pepero [*i.e.*, Pepe] about this potential [cocaine] deal . . . and Pepero then introduced him to El Gocho," the individual who was going to supply the defendants with the 800 kilograms of cocaine.  (Tr. 162).  Campo admitted to participating in approximately five meetings with Gocho, that Gocho had provided the one-kilogram cocaine sample, and that at the time of the defendants' arrest Gocho possessed the 800 kilograms that were to be used in the anticipated November 15, 2015 shipment.  (Tr. 148).

- <u>Daza</u>.  Daza, who was not working at the DEA's direction, "introduced Defendants to [Sentado]" in Honduras, *Campo Flores*, 2017 WL 1133430, at *3, participated in the October 3, 2015 meeting in Honduras (GX 110 (photograph from the meeting)), and participated in the November 6, 2015 meeting in Honduras (*e.g.*, GX 221-T at 1, 9).

- <u>Rayo</u>.  Rayo was a Honduran associate of Sentado, not acting at the direction of the DEA, who participated in the negotiations with the defendants and communicated with them directly.  (*E.g.*, GX 202-T at 14, 21).  On October 5, 2015, Flores complained to Rayo about the lack of communication from Sentado, and approximately one week later Flores told Rayo that the defendants were "waiting to receive your visit over here." (GX 504-T at 2-3).  Although it appears that Rayo never reached Venezuela, he continued to serve as an intermediary between the defendants and Sentado up to and including the November 6, 2015 meeting.  (*E.g.*, *id.* at 9 ("Look they sent you an invitation"); *id.* at 13-14).

- <u>Carlos Gonzalez</u>.  Because Gonzalez pleaded guilty to participating in the conspiracy with the defendants, the defendants cannot establish that he was anything but a knowing participant in the offense under the preponderance standard applicable to their sentencings.  He traveled to San Pedro Sula, Honduras with Soto on November 5, 2015, for a meeting that the defendants' drug pilots were supposed to attend, but which ultimately involved Gonzalez, Soto, CS-3, and Sentado.  (GXs 215-T, 216-T). Following the November 5 meeting, Gonzalez understood that the cocaine at issue would be transported from the Roatán Airport "to San Pedro Sula, from San Pedro Sula to Mexico, and then to the United States."  (Tr. 1057-58).  Gonzalez returned to Roatán on November 6 believing that there was an agreement that he and Soto would receive the defendants' cocaine shipment in exchange for a total of $600,000.  (Tr. 1071).

43

- <u>Soto</u>. Like Gonzalez, Soto is charged with participating in the same conspiracy as the defendants. The grand jury's finding of probable cause supporting the charge, based on the same evidence offered at trial, serves as a substantial impediment to the defendants proving that Soto was anything but a knowing participant in the crime. They have not done so.

In short, all of the individuals the defendants claim were not "knowing participants" in the crime were, in fact, deeply and directly involved in the conspiracy.

The defendants rest their argument to the contrary on the theory that these people did not know that the cocaine at issue was to be imported into the United States. (Def. Mem. at 18). That is certainly wrong with respect to Gonzalez, who testified that there was no doubt in his mind that the drugs would reach the United States "because practically all the drugs that come through my country, Honduras, end up in the states, in the United States." (Tr. 1058-59). Gonzalez also explained that the involvement of Mexicans in the negotiations "consolidated even more my certainty that the drugs were coming to the United States." (Tr. 1059). Moreover, Moreno—who was supervised by both defendants—accompanied Flores to very similar negotiations in Honduras on the following day, November 6, which included repeated discussion of the "Americans" and other aspects of the conspiracy that put him on notice of the nexus between their activities and the United States. (GX 222-T at 10:1, 15:20; GX 223-T at 6:26). Finally, as to all of the participants in the offense, the Court has already found that "an explicit manifestation" of intent to send drugs to the United States "is not required" to find the requisite knowledge and intent. *Campo Flores*, 2017 WL 1133430, at *2. The trial evidence demonstrated that "approximately 80 percent of the cocaine sent from Venezuela along the Central American corridor . . . is destined for the United States" and that "drug traffickers *as well as 'a fair amount of the population' in South America* have knowledge of these drug routes." *Id.* at *7 (emphasis added). In light of these participants'

44

deep involvement in the transaction at issue, the record supports a finding by a preponderance of the evidence that they knew, or consciously avoided learning, that the cocaine was destined for the United States.  As such, these individuals were knowing participants in the conspiracy, and the Court should reject the defendants' arguments to the contrary.

In the alternative, the defendants' criminal activity was "otherwise extensive." U.S.S.G. § 3B1.1(a); *see also United States* v. *Archer*, 671 F.3d 149, 161 (2d Cir. 2011) (affirming the application of a § 3B1.1(a) enhancement because it was uncontested that there were at least three knowing participants and "a fair number" of unknowing participants, "the precise number being impossible to determine").  In this regard, the issue is whether the number of unknowing participants results in "the functional equivalent" of criminal activity involving five or more participants.  *United States* v. *Kent*, 821 F.3d 362, 370 (2d Cir. 2016) (internal quotation marks omitted).  Gilson Barreota Flores participated in the crime, even if unwittingly, by supplying weapons to the defendants and helping to coordinate their access to private aircraft for trips to negotiate the drug deal.  The defendants' criminal activity also involved personnel at Maiquetía Airport such as "Rondon Casa Militar," who helped arrange the defendants' departure to Honduras for the October 3, 2015 meeting.  (GX 518-T).  The defendants' control of these participants resulted in what Flores described as the defendants' "full command" and "control" of the Maiquetía Airport.  (GX 222-T at 13:28-14:4; *see also* GX 223-T at 5:21).  The crime involved several pilots, such as Marco Uzcategui Contreras, who transported one or both of the defendants to Honduras (twice) and Haiti.  Finally, Soto made clear during the November 6, 2015 meeting in Honduras that numerous people at the Roatán Airport would be participating in the first drug shipment, and there would be additional personnel waiting at an alternative clandestine airstrip in

45

case "the gringos . . . come up." (GX 222-T at 16:4-32, 19:24). Thus, in addition to the fact that there were more than five knowing participants in the offense, the defendants' criminal activity was otherwise extensive. Accordingly, the Court should apply a four-level aggravating role enhancement to each defendant.

## IX.    U.S.S.G. § 2D1.1(b)(15)(C):  The Defendants Were Directly Involved in the Importation of Cocaine

Pursuant to U.S.S.G. § 2D1.1(b)(15)(C), because an aggravating-role adjustment is appropriate, and the defendants were "directly involved in the importation" of cocaine by virtue of their relevant conduct, two levels should be added to the extent the Court does not apply the enhancement at U.S.S.G. § 2D1.1(b)(3)(A).

Even though the importation offense was not completed, the defendants "counseled" and "commanded" several participants to take steps in the continuous process of importing cocaine that was to involve the FARC producing drugs in Colombia, the defendants dispatching the drugs from Maiquetía Airport, and the drugs reaching the United States via either the Sombrero Organization or the Sources. *See* U.S.S.G. § 2D1.1 app. n.20(B). The participants who were so counseled included Pepe and the bodyguards described by Flores in his confession. Finally, in two recent decisions from this District, courts have applied this enhancement to drug traffickers such as the defendants whose relevant conduct involves facilitating the importation of cocaine from points in South and Central America rather than at the U.S. border. *See United States* v. *Lobo*, 2017 WL 2838187, at *4; *United States* v. *Suarez*, 2014 WL 1998234, at *1, 3. Another court applied the enhancement based on "two maritime drug interdictions in international waters" that did not result in the actual importation of narcotics into the United States. *United States* v. *Ortiz-Lopez*, No. 11 Cr. 48, 2017 WL 397582, at *1 (M.D. Fla. Jan. 30, 2017). Accordingly, the

Court should apply the enhancement at Section 2D1.1(b)(15)(C) to the extent it finds that the enhancement at Section 2D1.1(b)(3) does not apply.

