```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                          15 CR 765 (PAC)

 5   EFRAIN ANTONIO CAMPO FLORES
     and FRANQUI FRANCISCO FLORES
 6   DE FREITAS,

 7                  Defendants.

 8   ------------------------------x

 9                                         New York, N.Y.
                                           December 14, 2017
10                                         3:00 p.m.

11   Before:

12                      HON. PAUL A. CROTTY,

13                                         District Judge

14                         APPEARANCES

15   JOON H. KIM
          Acting United States Attorney for the
16        Southern District of New York
     EMIL JOSEPH BOVE, III
17   BRENDAN QUIGLEY
          Assistant United States Attorneys
18
     BOIES, SCHILLER & FLEXNER LLP (NYC)
19        Attorneys for Defendant Campo Flores
     BY:  JOHN THOMAS ZACH
20        RANDALL WADE JACKSON
          JOANNA CHRISTINE WRIGHT
21
     SIDLEY AUSTIN LLP (NY)
22        Attorneys for Defendant De Freitas
     BY:  DAVID MATTHEW RODY
23        MICHAEL D. MANN
          ELIZABETH ANNE ESPINOSA
24
     ALSO PRESENT:  HUMBERTO GARCIA, Interpreter (Spanish)
25                  SANDALIS GONZALEZ, FBI
```

1                    (Case called)

2                    THE DEPUTY CLERK:  Counsel for the government, could

3    you please state your appearance.

4                    MR. BOVE:  Good afternoon, your Honor.  Emil Bove and

5    Brendan Quigley for the government, and we have with us here

6    Sandalis Gonzalez from the DEA.

7                    THE COURT:  Good afternoon.

8                    THE DEPUTY CLERK:  Counsel for the defendants.

9                    MR. ZACH:  Good afternoon, your Honor.  John Zach and

10   Randall Jackson on behalf of Mr. Campo Flores.

11                   MR. RODY:  Good afternoon, your Honor.  David Rody,

12   Mike Mann, and Elizabeth Espinosa for Mr. Flores.

13                   THE COURT:  How do you want to proceed, Mr. Jackson

14   and Mr. Rody?  Who do you want to go first?

15                   MR. RODY:  We understood, your Honor, that the

16   government is going to go first.

17                   MR. BOVE:  I'm happy to start.

18                   THE COURT:  Usually the defendant goes first, but if

19   the government wants to go first, that's all right with me.

20                   MR. BOVE:  I'm happy to go first, Judge, and if

21   anything is said that we'd like an opportunity to respond to,

22   we'll raise it then.

23                   We submitted over 200 pages of briefing to the Court

24   since this trial and verdict, and I'm not going to go into a

25   lot of detail about all the information that's set forth in

1    that because I know your Honor is familiar with the record.

2            From our perspective, there are seven aggravating

3    considerations that warrant the sentence that we've advocated

4    for of at least 30 years' imprisonment as well as a fine in

5    this case.

6            We believe that that sentence would be consistent with

7    the seriousness of the offense, the need for just punishment,

8    and the need for general deterrence of crimes like this that

9    involve one or more of the features I'm going to lay out.

10           The first is the drug quantity.  As the Court has

11   already found, there was in excess of 450 kilos at issue, and

12   we think that the record establishes that just the first load

13   we're talking about is 800 kilograms of cocaine.

14           The second, as the Court has already found, is that

15   the defendants played a leadership and organizing role in this

16   offense.  That alone is a unique aggravating consideration that

17   demonstrates that these two defendants deserve a more serious

18   punishment and a greater term of imprisonment than other

19   defendants who were coconspirators.  The third feature is the

20   weapons, the defendants' use of armed security in connection

21   with the offense.

22           The fourth is the declaration by Mr. Campo on behalf

23   of both defendants that they consider themselves to be at war

24   with the United States.  The fifth is the direct link here to

25   the FARC which is a designated foreign terrorist organization.

1    That, kind of consistent with being at war with the United

2    States, again, is another severe aggravating consideration here

3    at sentencing.

4            I think I'm on number six now.  That would be the

5    defendants' proposed use of facilities of the sitting president

6    of Venezuela in furtherance of the drug-trafficking scheme.

7            That kind of politically connected drug trafficking

8    really underscores the seriousness of the offense and the need

9    to deter this type of conduct, which is difficult to detect,

10   difficult to investigate, and difficult to disrupt.

11           Finally, your Honor, the statements by the defendants

12   that they intended to use at least some of the proceeds of the

13   offense to fund the December 2015 campaign of cilia Flores.

14           So it's this kind of joint consideration of using the

15   facilities of the sitting president to further the political

16   control of the defendants' family in Venezuela, particularly

17   under the circumstances of the human rights situation down

18   there.

19           So, for those seven reasons, your Honor, based on all

20   the evidence we've laid out, these men are not novices.  I

21   think the record establishes a connection to drug trafficking

22   back to April of 2015, really direct, extended efforts by

23   August of 2015 to send large loads of cocaine to Mexico and

24   then on to the United States.

25           For all those reasons, in order to reflect the

1    seriousness of the offense, the need for just punishment, and

2    to provide general deterrence for these types of activities, we

3    feel that a sentence of at least 30 years is appropriate and

4    that a fine is also appropriate.  The defendants have not

5    carried their burden of demonstrating their inability to pay.

6              THE COURT:  What fine do you want?

7              MR. BOVE:  The range, your Honor, is between $50,000

8    and $10,000,000 under the guidelines.  From our perspective, a

9    fine of at least $50,000 is appropriate.  Thank you.

10             THE COURT:  For the defendants.

11             Mr. Jackson.

12             MR. JACKSON:  Your Honor, good afternoon.

13             THE COURT:  Good afternoon.

14             MR. JACKSON:  Mr. Zach is actually going to address

15   primarily the 3553(a) factors and how we think they apply here.

16             THE COURT:  All right.

17             MR. JACKSON:  I just wanted to say briefly before he

18   started, your Honor, that we have deeply appreciated how

19   complex the issues have been surrounding this case and how

20   careful the Court's consideration has been and how much

21   patience the Court has had with these issues.

22             Overall, we are asking the Court to exercise that one

23   more time in looking very, very closely at the complexity

24   issues here.  For all the reasons that Mr. Zach is going to

25   outline, we're humbly asking that of the Court and hoping that

1    the Court will be able to exercise that again.  Thank you.

2          MR. ZACH:  Thank you, your Honor.

3          I want to echo again what Mr. Jackson was saying.  We

4    appreciate the respect the Court has shown us and the scrutiny

5    that's paid to the evidence.  I'd like to start just talking

6    about Mr. Campo Flores.  I'm just going to call him Efrain.