## X.  U.S.S.G. § 3C1.1:  The Defendants Attempted to Obstruct Justice In Connection With Their Pretrial Motions

A two-point obstruction of justice enhancement is also warranted for both defendants based on their false statements in sworn declarations filed in an effort to mislead the Court into concluding incorrectly that their confessions were obtained in violation of their constitutional rights.

### A.  Relevant Facts

In connection with pretrial motions, each defendant submitted a declaration under penalty of perjury (the "Flores Declaration" (Dkt. No. 46-1) and the "Campo Declaration" (Dkt. No. 52-1)), which contained numerous false statements relating to their arrests in Haiti, treatment by law enforcement, and post-arrest interrogation.

#### 1.  Lies Regarding the Defendants' Arrests in Haiti

Flores swore in the Declaration that, when he was arrested in Haiti on November 10, 2015 by personnel from the *Bureau de Lutte Contre Le Trafic de Stupefiants* ("BLTS"), "approximately 20 heavily armed men stormed the room," "armed with assault rifles, handguns, and grenades, and did not have any badges, insignia, or visible identification on their clothing or equipment."  (Flores Decl. ¶ 6).  Flores swore that the officers "never identified themselves as law enforcement."  (*Id.*).  Finally, Flores swore that "some of the men pointed their guns at my head" and the defendants "had not yet had breakfast, and [he] had not eaten anything since the night before."  (*Id.* ¶ 7).  Campo swore that "numerous armed men stormed into the room" wearing military uniforms without "any insignias."  (Campo Decl. ¶ 2).

47

At the suppression hearing, however, a member of the BLTS who participated in the arrest of the defendants credibly testified that: (i) he and the other BLTS officers present at the arrest wore uniforms indicating that they were from the "Police" and "BLTS" (Sept. 8, 2016 Tr. 6-7); (ii) the BLTS supervisor who managed the arrest operation generally wears plainclothes (*id.* at 18); (iii) only three BLTS officers accompanied the supervisor into the hotel to arrest the defendants (*id.* at 9); (iv) both the supervisor and the BLTS officers informed the defendants that they were "police" (*id.* at 10-11); and (v) no law enforcement personnel possessed grenades, and the officer did not point his gun at the defendants (*id.* at 7, 11). Special Agent Gonzalez also testified at the suppression hearing that when he entered the hotel following the arrest of the defendants in Haiti, it appeared that they had already eaten breakfast. (Sept. 8, 2016 Tr. 198).

In an opinion denying the defendants' motions to suppress, the Court found that, "[i]n a number of particulars, the evidence at the hearing contradicts Defendants' declarations." *United States* v. *Campo Flores*, 15 Cr. 765 (PAC), 2016 WL 5946472, at *8 n.8 (S.D.N.Y. Oct. 12, 2016). For example, "photographs taken the day of the arrest show that the Haitian police's uniforms had patches stating, in large letters, POLICE," and "credible testimony from a BLTS officer establishes that Defendants were informed in Spanish that they were being arrested by police at the time of their arrest." *Id.*

## 2. Lies Regarding the DEA's Clothing

Flores swore in his Declaration that when the defendants were turned over to the DEA in Haiti, the DEA agents "were in plain clothes and did not have any visible identification." (Flores Decl. ¶ 12). Campo swore that he encountered "six additional men" who were "wearing civilian clothes" but "did not indicate who they were," and that he "did not observe any markings

indicating where they were from." (Campo Decl. ¶ 5). However, a photograph of the defendants at the airport just before departing to the United States shows them standing next to a DEA agent wearing a jacket clearly marked "DEA." (Suppression Hr'g GX 6). Based on this photograph, the Court found that "[a]t least one DEA agent was wearing a jacket with a badge and DEA written in large letters on the front during the transfer of custody." *United States* v. *Campo Flores*, 2016 WL 5946472, at *8.

### 3. Lies Regarding Threats by the DEA

Flores swore in his Declaration that during the flight from Haiti to the United States, Special Agent Gonzalez told both defendants that the DEA "could help us if we cooperated with them and that, if we did not, we likely would spend the rest of our lives in a U.S. prison and might never see our families again." (Flores Decl. ¶ 14). Flores swore that Special Agent Gonzalez subsequently told him that "I must cooperate or that I [would] spend the rest of my life in prison." (*Id.* ¶ 20). Flores also swore that Special Agent Kimojha Brooks "told me that we were in 'huge trouble,' that we had committed a very serious crime, and that I could go to jail for life." (*Id.* ¶ 17). Campo swore that Special Agent Gonzalez told the defendants that "we would likely die in prison if we did not cooperate," and that his "infant children would not get to know" him but that his children "did not need [him] around anyway." (Campo Decl. ¶¶ 7, 9).

At the suppression hearing, Special Agent Gonzalez credibly testified—on both direct and cross-examination—that he did not threaten the defendants. (Sept. 8, 2016 Tr. 71-72, 138). Similarly, Special Agent Brooks credibly testified—on both direct and cross-examination—that no threats were made during the flight, and that he did not tell Flores that the crime was "very serious" or that Flores "could go to jail for life." (*Id.* at 247-49).

49

### 4. Lies Regarding Alleged Two-Step Interrogation by the DEA

Flores swore in his Declaration that during the flight from Haiti to the United States, and before signing a *Miranda* waiver, Special Agent Brooks asked Flores questions about the substance of the case, *i.e.*, "if I worked or did deals with Cilia Flores' two sons, my cousins." (Flores Decl. ¶ 18). Campo swore that he was

> questioned by Special Agent Gonzalez for what seemed to me to be a substantial period of time. At this point, I was not advised of any of the rights set forth in the Miranda waiver that was later given to me . . . . Among other things, I was asked about the various meetings I attended and statements that I made in connection with what the agents described as the conspiracy that I was charged with.
>
> [. . .]
>
> The agents then presented me with the Miranda form and I signed it. After I signed it, I spoke with them for what seemed again to be a substantial amount of time. During that time period, we discussed many of the same topics that we spoke about prior to me signing the form."

(Campo Decl. ¶¶ 9, 11).

At the suppression hearing, Special Agent Brooks testified that he only asked Flores about his pedigree information for purposes of completing required DEA forms, and did not ask either defendant questions about the charge or the evidence during the flight. (Sept. 8, 2016 Tr. 243, 258). Special Agent Gonzalez similarly testified that he did not ask either defendant substantive questions until after they signed the *Miranda* waivers. (Sept. 8, 2016 Tr. 67, 71). Both agents were cross-examined on these points, and their testimony remained consistent in all material respects thereby underscoring its credulity.

Following the hearing, the Court "adopt[ed] the DEA agents' testimony," declined to "find Mr. Campo Flores's declaration credible with respect to any pre-warning questioning," and concluded that "there was no pre-*Miranda* interrogation of Mr. Campo Flores." *Campo*

*Flores*, 2016 WL 5946472, at \*6.  As to Flores, the Court found that "there was no two-step interrogation," and that Special Agent Brooks "testified credibly that he asked Mr. Flores de Freitas pedigree questions only; S.A. Brooks further testified that he did not ask Mr. Flores de Freitas about business deals with his family." *Id.* at \*7.