7          We met him a little bet less than two years ago.

8    Before meeting him, we read the indictment, we read the press,

9    we read some background information on the case.  And I have to

10   confess that when we went to see him for the first time in the

11   MCC, we had a stereotype in mind of what we might be walking

12   into.

13         But from the very first interactions we had with

14   Efrain in the dingy visitation room as the MCC, we realized we

15   were completely off, your Honor.  We spent hundreds of hours

16   with Efrain.  He is humble, he is thoughtful, he is kind, and

17   he is shockingly naive.

18         Now, we stand here today with the government asking

19   for a 30-year sentence, at least a 30-year sentence.  I think

20   everyone would agree that's a massive sentence.  That is an

21   amount of time that's reserved for our most repugnant criminals

22   who have caused the most harm to society.

23         It's the type of sentence that's reserved for CPOTs,

24   for the top targets that the DEA goes after, who operate

25   long-term massive drug organizations.

1         It's not the type of sentence that's appropriate for

2    this case.  This case was, at best, a deeply flawed sting

3    operation, but the government in its sentencing submissions

4    repeatedly tries to sensationalize details to make it something

5    more than it is.

6         I want to be clear about something.  It is a serious

7    crime.  It is a serious conviction.  We're not saying it isn't.

8    What we're saying is that the Court knows the facts of this

9    case.  The Court has seen the evidence.  We know the Court will

10   sentence the defendants on proven facts and not on allegations

11   and not on speculation.

12        So, briefly, to get at the nature of the defendant, I

13   just want to say a few words about him in addition to what I

14   just did.  We know it's impossible for your Honor to know

15   Efrain the way that we do because we spent all this time with

16   him, but he is a young father.  He has two young children.

17        He tells us all the time about how much he misses

18   spending time with his oldest son who, before he left, would

19   sleep on his chest and next to him nearly every day, who he was

20   looking forward to teaching about sports and games.  He

21   desperately misses that.  We've spent tons and tons of time on

22   that.

23        His connection to his extended family, not just what

24   you read about in the press, but to uncles, and aunts, and

25   cousins is strong and important.  He is very supportive of

1    them, and I think that comes through in the letters that the

2    Court has seen.  Efrain's background isn't that of what you see

3    these typical CPOTs who are drug dealers because he isn't one.

4            He went to school.  He worked real jobs.  He has a law

5    degree.  In fact, he owns a small taxi company in Panama.

6    These are things that are inconsistent with the picture that

7    the government is trying to paint.  Efrain did not make his

8    living by selling drugs or being a narcotics trafficker.  He is

9    not violent, and he has no criminal history.

10           Not to rehash the past or a lot of the briefing, but

11   there is this continual pointing to him living this lavish

12   lifestyle, and I just want to address that very briefly.

13           If you were to look through his phone, you would see a

14   lot about his life.  You would see that the exaggerated claims

15   by the government just aren't the case.  He lives in a

16   three-bedroom apartment.  He doesn't live in some mansion.  He

17   doesn't own yachts.  He doesn't have lavish cars.  Again, he

18   ran a cab company in Panama.  The references in the

19   government's submissions to Ferraris and millions of dollars --

20   those are taken from the puffery and the conversations with the

21   CSs.

22           He didn't have Ferraris; he didn't have a mansion; he

23   didn't have millions of dollars.  It's just not true.  We want

24   to be clear.  For sure he's connected to and his extended

25   family includes the leaders of Venezuela.  For sure he lived at

1    standards that are well above that of normal Venezuelans.

2    We're not trying to say differently.  What we're trying to say

3    is that this depiction of him as a narco millionaire that

4    should be getting a CPOT-type sentence just does not hold

5    water.

6            We've seen that firsthand.  We've interacted with his

7    family, some of whom is here, and we've seen that they're not a

8    family of extraordinary means by any stretch of the

9    imagination.  We've seen the tremendous burden that this brings

10   to the family.

11           That ties into something we hope the Court will

12   consider in sentencing him, which is that he will largely be

13   alone and isolated here for the duration of his sentence.

14   Unlike many defendants, he can't be visited by his family

15   regularly.  It may be once or twice a year because of the

16   distance and because, frankly, in these changing times, there

17   are travel restrictions that are being imposed.  We don't know

18   one day to the next whether or not his family will be permitted

19   to see him.

20           So, as a result of that, we have sort of become his

21   closest family here in the United States.  I think from both

22   Mr. Jackson and I, we want to emphasize the good character of

23   Efrain.  We've been with him when his grandmother who raised

24   him died and he couldn't go visit her, which was a huge tragedy

25   in his life.

1       We were here when his next son was born and he

2  couldn't be there.  Honestly, Mr. Campo Flores was here for us

3  too.  I had a parent who died, and every time I would go see

4  him, he would comfort me and treat me with respect.  He has a

5  gentle soul.  He is a good person.

6       We can tell you that he is a danger to no one.  A lot

7  of these sentences involve defendants who seem like they could

8  hurt someone or be violent.  That is not Efrain.  We've sized

9  up many, many, many defendants in our lives, and Efrain is not

10  amongst those people that are a risk of hurting anyone.  He is

11  simply not violent, and he's been thoroughly humiliated by this

12  episode.

13       There are literally hundreds of articles out there.

14  There is zero chance that he is going to go out and do anything

15  wrong again because he can't.  He's seriously not a risk to

16  anyone.

17       (Pause)

18       MR. ZACH:  I'm not going to belabor the point, but in

19  the government's, like, articulation of factors, two things

20  that they threw out there, one of which included the FARC.

21       Your Honor, you've seen this case.  The FARC is not

22  part of this case.  He didn't run with the FARC.  He wasn't a

23  member of the FARC.  He wasn't touching upon them.  That is

24  purely, again, a sensationalized factor, and it just simply was

25  not part of this case.

1          The same with the statement about the election and

2     doing it to pay for the election.  What the government ignores

3     is that, according to their own DEA-6 of the post-arrest

4     statement, when he was actually asked about that statement,

5     according to their own agent, he said, yeah.  I did say that,

6     but that's not -- I didn't say it because the money was

7     actually going to go toward my family's election.  I did it

8     because I was afraid of being robbed and I had to seek

9     protection.  And by saying that, I thought people wouldn't mess

10    with me.

11         That was the reason for dropping those, and those

12    statements were made, again, in connection with the sort of

13    puffery and chest pumping when interacting with the CSs.  So

14    those really aren't factors that should take what would

15    otherwise be a run-of-the-mill importation conspiracy and blow

16    it up to something that's much larger.

17         Now, I'd like to conclude by just talking one last

18    time briefly about the nature of the offense.  As we said at

19    the outset, we're not denying that it's a serious offense.