## B.  Applicable Law

An obstruction enhancement is appropriate where a defendant provides "materially false information to a judge or magistrate judge," U.S.S.G. § 3C1.1 app. n.4(F), including by submitting a "knowingly false affidavit" in support of a motion, *United States* v. *Lincecum*, 220 F.3d 77, 80 (2d Cir. 2000).  Information is "material" where, "if believed, [it] would tend to influence or affect the issue under determination."  U.S.S.G. § 3C1.1 app. n.6; *see also United States* v. *Mendoza*, 12 F. App'x 73, 74 (2d Cir. 2001) (summary order) ("A defendant's knowingly false statement in an affidavit submitted in support of a motion to suppress is material if the statement could have influenced disposition of the suppression motion.").

"Before imposing the adjustment, the district court must find that the defendant 'consciously act[ed] with the purpose of obstructing justice.'"  *United States* v. *Lincecum*, 220 F.3d at 80 (quoting *United States* v. *Case*, 180 F.3d 464, 467 (2d Cir. 1999)).  "In determining the intent with which a defendant acted, a district court is entitled to rely on circumstantial evidence and on all reasonable inferences that may be drawn from all of the evidence."  *United States* v. *Khedr*, 343 F.3d 96, 102 (2d Cir. 2003).  The intent requirement is satisfied by a finding "that the defendant 'has clearly lied' in a statement made 'under oath'" relating to a "material matter." *Lincecum*, 220 F.3d at 80 (quoting *United States* v. *Williams*, 79 F.3d 334, 337-38 (2d Cir. 1996)). "The enhancement may be imposed based on a defendant's knowingly false affidavit in support of

a suppression motion if the affidavit could have influenced disposition of the motion." *United States* v. *Ramos*, No. 98 Cr. 263 (DC), 2005 WL 3543691, at *2 (S.D.N.Y. Dec. 28, 2005).

By its terms, the enhancement "applies not only to successful obstructions but also to attempts." *Lincecum*, 220 F.3d at 80-81. And "[t]he obstruction of justice enhancement [under Section 3C1.1] . . . is mandatory once its factual predicates have been established." *United States* v. *Friedman*, 998 F.2d 53, 58 (2d Cir. 1993).

## C. Discussion

The obstruction enhancement applies because both defendants submitted false declarations to the Court in an attempt to use falsehoods to achieve the suppression of their confessions.

### 1. Flores Attempted to Obstruct Justice Through His Declaration

The Court has already concluded that the detailed Flores Declaration was false in several respects, including regarding his arrest in Haiti, his interactions with the BLTS, and his interactions with the DEA. These lies were "material" because, "if believed," they "would tend to influence or affect" the outcome of the suppression motion. U.S.S.G. § 3C1.1 app. n.6.

The circumstances under which these lies were perpetrated support a finding of willfulness because of the number of falsehoods and the detailed manner in which they were presented. *See United States* v. *Sencion*, 2 F. App'x 106, 108 (2d Cir. 2001) (summary order) (affirming willfulness conclusion where court "found it 'impossible' to believe" that misstatements were made negligently); *see also United States* v. *Agudelo*, 414 F.3d 345, 350 (2d Cir. 2005) (reasoning that lies in *Lincecum* were willful and "reeked of fabrication because he could not have simply misremembered so much detail"). Flores's lies were plainly intended to mislead the Court

52

into concluding, incorrectly, that his confession was coerced and obtained in an unconstitutional manner. *See, e.g.*, *Lincecum*, 220 F.3d at 80 ("Although [defendant] argues that the false representations in his affidavit were not material . . . , it is plain that those sworn misrepresentations, if credited by the district court, would have resulted in the granting of his motion to suppress."); *United States* v. *Louis*, 63 F. App'x 29, 31 (2d Cir. 2003) (summary order) (affirming application of enhancement based on district court's finding "that defendant made material, intentionally false statements in an affidavit . . . in order to bolster defendant's argument that the arresting officers improperly interrogated him prior to informing him of his *Miranda* rights"); *see also* U.S.S.G. § 3C1.1 app. n.6 (explaining that a misstatement is material where "if believed, [it] would tend to influence or affect the issue under determination"). Indeed, as in *Lincecum*, the falsehoods in the Flores Declaration were part of the basis for conducting a suppression hearing relating to his allegations of a *Miranda* violation. *See id.* at 81 (noting that defendant's false statements "were sufficient to compel a hearing on his motion to suppress"). Accordingly, the Court should impose a two-level increase pursuant to U.S.S.G. § 3C1.1.

### 2.  Campo Attempted to Obstruct Justice Through His Declaration

The Campo Declaration contained similar types of lies regarding his arrest, the BLTS, and the DEA, which the Court also rejected as false. Moreover, whereas Flores was somewhat equivocal about the substance of his alleged pre-*Miranda* interrogation, Campo went further by swearing explicitly that he was subjected to extensive pre-*Miranda* questioning related to his offense conduct and the investigation. (*Compare* Flores Decl. ¶ 16, *with* Campo Decl. ¶¶ 9-11). After the suppression hearing, the Court explicitly found that Campo lied, stating that it did "not find Mr. Campo Flores declaration credible with respect to any pre-warning questioning."

*Campo Flores*, 2016 WL 5946472, at *6. Finally, all of Campo's lies were material because they could have influenced the outcome of the suppression motion and resulted in the suppression of his confession under applicable law. *See United States* v. *Louis*, 63 F. App'x at 31.

### 3. The Defendants Acted with the Requisite Intent to Obstruct Justice

The defendants are correct that the Court should not impose the obstruction enhancement without "consideration of possible mistake, confusion, or honest belief" explanations for the falsehoods in the defendants' declarations, *Agudelo*, 414 F.3d at 349. (Def. Mem. at 10). However, "[g]iven the numerous witnesses who contradicted [the defendants] regarding so many facts on which [they] could not have been mistaken, there is ample support" for a finding of specific intent to obstruct justice. *United States* v. *Dunnigan*, 507 U.S. 87, 95-96, (1993). Moreover, where, as here, defendants have "clearly lied in a statement made under oath," all that is necessary to support a finding of specific intent is for the Court to "point to the obvious lie and find that the defendant knowingly made a false statement on a material matter." *United States* v. *Young*, 811 F.3d 592, 604 (2d Cir. 2016) (internal quotation marks omitted). Both defendants clearly lied in their sworn Declarations about details of their interrogations that bore directly on the merits of their two-step interrogation claims, as well as additional details relating to their arrests and treatment by law enforcement that were designed to suggest to the Court that their confessions were involuntary. They now seek to rely on the latter category of falsehoods to suggest that they were too bewildered to remember the details of November 10, 2015, which resulted in the inaccuracies in their declarations. The claim is particularly dubious with respect to Campo, who is an attorney. (*E.g.*, GX 2001 at 2). In any event, the Court has already found these claims to have been "exaggerated," *Campo Flores*, 2016 WL 5946472, at *8 n.8, and the defendants should

not be permitted to rely on them at sentencing to avoid accountability for their efforts to corrupt the fact-finding process.