20    It's a (b)(1)(A) drug case.  That's a serious offense.

21         THE COURT:  There is a mandatory minimum.

22         MR. ZACH:  There is a mandatory minimum of ten years,

23    and we're not walking away from that, and the defendant was

24    convicted by a jury.

25         But in considering sentencing, your Honor, we do think

1    it's important to look back at the evidence for a couple of

2    reasons which is, because while the jury found him culpable

3    because he went down this bad path -- and they thought the

4    proof was there and found the proof to be there -- you can't

5    sort of ignore the flaws in the investigation as to how CS1 and

6    CS2 interacted with the defendants because that is sort of

7    proof of their ultimate culpability and to the degree to which

8    they participated and to the risk of their recidivism.

9        Meaning all of these conversations are through the

10   lens of CS1 and CS2 engaging in these conversations, and I

11   don't think anyone would really dispute that CS1 and CS2 were

12   savvier than the defendants, that CS1 and CS2 were egging on

13   the defendants, and that the defendants in their statements

14   were trying to look bigger and more important than they were.

15       So, when you look at these types of statements that

16   the government points to, they're trying to take theater and

17   translate it into reality.  There was a reality here.  The jury

18   found it, but to take it, again, out of the typical importation

19   case and into the stratosphere based on the theater of these

20   recordings is not appropriate, your Honor.  Mr. Rody, I think,

21   is going to address this, and I'll leave it to him.

22       But the sort of collateral attempt to take these

23   snippets of other crimes they allege taking place in Venezuela

24   from text messages here and to try and push that in through

25   3553(a) when the Court has already rejected arguments made

1  about violence and the threats of violence and bribery under

2  the guidelines, is inappropriate.

3      At a minimum, they certainly don't meet burden of

4  proof.  We would submit to your Honor that it's just

5  speculation and it should not be relied upon, but Mr. Rody is

6  going to touch on that in more detail.

7      So I'd like to stop, your Honor, by saying Mr. Campo

8  Flores is not violent.  He got in over his head.  He was

9  foolish, but he is a good man.  He's a good man.  He's,

10  frankly, a friend to us.  There is zero chance that he will

11  ever reoffend.  He has been humiliated.  Deterrence has been

12  fulfilled.  His family has been broken.

13      Given all of the circumstances in this case, he should

14  receive a sentence far, far, far beneath the guidelines, and we

15  would ask for a sentence at the mandatory minimum.

16      Again, your Honor, we really appreciate the care with

17  which you've overseen the trial.

18      THE COURT:  Okay, Mr. Zach.

19      Should we hear from Mr. Campo Flores now?  Or do you

20  want to hear from --

21      MR. RODY:  Can we have one second, Judge.

22      (Pause)

23      MR. RODY:  Judge, if you don't mind --

24      THE COURT:  I don't mind.

25      MR. RODY:  I'll go because there are some common

1    issues, and then maybe the defendants can speak.

2         THE COURT:  The defendants will have an opportunity to

3    speak.

4         MR. RODY:  Yes, sir, and I know Mr. Flores intends to

5    speak.

6         Judge, I wanted to be focusing my time talking about

7    Mr. Flores' personal history and characteristics, but I really

8    feel compelled to respond to some of the things the government

9    says.

10        I still remain astonished that the government is

11   seeking 30 years in this case against these defendants,

12   especially Mr. Flores here.  I mean, I won't rehash what

13   Mr. Zach just said about the FARC other than that the only

14   proof that I'm aware of is one passing reference in a recording

15   and the fact that he said in a post-arrest statement that Dojo,

16   their supplier, was getting the drugs from the FARC.  So these

17   guys do not have a direct connection to the FARC.  Yet it is

18   peppered throughout the brief maybe a dozen times or more.

19   Why?

20        We think it is pure sensationalism.  They do not have

21   connections to the FARC.  They are getting drugs from a

22   supplier.  That's it, or that's what they thought.

23        The second thing about the elections, the government

24   takes the defendants' post-arrest statements as gospel, full

25   confessions they told the jury, but they want to say that

1    that's not truthful when both defendants denied -- by the way,

2    both defendants were asked, was this for the elections?  And

3    they both said no.

4           So I think the Court should credit that denial.  That

5    wasn't what it's about.  Again, throughout the brief, it's

6    peppered.  And again Mr. Bove raised it here.

7           None of that stuff relates to this case, and I believe

8    it is an attempt to give the Court a misimpression about how

9    bad these defendants are, and I hope the Court won't let it do

10   that.

11          Some of the other factors that Mr. Bove raised,

12   leadership role and weapons.  I fully understand the Court's

13   ruling at the hearing in September.  I thought that was a

14   valuable exercise because we were able to knock out some of the

15   more, I think, ridiculous claims by the government.

16          On the leadership role, again, the relationship with

17   people like Pepero Dojo -- they were the suppliers.  They were

18   not members of an organization that they guys were leading like

19   some of the people we'll talk about in the comparator case,

20   Christopher Coke who had an organization and an army of folks.

21          On weapons, again, they had bodyguards because of who

22   they were, because they were related to the ruling family.  So

23   the bodyguards accompanied them to meetings.  So, yes.  There

24   were weapons at the meetings, and we understand the Court's

25   rulings, but there is not an iota of proof that we're aware of

1    that these guys personally carried guns on them during deals,

2    that they threatened anybody.

3          The Court found that the government could not prove by

4    a preponderance of the evidence that there was any violence or

5    threats of violence in the offense, and that's a critical fact.

6    The same with the declaration of being at war with the U.S.  I

7    think the Court got a sense of this.  It's clear a lot of this

8    was talk to try to impress CS1.

9          So let me tell you what I think are the three most

10   important factors that we would urge the Court to consider with

11   respect to the sentence for Mr. Flores.  Those are that no

12   drugs were recovered, he has no criminal record, and that there

13   is no proof here of continuing drug-dealing conduct.

14         I'll talk about each of these, but I see them as being

15   of a piece, Judge.  They are all interrelated, and I think they

16   all have a great impact on the sentence, and they all warrant a

17   greatly reduced sentence.

18         We are asking for the mandatory minimum sentence which

19   we think in this case meets the standard of being sufficient

20   but no greater than necessary to fulfill all the purposes of

21   sentencing.

22         So the first thing, that no drugs were recovered.  I

23   know we've talked about this.  Yes, it was a dry sting.  The

24   government recovered no drugs.  Again, we would say they never

25   had any drugs.  The government disputes that, but their

1    statements in their last brief only proved that they never had

2    it.

3            There are some text messages.  There are some

4    conversations about their supplier having the drugs.  They

5    never had it.  Why didn't they ever get it.  That's I think a

6    question that's related to the other two issues, and I'll try

7    to demonstrate why.