## XI.    The Defendants' Eleventh-Hour Request for a Hearing Should Be Denied

There is no need for a hearing to resolve the parties' factual disputes, which can be addressed on the basis of the record and the submissions. Each defendant will have an opportunity to present additional advocacy on these issues at his sentencing, and the Court should deny the defendants' eleventh-hour request for an additional joint hearing prior to their separate sentencings.

### A.    Relevant Facts

The defendants were convicted at trial almost 10 months ago, on November 18, 2016. At that time, the Court set a sentencing control date of March 7, 2017. (Dkt. No. 133). The date was subsequently adjourned until June 27, 2017. Draft PSRs were disclosed by May 23, 2017. By joint letter dated June 17, 2017, the defendants requested a further adjournment of their sentencings, with the consent of the Government, "in light of the numerous and complex sentencing issues presented in this matter." (Dkt. No. 173). The Court granted the request and adjourned the sentencings until September 12 and 13, 2017. (*Id.*).

The final PSRs were issued on August 15, 2017. On August 25, 2017, the defendants filed a 52-page "Joint Initial Sentencing Submission In Opposition to the Guidelines Calculations in the Presentence Reports." (Dkt. No. 178). Approximately one week prior to sentencing dates that had been established for almost three months, defense counsel requested via email that a single date in September 2017 be scheduled to "serve as a hearing" at which the defendants can "argue the numerous factual and legal issues presented by the Guidelines

55

calculations in the PSR - as we argued in our joint submission of August 25th." In response to the Government's opposition to a hearing, counsel claimed that the Government "seeks to rush through this process," which commenced last November, and requested a new schedule that "allows the parties and the Court to work through the complex legal and factual issues . . . concerning the PSR's many Guidelines enhancements." (Dkt. No. 179).

## B. Discussion

The defendants—each represented by retained counsel from a large law firm—have been on notice of the Probation Office's view of the Guidelines since the draft PSRs were disclosed in late-May 2017. They obtained an adjournment of their sentencings approximately one month later in order to present objections to the draft PSRs and evaluate the enhancements at issue. They have had the final PSRs since mid-August 2017. *See United States* v. *Prescott*, 920 F.2d 139, 146-47 (2d Cir. 1990) (finding no error in refusal to adjourn sentencing where defendant and attorneys were afforded sufficient time to review relevant materials). Thus, the defendants have had more than enough time to engage with, and present advocacy relating to, the factual record and Guidelines calculations.

Counsel submitted at least some of that advocacy to the Court in their August 25 submission, and have not specified any evidence or testimony that they wish to present at the requested hearing. Instead, as suggested by their email, they seem to seek an opportunity to present oral advocacy relating to the points already "argued in our joint submission of August 25th." To the extent the Court wishes to hear more from the parties about the Guidelines, there is no reason that such argument cannot be accomplished at the defendants' individual sentencings. More importantly, "it is well established that a district court need not hold an evidentiary hearing to

56

resolve sentencing disputes, as long as the defendant is afforded some opportunity to rebut the Government's allegations," which the defendants did, at least "Initial[ly]," on August 25. *United States* v. *Cacace*, 796 F.3d at 191 (internal quotation marks omitted); *see also* U.S.S.G. § 6A1.3(a) & cmt. (noting that "lengthy sentencing hearings seldom should be necessary" and "[w]ritten statements of counsel or affidavits of witnesses may be adequate under many circumstances" to resolve sentencing disputes); *United States* v. *Rutigliano*, 614 F. App'x 542, 547 (2d Cir. 2015) (summary order) (finding no abuse of discretion in denial of sentencing hearing where court found defendant was "'raising issues litigated at the trial and some of them determined by the court in preparation for the trial, and . . . essentially for [the court] to have another trial on some of these issues, and [the court was] not going to do that'"); *United States* v. *Slevin*, 106 F.3d 1086, 1091 (2d Cir. 1996) (finding no abuse of discretion in denial of sentencing hearing where defendant was permitted to cross-examine witnesses at trial, "submit written argument to the court" and "argue the issue orally"). Accordingly, the defendants' request for a hearing should be denied, and the Court should proceed with individual sentencing proceedings relating to each defendant.

### THE DEFENDANTS ARE NOT ELIGIBLE FOR SAFETY-VALVE RELIEF

The defendants also seek to avoid the consequences of their actions, and their convictions, by claiming eligibility for safety-valve relief based on their confessions alone. However, neither defendant has disclosed all information in his possession relating to "same course of conduct or of a common scheme or plan," 18 U.S.C. § 3553(f)(5), and the record demonstrates that such a proffer from either defendant would confirm that they are not in fact eligible for the relief they seek.

## I. Applicable Law

The "safety valve," codified at 18 U.S.C. 3553(f), allows certain defendants relief from otherwise applicable mandatory minimum sentences.  In enacting the safety-valve provision, "Congress intended to provide relief from statutory minimum sentences to those defendants who, *but for their minor roles in criminal activity*, could (and would) have provided the Government with substantial assistance."  *United States* v. *Reynoso*, 239 F.3d 143, 146 (2d Cir. 2000) (emphasis in original) (discussing the legislative history of the provision and also noting that Congress "was concerned about the low-level figure in a drug conspiracy who sought to provide the Government with substantial assistance but, by virtue of his or her minor involvement in the criminal activity, had no new or useful information to trade" (quotation omitted)).

To qualify for the safety valve, a defendant must establish that he meets five criteria.  The burden is the defendant's.  *Id.*; *accord United States* v. *Jimenez*, 451 F.3d 97, 102-03 (2d Cir. 2006) ("The safety valve certainly was not intended to impose on the government five additional elements that it must prove before triggering the imposition of a mandatory-minimum sentence.").  The five criteria are:

> (1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;
>
> (2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
>
> (3) the offense did not result in death or serious bodily injury to any person;
>
> (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in section 408 of the Controlled Substances Act; and

(5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement

18 U.S.C. § 3553(f).

## II.  Discussion

The defendants have not demonstrated that they meet the second, fourth, and fifth safety-valve criteria.

As to the second and fourth criteria, for the reasons set forth above with respect to the application of Sections 2D1.1(b)(1), 2D1.1(b)(2), and 3B1.1, the defendants have failed to show that:  (i) they "did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense"; and (ii) they are not eligible for an aggravating-role adjustment.  18 U.S.C. § 3553(f)(2), (f)(4).[11]

Moreover, neither defendant has disclosed "all information" that he has "concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan."  18 U.S.C. § 3553(f)(5).  While the defendants' confessions were largely sufficient to meet the elements necessary for the offense of conviction, they were not complete disclosures of the defendants' full course of conduct—including their additional activities with

---

[11] Even if the Court found that the four-point "leader or organizer" adjustment did not apply, the defendants would still be ineligible for the safety valve because, for all the reasons discussed above, they meet the criteria for the three- and two-point "manager or supervisor" aggravating-role adjustment, *see* U.S.S.G. §§ 3B1.1(b)-(c).