8            The thing that's critical, I think, in terms of the

9    sentence of the fact that the drugs weren't recovered is this:

10   The drug amount overwhelmingly drives the sentence in this

11   case.  The drug amount puts it at level 38 to start, and I

12   think we ended up at level 44.  So the drug amount is driving

13   the sentence in this case.

14           We don't dispute that it is level 38.  We don't

15   dispute that the defendants admitted there was a conspiracy

16   involving 800 kilograms, but the issue of the origin of the

17   amount -- and I fully understand the Court's ruling on that --

18   but the issue of the origin of the amount, where that amount

19   came from, goes back to that first meeting with Sentado in

20   Honduras that we don't know a lot about because there is no

21   recording of it and because Sentado was dead.  So there is no

22   witness that can testify about it.

23           So I think there is some uncertainty and some

24   unfairness here, where the drugs drive the sentence so greatly,

25   to peg it to a number that we just don't know where it came

1   from.  We don't know what the conversation was, who said what

2   with Sentado, who said what.

3          So I'll just say at this stage, at the 3553(a) stage,

4   as opposed to talking about what the guideline range is, there

5   is room in the Court's discretion to consider that absence of

6   information as a mitigating factor on the drug amount.

7          Second factor, no criminal record.  Again, I view

8   these as all being interrelated.  The reason he has no criminal

9   record is that he has never been arrested for any crimes in

10  Venezuela.  He's never been arrested for any crimes in

11  Venezuela, we would submit, because he was not involved in

12  criminal activity or dealing drugs.

13         The fact is that the defendants were very

14  inexperienced drug dealers.  Again, the government disputes

15  this, but the record is clear from the evidence at trial that

16  the DEA agents and CS1 thought that they were inexperienced

17  amateurs.

18         They deal with drug dealers every day, real drug

19  dealers.  CS1 is a real drug dealer, a former Sinaloa Cartel

20  drug member and probably still a member of the Sinaloa Cartel.

21         So they know what real drug dealers are like, what

22  real drug dealers know, the kind of things that real drug

23  dealers do.  And that wasn't these guys, and they knew it.

24  They talked about, the agents and CS1, and they joked about how

25  inexperienced these guys were.

 1          Third thing, and I think this is the most important

 2   one of the three, Judge, and I would say the key differentiator

 3   in this case, and that is that there is no proof here of

 4   continuing drug-dealing conduct.

 5          The government cannot prove that the defendants have

 6   ever actually delivered drugs to anyone, ever.  I said that in

 7   our opening sentencing brief here at this stage, and the

 8   government tried to dispute it, and they came up with a list of

 9   quotes and texts and transcript snippets of things that are all

10   about prospective plans or aspirations or references to prior

11   failed deals and things like that or sheer puffery in front of

12   CS1.

13          That's not what I'm talking about.  Your Honor has

14   been on the bench a long time and no doubt has seen a lot of

15   drug cases.  The folks at the front table and the back table

16   have all tried a lot of drug cases in this courthouse.

17          In those cases, even in sting cases, there is evidence

18   about prior drug dealing.  There are seizures of drugs.  There

19   are recordings of actual drug transactions.  There are seizures

20   of all the paraphernalia and things that go along with drug

21   dealing -- money counting machines, ledgers, every different

22   kind of evidence you can think of.

23          Most importantly, there is witness testimony.

24   Witnesses get up on the stand and talk about deliveries of

25   drugs, loads, shipments, names, dates, places of things, and

1    you can establish these guys are responsible for three years of

2    conduct, ten years of conduct, X number of kilos like in the

3    cases we cite, Christopher Coke, Lobo, things like that.

4          There is none of that here, none of that evidence.

5    The government could not prove that these guys have ever

6    delivered a single gram to anybody anywhere if they had to.  I

7    think that's a key differentiator because in the other cases,

8    as I just said, that evidence is present.

9          So I say they're interrelated because the fact that

10   the government recovered no drugs here is consistent with the

11   fact that there is no proof that the defendants have actually

12   delivered drugs to anyone.

13         The fact that there is no proof they've ever delivered

14   drugs to anyone is consistent with the fact that they have no

15   criminal record.  There is no opportunity to have been arrested

16   for something like that.  So I suggest that all these factors

17   together warrant a greatly reduced sentence than what the

18   government is talking about.

19         I want to move to some of the cases, Judge.  I'm not

20   going to go into detail in the cases because your Honor has

21   seen them, but all of those cases involve actual drug

22   deliveries and actual drug dealers.

23         This Cuero case that the government sort of scoffs at

24   because they say he's a toiling drug worker while these guys

25   are big leaders, Cuero is in one of these little boats with

1    350 kilos of drugs, and that's 350 kilos of drugs more than

2    these guys ever had.  They never had that much.

3        And Cuero admitted to having done 15 to 20 such

4    deliveries.  So that's thousands of kilos that that individual

5    was responsible for.  Plus he had a prior narcotics conviction

6    which these guys don't have, and he got, I believe, 144 months.

7        The Lobo and Coke cases are examples of very

8    large-scale drug dealers.  Lobo, again, the government's own

9    evidence is that he is part of an organization that's

10   responsible for 4,400 kilos or something coming into the

11   United States, thousands and thousands, and that he personally

12   helped deliver some 1,400 kilos in two loads.  None of that

13   happened here.  There is no evidence of any drugs being dealt.

14   And Lobo gets 24 years.

15       Coke not only delivered tons of actual drugs, but he

16   did it for decades.  He controls this army of soldiers in

17   Jamaica and was involved in all sorts of violence, and he gets

18   23 years.  None of that happened in this case.

19       The point about it, Judge, is that we believe -- we

20   would respectfully submit -- that the sentence for Mr. Flores

21   should be meaningfully distinguished from Coke and Lobo.  It

22   should be much lower than theirs because their actual

23   involvement in any type of drug dealing that anybody can point

24   to is so much less.

25       I think it's not hard to figure what is driving the

government here.  It is this X factor of Venezuela, that they are from Venezuela.  I think if they were from the Dominican Republic or they were from the Bronx or something like that, we would not even be having this debate.  This would be a ten-year case.

There is a lot not to like about Venezuela today we can all agree -- its administration, its government.  We can all agree it's troubled, but it is not fair to tie these guys to the problems of the state.

They are not the cause of the problems in Venezuela, they are not officials of the state, they are not the president, and they should not bear the brunt of the government's ire at Venezuela.  These guys of course need to be sentenced for their individual characteristics, and I'll turn to that now.

We think that there are very sympathetic factors about Mr. Flores.  He has many admirable traits as attested to by his family members and friends.  He grew up in very tragic and traumatic circumstances.