Pepe and the Sombrero Organization.  One of the cases relied upon by the defendants establishes that even drug-trafficking activities unrelated to the United States can constitute part of the "same course of conduct."  18 U.S.C. § 3553(f)(5).  Specifically, in *United States* v. *Azeem*, the Second Circuit affirmed a sentencing court's ruling that heroin transported from Pakistan to Egypt was part of a common scheme that also involved the importation of heroin into the United States, where the defendant used the same courier to deliver the heroin in New York and Cairo.  946 F.2d 13, 16-17 (2d Cir. 1991).  Here, the drug-trafficking course of conduct involved overlapping participants, *e.g.*, the defendants and Pepe, and the same methodology at Maiquetía Airport.  (*See, e.g.*, GX 403-T at 4 (Campo explaining to an associate that "[t]his is a homerun for us" because "no one can get tickets right now to travel and we have the connections ready"); *see also id.* at 5 (Campo exclaiming that the defendants "ha[d] gold in our hands and we're throwing it away" by not using their access to Maiquetía Airport to dispatch drug loads)).  Therefore, the defendants' failure to disclose and acknowledge drug-trafficking activities prior to meeting Sentado is fatal to their efforts to obtain safety-valve relief.

The defendants' confessions also omitted material facts even with respect to their negotiations with Sentado, CS-1, CS-2, and CS-3.  Flores did not disclose that he provided a sample of cocaine to CS-1 and CS-2 in Caracas, much less how that sample was obtained and what the defendants did with the remainder of the kilogram following the October 27 meeting.  He offered no details at all relating to the three meetings in Caracas, his November 6, 2015 meeting in Honduras, or the participation in the offense of Honduran airport personnel such as Soto.  In addition, perhaps believing that the evidence against him was limited principally to his

negotiations with DEA informants, Flores did not disclose the role played by Rayo in Honduras, or the fact that Campo had cultivated a connection with the FARC.

Similarly, Campo failed to disclose any information regarding his additional drug-trafficking activities in August and September 2015, including but not limited to his negations with Pepe and the Sombrero Organization.   In addition, Campo reminded Flores in written communications that he had temporarily "disappeared" from negotiations with Pepe because of dealings with "a Mexican snitch and his friend, el pollo" (GX 405-T at 5), and Campo exchanged communications in late-September 2015 with an associate using the BlackBerry Messenger screenname "A.m." regarding plans for a drug shipment and "[t]he plane's model" (GX 403-T at 4).   On October 19, 2015, after meeting with Sentado but before meeting with CS-1 and CS-2 in Caracas, Campo exchanged messages with "Gallo" about an upcoming meeting with an "investor." (GXs 416-T, 417-T).[12]   Gallo wrote to Campo that "everything is ready" with the aircraft ("car"), and that the "investor wants to see how everything is being handled."   (GX 416-T at 2; 417-T at 2).   Thus, Campo failed to disclose that he was in contact with multiple individuals about similar drug transactions during the same period in which he was negotiating with DEA informants. Accordingly, the defendants have not met their burden of showing that they are eligible for safety-valve relief.

---

[12] Campo exchanged these messages using a BBM account with screen name "HRCF," the initials of former Venezuelan president Hugo Rafael Chávez Frías (Tr. 189), which Campo also used to communicate with CS-1.  (*Compare* GX 416-T, *with* GX 301-T).  The Government did not seize the device that Campo used to access the "HRCF" BBM account, and therefore did not obtain additional content from that account.  But Campo used his other phone, GX 100, to take pictures of his exchange with "Gallo" using the "HRCF" BBM account.  (*See* GX 416; GX 417).

## THE SECTION 3553(a) FACTORS SUPPORT SUBSTANTIAL SENTENCES FOR BOTH DEFENDANTS

The balancing of the Section 3553(a) factors strongly supports the imposition of substantial sentences of not less than 30 years' incarceration for both defendants.

The "nature and circumstances of the offense" are exceedingly serious.  18 U.S.C. § 3553(a)(1); *see also id.* § 3553(a)(2)(A) (appropriate sentence should also "reflect the seriousness of the offense").  The defendants sought to rely on their political power and impunity to import huge quantities of cocaine into the United States in an effort to make $20 million that was to be used in part to fund Cilia Flores's campaign for the Venezuelan National Assembly and prolong their family's control of Venezuela.  Campo stated this objective repeatedly:

- "[M]y mom is running for the election and I need . . . twenty million dollars. . . .  In other words, the issue of the money . . . we need it by December [2015]" (GX 203-T at 11:1-9);

- "I will need twenty million by December tenth at the latest" (GX 208-T at 21:16);

- "[E]elections in regards . . . to my father [*i.e.*, Venezuelan President Nicolas Maduro], but what we want is for him to take control again of the . . . National Assembly" (GX 201-T at 2:4-10);

- "[W]e want to take possession again of the . . . National Assembly and . . . several places with power" (GX 201-T at 22:17); and

- "What I want is to start work because the electoral campaign is almost here and I always contribute . . . [w]ith money if you know what I mean that is why I want to start work" (GX 3508-38-T at 2 (Oct. 5, 2015 text messages to Sentado)).

This was not bluster.  At the October 26, 2015 meeting in Caracas, Campo explained in detail "[w]hy I am telling you [CS-1] that I need that quantity for right now in December [2015]."  (GX 206-T at 30:18).  Campo indicated that "each of the states of Venezuela" is "divided into . . . parishes" with a "leader" who, for example, "makes a commitment to us of four thousand votes."

(*Id.* at 30:22-31:9).  Campo then stated "each vote costs me a hundred dollars, for example," "so when the election is over" the defendants typically engage in the following analysis and activity: "'Perfect.  Did they come through for us?' 'Oh, good, [h]ere's your money.'"  (*Id.* at 31:21-28).[13]  The politically corrupt objective of the defendants' drug-trafficking efforts, particularly in light of the conduct of the current administration in Venezuela and the conditions there, is a significant aggravating consideration associated with the defendants' offense.

   In pursuit of their goal of making $20 million by importing huge quantities of cocaine into the United States, the defendants relied on armed bodyguards and corrupt connections to law enforcement, they developed an actual connection to the FARC (a designated foreign terrorist organization), and they solicited multi-million dollar bribes to free incarcerated drug traffickers Araujo Duran and Polanco.  They, at minimum, condoned acts of violence by their drug-trafficking associates, including a brutal murder.  (*E.g.*, Ex. B at 5-6; Ex. C at 4-8).  Were the defendants the "novices" their lawyers portray them as (*e.g.*, Def. Mem. at 5), that mid-summer 2015 killing would surely have caused them to abandon their pursuit of drug trafficking as a means of maintaining their family's political control in Venezuela and enriching themselves.  But they did not.  Instead, throughout August 2015, the defendants negotiated with Pepe and the Sombrero Organization to send large loads of cocaine to Mexican drug traffickers.  This is because, with

---

[13] Campo also described a previous situation in which the defendants paid "a large sum of money" because "some points in the [Venezuelan] Constitution were going to be amended," but the measure "lost in some towns" where the bribes were paid in advance.  (GX 206-T at 32:14-18).  He indicated that the defendants were "forced to deal harshly with all these shitheads who defrauded us."  (GX 206-T at 32:22).  This experience led Campo to conclude that it was better to "wait for the election to take place" before paying bribes intended to secure victory.  (GX 206-T at 33:4).

respect to drug trafficking, Campo believed that the defendants' status in Venezuela was akin to "hav[ing] gold in our hands." (GX 403-T at 5; *see also id.* at 4 ("This is a homerun for us no one can get tickets right now to travel and we have the connections ready we're doing good.")). Dissatisfied with their lack of progress with the Sombrero Organization, the defendants turned quickly to Sentado, and ultimately DEA informants, in an effort to achieve their $20-million goal. As explained above, Sentencing Guidelines Part III, *supra*, this financial objective drove the drug quantity in the defendants' negotiations rather than anything said by individuals acting at the DEA's direction.