His mother died of cancer when he was eight years old leaving him and his sister with his father who was an alcoholic and beat them regularly, emotionally and physically abused them, and would kick them out of the house regularly.

He grew up moving from home to home, staying with his grandmother who he loved very much and was very close to, but

1    also other relatives.  Sometimes they did not have enough money

2    to eat, and Mr. Flores would have to help his grandmother

3    selling food in the street to make enough money to buy food for

4    them.

5          So he did not have any stable home or the love of a

6    parent, and it's surprising that he didn't end up on the

7    streets in a continuous life of crime, but he's always been a

8    hard worker, as I said, starting at the age of 12.

9          At 17, his father kicked him out of the house for the

10   last time, he dropped out of school, and he went to work.  He

11   learned how to repair cell phones, and he started repairing

12   cell phones in a small shop.  He did that for a few years and

13   saved up enough money to open his own cell phone shop,

14   repairing cell phones and selling cell phones.  He did this

15   living on his own and providing for himself while he was a

16   teenager.

17         Eventually he had a child, and after he split up with

18   the mother of the child, he moved in with a roommate.  So, at

19   the time of his arrest, he was living with a roommate in a

20   two-bedroom apartment in Venezuela, and the roommate owns a

21   food distribution, and then he helped him with the food

22   distribution business.  This is not the life of a drug kingpin.

23         The letters from his friends and family show that he

24   has many good qualities.  They describe him as humble and

25   decent and respectful and hard working and responsible.

1          And he's a quiet man, Judge.  You saw that at trial.

2     On the videotapes -- he hardly says anything on the videotapes.

3     He's also described as a man with a big heart, who is kind and

4     does many small acts of kindness for neighbors and friends,

5     giving money to others to pay for medical expenses for

6     someone's brother's epilepsy and someone's mother's arthritis.

7     He would buy toys for poor children in the neighborhood at

8     Christmastime.  And again and again he's described by others,

9     not even his former partner or the mother of his child, but

10    he's described by others as a good father to his son.

11         So I'll turn to his son.  Mr. Flores has a

12    nine-year-old son, and that is the most important relationship

13    in his life.  He had his son when he was very young.  I believe

14    he was only 23, and he doted on his son.

15         He picked him up from school every day.  Even after he

16    split up with his son's mother, he would take him every

17    weekend, and his son means more to him than anything else in

18    the world, and his son wrote about that.

19         And even his son's mother describes him as the

20    greatest father in the world, and it's plain to see that

21    Mr. Flores has a special bond with his son.

22         His son talks about how his father teaches him respect

23    and politeness and calmness and patience, a lot of the

24    qualities that we have seen over the last couple years with

25    Mr. Flores.  These are values that we think Mr. Flores

1  exhibits.

2        His son is suffering emotionally, which is

3  understandable, and Mr. Flores understands that he's

4  responsible for that, and he's taken responsibility for it.

5        So, Judge, we believe that a ten-year sentence

6  satisfies the purposes of sentencing because it does not create

7  an unwarranted disparity with these much worse drug dealers who

8  get in the low 20's.

9        We believe that it will ensure sufficient deterrence

10  to anybody else who would say you could get arrested in a case

11  where you never distributed any drugs and still get ten years

12  in a United States prison.

13        Similar to Mr. Campo Flores, there is absolutely no

14  need to deter him further.  He will never commit another crime.

15  He has been destroyed by this experience.

16        On that note, I should say, Judge, that I view today

17  as a very somber day because even under the best of

18  circumstances, Mr. Flores will walk out of here with a ten-year

19  sentence that will keep him away from his son for many, many

20  years, that will keep him from his son until he's a teenager.

21        But there is an enormous qualitative difference

22  between a ten-year sentence that will still punish him very,

23  very severely and what the government is talking about, a

24  30-year sentence or even a 20-year sentence, that will just

25  destroy his relationship with his son.  It would be a

1   fundamentally life-altering and debilitating experience.

2          The government tosses around 30 years so casually.

3   That is an enormous amount of time, and it really is tantamount

4   to life for Mr. Flores, certainly the best years of his life,

5   the better part of his life.

6          I'm trying to make clear to the Court how Mr. Flores

7   is different from these other drug dealers and what the

8   distinguishing factors are, but he is not among the worst of

9   the worst.  He is not a hardened criminal.  He is not someone

10  who is deserving of a lengthy sentence.

11         Our view, most respectfully, Judge, is that such a

12  sentence would be grossly excessive and unnecessarily cruel

13  here.  It would be far greater than necessary to fulfill the

14  purposes of sentencing.

15         His life has value.  He has a chance to have a

16  productive life after he gets out after a ten-year sentence,

17  but something higher would be devastating to him, and we don't

18  believe it would be justice in this case.

19         So we most humbly and ask the Court to impose the

20  ten-year sentence.  Thank you very much.

21         THE COURT:  Do you want to give the government its

22  rebuttal, or do you want to hear from the defendants?

23         MR. JACKSON:  Your Honor, the government can go.

24         THE COURT:  Mr. Bove.

25         MR. BOVE:  Thank you, Judge.

1          I think a lot of that was just rehashing things that

2    we've gone back and forth on in our briefs.  So I'm going to be

3    brief.

4          There are three categories of evidence in this case:

5    The recordings, the confessions, and the phones.  Each is

6    individually powerful.  Together they establish the seven

7    things I laid out that warrant the 30-year sentence that we're

8    talking about.

9          I'm not saying that casually.  I'm saying that based

10   on a trial record that was developed in this courtroom and on

11   the basis of the additional chats and communications that we

12   attached to our sentencing submission.

13         When the defendants are faced with a sentencing record

14   like this, they're left making arguments like well, that was

15   puffery.  He didn't really mean that.  That's not what he said.

16         Judge, you have the transcripts.  You've seen them.

17   I'll just touch on a couple of these points.  The government

18   didn't manufacture the FARC connection to the offense conduct.

19   Campos said it in Haiti on tape.  That's not through the lens

20   of CS1 or CS2.  That's through the lens of a camera and a

21   transcript that you have before you.  He then confirmed that

22   FARC connection in his confession.

23         The point is similar about the use of drug proceeds to

24   fund this election.  It was said by Campo in writing to

25   Sentado.  It was said repeatedly in Caracas on camera, and of

1    course these men denied that after they were arrested, Judge.

2         This is one of the, if not the, most thoroughly

3    egregious aspects of this crime, that they were going to use

4    these proceeds to try and keep their power in Venezuela and

5    their family's power, in light of the way that the family was

6    exercising it.