Had this offense, or even a "dry" conspiracy in the Bronx, involved only five kilograms of cocaine, as opposed to the more than 800 at issue, the defendants would be subject to a mandatory 120-month term of imprisonment. Had the object of the conspiracy involved only 800 kilograms of cocaine, without any of the other aggravating considerations, the Guidelines would recommend a sentence of 235 to 293 months' imprisonment at level 38. But the offense did involve such additional features, including weapons, threats of violence, attempted bribes, and breathtaking political corruption. Experienced personnel at the Probation Office have evaluated the nature and seriousness of the offense, in light of the numerous other drug-trafficking cases they see in the District, and concluded that life sentences are appropriate. Thus, Sections 3553(a)(1) and 3553(a)(2)(A) counsel strongly in favor of substantial terms of incarceration.

The "history and characteristics" of the defendants also merit substantial sentences. 18 U.S.C. § 3553(a)(1). The defendants have shown no remorse, and accepted no responsibility. As explained further in the next Section relating to the appropriateness of fines, the defendants are wealthy, entitled adults who donned a thick cloak of impunity in Venezuela prior to their arrests.

Flores told Soto and others in Honduras: "[W]e cheat, do stuff, and everything, we don't walk straight" and "it's best to have a political position, one of these public positions." (GX 224-T at 2:4-10). His description is entirely consistent with the defendants' efforts to leverage their relationship with their cousin, Carlos Erick Malpica-Flores, to extract bribes from PDVSA debtors. *See* Factual Record Part II.B, *supra*. The defendants also lied to the Court during pretrial motions in an effort to escape justice, and tried to mislead the Probation Office into believing that they were only modest, middle-class, working citizens. (*See* Campo PSR at 36 ("The defendant presented himself as if he were from a middle-class family; however, it appears he is from a very wealthy family in Venezuela with powerful political connections.")).

Before their arrests, the defendants declared that they were at "war" with the United States, apparently based on belief that the "opposition" in Venezuela was "getting an infusion of a lot of money" from this country. (GX 201-T at 24:31-25:4). The defendants also bragged about their family's human rights abuses with respect to that opposition. For example, in response to a question about opposition to the Venezuelan government, Flores explained that "all of them have died" and "[a]nyone who gets half stupid, boom! He gets locked up." (GX 224-T at 3:26-30). He continued, "any opposing candidate who comes out and starts to become a pest . . . three or four have already been locked up." (*Id.* at 4:2).

Finally, on October 26, 2015, Campo told CS-1 and CS-2 that the defendants were motivated to do good deeds in their lives based principally on the hope that they would receive a spiritual blessing that would allow them to avoid failed drug loads and law enforcement interdictions. (GX 207-T at 22-23). After Campo explained that he could guarantee with "ninety nine percent" certainty that the drug loads would be dispatched successfully from Venezuela, he

indicated that "we're not precisely . . . little angels" but "we do a good thing" to "try to compensate" for the remaining one percent the defendants felt they could not control by virtue of their power. (GX 207-T at 22:29). Campo said that "in a personal capacity, we set up a hospital, build a school, a house here" in the hope that the defendants would be forgiven for their crimes, at least as a religious matter, because they "helped like thirty thousand people." (GX 207-T at 23:25). These comments confirm that the defendants are self-centered, morally bankrupt criminals motivated in nearly all respects not by ethics, altruism, or civic duty, but rather greed. Accordingly, the personal characteristics of the defendants warrant additional punishment rather than leniency.

Nearly all of the remaining Section 3553(a) factors apply in a similar fashion. The "need for the sentence imposed . . . to promote respect for the law," "to provide just punishment for the offense," "to afford adequate deterrence," and "to protect the public" support the imposition of a substantial term of imprisonment for each defendant. 18 U.S.C. §§ 3553(a)(2)(A)-(D). The defendants have shown no respect for the law in the United States or Venezuela. There is also no reason to believe that they will abandon their "war" with the United States after they serve their sentences. Moreover, should the defendants return to crime, Venezuela will not extradite even the most ordinary of its citizens, much less these men, to face new charges. Flores's expressed belief that the "DEA is not here" in Venezuela with sufficient resources and authority to prevent people from dispatching large loads of cocaine further underscores the point. (GX 201-T at 48:11). Thus, specific deterrence is a critical feature of both defendants' sentencings, and so is the need to protect the public from further crimes by the defendants.

General deterrence is even more important.  As a result of what Special Agent Mahoney described as the "robust radar program" in neighboring Colombia, one of the principal ways that South American cocaine is dispatched toward the United States is via flights departing Venezuela.  (Tr. 553-54).  Structural and logistical support for these activities provided by political officials and their associates or relatives, like the defendants, is one of the most difficult forms of drug trafficking to interdict and deter.  Several Venezuelan officials currently face drug-trafficking charges and other sanctions in the United States based on these types of activities, but they remain protected behind the country's border and extradition policy.[14]  The Court already observed that, as a general matter, "drug traffickers send drugs up through the Central American corridor 'to recede from their role in getting cocaine to the United States.'"  *Campo Flores*, 2017 WL 1133430 at *7 (quoting Tr. 544).  The challenges of deterring and incapacitating criminals who harm the United States and its interests through large-scale drug trafficking from well outside our borders are even greater with respect to politically connected and powerful individuals such as the defendants.  Put simply, it is extraordinarily difficult to investigate, arrest, extradite, and convict these types of corrupt criminals.  When those things are accomplished successfully by law

---

[14] *E.g.*, *United States* v. *Nestor Luis Reverol Torres*, No. 15 Cr. 20 (E.D.N.Y.); *United States* v. *Hugo Armando Carvajal-Barrios*, No. 11 Cr. 205 (S.D.N.Y.); *see also* OFAC, *Treasury Sanctions the President of Venezuela*, July 31, 2017, https://www.treasury.gov/press-center/press-releases/Pages/sm0137.aspx (last accessed September 10, 2017); OFAC, *Treasury Sanctions 13 Current and Former Senior Officials of the Government of Venezuela*, July 26, 2017 (sanctions including Carlos Erik Malpica Flores), *available at* https://www.treasury.gov/press-center/press-releases/Pages/sm0132.aspx (last accessed September 10, 2017); OFAC, *Treasury Sanctions Prominent Venezuelan Drug Trafficker Tareck El Aissami and His Primary Frontman Samark Lopez Bello*, Feb. 13, 2017, *available at* https://www.treasury.gov/press-center/press-releases/Pages/as0005.aspx (last accessed September 10, 2017).

enforcement, as they were here, it is crucial that such defendants' sentences show that there will be extremely significant consequences in the U.S. justice system for individuals who behave in this fashion and are caught.