7         They described the way that their family was

8    exercising that power, again, on tape, on camera.  They talked

9    about Venezuelan officials, members of their family, locking up

10   members of the opposition, anyone who dared to oppose them.

11        This is an aspect of this offense, it's one that is

12   seriously aggravating, and it's one that was captured on tape,

13   Judge.  And it's not enough.  It's not persuasive to simply say

14   they didn't mean it and they wrote it off after they were

15   caught red handed in the course of this.

16        What the defendants' false denial on that airplane

17   back from Haiti reflects is that they understood that that was

18   one of the most serious parts of their crime and one of the

19   most serious aspects of their culpability.

20        We continue to hear this argument from the defense

21   that no drugs were recovered in this case.  That is a function

22   of the fact that the defendants operated with impunity in

23   Venezuela.

24        There is no mention in this discussion yet of the kilo

25   of cocaine that they brought to the meeting.  The defendants

1   spent most of this case pretending that that wasn't cocaine,

2   and now they ask you to ignore it.

3          That kilo in the room on tape in Caracas demonstrates

4   that of course they had access to these drugs.  That's

5   precisely what they repeatedly said to the sources, that's what

6   they demonstrated by bringing the sample, and that's what they

7   told the DEA after they were arrested.

8          At bottom, the defendants are just asking you to

9   ignore the evidence.  I know that Your Honor has followed the

10  record carefully in this case, and we simply urge you not to do

11  that.

12         The record in this case establishes the need for a

13  sentence of 30 years relative to the seriousness of this

14  offense, the need for just punishment of this type of conduct,

15  politically connected drug trafficking by men who seek to act

16  with impunity from behind the borders of a country that will

17  not extradite any of its citizens, much less members of the

18  first family, to be punished for their crimes against this

19  country.  The third point, the general deterrence, again, of

20  that type of conduct.

21         So, for all those reasons, we stand by the request of

22  the 30-year sentence, not casually, but on the basis of the

23  evidence that we put before you.

24         THE COURT:  Mr. Campo Flores, you have an opportunity

25  to speak.

```
 1                  MR. ZACH:  Your Honor, may he remain seated?

 2                  THE COURT:  Yes.  Please.

 3                  DEFENDANT CAMPO FLORES:  Good afternoon.  Your Honor,

 4     from the bottom of my heart, I thank you for the opportunity

 5     that you are giving me to express myself.  I would also like to

 6     thank you for the respect that you have implemented in treating

 7     myself and my cousin.

 8                  I have been before you several times in this

 9     courtroom.  I know that I have made very serious mistakes in

10     this case.  I know that I lost focus of what was most important

11     to me.

12                  I would like to apologize from the bottom of my heart

13     to my beautiful family, to my wife who is here present today,

14     and also to my children for having strayed so far away from the

15     correct path that I should have followed as a human being.

16                  I would also like to thank my wife for all the love

17     and support that she has shown me, not only during the course

18     of this case but throughout our entire life together.  I truly

19     thank her.  I would like to tell my wife, although I know that

20     she knows this, that I love her with my whole being.

21                  My wife, I ask of you, in the most humble way, to

22     forgive me for not being there the day that our son was born or

23     being here instead going through this situation.  I would also

24     like you to know that, along with our children, you are the

25     brightest of lights and my fullest meaning for being.
```

1      I would also like to thank my mother and my entire

2  family.  I am very thankful for all the support that they have

3  given me and my cousin throughout this case.  I love you, and I

4  miss you dearly.

5      Your Honor, when we arrived in the United States over

6  two years ago, I had no idea either about the laws or the

7  language here.  As you know, I am an attorney, and I have tried

8  to learn about your laws and your language in order to be able

9  to grasp a little bit better what has happened here.

10      (IN ENGLISH):  Now I have worked too much, and I know

11  I can speak English a little bit with my lawyers and with other

12  people.

13      Once again, your Honor, I appreciate the chance that

14  you're giving me to be able to express myself and to address my

15  wife here in court, and I also do the same for my family.

16      I also would like them to know that I am very

17  remorseful and ashamed for all the harm and suffering that this

18  has caused.  Honestly, your Honor, thank you very much.  I know

19  that you will be just when you impose a sentence, and I thank

20  you for that.

21      Thank you once again for all the respect that you have

22  shown to myself and my cousin.  Thank you very much.

23      THE COURT:  Thank you very much.

24      Mr. De Freitas.

25      MR. RODY:  He'd like to remain seated also, Judge.

1              THE COURT:  Yes.  Sure.

2              DEFENDANT DE FREITAS:  Good afternoon.

3              THE COURT:  Good afternoon.

4              DEFENDANT DE FREITAS:  Your Honor, I'm very grateful

5      for the opportunity of being able to address you.  I'm not a

6      person who speaks a great deal.  So I want you to know that

7      it's very difficult for me.

8              My family has always told me that I'm really good at

9      showing what I feel through my actions and my gestures but I'm

10     not very good at expressing myself with words.  But in spite of

11     not being a good speaker, I knew that I had to say something.

12             I'm so sorry for the terrible mistake that I have

13     committed.  We're all human, and sometimes we sin, but that's

14     no excuse for my having gotten involved in what I consider to

15     be the most shameful experience of my life.  I'm truly sorry

16     for my acts which made me get involved in this situation.

17             Throughout my life, I made a great effort to do what's

18     right and to take care of my family.  I've never had a great

19     deal of money, and I've been making efforts and working hard to

20     survive from when I was just 12.

21             During my childhood, I frequently went to live with my

22     grandmother, as well as with other relatives.  And sometimes we

23     didn't have enough money to buy food.  My father threw me out

24     of my home when I was 17.  I stopped studying, and I started

25     working full time to make a living.  I did many sporadic jobs

1   to be able to survive.

2          I worked at a store that sold phones and cell phones

3   and also repaired them, and at the same time I was able to have

4   my own small store.  I did this with a great deal of effort and

5   working very hard.

6          I also sold construction materials, and I worked with

7   a friend with whom I had a business to distribute food.  I

8   always did anything I could to avoid my family going hungry.

9   I've always been a good person.  Even in jail, I try to help

10  those who are in a worse psychological situation than the one I

11  find myself in.

12         I try to give advice to others when they feel badly.

13  I cut peoples' hair, and I repair their radios as an act of

14  charity, and I do this happily.  I've studied English, and I've

15  learned something in the time that I've spent here.  I study

16  the Bible frequently, and I also frequently go to church.

17  Throughout this whole process, I've tried to stay positive.

18         My son was born when I was 23 years old, and he's the

19  most important person in the world for me.  I've done

20  everything to take care of him and to show him how much I love

21  him.  And until I was arrested, I was able to do that every

22  day.  I feel disconsolate, and it truly disheartens me knowing

23  that I can't be with him in Venezuela.