On September 5, 2017, Judge Schofield sent the right message to another politically connected, corrupt drug trafficker by imposing a 24-year sentence and a $50,000 fine on Fabio Lobo, the son of the former President of Honduras.  (*See* Ex. E (sentencing transcript)).  Lobo was convicted, upon a plea of guilty, of participating in a conspiracy to import large quantities of cocaine into the United States based on the logistical support and protection that he provided to significant Honduran drug traffickers, including while his father was president of the country. Lobo's was another case where, as the defendants here have frequently emphasized, "[n]o drugs or guns were seized."  (Def. Mem. at 1).  Following a *Fatico* hearing, Judge Schofield concluded that Lobo's Guidelines range was 360 months to life imprisonment, and the Probation Office recommended a sentence of 25 years.  (Ex. E at 6:7-12, 22:24-23:1).  The court consulted information from the Sentencing Commission and concluded that defendants with a "similar sentencing guideline profile" around the country receive, on average, sentences of 24.5 years' imprisonment.  (Ex. E at 22:13-24).  The court also emphasized that one of the factors under consideration was general deterrence, *i.e.*, the need to "deter others who might be like you and who would see what the consequences are of actions like the ones you have taken."  (Ex. E at 19:10-11).  Judge Schofield then reasoned:

> The most damning fact in your background and in your participation in this is that . . . [y]ou were the son of the sitting president of Honduras, and you used your connections, your reputation in your political network to try to further corrupt connections between drug traffickers and Honduran government officials.  And these included not only lowly officials, like customs people and military and law enforcement personnel, but also

extremely high level officials.  In short, what distinguishes your case from so many is that you facilitated strong government support for a large drug trafficking organization for multiple elements of the Honduran government, and you enriched yourself in the process.

(Ex. E at 20:8-21).  The court continued:  "The point is really that you abused who you are and the benefits and advantages that you had to further this crime. . . .  whether it was four tons [of cocaine], whether it was half a ton, *the fact that is most weighty in my mind was the abuse of your position and the privilege that you enjoyed*."  (Ex. E at 20:24-21:1, 21:6-8 (emphasis added)).

Although every case is unique and there are some differences between the defendants' offense conduct and Lobo's crime, Lobo pled guilty rather than proceeding to trial and did not attempt to obstruct justice as the defendants did.  More importantly, the most significant commonality between the cases is that these privileged men corruptly leveraged power derived from their familial connections to the most high-ranking political officials in their respective countries in order to support drug traffickers and enrich themselves.  The defendants' efforts to do so are even more egregious than Lobo's because the defendants had the additional objective of using drug proceeds to prolong their family's control of Venezuela by funding at least one political campaign for Cilia Flores.  This type of conduct permits large-scale drug trafficking to flourish throughout the Americas region and in Mexico, and leads to the types of violence reflected in the defendants' text messages and what defense counsel described to the jury as "the Sinaloa cartel . . . defacing bodies with acid in order to make it harder for the authorities to identify" its victims.  (Tr. 909).  Accordingly, under Section 3553(a), substantial sentences are also warranted based on the need to promote general deterrence of this particularly noxious brand of politically-connected drug trafficking by officials and their associates who otherwise act with impunity in their own countries.

69

The defendants appear to contemplate additional sentencing submissions, but nothing they have said to date merits leniency.  First, the defendants cling to their claim that they were not "capable of possessing the quantities of drugs that are driving the Guidelines here."  (Def. Mem. at 52).  The evidence shows otherwise.  Campo told CS-1 that the defendants had access to a supplier who could provide cocaine by the "shovelful" (GX 207-T at 4:5), he described his connection to a FARC official, and he admitted to the DEA that Gocho had the drugs in hand for the November 15 shipment (GX 2001 at 3).  Thus, this argument should be swiftly rejected.

Second, the record does not support the defendants' claim that they were "inexperienced amateurs."  (Def. Mem. at 1).  The Court found that the defendants offered "no evidence" at trial that the DEA induced them to commit the offense.  *Campo Flores*, 2017 WL 1133430, at *3 ("There is simply no evidence here, however, that Sentado—either acting alone or through his 'henchmen'—initiated the crime or set Defendants' participation in the conspiracy in motion.").  The Court also found, based on the trial record, that there was "significant evidence" of the defendants' "willingness to commit the charged crime," including the "eager" manner in which they "proceed[ed] full steam ahead with the scheme."  *Id.*; *see also id.* at *3 (summarizing evidence supporting the "reasonable conclusion that Defendants themselves actively sought out the charged conspiracy").  These findings are well-supported by evidence that the defendants had, in fact, engaged in drug trafficking activities before Daza introduced them to Sentado.

Campo proudly stated on a recording in Caracas:  "I've been doing this work since I was eighteen."  (GX 207-T at 6:12).  In August 2015, Campo wrote to Pepe that "we've done this a couple of times already" and also referred to a prior failed drug deal.  (GX 408-T at 14 ("[T]he last time they left us hanging and we had to pay some money for the pork chops understand

me.")).  Similarly, Campo told CS-1 that he had "worked" with "G2s" (GX 203-T at 26), and described a failed drug deal by referring to getting "a bad batch once."  (GX 207-T at 3:6).  Campo indicated that the same supplier who provided the "bad batch" had agreed more recently to provide "very solid stuff, the best you can get."  (*Id.* at 3:18).  Campo also said that "over here [in Venezuela] we work with a person that receives from us, but the one who gives me the little animals [*i.e.*, kilograms of cocaine] is a different one." (GX 201-T a 4:9).  Campo later explained that "[i]t's been a long time since I've purchased directly, I mean, since we've gone ourselves and looked" for cocaine, but the defendants did just that when they procured the kilogram cocaine sample that they brought to the October 26, 2015 meeting in Caracas.  (GX 202-T at 6:10).

Also in October 2015, Flores exchanged communications with an associate who "explain[ed] about the equipment [*i.e.*, cocaine] that is going to france they are paying 29 for it," and invited Flores to an in-person meeting with "the colombian's right hand" to "[f]inalize everything."  (GX 502-T at 2).  Relatedly, Campo told CS-1 about negotiations "with some French people" who wanted to be paid "with thirty percent of the cost of the product," and referred to "some" drug-trafficking contacts in Europe during the November 10, 2015 meeting in Haiti.  (GX 206-T at 24:14-20; GX 230-T at 6:12).  Thus, the record establishes that the defendants had, at minimum, months of drug-trafficking experience before their meeting with Sentado.

Finally, the cases cited by the defendants in support of their mitigation arguments under Section 3553(a) are inapposite.  In *Georgescu*, the court found "no evidence that the defendant had engaged in any conduct of this sort in the past," including interactions with the FARC, and that there were no actual members of the FARC involved in the conspiracy.  (Def. Mem. Ex. A at 29).  Here, in contrast, the defendants developed a connection to an actual member

71

of the FARC who they planned to use as a source of supply of cocaine.  The *Georgescu* court also found mitigation in the fact that the defendant "serve[d] as an informant for the FBI in Las Vegas from 2001 to 2003, reporting information about various criminal activities, primarily credit card and other types of fraud," and provided information and, briefly, proactive cooperation, to help facilitate the arrest of one of his co-defendants.  (*Id.* at 29, 30).  The defendants in this case have declared war against the United States rather than offering assistance.

The defendant in *Toure* pled guilty rather than going to trial.  (Def. Mem. Ex. B at 2).  There was a dispute at sentencing as to whether informants said the word "FARC" at all on a recording, and Judge Jones ruled that she could not "hear the word 'FARC' on the tape."  (*Id.* at 21).  The court also ruled that the defendant "grew up in abject poverty," "there was no actual involvement by the defendant . . . in the activities of either al-Qaeda or the FARC," the defendant "was certainly not told of any specific, detailed terrorist act or plot," and, unlike in this case, the defendant "was not ideologically motivated" by "anti-American ideology."  (*Id.* at 46-49).  Thus, Toure's circumstances are in stark contrast when compared to those of the defendants.