24         And even while I'm here, I've tried to transmit him

25  positive thoughts in those 15 minutes that I'm able to speak to

1   him.  I always talk to him of the value that a family

2   represents and of having respect towards others and that he has

3   to study a great deal to prepare himself to be a good person in

4   life.

5          I am so sorry.  I'm sorry with my son.  I'm sorry with

6   my grandmother, and all of my family members, and all those who

7   love me.  They suffered because of my actions, and they

8   certainly don't deserve not even one instant of that suffering.

9          My intention and responsibility is to repair the

10  damage that I've caused.  I ask you humbly and respectfully to

11  allow me to return home so I can be near my son as soon as

12  possible.

13         With all my heart, I ask you to give me an opportunity

14  to repair my mistakes.  Thank you.

15         THE COURT:  Does anybody else at the government table

16  or the defense table want to be heard?

17         MR. BOVE:  No, your Honor.  Thank you.

18         THE COURT:  Mr. Zach?

19         MR. ZACH:  No, your Honor.

20         THE COURT:  Mr. Rody?

21         MR. RODY:  No, your Honor.

22         THE COURT:  I'll proceed now to sentence.

23         The two defendants, Mr. Campo Flores and Mr. Flores De

24  Freitas, were convicted by a jury in this court after a trial.

25  They were convicted of conspiring to import 5 or more kilograms

of cocaine into the United States from a foreign country in

violation of 21 U.S. Code, Section 952(a) and 961(a)(1) or to

distribute 5 or more kilograms of cocaine knowing and intending

that it would be imported into the United States in violation

of 21 U.S. Code, Sections 959(a) and 960(a)(3).

The government's proof at trial was that the

defendants agreed to arrange a flight or flights transporting

800 kilograms of cocaine from Venezuela to Honduras knowing and

intending that the cocaine was ultimately bound for the

United States.

The two defendants are nephews of the first lady of

Venezuela.  Their plan was to take advantage of this political

connection by coordinating a private flight that would appear

legitimate and be subject to less scrutiny, notwithstanding the

illicit cargo that it was to carry.

They wanted to raise money for the political campaign

of their government in Venezuela, and the amount of money

needed or desired had an impact on the amount of drugs to be

transported in the proposed transaction.

The conspiracy was formed in 2015 and ended with the

arrest of the two defendants in Haiti in November of 2015.  The

two defendants went to Haiti to pick up their payments for

drugs which were to be shipped from Venezuela to Honduras on

November 15.  Since the jury's verdict in November of 2016,

there has been extensive briefing.

 1           After the jury verdict, defendants moved for acquittal

 2    under Federal Rule of Criminal Procedure 2429 and for a new

 3    trial under Rule 43.  When I say "extensive," I point to the

 4    fact that the government's response to the motions was over 100

 5    pages in length.

 6           Thereafter, the presentence reports were prepared.

 7    The PSR for Mr. Campo Flores was prepared on May 23 and was

 8    revised on August 15.  The PSR for Mr. Flores De Freitas was

 9    prepared on May 18 and was revised on August 15, 2017.

10           The defendants filed their objections to the revised

11    reports.  The government submitted its views on September 11.

12    The Court held a hearing for arguments on the presentence

13    report and the proposed enhancements on October 3.

14           At the conclusion of the hearing, the Court entered an

15    order which did the following:  It set the base offense level

16    of 38.  It enhanced the offense level by 2 for the possession

17    of guns because the record is clear that the defendants'

18    security guards possessed firearms during the course of the

19    charged offense.  I decline to enhance the offense level for

20    the use of violence or credible threats to use violence.

21           I enhance the offense level by two for the importation

22    of controlled substances using private aircraft.  I decline to

23    enhance the offense level for bribing federal foreign

24    officials.

25           I decline to enhance the offense level for taking an

1    aggravating role in the importation of a controlled substance.

2    I enhance the level by 2 for the two defendants being the

3    organizers for taking a leadership role in the charged offense.

4    I decline to enhance the offense level for the obstruction of

5    justice, and I denied the defendants' application for safety

6    valve relief.

7        Altogether, the guidelines reached an offense level of

8    44 which under the guidelines is reduced to 43.  Since the two

9    defendants are in criminal history category I, this results in

10   a guideline calculation of life, which is what the PSR

11   recommends.

12       The government recognizes that a life sentence would

13   be disproportionate and suggests instead a sentence of 360

14   months or 30 years.

15       The defendants maintain that this proposed sentence is

16   excessive.  The defendants' arguments in sentencing echo their

17   earlier arguments in post-trial motions, that this was a dry

18   sting in which there were certainly no drugs anywhere close to

19   the amount used in the guideline calculation.

20       Further, the two defendants were novices in the drug

21   business.  They were incompetent in this effort.  They made a

22   number of foolish decisions.  Instead, indeed, they were in way

23   over their heads, taken advantage of by the overzealous DEA and

24   two confidential sources who are the real criminals who should

25   be punished here rather than the defendants.

1           There was no violence.  There was no proof that any

2    drugs were delivered into the United States.  The references to

3    the U.S. market were instigated or introduced by the

4    confidential sources, not by the two defendants.

5           There is no need to repeat the defendants' arguments

6    which were made and rejected by the jury and by the Court in

7    denying the defendants' Rule 29 or Rule 33 motions, especially

8    since the arguments made here were heard on October 3 when the

9    Court heard arguments on the PSR.

10          To the extent they're being repeated here, they cannot

11   fare any better.  As to the parties' sentencing memoranda, both

12   submit numerous letters.  I believe in Mr. Campo Flores',  there

13   are over 23 letters, and Mr. Flores De Freitas has 10 or 11 or

14   12.

15          Nothing is said about the crimes the defendants

16   committed in these numerous letters.  I guess this is not a

17   surprise.  We know from Mr. Campo Flores' confession that he

18   never told his family about his involvement in the conspiracy

19   as they would kill him.

20          But the Court will take into consideration that both

21   defendants are blessed with solid family connections.  They are

22   loving and caring, and it seems to be reciprocal so that their

23   separation because of their crime will be painful.  It will be

24   particularly painful because the opportunities for visitation

25   from Venezuela will be very limited.

1          Of course, the same is true of a vast number of

2   defendants who are charged with a crime.  One of the things I

3   noted was I received no letters from the defendants, which is

4   typical in this case where the defendants accept responsibility

5   or express remorse.

6          I listened very carefully to Mr. Campo Flores and

7   Mr. Campo De Freitas, and they seem to be more concerned about

8   the impact of what they did on the family than in violating the

9   laws of the United States.