This is not a "reverse sting case" of the type discussed in *United States* v. *Cambrelen*, 29 F. Supp. 2d 120 (E.D.N.Y. 1998).  (*See* Def. Mem. at 51).  The Guidelines in this case are not "driven by decisions of informants and government actors."  (*Id.*).  Instead, the Guidelines are driven by the defendants' words and actions.  Neither the DEA nor its informants artificially inflated the quantities of drugs the defendants wanted to import into the United States because the defendants almost immediately declared their intention to make $20 million through the endeavor.  Prior to their arrests, the defendants likely would have felt disappointed, rather than manipulated, if told by informants or co-conspirators that their venture would involve only a mere

72

800 kilograms of cocaine.  That is because 800 kilograms would not have made the defendants the $20 million they sought to help maintain their family's control of Venezuela.  The sentencing record establishes that the defendants were willing to—and in some cases did—use almost any means necessary to pursue that goal, including bribes, weapons, and violence.

In sum, cases cited by the defense in which the defendants at issue were simply domestic drug dealers or foreign drug traffickers are not apt comparisons.  Analogous cases to this one are those in which foreign politicians and those closely connected to such people—like Fabio Lobo in Honduras—seek to facilitate large-scale drug trafficking.  In addition to the weapons, threats, attempted bribes, and attempted obstruction of justice, what sets this case apart from even the cases in the analogous category is the defendants' intention to funnel drug proceeds back into the coffers of their family's political apparatus in order to maintain control of a country that they are in the process of crippling.  Accordingly, the Section 3553(a) factors warrant the imposition of a substantial sentence of not less than 30 years' imprisonment for both defendants.

## THE COURT SHOULD IMPOSE FINES

The defendants have not established that they are unable to pay fines, and the Court should impose them at the time of their sentencings.

## I.  Applicable Law

The Sentencing Guidelines provide that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine."  U.S.S.G. § 5E1.2(a).  "The burden of establishing inability to pay rests on defendant."  *United States* v. *Salameh*, 261 F.3d 271, 276 (2d Cir. 2001) (citing *United States* v. *Thompson*, 227 F.3d 43, 45 (2d Cir. 2000)).

## II.  Discussion

The Court is "surely not required to accept uncritically a representation" by the defendants that they lack the ability to pay fines.  *United States* v. *Marquez*, 941 F.2d 60, 66 (2d Cir. 1991).  Based on the evidence of their extensive wealth, which defense counsel sought to preclude from being offered at the trial, the Court should impose fines within the applicable range of $50,000 to $10 million.  *See* U.S.S.G. § 5E1.2(c)(4); *see also* 21 U.S.C. § 960(b)(1) (authoring maximum fine of $10 million).

In August 2015, Flores wrote to Pepe:  "I need to sell a ferrari that I have around somewhere."  (GX 515-T at 3).  The possession of such a vehicle is hardly indicative of impoverished circumstances, particular relative to conditions in Venezuela.  And Flores's desire to sell the asset was based on the defendants' interest in buying a plane to use to ship large loads of cocaine rather than financial need.  (*E.g.*, GX 515-T at 11-12 (Flores explaining to Pepe that the defendants were "waiting to purchase one [*i.e.*, a plane] as soon as we are able to" and sending Pepe a photograph of a U.S.-registered Learjet)).  Flores's ability to pay a fine is further demonstrated by the fact that he traveled by private jet three times during the crime, twice to Honduras and once to Haiti.  In electronic communications, the defendants indicated that one such trip cost $20,000, and Campo told Gilson that Flores was "the one who has the money."  (GX 405-T at 14; GX 407-T at 22).

Campo also repeatedly touted the defendants' wealth.  On October 26, 2015, for example, he told CS-1 and CS-2 during a meeting with Flores:

I've been doing this work since I was eighteen.  Due to God and the Virgin we have made money.  And ever since we started making money, we've been flashy. . . . we

74

> have Ferraris . . . . so, this level of comfort that I have here is not going to go away because of a measly ten million dollar deal . . . Because I make ten million with oil.

(GX 207-T at 6:12-22).  During the same meeting, Campo told the informants:

- "[S]ince we started making money many years ago, we have been careful and we have said, 'Well, let's invest in this, let's invest in this, let's invest in this, and let's invest in that.'"  (GX 208-T at 5:33).

- "It was very easy for us to make money here in the country . . . because we worked with anything.  We worked with gold, we worked with sweets [*i.e.*, drugs], we worked with iron, we worked with cement, [but] not anymore."  (GX 205-T at 28:13).

- "I mean, nobody can say . . . 'Look, how come this guy drives those trucks over here, look, even the bodyguards have three hundred thousand dollar trucks, how can that be?' But they have no way of knowing how it came to be.  How did it come to be?"  (GX 208-T at 15:13).

The defendants' wealth "came to be" by virtue of their corruption and criminality, and they should be required to pay a fine consistent with the evidence rather than their self-serving, uncorroborated statements to the Probation Office.  (*See* Flores PSR ¶ 159 ("The defendant's counsel indicated that they have tried to obtain financial documents for the defendant without success."); *see generally* Campo PSR ¶¶ 163-64 (lacking any discussion of supporting documentation)).

Campo described the source of at least some of the defendants' wealth during one of the meetings in Caracas.  He said that there was an "agreement" between members of the defendants' family and Venezuelan official Diosdado Cabello,[15] which allowed his family to "control the oil completely" in Venezuela:

> And an agreement was, was reached, let's say behind closed doors, "You leave these three things to me and you can control the oil completely by yourselves." Great, because if I give them this, which was my job when Commander, uh . . .

---

[15] Flores described Cabello as "[t]he most powerful guy in the country."  (GX 224-T at 6:26).

Chavez [*i.e.*, former Venezuelan President Hugo Rafael Chávez Frías, who died in March 2013] was in charge, this used to be a job shared by everyone.

[. . .]

So unfortunately, may he rest in peace, Chavez passes away and then this was left under his control, and then the oil was left under our control. "Well, if I give you this, you give me that." And we said, "Oh, well the profits are basically the same, maybe a bit more here than there, or there's more there than here, but . . . we're not going to get into your patch. . ."

(GX 207-T at 30:13-31:1).

Recognizing the evidence of their vast wealth in the discovery materials, the defendants filed a joint motion *in limine* to preclude such proof at trial. (*See* Dkt. No. 90). In that document, the defendants referred to evidence from their phones "that depict[s] the Defendants in the proximity of various vehicles and properties," but suggested that their "wealth" was not "unexplained" and may have been derived from "a gift or inheritance" or one of "multiple sources of legitimate income." (*Id.* at 1). Later in that filing, the defendants argued affirmatively, contrary to their more recent representations to the Probation Office, that they "have multiple sources of legitimate income." (*Id.* at 8). The same record that animated the defendants' pretrial concerns about how the jury would view their wealth shows that their retained attorneys cannot meet their burden of demonstrating that the defendants are unable to pay a fine. Accordingly, the Government respectfully submits that the Court should impose fines that are substantial relative to the defendants' wealth and the severity of their conduct.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Court should calculate an applicable Guidelines range of life for each defendant, impose substantial terms of not less than 30 years of incarceration for both men, and impose fines within the applicable range of $50,000 and $10 million.

Dated: New York, New York
        September 11, 2017

                              Respectfully submitted,

                              JOON H. KIM
                              Acting United States Attorney for the
                              Southern District of New York

         By:     _____
                 Emil J. Bove III
                 Brendan F. Quigley
                 Assistant United States Attorneys

Cc:      Defense Counsel
         (Via ECF)

77