10         Now, under 3553(a), which guides my sentencing, I have

11  to consider the nature and the circumstances of the offense and

12  the history and characteristics of each of the defendants and

13  the need for the sentence being imposed has to reflect the

14  seriousness of the offense, to promote respect for the law, and

15  to provide just punishment for the offense.

16         I have to afford adequate deterrence to criminal

17  conduct, to protect the public from future crimes of the

18  defendant, and to provide the defendant with necessary

19  education or vocational training, medical care, or other

20  correctional treatment in the most effective manner.

21         I don't think I have to protect the public from

22  further crimes of the defendants, I don't think they need

23  individual deterrence, and I don't believe they need

24  educational or vocational training.

25         So the focus is on imposing a sentence to reflect the

seriousness of the offense, to promote respect for the law, to

provide just punishment for the offense, and to afford adequate

deterrence to criminal conduct.

At the hearing that took place on the PSR -- and what

we did and what we accomplished at that time was we reviewed

the kinds of sentences which were available and the guidelines

ranges which were applicable with the enhancements and without

the enhancements.  So that I believe has been satisfied under

3553.

Now, the sentence that I impose has to be a reasonable

sentence.  It has to be reasonable procedurally and

substantively.  Procedurally, I have to properly calculate the

guideline range, and I believe that has been properly

calculated at level 43.

I have to recognize that the guidelines are

discretionary, not mandatory.  And I certainly do that.  While

the guidelines are set at 43 resulting in a guideline range of

life, the government recognizes -- and all parties certainly

recognize -- I don't have to do that.  Even the government

recognizes that I should only use my discretion that I have in

this matter for a sentence of 360 months.  The defendants seek

120 months.

I read the 3553(a) factors.  It's important to note

what those factors are, and I've identified the factors that

are going to control my decision, and I have to adequately

1    explain the chosen sentence that I am going to impose.

2              That's the procedural requirements of imposing the

3    sentence.

4              With regard to the substantive sentence, I have to

5    have a sentence that has to be located within the range of the

6    permissible decisions.  I note that both defendants suggest 360

7    months given the facts and circumstances of this case would not

8    be within the range of permissible sentences.

9              I've read the cases which the parties have cited which

10   they say are comparable.  Unlike other cases which really

11   follow as precedent, I can't follow those cases as precedent.

12             I regard them as instructive, but I have to make an

13   independent, individualized sentencing determination which

14   takes into account the nature and circumstances of the offense

15   which change from case to case, the history and characteristics

16   of the defendant which definitely change from case to case, as

17   well as the statutory factors.

18             The one case that stood out to me was the Lobo case

19   because in the Lobo case, there was a relative of the corrupt

20   president of Honduras who was engaged in drug trafficking, and

21   that is consistent with the drug transaction which was being

22   contemplated here.

23             I also recognize that justice has to be tempered with

24   mercy; otherwise, you have cruelty.  But you cannot have mercy

25   without justice.  Otherwise, the wrongdoer goes free, is

1    unpunished.  And that, of course, would be unjust.

2          If wrongdoers, those who violate the law, go

3    unpunished, it weakens the notion of good and evil in the

4    public's consciousness.  It introduces moral relativism where

5    you cannot tell the difference between right and wrong.

6          That's why in 3553(a), I have to impose a sentence

7    which reflects the seriousness of the offense and affords

8    adequate deterrence to criminal conduct by others who might

9    want to take advantage of a sentence which is inappropriately

10   insufficient.

11         I've considered the arguments of counsel.  What moves

12   me is that Mr. Campo Flores and Mr. Flores De Freitas perhaps

13   were not the most astute drug dealers that ever existed, and

14   they were in over their heads.  Prior to this particular arrest

15   and their indictment and trial and conviction, they seemed to

16   be law-abiding citizens.

17         Of course, all the evidence here really comes out of

18   the mouths of the two defendants by way of the conversations

19   which were tape recorded by CS1, the phone taps, and the text

20   messages which were sent back and forth.  The evidence was not

21   generated by confidential sources.  Really the defendants were

22   tried and convicted from words out of their own mouth.

23         360 months is an extraordinarily long period of time.

24   It's extraordinarily long because it's, in effect, for these

25   men at their age, the equivalent of a life sentence.  I believe

 1    that that is too harsh a sentence.

 2            I'm going to impose a sentence of 216 months which

 3    will put this case at the offense level of 36, which I think is

 4    appropriate, considering all the circumstances, the nature and

 5    the circumstances of the offense and the history and

 6    characteristics of Mr. Flores De Freitas and Mr. Campo Flores.

 7            I'm not going to impose a term of supervised release

 8    on either defendant.  There will be no probation.  I'm going to

 9    impose a fine on each defendant of $50,000.  Restitution is not

10    applicable.

11            Is there any forfeiture, Mr. Bove?

12            MR. BOVE:  No, your Honor.

13            THE COURT:  There is no forfeiture.  I must impose a

14    special assessment of $100.

15            That's the sentence I intend to impose.

16            Any objections, Mr. Rody and Mr. Zach?  Mr. Jackson?

17            MR. JACKSON:  Your Honor, beyond our objections

18    previously stated, we don't have any additional objections.

19            THE COURT:  Mr. Rody.

20            MR. RODY:  Same, Judge.  Thank you.

21            THE COURT:  Okay.  Under Rule 32 of the Federal Rules

22    of Criminal Procedure, gentlemen, I have to advise you that you

23    have a right to appeal the sentence that I've just imposed.

24            If you can't afford to pay for counsel, you can apply

25    to appeal in forma pauperis.  If you so request, my clerk will

1   immediately prepare and file a notice of appeal on your behalf.

2   The notice of appeal has to be filed within 14 days from the

3   entry of judgment.   Judgment will be entered by no later than

4   noontime tomorrow.

5           Are there any open counts, Mr. Bove?

6           MR. BOVE:  Yes, Judge.  And the government moves to

7   dismiss them.

8           THE COURT:  The open counts are dismissed.

9           Anything else?

10          Do you want a recommendation, Mr. Rody?

11          MR. RODY:  Yes, Judge.  To facilitate visits, we would

12  request that the Court recommend that Mr. Flores be housed at a

13  facility in Florida.  I know FCI Coleman is one.  It is much

14  closer and much cheaper to get there from Venezuela.

15          THE COURT:  I will make that recommendation.  As you

16  know, it's only a recommendation.

17          MR. RODY:  Understood.

18          THE COURT:  Mr. Zach?

19          MR. ZACH:  Your Honor, we'd make a similar

20  recommendation.  If the Court will allow, we recommend that

21  they be housed together.

22          THE COURT:  Yes.

23          Anything else?

24          MR. BOVE:  No, your Honor.  Thank you.

25          THE COURT:  Thank you very much.